IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of EZEKIEL ELLIOTT, | § § § § § | |
| | § | CASE NO. 4:17-cv-00615 |
| Petitioner, | § § | |
| v. | § § | PETITION TO VACATE ARBITRATION AWARD |
| NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, | § § § | |
| Respondents. | | |

Petitioner National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Dallas Cowboys Running Back Ezekiel Elliott, hereby petitions this Court, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and Section 10 of the Federal Arbitration Act, 9 U.S.C § 10 ("FAA"), to vacate the forthcoming Arbitration Award ("Award"), which is the product of a process that has already deprived the Union and Elliott of fundamental fairness and will be issued by Arbitrator Harold Henderson imminently. Respondents are the National Football League and its labor relations arm, the National Football League Management Council (collectively, the "NFL" or "League").

## INTRODUCTION

1. No matter how narrowly the NFL tries to define the bedrock labor law requirement to conduct fundamentally fair arbitration hearings, the NFL and its unilaterally appointed arbitrator—Harold Henderson—have already defied it, even before the decision is shortly issued. In the arbitration below, Elliott and the NFLPA appealed a six-game disciplinary

suspension imposed upon Elliott by the NFL that threatens irreparable harm to his season, career, and reputation.  In what may mark one of the most fundamentally unfair arbitral processes conceivable, Elliott and the Union were subjected to an arbitration process in which, among other things, there was a League-orchestrated conspiracy by senior NFL executives, including NFL Senior Vice President and Special Counsel for Investigations Lisa Friel, to hide critical information—which would completely exonerate Elliott—from: (i) NFL Commissioner Roger Goodell, who imposed the discipline; (ii) the outside expert advisors who were appointed by the Commissioner to counsel him on imposing discipline; (iii) the NFLPA and Elliott; (iv) the Dallas Cowboys; and (v) NFL fans.  That critical information was the now-undisputed fact that the co-lead investigator who conducted every fact witness interview in the investigation of Elliott—Kia Roberts, the NFL's Director of Investigations—reached the conclusion, after reviewing all of the evidence gathered, that Elliott's accuser, Tiffany Thompson, was not credible in her allegations of abuse and that there was insufficient corroborating evidence of her incredible allegations to go forward with any discipline against Elliott.  The withholding of this critical information from the disciplinary process was a momentous denial of the fundamental fairness required in every arbitration and, of course, does not satisfy federal labor law's minimal due process requirements.

2.      Further, the fundamental unfairness set forth above was then compounded, multiple times, by denying Elliott the opportunity to confront his accuser and have her sit for cross-examination, a denial which deprived Elliott and the Union of the most basic rights of a fundamentally fair procedure, in a proceeding where everyone agreed that the credibility of the accuser and Elliott were essential to resolution.  As for Elliott, he appeared before the arbitrator, testified under oath, and gave strong, credible testimony denying any wrongdoing.  Arbitrator Henderson, however, would not grant Elliott and the Union's request to have the accuser,

Thompson, testify, and would not even provide Elliott or the Union with the investigative notes of the six times Thompson was interviewed by the NFL.  As such, not only was Elliott denied the most fundamental rights to be able to confront his accuser and to have her credibility assessed against his, the arbitrator also rendered himself incapable of directly assessing the credibility of Thompson—which was critical to the fairness of the proceeding.

3.      The third deprival of fairness was the arbitrator's refusal to compel the testimony of Commissioner Goodell, who imposed Elliott's discipline.  Without testimony from the Commissioner, it was not possible to determine the full impact of the conspiracy, or precisely what the Commissioner knew or did not know about his co-lead investigator's conclusion that there was not sufficient credible evidence to proceed with any discipline under a League Personal Conduct Policy that requires "credible evidence" to support the charges in a case like this, where the player has been accused of domestic violence, but law enforcement investigated and rightly declined to bring any charges due to conflicting evidence and inconsistent accounts of the alleged events.  Moreover, because Commissioner Goodell was not required to testify, it was impossible for Elliott and the Union to learn additional critical facts, such as: who decided to exclude Roberts from the meeting with the Commissioner's outside expert advisors on June 26; who asked Friel what the investigators had concluded with respect to the credibility of the charges (notwithstanding that the panel's inquiry was never informed by Roberts's credibility determination to begin with); or who decided not to include Roberts in Commissioner Goodell's meeting to discuss the findings of the disciplinary investigation.  This third prong of fundamental unfairness thus provides yet another reason, independently and collectively, for why this Petition should be granted and Mr. Henderson's tainted arbitral award should be vacated.

4.      On August 11, 2017, the NFL suspended Elliott for six games for violating Commissioner Goodell's Personal Conduct Policy ("PCP").      Ex.  A-NFLPA-16.      The Commissioner's representative stated there was "substantial and persuasive evidence" that Elliott had committed acts of physical violence against the accuser, Thompson, a woman with whom he had an intimate relationship (Discipline Letter, Ex. A-NFLPA-49 at 3, 5).  But that determination was made during a now-exposed conspiracy, in which it was concealed from all relevant parties that the NFL's co-lead investigator, Roberts, had concluded, after reviewing all of the assembled evidence and conducting all of the fact interviews—including six interviews of Thompson—that the accuser's repeatedly inconsistent stories and other credibility issues were an insurmountable obstacle to imposing discipline, as there was insufficient corroborating evidence to support any discipline, or to overcome Elliott's consistent denials of any acts of domestic violence.  Elliott Arb. Hr'g Tr. (Aug. 29), Ex. C at 300:15-22.[1]

5.      Indeed, Elliott was never charged with any crime, and the district attorney investigating Elliott concluded his inquiry with a public statement announcing that Elliott would not be charged due to "conflicting and inconsistent information across all incidents" provided by Elliott's accuser, the only eyewitness against him.  Ex. A-NFLPAC-40.  Nor was Elliott ever arrested, because the police officers on the scene concluded that there was no probable cause to require a mandatory arrest "[d]ue to conflicting versions of what had taken place over the listed dates."  Ex. A-NFLPA-24 at 2.

6.      In imposing discipline against Elliott despite the absence of any action by law enforcement, the NFL conducted a massive investigation that lasted more than a year, co-led by

---

[1] Petitioner will update these filings with the final August 31, 2017 Hearing Transcript when it becomes available.

Roberts, who interviewed every fact witness personally.  This massive amount of work resulted in a final investigative report ("Elliott Report") which, unlike virtually every similar NFL investigative report in the past, deliberately omitted a conclusion.  Had the report stated a conclusion, Roberts, as co-author, would have had to reveal her conclusion, as an experienced lawyer and prosecutor, that there was not sufficient evidence to proceed with any discipline.  Unbeknownst to Roberts, it was Friel—who believed that the evidence was *sufficient* to support the imposition of discipline—along with NFL counsel, who determined that the report should be void of a conclusion.  *See* Arb. Hr'g Tr. (Aug. 29), Ex. C. at 138:16-20 (Roberts unaware of who decided that Elliott Report should not provide conclusions); Arb. Hr'g Tr. (Aug. 30), Ex. C at 265:15-21 (decision to exclude conclusions in Report was made by Friel and NFL counsel).  *See also generally*, Ex. A-NFLPA-44 (Elliott Report).  Based on the Elliott Report, the Commissioner determined—without the benefit of the deliberately concealed conclusions reached by Roberts—that there was not credible evidence of a policy violation, and that Elliott committed three—out of five—alleged acts of domestic violence against Thompson.

7.     This flawed determination by the Commissioner was also based on advice he received from four designated outside expert advisors, but those experts too were prevented from learning of the conclusions reached by the NFL's co-lead investigator about the lack of credibility and evidence to support the accuser's claims.  Indeed, when one of the advisors, Mary Jo White, a former prosecutor herself, asked Friel what conclusions Roberts had drawn from the evidence gathered, Friel only admitted that she (Friel) had concluded that one of the five claimed incidents was not credible.  June 26, 2017 Hr'g Tr., Ex. A-NFLPA-45 at 151:20-152:7. As for the rest, Friel did not reveal the conclusions of Roberts that all of the allegations were not credible and could not be supported, and instead gave the impression that the other allegations

were found to be credible.  *Id.* at 152:8-153:14.   There was also a deliberate decision to keep Roberts out of this critical meeting with the advisors, as part of the overall conspiracy to conceal her conclusions from the Commissioner, the player, the Union, the Cowboys, and the world. *E.g.*, Arb. Hr'g Tr. (Aug. 30) 265:15-21; 278:13-21.   As for Thompson, it was undisputed that she publicly threatened to ruin Elliott's career at the time she made the false allegations of abuse at issue.  *E.g.*, Ex. A-NFLPA-44 at 98, 100.  When the police and city attorney would not act on her false allegations, she turned to the NFL and voluntarily provided the NFL with six interviews in which she repeated her false allegations.   It was the lack of credibility and continued inconsistency in her claims that led Roberts, who interviewed her, to conclude that the allegations had no merit.  Indeed, Roberts prepared a separate document listing some of the most significant inconsistencies in Thompson's claims as compared to other credible witnesses and evidence; she labeled this document the "Inconsistency Transcript" (a term someone at the NFL tried to cross out). *See* Ex. B-NFL-B.2.99.   She also noted that Thompson asked one of her friends to lie to police about the allegations against Elliott.  Yet, arbitrator Henderson deprived Elliott and the NFLPA of the right to confront this incredible accuser and fully expose her lack of credibility at the arbitration hearing.

8.      Elliott appealed his suspension pursuant to the procedures set forth in Article 46 of the NFL-NFLPA Collective Bargaining Agreement ("CBA").   Thereunder, Commissioner Goodell or his designee—in this case Henderson, the former head of Respondent NFL Management Council—served as the arbitrator.  The CBA requires player discipline to be "fair and consistent."  Ex. A-NFLPA-15 at 8.  And, pursuant to the terms of the PCP, when there is no criminal finding on which to base discipline, there must "credible evidence" to support the

discipline.  Ex. A-NFLPA-16 at 5.  Elliott was deprived at the hearing of a fundamentally fair arbitral process to satisfy his CBA burden on these issues.

9.      The arbitration before Henderson lasted for three days, on August 29-31.  At the conclusion of the hearing, Henderson announced that he would issue his award shortly: it is expected to be issued over this coming Labor Day weekend.  The timing of the Award is critical, as Elliott, and the Cowboys, will suffer immediate irreparable harm once the suspension goes into effect, as Elliott, the star running back for the Cowboys, must begin practicing for the team's opening game against their Division rival, the New York Giants, on Tuesday, September 5.  Because of this urgency, Elliott and the NFLPA intend to file a motion for a temporary restraining order and preliminary injunction to be decided before any suspension of Elliott can go into effect, as a result of an arbitral award borne out of a fundamentally unfair process, which thus must be vacated.

10.      For the avoidance of doubt, the NFLPA and Elliott do not seek in this Petition for the Court to make its own determinations about Elliott's or Thompson's credibility, or any other matter of fact-finding properly left to the arbitrator.  Rather, the controlling and paramount *legal* question presented here is whether an arbitration concerning the existence of "credible evidence" for employee discipline based on "he-said/she-said" claims of domestic violence can be fundamentally fair when senior NFL Executives have conspired to obscure (including from the Commissioner and his advisors) their own Director of Investigations' conclusion that there was no credible evidence upon which to impose discipline, and the arbitrator has refused to require the NFL to make available for testimony and cross-examination: (i) the accuser whose credibility is at issue (or the investigative notes of her six interviews), and (ii) the Commissioner who was deprived of critical facts in making his disciplinary determination.      Presumably, the

Commissioner would have reached a very different disciplinary conclusion—one of exoneration and no discipline—had he known about the evidence which Friel and other unidentified, high-ranking NFL Executives chose to conceal from the disciplinary process.

## JURISDICTION AND VENUE

11.    This is an action to vacate the Award pursuant to Section 301 of the LMRA and Section 10 of the FAA.  This Court thus has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331.

12.    The Dallas Cowboys, one of the thirty-two franchises in the NFL, is headquartered in Frisco, Texas, maintains AT&T Stadium in Arlington, Texas, and does business in this District.   The NFL derives revenue from throughout the State of Texas through advertising, ticket sales, merchandising, and broadcasting and is subject to personal jurisdiction here.

13.    Venue is proper in this court under 28 U.S.C. § 1391 and 29 U.S.C. § 185, as the NFL regularly transacts business in this District and the Cowboys are headquartered in this District.  Moreover, Elliott is employed by the Cowboys, who are headquartered in this District.

## PARTIES

14.    Petitioner NFLPA is a nonprofit corporation duly organized and existing under the laws of the Commonwealth of Virginia.  The NFLPA is the Union and exclusive collective bargaining representative of all present and future NFL players, including Elliott.  The NFLPA's offices are located at 1133 20th Street, N.W., Washington, D.C. 20036.

15.    Petitioner Ezekiel Elliott is a professional football player and member of the NFLPA.  He was selected by the Dallas Cowboys in the 2016 NFL Draft.  Last season, his first in the NFL, he was named Offensive Rookie of the Year, first team All-Pro, and he was selected

8

for the Pro Bowl. He is the starting running back for the Cowboys and one of the top players at his position in the NFL.  Elliott resides in Texas.

16.     Respondent National Football League maintains its offices at 345 Park Avenue, New York, New York, 10154, and is an unincorporated association consisting of thirty-two separately owned and operated professional football franchises, one of which is located in this District.  Elliott's team, the Cowboys, is headquartered in this District.  And the National Football League conducts business in this District by and through its franchise members.

17.     Respondent National Football League Management Council is the exclusive bargaining representative of all present and future employer member franchises of the NFL.

## RELEVANT NON-PARTIES

18.     Arbitrator Harold Henderson spent 16 years as the NFL's Executive Vice President for Labor Relations and Chairman of Respondent National Football League Management Council's Executive Committee.  Upon information and belief, Henderson is still employed part-time by the NFL and thereby reports to the NFL Commissioner, the NFL controls Henderson's pension, prior NFL financial disclosures show that the League paid Henderson $2.5 million from 2009-2012, and the NFLPA expects that Henderson has received significant additional sums since that time (no more recent information is publicly available).

19.     Tiffany Thompson lives in Columbus, Ohio, where Elliott attended college.  She previously had a personal, intimate relationship with Elliott.  Thompson made the allegations against Elliott that prompted the NFL's investigation into his conduct, and she is the only eyewitness upon whose claims the NFL premised Elliott's suspension.

20.     Kia Roberts is the Director of Investigations for the NFL.  She conducted the League's investigation of Thompson's accusations against Elliott, interviewed Thompson six

different times, and compiled many of the notes that were the basis for the Elliott Report.  The NFL excluded her from meeting with the Commissioner to discuss her conclusions about the investigation, excluded her from meeting with the Commissioner's outside expert advisors in the investigation, excluded from the NFL's investigative report her conclusions that there was insufficient evidence to substantiate the accuser's incredible claims, and tried to prevent her from testifying at the hearing, before she was ordered to appear.

21.     Lisa Friel is the Special Counsel for Investigations for the NFL.  She was a co-author of the Elliott Report.  She did meet with Commissioner Goodell to express her conclusions that discipline should be pursued, and also met with the Commissioner's advisors to answer their questions, while Roberts was deliberately excluded.

22.     Cathy Lanier is the Senior Vice President of Security for the NFL.  Roberts reports directly to Lanier.

**STATEMENT OF FACTS**

**A.     Discipline for Conduct Detrimental Under the CBA**

23.     The parties are bound by the CBA, which was executed on August 4, 2011.

24.     Through the collectively-bargained NFL Player Contract (Appendix A to the CBA), the NFL Commissioner is empowered to impose discipline for "conduct detrimental to the integrity of, or public confidence in, the game of professional football."[2]  As an asserted exercise of this authority, the Commissioner each year unilaterally (*i.e.*, without collective-bargaining with the Union) promulgates the PCP to provide notice to players about what the Commissioner considers to be conduct detrimental to the League, as well as the disciplinary

_____

[2]   Available   at   https://nfllabor.files.wordpress.com/2010/01/collective-bargaining-agreement-2011-2020.pdf.

consequences of such conduct, the investigative procedures to be employed, the role of expert advisors, and the requirements of evidentiary proof to find a violation.  Ex. A-NFLPA-16.

25.     It is undisputed that the CBA requires that the Commissioner's conduct detrimental discipline be fair and consistent.  *Rice* Arbitration Award (Nov. 28, 2014), Ex. A-NFLPA-15 at 8 ("[D]iscipline under [Article 46] must be fair and consistent."); *Bounty* Arbitration Award, (Dec. 11, 2012), Ex. D at 4 (role of the Article 46 Hearing Officer is to "review[] the discipline for consistency of treatment, uniformity of standards for parties similarly situated and patent unfairness or selectivity"); *see also Peterson* Arbitration Award (Dec. 12, 2014), Ex. E at 3 (fair and consistent is "agreed" standard of review).  Arb. Hr'g Tr. (Aug. 29), Ex. C at 84:3-5 (NFL "certainly do[es]n't dispute that the discipline has to be fair and consistent.")

26.     And, in the applicable iteration of the PCP, Commissioner Goodell himself added the evidentiary requirement that conduct detrimental discipline must be supported by "credible evidence" where, as here, the discipline is not based on criminal charges or findings:

> A player violates this policy if he has a disposition of a criminal proceeding (as defined), or if the league's investigation demonstrates that he engaged in conduct prohibited by the Personal Conduct Policy.  *In cases where the player is not charged with a crime, or is charged but not convicted, he may still be found to have violated the Policy if the **credible evidence** establishes that he engaged in conduct prohibited by this Personal Conduct Policy.*  Ex. A-NFLPA-16 at 5.

27.     Article 46 of the CBA sets forth the procedures for players to appeal conduct detrimental discipline.  Article 46 of the NFL Collective Bargaining Agreement, Ex. A-NFLPA-58.  The hearing officer (arbitrator) is either the Commissioner or his designee.  In this case, Commissioner Goodell designated Henderson.

28.     In the letter to Elliott announcing his suspension ("Discipline Letter"), the NFL wrote that "[p]ursuant to Article 46 of the Collective Bargaining Agreement," Elliott was suspended because of "substantial and persuasive evidence that [Elliott] engaged in physical violence against Ms. Thompson," a violation of the Policy subject to a baseline six-game suspension.  Out of five alleged incidents of domestic violence claimed by Thompson, the Commissioner only found a basis for discipline for three of the alleged acts.  The Commissioner also found no mitigating or extenuating circumstances and imposed a six-game suspension as the discipline.  Ex. A-NFLPA-49 at 1, 3, 5.  That discipline will take effect immediately if Mr. Henderson issues an arbitral award affirming the discipline.

**B.     Columbus Law Enforcement Determines There Is "Conflicting Evidence" and Declines to Charge Elliott**

29.     In July 2016, the Columbus, Ohio Police Department investigated allegations by Thompson that Elliott had been physically abusive toward her on five alleged occasions during the week of July 16, 2016.  *See* Ex A-NFLPA-49 at 1, 3-4.

30.     Officers on the scene on July 22 concluded there was no probable cause to require a mandatory arrest of Elliott under governing Ohio law.  Their Police Report states their determination was "[d]ue to conflicting variations of what happened."  Ex. A-NFLPA-24 at 7.

31.     Thereafter, the Columbus City Attorney's office conducted its own extensive investigation, including interviewing witnesses and gathering relevant evidence.  It thereafter announced, after an extensive fact investigation, that it would not bring charges against Elliott. Ex. A-NFLPA-40.  The Columbus City Attorney's office explained that "[a]fter reviewing the totality of the evidence," it "declined to approve criminal charges . . . primarily due to conflicting and inconsistent information across all incidents, resulting in concern regarding the sufficiency of the evidence to support the filing of criminal charges."  *Id.* at 2.

### C.      The NFL's Investigation

32.      The NFL's Director of Investigations, Kia Roberts, co-led the League's own investigation into Thompson's allegations with Friel.  But it was Roberts who conducted *all* of the fact interviews and Friel did not conduct any (except for an interview of Elliott with the Commissioner's outside expert advisors, from which Roberts was excluded).  *See* Hr'g Tr. (Aug. 30), Ex. C at 261(8-16).

33.      The NFL would ultimately conduct twenty-two interviews, including six with Thompson and numerous others with her relatives and friends.  Ex. A-NFLPA-44 at 1-2. Roberts personally interviewed Elliott, Thompson (six times), several of Thompson's friends, and conducted all other fact interviews conducted as part of the NFL investigation.  Ex. A-NFLPA-44.  The League also collected a number of photos from Thompson and public documents from Columbus law enforcement authorities, and asked two medical examiners to review and opine on Thompson's bruises as depicted in the photographs.  *Id.* at 9-10. Ultimately, it was established that neither doctor could rule out the fact that the bruises depicted were consistent with numerous other possible causes *apart* from the allegations of abuse, including drunken and drug-induced falls, fights with other persons, rough sex and other possible causes.  Hr'g Tr. (Aug. 31), Ex. C. 40-112; 122:22-124:1.

34.      Of the six Thompson interviews, however, the NFL transcribed only two.  Ex. A-NFLPA-42 and 43.  League investigators did take notes of the four, non-transcribed Thompson interviews, but the NFL refused to produce them, and the arbitrator ruled that the NFL could withhold them.  Ex. A-NFLPA-55 at 3.

35.     The NFL similarly chose not to make audio recordings, video recordings, or transcriptions of numerous other fact interviews over the course of the Elliott Investigation.  *See, e.g.*, *id.* at 2-3.

36.     The NFL issued the Elliott Report on June 6, 2017, reporting on the results of its more than year-long investigation.  Ex. A-NFLPA-44.  Unlike most other NFL investigative reports issued in connection with Commissioner discipline, the investigators' conclusions about what the evidence showed were excluded from the report. *See id.*  Neither Roberts nor Friel—the co-authors of the report—could identify who at the NFL made the decision not to have any conclusions or recommendations in this mammoth report, which was more than 160 pages long, with more than 100 exhibits. Ex. A-NFLPA-44.

37.     The League subsequently provided the Report to the NFLPA and Elliott for their review, as the PCP required, and the Union responded on July 17 by filing a report demonstrating the many critical flaws in the purported evidence contained in the Elliott Report, including the glaring unreliability of Thompson's testimony and allegations.  Ex. A-NFLPA-48.  But what the Union and Elliott did not know was that Roberts had reached the same conclusion as the player and the Union: there was insufficient evidence to proceed with any violation claim.

38.     The NFL convened a meeting on June 26—attended by League personnel, a panel of outside "expert" advisors to the Commissioner (provided for in the PCP), Elliott, his agents, and NFLPA counsel—at which NFL Special Counsel for Investigations Lisa Friel presented the findings of the Elliott Report.  A-NFLPA-45.  Significantly, Roberts was excluded from this critical meeting, and neither Roberts nor Friel could identify which top NFL Executive made this decision.  *Id.* Hr'g Tr. (Aug. 29) at 162:22-25 (Roberts: Is the question do I know why I wasn't invited?  Mr. Kessler: Yes.  Ms. Roberts: No); Hr'g Tr. (Aug. 30) at 277:5-8 (Q: Who made the

decision for Ms. Roberts not to meet with the outside advisors at the meeting? Friel: I have no idea.")

39.     At this critical hearing, one of the Commissioner's advisors, Mary Jo White, a former Chair of the SEC and a former federal prosecutor, asked the critical question about what conclusions the investigators had reached about the credibility of the allegations.   Because Roberts was excluded from the meeting, only Friel was there to answer, and she continued the cover-up in the following exchange, only admitting that one alleged domestic violence incident was incredible, while sidestepping any revelation of the investigators' conclusions about the four other alleged acts:

> Ms. White: And then, Adolpho, you tell me if this is an inappropriate question. You've obviously, and your investigators, your staff as well, have interviewed Miss Thompson several times from the record.  With respect, I will start at the back end.  With respect to what she has told you and told the police, city attorney, with respect to the July 22 incident, have you found what she said to you – we will take it with you first – to be credible, as to the July 22 event?

> Ms. Friel: No.

> Ms. White: Otherwise, have you generally found her to be credible?  I know that is a big question.

> Ms. Friel: It is a big question.  I will go back and say it this way.  We felt comfortable making the determination that she was not credible about the July 22 incident in large part because of her own friend Ayrin Mason, said it did not occur.  And we found Ayrin Mason very credible.  I would say that the other person we found very credible was her Aunt, Elaine Glenn.  What we looked at in terms of looking at the evidence was here's what Miss Thompson said and what other evidence can we gather to see if it backs up her credibility or does not back up her credibility.  And that would be hard evidence, like the text messages; they say what they say, they went to who they went to.  The photographs, especially the ones with metadata on them.  The opinions we got back from the two doctors that we spoke to.  And as I said, Ayrin Mason who saw injuries during the week as did her Aunt both seeing it [on] FaceTime and then seeing photographs that got sent.  I want to say it that way, that that evidence is really, in my opinion what we should be looking at, and what does all that corroborative consistent or inconsistent evidence say about Miss Thompson's credibility.

40.     Had Roberts been at the meeting, she undoubtedly would have informed the outside expert advisors, the player, and the Union of her conclusion that there was no credible evidence to proceed with respect to any of the allegations.

41.     Further, other top NFL Executives, including Jeffrey Pash, the Executive Vice President and General Counsel of the NFL, and B. Todd Jones, the Senior Vice President and Special Counsel for Conduct, were in attendance.  It is unknown whether one of them made the decision not include Roberts in this critical meeting or whether they were also victims of the conspiracy to conceal.

42.     In response to the Elliott Report and the June 26 meeting, as mentioned above, the NFLPA and Elliott prepared a written submission cataloguing the overwhelming evidence ***contained in the NFL's own report*** undermining Thompson's credibility.  Ex. A-NFLPA-48. For example:

- Thompson lied to investigators and encouraged her friend to lie to the police as well (*id.* at 15-16, 22-23);

- Thompson destroyed relevant evidence from her cell phones (*id.* at 23-24);

- Thompson changed her account of critical events repeatedly and only mentioned significant information after she had been interviewed a number of times (*see, e.g.*, *id.* at 11, 20, 27-29);

- Thompson's allegations were inconsistent with other evidence (*see e.g.*, *id.* at 8, 12, 32);

- Thompson's credibility was undermined by her numerous threats to "ruin" Elliott's life and career as revenge for his not wanting to continue his relationship with her in the manner she desired  (*see, e.g.*, *id.* at 9, 24-25); and

- Thompson considered extorting Elliott with alleged sex videos and took steps to effectuate such a plan (*id.* at 26-27).

43.     The NFLPA and Elliott also demonstrated in their response submission that neither of the two medical expert reports submitted to the NFL established any causal link

between Elliott and the injuries Thompson claims he caused, or any reliable basis to even date the alleged injuries. *Id.* at 4.

44.    It was not until the arbitration hearing that the NFLPA learned, through its examination of NFL lead investigators Roberts and Friel, that, in fact, Roberts agreed with the NFLPA and Elliott that there was no basis to proceed with any disciplinary claim based on the evidence that had been gathered.

**D.    The Conspiracy to Conceal Critical Evidence from the Commissioner, the Commissioner's Outside Expert Advisors, the NFLPA, Elliott, the Arbitrator, the Cowboys and NFL Fans**

45.    It was only through the examination of Roberts and Friel at the subsequent arbitration hearing that the conspiracy to conceal critical evidence was exposed.

46.    For example, on the first day of the three-day arbitration hearing:

- Roberts testified repeatedly that "I had concerns about [Thompson's] credibility (Arb. Hr'g Tr. (Aug. 29), Ex. C at 172:24) because "[i]t seemed like there were **numerous witnesses** who what they had to say was in, you know—**diametrically opposed** to what [Thompson] stated" (*id.* at 173:19-22) (emphasis added). Roberts could not recall from her time as a prosecutor ever "put[ting] on the stand" a witness that "had this many inconsistencies in their testimony that was going to be used to attack their credibility." *Id.* at 226:22-227:1. *See also id.* at 175:13-19 ("As I was looking through that additional evidence . . . there were concerns that I had about her credibility"); 188:10-25 (Roberts did not find credible Thompson's explanation for a text message that asked her friend to lie to Elliott's lawyers about an alleged incident of abuse by Elliott);

- In the course of the Elliott Investigation, Roberts regularly found "inconsistencies in what Ms. Thompson" said (*see, e.g.*, *id.* at 142:2-6, 143:9-23) and created an entire document called "Inconsistency Transcripts" to catalogue them all "[b]ecause . . . things that [Thompson] said . . . were inconsistent with each other" (*id.* at 143:3-7); someone at the NFL attempted to cross out the words "Inconsistency Transcripts," but was not successful in doing so. *Id.* at 142:21-143:2;

- The NFL learned that Thompson lied to police and to Roberts about critical details, such as whether Thompson had been involved in a fistfight with another woman during the week of the alleged domestic violence, which could

have caused some of the bruises of which she took pictures (*see, e.g.*, *id.* at 147:2-150:19), and Roberts admitted that from evidence of the fight "[s]tanding on its own," she "wouldn't draw the conclusion Ms. Thompson was telling the truth" (*id.* at 153:7-12);

- Likewise, Roberts found that other witnesses, including Thompson's own friends and third parties, offered different versions of events that were not "consistent with what Ms. Thompson told" the NFL (*id.* at 156:17-25) and compelled Roberts to question Thompson about why someone who was not "a particular friend of Elliott" would offer contradictory testimony (*id.* at 179:5-13); and

- Roberts testified that one of Thompson's friends said that "she was told to lie by Ms. Thompson to police" (*id.* at 159:21-23), and that it was not credible when Thompson tried to explain it away (*id.* at 188:10-25).

47.     Ultimately, it was revealed that Roberts had concluded that Thompson's credibility was so damaged that no discipline should be pursued against Elliott for allegations that could not be supported with sufficient credible evidence.  Arb. Hr'g Tr. (Aug. 30), Ex. C. at 301:22-302:4.

48.     Roberts testified on this first day of the arbitration that she shared her credibility concerns about Thompson with Friel and others on the League investigative team (*id.* at 172:21-173:22, 163:11-165:23), including with her boss, Lanier.  *Id.* at 165:1-7.  It was later revealed that Lanier agreed with Roberts's assessment that there were "issues of credibility" with respect to Thompson.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 319:4-10.  The conspiracy then came into play. First, Friel and NFL counsel decided that the Elliott Report would not include any conclusions (*id.* at 265:15-21)—but Roberts did not know who decided this.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 137:22-138:7.  Omitting these conclusions was a necessary step in concealing Roberts's determinations from the Commissioner and others.

49.     Second, Roberts was never included in any meeting with the Commissioner to present her conclusions about the investigation and the lack of sufficient evidence.  *Id.* at 163:11-13.

50.     Third, Roberts was not invited to the meeting with the Commissioner's outside expert advisors, and she did not know who made the decision to exclude her from that critical meeting either.  *Id.* at 161:16-19; 162:22-25.  Nor was she given any other opportunity to convey her conclusions that the accuser was incredible, and there was insufficient evidence to go forward to the outside expert advisors on any other occasion.  *Id*. at 161:20-22.

51.     The conspiracy to conceal Roberts's conclusions as the co-lead investigator were especially harmful because she was the only one of the co-lead investigators to interview Thompson—and she did so six times.  *Id*. at 161:23-162:5.[3]  Roberts also served as the co-author of the Elliott Report, where her conclusions would have been revealed but for the decision by some unknown NFL executive to conceal them.  *Id.* at 136:18-21.

52.     On the second day of the hearing, Friel testified, and the conspiracy became further exposed.  First, after repeated questioning, Friel admitted that it was Roberts' conclusion that after review of the totality of the evidence, there was ***insufficient evidence to corroborate Thompson's version of events***.  Arb. Hr'g Tr. (Aug. 30), Ex. C. at 301:22-302:4.  Friel admitted that this conclusion was excluded from the Elliott report, as a result of a decision that she made with NFL counsel. *Id.* at 265:15-21

53.     Further, Friel testified that she attended a meeting with Commissioner Goodell and other top NFL Executives to discuss the findings of the investigation. *Id.* at 274:22-275:5

---

[3] Roberts acknowledged that Kim Janke, an NFL Security Representative, was also present at the interviews with Thompson.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 162:3-11.

But Roberts was not invited to this meeting either.  *Id.* 277:5-8.  Since Roberts was the only lead investigator to interview Thompson, and was the co-author of the Elliott Report, it is inexplicable as to why an experienced lawyer like Pash, for example, would not have insisted that Roberts attend this critical meeting to inform the Commissioner about what the investigation had revealed.

54.     After first asserting attorney-client privilege, Friel eventually revealed that she told the Commissioner it was her view that there was sufficient evidence to proceed.  *Id.* at 275:1-19.  Roberts, on the other hand, could not express her conclusions, based in part on her six interviews of Thompson, to the Commissioner herself, since she was not present.

55.     Finally, Friel claimed not to know who decided not to include Roberts in the meeting with the outside expert advisors on June 26.  *Id.* 277:5-8

56.     Friel testified that she "didn't think it was that important" for Roberts to meet with the outside expert advisors.  *Id.* at 278:13-21.  Roberts, on the other hand, testified that it would be "important to talk to the person who has interviewed the accuser if you're going to make a determination as to whether or not the accuser is telling the truth."  Arb. Hr'g Tr. (Aug. 29), Ex. C at 163:1-7.

57.     At no point during the June 26 meeting were the outside expert advisors informed of Roberts' opinion that there was insufficient evidence to corroborate Thompson's version of events.  *See generally* NFLPA Ex. 45.

58.     And tellingly, it was Friel—in conjunction with NFL counsel—who determined that the Elliott Report should not include a recommendation as to whether Elliott violated the Personal Conduct Policy.  Arb. Hr'g Tr. (Aug. 30), Ex. C. at 15-21.

**E.      Arbitrator Henderson Denies Elliott and the Union Access to Critical Evidence Necessary for a Fair Hearing**

59.     Elliott and the Union timely filed an appeal of his suspension pursuant to Article 46 (Ex. A-NFLPA-50).  The arbitration appeal hearing was conducted from August 29-31.  Arb. Hr'g Tr., Ex. C.

60.     Prior to the hearing, the NFLPA and Elliott requested that the NFL produce, among other things, all documents related to the Thompson interviews, including the investigation notes taken by lead investigator Roberts.  NFLPA Request for Documents and Witnesses, Ex. A-NFLPA-51 at 1-2.  The NFLPA and Elliott also requested that the NFL produce, among other critical witnesses, Thompson, whose credibility went to the very core of the arbitration proceeding.  *Id.* at 3-4.

61.     In an August 22 response letter, the NFL refused to produce Thompson or the notes of the investigators who interviewed her.  Ex. A-NFLPA-52 at 2.  The NFL also refused to produce Roberts, arguing that her testimony would be duplicative of Friel's, whom the League agreed to make available. *Id.* at 4.  And the NFL made the unsubstantiated claim that it could not compel Thompson's testimony (*id.* at 3), notwithstanding the fact that she had already, voluntarily submitted to *six* interviews by NFL investigators and also provided the League with numerous photographs and hundreds of text messages.  Ex. A-NFLPA-44 at 1-2.  Roberts would later candidly testify that in her nine-years as a prosecutor, she had never "cho[sen] to put a witness on the stand knowing that they had this many inconsistencies in their testimony" (Arb. Hr'g Tr. (Aug. 29), Ex. C at 226:22-227:1)—offering the most likely explanation for why the NFL refused to produce Thompson at the hearing.  Friel later testified that she could not identify any efforts made by the NFL even to find out if Thompson would agree to testify at the hearing. Arb Hr'g (Aug. 30), Ex. C at 277:22-278:12.

62.     On August 25, 2017, following a telephonic hearing, Henderson denied all of the NFLPA's evidentiary requests, except he ordered Roberts to testify at the hearing.  Ex. A-NFLPA-55.  Even though, as arbitrator, Henderson was required by the PCP to assess the existence of "credible evidence" against Elliott, he inexplicably found that Thompson's "testimony and availability for cross examination" was not "essential to Mr. Elliott's defense," and he ruled that the NFL was not obligated to produce investigation notes of Thompson or anyone else.  *Id.* at 2-3.

63.     Henderson's decision was flatly at odds with Article 46 appeal hearing precedent in which arbitrators had compelled the production of important witnesses by the NFL—perhaps none of whom were more important to the player's ability to have a fair hearing than Thompson—the sole eyewitness besides Elliott to the alleged claims of abuse.  *See Brady* Decision on Hearing Witnesses and Discovery (June 22, 2015), Ex. F at 2 (ordering live testimony of Ted Wells, who "supervised the investigation and preparation of the Investigative Report that serve[d] as the basis for Mr. Brady's discipline"); *Rice* Order on Discovery and Hearing Witnesses (Oct. 22, 2014), Ex. A-NFLPA-14 at 2 (exercising "discretion of the hearing officer" to "compel[] the witnesses necessary for the hearing to be fair" and ordering live testimony of all witnesses present for "central issue in the case," including Commissioner Goodell); *New Orleans Saints ("Bounty")*, Pre-Hearing Order No. 4 (Nov. 9, 2012), Ex. G at 1 (ordering live testimony of lead investigator Jeff Miller for "reasonable cross-examination"). Even more significantly, this ruling deprived Elliott and the NFLPA of a fundamentally fair hearing.

64. On the first day of the hearing, the Union and Elliott reiterated their request for the testimony of Thompson and the investigator notes of her interviews. That request was denied by the arbitrator. Arb. Hr'g Tr. (Aug. 29), Ex. C at 32:3-15.

65. At the hearing, Elliott testified—categorically, unequivocally, and under oath—that he had not committed any misconduct against Thompson. *See e.g.*, Arb. Hr'g Tr. (Aug. 30), Ex. C at 86:4-10; *see also* A-NFLPA-45 at 135:2-3 ("I've never assaulted Tiffany Thompson. I would never do that."); *see also* Ex. A-NFLPA-44 at 28, 44, 48 (examples from Elliott Report of Elliott denying any wrongdoing). Moreover, although there was no other witness to the alleged incidents besides Elliott and Thompson, Alvarez Jackson was present in Elliott's apartment during the time of the alleged incidents, and he testified that he neither saw nor heard any evidence of abusive conduct and did not hear of any complaints of abuse from Thompson. Arb. Hr'g Tr. (Aug. 30), Ex. C at 222:1-5.

66. The NFLPA and Elliott also presented expert evidence at the hearing, completely debunking the claim that the League's medical experts could reliably determine the date of bruises from the photographs they reviewed, or determine what caused the bruises. Arb. Hr'g Tr. (Aug. 29), Ex. C at 91-132. These fatal deficiencies in the NFL's expert reports were ultimately confirmed by the NFL's experts themselves. Arb. Hr'g Tr. (Aug. 31), Ex. C. 40-112; 122:22-124:1

67. During the hearing, when the conspiracy to conceal Roberts' conclusions was uncovered, it became evident that Commissioner Goodell himself had become a critical witness for the proceedings. A major issue in the arbitration was whether the arbitrator should defer to the fact determinations of the Commissioner—as the League argued—when it appeared that critical facts had been concealed from the Commissioner. The only way to get to the bottom of

23

the conspiracy to conceal evidence from the Commissioner was to get testimony from the Commissioner himself.  But Henderson denied any access to this critical witness as well.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 348:18-349:15.

### F.    Henderson's Award

68.    At the conclusion of the three days of arbitration on August 31, Henderson stated on the record that he would issue his award shortly.  Because an Award affirming the discipline will take immediate effect when issued, the Union and Elliott were forced to immediately file this Petition to prevent severe and irreparable harm to Elliott, his reputation, and his career.

69.    The Cowboys' first game is September 10, and practices for that opening game begin on Tuesday, September 5.  Unless enjoined by this Court prior to that time, Elliott's suspension, if sustained by the Award, will have devastating effects, making immediate preliminary injunctive relief essential.

### GROUNDS FOR VACATUR:

### DENIAL OF FUNDAMENTAL FAIRNESS

70.    Judicial review of an arbitration award is narrowly circumscribed and deferential. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).  That deference does not mean, however, that arbitration awards are inviolate.  *See Murphy Oil USA, Inc. v. United Steel Workers AFL-CIO Local 8363,* No. CIV.A.08-3899, 2009 WL 537222, at *3 (E.D. La. Mar. 4, 2009) (vacating award).

71.    Bare minimum standards of fairness must characterize every legitimate arbitration.  Where the arbitral process falls short of those standards and deprives a party of a full and fair hearing, the resulting award should be vacated.  *See Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (citing FAA in affirming vacatur of award

procured from "fundamentally unfair" labor arbitration proceedings); *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 494 (5th Cir. 2003).[4]

72.     Thus, "the court has authority to vacate an award if a party has been denied a fundamentally fair hearing."  *Murphy Oil USA*, 2009 WL 537222, at *3.  Vacatur is warranted under the LMRA and the FAA "where the arbitrators were guilty of misconduct in . . . refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced."  9 U.S.C. § 10(a)(3).

73.     Courts across jurisdictions have recognized that, irrespective of collectively bargained terms, a fundamentally fair hearing requires that a party is afforded an "adequate opportunity to present its evidence and arguments," or the resulting award is subject to vacatur. *See, e.g.*, *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39-40 (1st Cir. 1985) (affirming vacatur, in part, on fundamental fairness grounds where "the exclusion of relevant evidence 'so affect[ed] the rights of a party that it may be said that he was deprived of a fair hearing'") (citation omitted); *cf. El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) ("each party must be given the opportunity to present its arguments and evidence"); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997) (vacating award because arbitration panel "excluded evidence plainly 'pertinent and material to the controversy,'" which "amounts to fundamental unfairness") (citing 9 U.S.C. § 10(a)(3)).

---

[4] Although this case arises under Section 301 of the LMRA, the Court may look to the FAA for the purposes of adjudicating an arbitral challenge arising out of a collective bargaining agreement.  *Int'l Chem. Workers Union*, 331 F.3d at 494 ("When reviewing a case involving a CBA and arising under Section 301, courts are not obligated to rely on the FAA but may rely on it for guidance in reviewing an arbitration award."); (citing *Misco,* 484 U.S. at 41 n.9 (acknowledging that "federal courts have often looked to the [FAA] for guidance in labor arbitration cases," especially where section 301 of the LMRA applies).

74.     The Fifth Circuit is no exception, holding that "[i]t is appropriate to vacate an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing," or if "the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300–01 (5th Cir. 2004).

75.     Indeed, courts within this Circuit and others have held that an arbitrator has an "*affirmative duty* to 'insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other side. . . . [A] failure to discharge this simple duty would constitute a violation of FAA § 10(a)(3), where a party can show prejudice as a result.'" *Ostrom v. Worldventures Mktg., LLC*, 160 F. Supp. 3d 942, 950 (M.D. La. 2016) (citation omitted; emphasis added).  Parties "must be allowed to present evidence without unreasonable restriction . . . and must be allowed to confront and cross-examine witnesses," or the award will be subject to vacatur.  *ICAP Corporates, LLC v. Drennan*, 2015 WL 10319308, at *6 (D.N.J. Nov. 18, 2015) (citation omitted).  Courts have specifically identified investigative files as subject to this affirmative duty.  *E.g. Home Indem. Co. v. Affiliated Food Distribs.*, 1997 WL 773712, *4 (S.D.N.Y. Dec. 12, 1997).

76.     The arbitration proceedings below do not satisfy these most rudimentary elements of fundamental fairness.  As chronicled above, Elliott was the victim of a deliberate conspiracy to conceal critical evidence, denied access to critical testimony from his accuser, Thompson, and the ability to cross-examine her, and denied access to the NFL's investigator notes of Thompson's interviews, four of which were not even transcribed.  *See Gulf Coast*, 70 F.3d at 850 (vacating award under "pertinent and material" standard in LMRA proceeding because arbitrator refused to consider crucial evidence).

77.     Mr. Elliott and the Union were also deprived of the critical testimony of Commissioner Goodell, when it became evident that the conspiracy to conceal evidence from everyone, including the Commissioner, was essential to determining whether any deference should be paid to the Commissioner's fact findings and to determine whether the conspiracy engaged in had destroyed the validity of the entire disciplinary process in this case.

78.     The deprivation of critical evidence, including critical evidence going to the accuser's credibility, was especially unfair and damaging in this proceeding, in which discipline for alleged domestic violence is being pursued even though there was no arrest or criminal charge, let alone a conviction; no tape, audio, or other recording of the alleged conduct; no eyewitness to the alleged conduct other than purportedly the accuser herself; and Elliott has maintained his innocence of this conduct since the allegations were first made, and denied them under oath.  Indeed, the PCP itself has a rule that in such a case, where there are no criminal proceedings, there must be "credible evidence" to sustain the discipline.  Ex. A-NFLPA-16 at 5. How can an accused player be expected to have a fair opportunity to demonstrate that the Commissioner was not fair and consistent in finding credible evidence in such a case, when he cannot confront and examine his accuser to demonstrate her lack of credibility?

79.     And, in this case, we now know that there was a conspiracy to conceal the fact that the NFL's own co-lead investigator had concluded, with her boss, that the accuser's claims were incredible and were not sufficiently supported by any corroborating evidence.  This made it all the more critical to require the accuser to testify, but the arbitrator refused.

80.     Although investigators Friel and Roberts were made available, *their* testimony about Thompson's severe credibility issues simply reinforced the critical importance of the NFLPA and Elliott being afforded the opportunity to cross-examine Thompson.  Their testimony

also underscored why the arbitrator could not fairly uphold Elliott's discipline, since he could not fairly or accurately determine credibility without hearing from Thompson himself. The fundamentally unfair arbitration proceedings conducted by Henderson here can be analogized to a judge (and a partial one at that) making assessments about the accuser's credibility and the events in question based solely upon the hearsay testimony from *the prosecutors*, and no testimony or cross-examination of the accuser herself. While this is not a criminal case, fundamental fairness, which applies to all arbitrations, requires that the accuser be available in a case like this, where credibility is the essence of the issue to be determined in the arbitration, and the player bears the heavy burden of proof to show that the Commissioner's discipline was not fair or consistent and based on credible evidence in accordance with the PCP. Nor should the NFL be heard to argue that Thompson was beyond their control. The record demonstrates that Thompson has been fully cooperating with all of the NFL's requests—having provided numerous photographs as well as her cell phones, and having sat for six interviews with the NFL's investigators. Further, the record is clear that the NFL has made no showing that Thompson would refuse to appear, as Ms. Friel testified that she was not aware of any efforts by the NFL even to ask her to do so. Arb. Hr'g. Tr. (Aug. 30, 2017), Ex. C at 277:22-278:12.

81.     The NFLPA and Elliott are not asking the Court to substitute its own judgments for the arbitrator's concerning Elliott's and Thompson's respective credibility. Rather, Petitioners ask the Court to conclude that arbitrator Henderson could not, as a matter of law, conduct a fundamentally fair hearing into the existence of "credible evidence" to justify a six-game suspension in the absence of the testimony and cross-examination of Thompson, and without access to the investigator's notes of her prior interviews.

82.     Further, it was not possible for Elliott and the Union to have a fundamentally fair hearing in light of the uncovered conspiracy by the NFL to conceal critical exculpatory facts from the player, the Union, the Commissioner and his outside expert advisors, and the refusal to compel Commissioner Goodell to testify so that the full depths of this conspiracy could be revealed, including what other evidence was concealed from the Commissioner and which top NFL Executives—besides Ms Friel—were responsible for this conspiracy, which fundamentally destroyed the fairness of these proceedings.  *See Gulf Coast*, 70 F.3d at 850; *Karaha Bodas*, 364 F.3d at 300–01; *ICAP Corporates*, 2015 WL 10319308, at *6 ("[P]arties to an arbitration 'must be allowed to present evidence *without unreasonable restriction* . . . and must be allowed to confront and cross-examine witnesses . . . .  Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award.'") (citation omitted; emphasis added); *Tempo Shain*, 120 F.3d at 20-21 (vacating award where panel "excluded evidence … pertinent and material to the controversy") (citation omitted).

83.     For all of the above reasons, the arbitration conducted by Henderson was fundamentally unfair and inconsistent with the most basic requirements for a fair arbitral proceeding.

84.     In light of the foregoing, and from the face of the arbitral record submitted herewith, as well as further submissions to be made in support of this Petition to Vacate, the Court should conclude that Elliott and the NFLPA were denied the fundamental fairness guaranteed to them under the LMRA and FAA.  The Award should thus be set aside.

## PRAYER FOR RELIEF
## VACATUR OF AWARD

85.     The NFLPA and Elliott repeat and re-allege Paragraphs 1-84 as if set forth fully herein.

86.     The NFLPA and Elliott petition to vacate the Award on the ground that Elliott was deprived of his labor and arbitral law rights to a fundamentally fair proceeding.

87.     WHEREFORE, in light of the foregoing, and in accordance with Section 301 of the LMRA and Section 10 of the FAA, the NFLPA and Elliott respectfully request that the Court vacate the Award.

Dated: August 31, 2017                    Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Thomas M. Melsheimer*
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com

2501 N. Harwood Street, 17th Floor
Dallas, TX 75201
(214) 453-6500 – Telephone
(214) 453-6400 – Facsimile

**Jeffrey L. Kessler (*pro hac vice pending*)**
New York Bar No. 1539865
jkessler@winston.com
**David L. Greenspan (*pro hac vice pending*)**
New York Bar No. 4042099
dgreenspan@winston.com
**Jonathan J. Amoona (*pro hac vice pending*)**
New York Bar No. 4797338
jamoona@winston.com
**Angela Smedley (*pro hac vice pending*)**
New York Bar No. 4942132
asmedley@winston.com
**Joseph A. Litman (*pro hac vice pending*)**
New York Bar No. 5030911
jlitman@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700 – Telephone
(212) 294-4700 – Facsimile

*Counsel for Petitioner National Football League*
*Players Association and Ezekiel Elliott*