# Exhibit A-NFLPA-15

ZUCKERMAN SPAEDER LLP

1185 AVENUE OF THE AMERICAS   31ST FLOOR
NEW YORK, NY  10036-2603
212.704.9600   212.704.4256 fax   www.zuckerman.com

**In the Matter of Ray Rice**
**Decision**
**November 28, 2014**

**SUMMARY OF DECISION**

On February 15 of this year, Ray Rice hit his then-fiancée, Janay Palmer in the elevator of an Atlantic City hotel and casino.[1]  She hit her head on the rail and fell unconscious to the floor.  A surveillance camera captured Rice dragging her unconscious out of the elevator.  Rice was indicted for felony assault under circumstances evidencing indifference to the value of human life.  The criminal proceeding, however, ended with a court ordered pre-trial intervention, an agreement that the case would be dismissed after one year if Rice satisfactorily completed an anger management course, attended counseling and committed no further crimes.

Thereafter, on June 16, Rice met with NFL Commissioner Roger Goodell for a pre-discipline meeting.  At that meeting, Rice told the Commissioner that he had hit Mrs. Rice in the elevator.  The NFL knew of the indictment and the results of the criminal proceeding.  They had seen the video of Rice's conduct outside the elevator.  They had gathered comparator cases of disciplines given for previous violations of the Personal Conduct Policy based on acts of domestic violence.  They believed that there was a second video from a camera inside the elevator.  Various sources, including NFL security, had reported its existence.  Rice had received this video in discovery during his criminal case, but it had not been aired publicly, as had the first video.  The NFL never asked Rice for the second video.  Approximately one month after the meeting with Rice, Commissioner Goodell issued a two-game suspension with an additional fine

---

[1] Ray Rice and Janay Palmer are now married.  As she has taken Rice as her last name, she is referred to as "Mrs. Rice" throughout.

of one week's salary. A firestorm of public criticism followed. In its wake, the Commissioner admitted that he "didn't get it right," and shortly thereafter increased the presumptive penalty for domestic violence for a first-time offender to six-games. Notably, after announcing this increased penalty under the Policy, the Commissioner called Rice to assure him that the new policy would not affect him—that it was forward looking and his penalty would not be increased.

Then, on September 8, a video from the camera inside the elevator was aired publicly. It captured Rice hitting Mrs. Rice and her hitting her head on the elevator railing and falling to the floor unconscious. It also shows Rice trying to pick her up and, apparently unable to do so, dropping her, as the elevator doors begin to open. That same day, alongside a furor of public outcry over the second video, the Commissioner suspended Rice indefinitely. The NFL justified this increased penalty solely on the basis that the second video was new evidence that showed a "starkly different sequence of events" of what happened in the elevator than what Rice had said at the June 16 meeting. In this arbitration, the NFL argues that Commissioner Goodell was misled when he disciplined Rice the first time. Because, after careful consideration of all of the evidence, I am not persuaded that Rice lied to, or misled, the NFL at his June interview, I find that the indefinite suspension was an abuse of discretion and must be vacated.

**BACKGROUND**

In the early morning hours of February 15, Ray Rice and his then-fiancée were with two other couples at a hotel and casino in Atlantic City for the Valentine's Day weekend. After drinking a large volume of alcohol, the couple got into an argument, and Rice left their table. The hotel's surveillance cameras recorded what happened next. The tape shows that Mrs. Rice followed him to the bank of elevators where he was standing holding a phone. Exhibit 36. As she walked by toward the elevator, she slapped at him. *Id.* She entered the elevator, and he

followed her. *Id.* In the elevator, she slapped at him again, and as she came toward him, he hit her, knocking her into the elevator rail, and she fell to the floor unconscious. Exhibit 35.

Rice and Mrs. Rice were arrested and charged with misdemeanor assault by the Atlantic City Police Department. Neither pursued charges against the other, and there were no reported injuries. The NFL received this information on the afternoon of February 16, by which time the Baltimore Ravens already had learned of the arrest. Exhibit 2; Tr. 224:3-7.

Although the NFL immediately began its own investigation, Commissioner Goodell waited for the law enforcement process to conclude before he considered the appropriate discipline for Rice. Tr. 89:4-8. On March 27, a New Jersey state grand jury indicted Rice on one count of aggravated assault. The indictment alleged that Rice had attempted to and did purposely and knowingly cause significant bodily injury to Mrs. Rice "under circumstances manifesting extreme indifference to the value of human life." Exhibit 16 at NFL_RICE-000065-67. On May 1, Rice signed a pre-trial intervention (PTI) agreement upon the recommendation of the PTI Director and with the consent of the Atlantic County Prosecutor's Office. This agreement postponed all further criminal proceedings for twelve months on the condition that Rice fulfill the supervisory terms of the agreement, which included anger management counseling.[2] Exhibit 16 at NFL_RICE-000069-71. With the criminal process resolved, Commissioner Goodell scheduled a pre-discipline meeting for June 16. Tr. 89:8-14.

**Information Known to the NFL Prior to the June 16 Meeting**

Commissioner Goodell first heard about the incident involving Rice and Mrs. Rice when he saw a video of the scene outside the elevator on television days after the assault occurred. Tr. 87:5-7. The video, which was played at the arbitration hearing, captures the scene of Rice

---

[2] If Rice successfully completes the required programs and meets the other standard conditions of PTI, the prosecution will be discontinued. *See* Exhibit 16 at NFL_RICE-000071; Pre Trial Intervention Program, New Jersey Courts, http://www.judiciary.state.nj.us/criminal/crpti.htm (last visited Nov. 25, 2014).

3

coming out of the elevator. It shows Rice trying to carry his unconscious fiancée, and her shoes and purse, out of the elevator and dropping her. Exhibit 36. After this, Rice can be seen trying to move her legs out of the way of the elevator door. *Id.* He next tries to lift her again and is unable to do so. *Id.* Another individual, who is apparently a member of the hotel and casino security staff then enters the frame. *Id.* The Commissioner testified that when he viewed this video he had an immediate reaction. Tr. 88:18-21. He described Rice's actions as "horrible" and saw Rice as callous. *Id.*; Tr. 117:2-16. At the time of the June 16 meeting, the NFL also knew that there was a camera inside the elevator and thought it was likely that there was a video from that camera. Tr. 246:25-247:21. Various sources, including NFL security, had reported the existence of such a video. Exhibit 6; Exhibit 7; Exhibit 8; Exhibit 11. Rice had received this video in discovery during his criminal case, but the NFL never asked Rice for the second video. Tr. 247:22-248:6.

In preparation for the June 16 meeting, NFL staff prepared a binder for Commissioner Goodell. The binder contained Rice's Player Profile, a Final Discipline Memo, which summarized the Rice assault and the legal disposition, two NFL Security Memoranda, the Indictment, the PTI, various media reports and the NFL's Personal Conduct Policy. Exhibit 16. The NFL was also in possession of the complaint underlying Rice's arrest, which states that Rice committed assault "by striking [Mrs. Rice] with his hand, rendering her unconscious." Exhibit 5 at NFL_RICE-000016.

**The Meeting of June 16th**

On June 16, Commissioner Goodell conducted the pre-discipline meeting for Rice. Also present were Jeff Pash, NFL General Counsel; Adolpho Birch, NFL Senior Vice President of Labor Policy and Government Affairs; and Kevin Manara, NFL Senior Labor Relations Counsel.

Rice was accompanied by his wife; Dick Cass, the owner of the Baltimore Ravens; and Ozzie Newsome, the Ravens' General Manager. Heather McPhee, Associate General Counsel of the NFLPA, and Ben Renzin, Rice's agent and friend since childhood, were also in attendance.

**The First Discipline**

On July 23, Commissioner Goodell issued a discipline letter suspending Rice for two games and fining him an additional game's salary. Exhibit 20. In making this determination, he testified that the prosecutor's and judge's decisions to put Rice into pre-trial intervention had a "big influence" on him. Tr. 98:10-14. He put weight on Rice's testimony, his accountability, acceptance of responsibility, remorse and his description of what took place.[3] Tr. 98:16-19. In addition, Manara had prepared a chart listing prior domestic violence cases and the attendant punishment meted out in each one to aid in setting the appropriate level of discipline. Tr. 321:24-322:4. Commissioner Goodell did not specifically recall reviewing this chart, Tr. 165:17-25, but recalls discussing prior disciplines with Birch and Pash. Tr. 169:5-8. No prior domestic violence cases reviewed by him had resulted in discipline of more than two games.[4] Tr. 181:5-24. At the arbitration hearing, Commissioner Goodell testified, "I do accept that I

---

[3] To the extent that the NFL argues that Commissioner Goodell also relied upon certain of McPhee's comments regarding the outside-the-elevator video at the June 16 meeting in making his decision, NFL Post Hearing Br. at 8, 13, I do not credit that argument. The Commissioner recognized that she did not know any more than he did, Tr. 98:22-24, and no one at the NFL followed up with her on those statements, Tr. 315:14-21; 389:5-19.

[4] The parties presented evidence that, from 2007 through the date of Rice's first discipline, the likely maximum punishment for any conduct categorized as domestic violence was two games. *See* Exhibit 33 at NFL_RICE-000127 (one game); *id.* at NFL_RICE-000128-129 (two games for choking pregnant girlfriend); *id.* at NFL_RICE-000132-135 (one game); Exhibit 48 (two games); Exhibit 49 (two games); Exhibit 50 (one game); Exhibit 52 (one game reduced to zero games on appeal); Exhibit 53 (one game); Exhibit 55 (one game); Exhibit 56 (one game); Exhibit 58 (one game); Exhibit 59 (one game); Exhibit 60 (two games); Exhibit 61 (one game); Exhibit 62 and 63 (two games modified to one game on appeal); Exhibit 64 (one game); Exhibit 65 (one game); Exhibit 68 (zero games); Exhibit 71 (zero games); Exhibit 72 (two games); Exhibit 73 (two games). The only examples of substantially longer discipline presented included a temporary indefinite suspension for threatening a partner with a gun, in violation of both the Personal Conduct and the Weapons policies, Exhibit 33 at NFL_RICE-000123, and a six-game suspension, reduced to four games, for multiple alleged sexual assaults. *Id.* at NFL_RICE-000130. The NFL also cited to a three game suspension given to a player who was at least twice charged with crimes of domestic violence and, in two years in the League, was involved in "no fewer than ten incidents in which law enforcement was required to intervene." *Id.* at NFL_RICE-000124-125. This suspension was later reduced to one game on appeal. Tr. 175:5-19.

5

have to be consistent with consistent circumstances, and so if there are consistent circumstances, I think that's about fairness, and fairness would be you should be as consistent as possible in your discipline." Tr. 164:25-165:6.

On July 28, Birch publicly explained the decision in an ESPN radio appearance, stating, "The commissioner's authority in this case doesn't provide for a particular ceiling on what he could do. However, we are bound in large part by precedent in prior cases, decisions that have been heard on appeal in the past, and notions of fairness and appropriateness. You have to [look] at what would happen relative to other leagues, other organizations, other entities, and determine whether or not you think the action that the commissioner took was appropriate, but the reality is that we have to make decisions that are fair and consistent with both the prior case law and the prior precedent, but also the message that we need to send as a league to ensure that people understand the standards of conduct expected of them." Exhibit 74 at NLFPA_RICE-0136. At the arbitration hearing, Birch confirmed this view. Tr. 385:3-386:6.

In his testimony, Commissioner Goodell acknowledged that after he announced the discipline, there was public criticism that it was insufficient. For that reason, he made a decision to reevaluate the League's policies on personal conduct, domestic violence and sexual assault. He felt that the policies did not reflect the League's values. Tr. 99:11-100:20. He testified that the League had let its standards fall below where they should be—that they needed to be reassessed, and that the League needed to "go back and say, . . . '[W]e are in a different age, with different issues and different challenges.'" Exhibit 47 at NFPLA_RICE_0216; Tr. 204:3-21. He subsequently sent a letter to the NFL Owners, writing that he "didn't get it right" and was changing the Personal Conduct Policy from one that contained no minimum suspension for first-time offenders to a presumptive six-game suspension. Exhibit 42.

Despite recognizing that the original policy was inadequate, the Commissioner never considered changing Rice's discipline because "I gave him the discipline, I felt it was appropriate." Tr. 101:7-13. The policy change was forward looking because the League is "required to provide proper notification." *Id.*; Tr. 100:13-15. After the policy change, he called Rice and made clear to him that "it didn't impact on him . . . He was given his discipline and we moved forward." Tr. 101:16-102:9.

**The Second Video and Suspension**

On September 8, the second video—showing what happened inside the elevator—was aired publicly, and Commissioner Goodell saw it the same day. He testified that he had never seen it before. Tr. 103:23-104:2. He further testified that he was shocked, that it was far more violent than Rice's description of the assault, and that Rice's reaction when his wife was on the ground was callous. Tr. 104:7-15. What he saw, he testified, was inconsistent with what Rice had told the NFL, and it was "obviously very violent and very disturbing to watch." *Id.* As soon as he arrived at the office, the Commissioner assembled all those who worked on the issue to a meeting, at which they looked back at the notes of the June 16 meeting, and "made sure all of us had the same recollection." Tr. 105:4-8. That same day, he imposed an indefinite suspension on Rice. Tr. 106:18-20. The discipline letter, dated three days after the suspension, states that the heightened sanction was based on the fact that Rice presented a "starkly different sequence of events" than what was captured in the second video. Exhibit 29.

**APPLICABLE LEGAL STANDARDS**

While the parties strongly dispute what standards apply in reviewing determinations of League discipline under Article 46 of the NFL-NFLPA collective bargaining agreement, the legal standards are not outcome determinative in this case, which turns on the facts.

7

Nonetheless, I am persuaded that Article 46 does not contain a just cause provision, either explicit or implied. Where a collective bargaining agreement is silent on just cause, arbitrators often find that such a provision is implied. *See In re J&J Maintenance Inc.*, 121 Lab. Arb. 847, 855 (2005). The CBA between the NFL and the NFLPA, however, is not silent on the matter; it explicitly includes just cause in the Club discipline provisions of Article 43. This inclusion demonstrates that the parties knew how to include such a provision when it was bargained for, bolstering the conclusion that it should not be read into Article 46.

Even accepting that Article 46 does not contain a just cause provision and thus is not subject to the attendant standards of industrial due process, such as "double discipline" and "disparate treatment," discipline under the Article must be fair and consistent. The NFL does not dispute this proposition. Tr. 164:25-165:6 (Goodell); 385:2-386:13 (Birch); *see also Bounty*, Final Decision, at 4 (Dec. 11, 2012); Exhibit 33 at NFL_RICE-000128. For me, this means that discipline determinations under Article 46 should be reviewed to determine whether the Commissioner abused his discretion, that is, whether his determination was arbitrary or capricious. Where the imposition of discipline is not fair or consistent, an abuse of discretion has occurred.

The lack of a just cause provision also implicates where the burden of proof lies in appeals of League discipline. Without a just cause standard, the burden of proof lies upon the party challenging the discipline. *See In re Logan-Hocking (Ohio) Local School District Bd. of Educ.*, 122 Lab. Arb. 550, 557-58 (2006). That is to say, the disciplined employee, which in most instances operates through his certified collective bargaining representative, here, the NFLPA, has the burden of showing that the discipline was arbitrary or capricious.

## DISCUSSION

The sole issue in this matter is whether what Rice told the Commissioner and other League representatives about the assault at their June 16, 2014 meeting was "a starkly different sequence of events" than what was captured on the "inside-the-elevator" video. It was not. In so holding, I find that the NFLPA has carried its burden of demonstrating that Rice did not mislead the Commissioner at the June 16 meeting and, therefore, that the imposition of a second suspension based upon the same incident, and the same known facts about that incident, was arbitrary.

**Evidence Going Into the June 16 Meeting**

Going into the June 16 meeting, the League had information that "Rice struck Palmer, rendering her unconscious." Exhibit 16; *see also* Exhibit 5 (criminal complaint). It also had already viewed the "outside-the-elevator" video, which demonstrated these facts: that Mrs. Rice was unconscious, that Rice had carried her out of the elevator and, seemingly unable to pick her up, had dropped her to the floor; and that he had attempted to pull her legs out of the elevator entrance, where they were blocking the door. Exhibit 36.

**Arbitration Hearing Testimony About the June 16 Meeting**

At the June 16 meeting, Commissioner Goodell welcomed everyone and then turned to Birch to ask the questions. Tr. 93:14-16; 335:19-24; 464:21-465:4; 510:6-13. Birch then asked Rice to tell them what had happened on February 15. Tr. 464:25-465:4; 510:15-16.

Rice testified that he told the Commissioner the following: after an argument at the restaurant, as Rice approached the elevator bank, Mrs. Rice followed him and was yelling at him. Tr. 468:2-5. She was cursing and trying to snatch his phone, and he said something vulgar to her. Tr. 468:5-7. He then gestured at her, and she slapped him. Tr. 468:9-10. He started

9

walking to the elevator, and she went ahead of him. In the elevator, he made another gesture at her and again said something vulgar, and she hit him. Tr. 468:11-16. As Rice testified at the arbitration hearing, he then told the Commissioner, "I hit her, [when] she was coming back towards me. . . . and I hit her, and she went down and she hit her head, and then by the time the elevator got up, the elevator opened, a security guard was right there and he said, after I was dragging her out, 'you had assaulted her, get away from her.'" Tr. 468:16-25. At the arbitration hearing, Rice demonstrated with his left arm how he hit Mrs. Rice that night, swinging it in an arc across his body with his hand open. Tr. 470:9-21. More significantly, he testified that he had given the same demonstration at the June 16 meeting when he told the Commissioner about the events, making it clear that his arm "came across" his body and hit her. Tr. 468:17-18; 470:9-21. Birch did not pose any questions to follow up on Rice's description of the assault. Tr. 303:16-304:15; 341:7-10; 347:2-10; 513:18-25; *see also* Tr. 150:6-9. On cross examination at the arbitration hearing, Rice testified, "I told the Commissioner that I hit her, she hit her head on the railing, and that's when I realized she was out." Tr. 494:18-24.

Mrs. Rice, who was present at the June 16 meeting, also testified that Rice had told the Commissioner that "[she] slapped him once, we got in the elevator, [she] slapped him again, and that's when he came across and hit [her], and [she] fell, and [she] was unconscious." Tr. 512:14-17. When she testified that Rice had said he came across and hit her, she moved her arm in an arc across in front of her body. Tr. 512:22-513:2. She testified that Rice had made this same gesture on June 16. Tr. 512:25 ("that's exactly what he did"). Mrs. Rice could not remember whether Rice had said anything about her head hitting the elevator railing. Tr. 513:9-12 ("Yes, probably. . . . maybe."). She did remember that no one had asked him for specific details about what went on in the elevator. Tr. 513:18-25. Mrs. Rice also testified that she could recount only

10

what Rice had told the Commissioner because she did not remember what happened in the elevator. 514:24-515:6. On June 16, when Birch directed the conversation to her and asked how she felt, she couldn't speak; she just cried and said "I'm just ready for it to be over." Tr. 516:25-517:7.

Heather McPhee, an attorney with the NFLPA, was also present on June 16. At the arbitration hearing, she testified that Rice had "said that he and his wife had gone to Atlantic City with friends for the . . . celebration of Valentine[']s Day. They had gone out to dinner and to a club." Tr. 535:15-18. She remembered that in describing the club, he mentioned "bottle service," and she recalled asking what bottle service is. Tr. 535:18-21. McPhee testified that Rice told the Commissioner that he and his wife "got into an argument, and when they were at dinner they were still arguing. One left and the other followed. The one who left was standing at the elevator bank, so they were right in front of the elevator bank. They were still arguing. Ray said that Janay swung – slapped at him." Tr. 535:22-536:4. McPhee recalled the phrase "slapped at" because it seemed awkward to her. Tr. 536:4-6. She also remembered writing the phrase down. Tr. 536:6-7. McPhee further testified that Rice told the Commissioner: "they got into the elevator, they were still fighting, still arguing, and Janay moved toward him and again slapped or swung at him, and then he said and I hit her, and then she fell and hit her head on the railing. He said I think she hit her head on the railing. She fell in the elevator. She seemed knocked out when the elevator door opened which was seconds later. She was not conscious. He stepped over, pulled her out of the elevator, and within seconds the security person was there." Tr. 536:7-18. McPhee testified that she had been pleased because Rice had not downplayed the assault and had described it in the same terms that he had used in discussions with his representatives. Tr. 540:18-541:8.

11

To demonstrate that Rice had misled it, the NFL presented the testimony of Commissioner Goodell, Manara, and Birch. Commissioner Goodell testified that upon the release of the second video, he and members of his staff "met immediately" and "looked back at notes" and "made sure all of us had the same recollection of what [Rice] said on June 16th." Tr. 105:4-106:2. He recalled what Rice had said this way: that he and his wife got on the elevator and Mrs. Rice "struck him, he said that he slapped her, and that she fell, hit her head, and knocked herself out." Tr. 94:23-95:4.

Manara was present at the June 16 meeting as a note taker. Tr. 292:6-12. He testified that Rice said that he and his wife were arguing while they waited for the elevator and that Mrs. Rice "hit him. Then they got into the elevator. [Rice] then said that when they were in the elevator[,] she hit him again. At that point[,] Mr. Rice said that he slapped her, and that she fell, and that as she fell[,] she hit her head and knocked herself out." Tr. 294:19-295:2.

Birch testified that he remembered Rice saying that Mrs. Rice "hit him outside of the elevator, they got in the elevator, she hit him again, then he, I don't know what word he used, but he hit her, and [] she lost her balance, fell[,] hit her head on the side of the handrail, knocked herself out, something like that." Tr. 340:16-21. Based upon these recollections, the NFL argues that Rice misled them by stating that he slapped rather than hit Mrs. Rice in the elevator and that he tried to minimize the force of his blow by claiming she knocked herself out by falling into the elevator handrail.

**Contemporaneous Notes**

Were I left with only the testimony of these witnesses, the question of what Rice reported on June 16 might be a closer one. However, an analysis of the testimony together with the notes made contemporaneously by Commissioner Goodell, Birch, Manara, and McPhee leads me to

conclude that Rice told the League that he "hit" his wife and that he did not say that she "knocked herself out." The Commissioner's notes are not detailed and do not contain any verbatim quotes of what Rice said happened in the elevator. They do not contain the word "slap" anywhere. Exhibit 19. They do contain the word "struck" at what appears to be the only entry relating to Rice's statements about what happened in the elevator. *Id.*

Birch's notes are even sparser, with the phrase "bottle service" the only reference to the night of the assault. Exhibit 18. Manara's notes are more detailed than those of the Commissioner and Birch, which is to be expected since he was the assigned note taker. In relevant part, Manara's notes read, in six successive lines: "arguing while waiting for elevator / exchanging words / she hit him / got in elevator / she hit him again / he slapped her; fell; knocked herself out." Exhibit 17. While Manara was a credible witness, I am not persuaded that his notes reliably report that Rice used the words "knocked herself out." For example, although Manara's notes use "slapped," the majority of the witnesses, including Newsome and Birch, used the word "hit" to describe what Rice said.[5] Manara himself admitted that the section of his notes describing the assault was not "verbatim." Tr. 308:25-309:17.

More persuasive to me are McPhee's more detailed and careful notes, which emphasize the exact words Rice said with quotation marks. The following are the relevant part of McPhee's notes, written with the emphasis and quotation marks as they appear in the original:

- Exchanged words/arguing @ elevators
- Ray thinks Janay "sort of slapped @ him"
- Entered elevator, still arguing
- Shoes (?) off
- Janay moved toward him, "sort of slapped or swung"
- "And then I hit her."
- She fell, thinks hit head on railing
- Seemed "knocked out"

---

[5] Newsome testified that Rice told Commissioner Goodell that Rice had hit Mrs. Rice, Tr. 430:13-15, and that Rice had previously told Newsome the same, Tr. 433:18-19.

13

- Elevator opened, she wasn't conscious, pulled her out
- Security there almost immediately. Called agent.
- Arrested that night. (Both)

Exhibit 41 at NFLPA_RICE_0037. McPhee testified that when she used quotation marks that meant the words were the exact ones used. Tr. 539:7-11. She was emphatic that Rice did not say that Mrs. Rice had "knocked herself out." Tr. 541:20-25.

The testimony of Commissioner Goodell and Birch is further diminished by the vagueness of their recollections. For example, when asked whether Rice used the word "struck" to describe Mrs. Rice hitting him, Commissioner Goodell testified, "I believe so, it has been several months." Tr. 122:20-24. Birch himself admitted that he could not recall what word Rice used to describe hitting Mrs. Rice. And when testifying that Rice stated that Mrs. Rice had "knocked herself out," Birch added the qualifier, "something like that." Tr. 340:16-21.

**Conclusions**

There are only two real differences as to what the parties assert Rice told the Commissioner on June 16: (1) whether he said "hit" or attempted to minimize the assault by saying "slapped" and (2) whether he said that Mrs. Rice "knocked herself out." Based on all of the evidence, I conclude that Rice said, "hit," that he did not say "knocked herself out," and that he did not mislead the League in the June 16 meeting.[6] Moreover, I have viewed the videos from both inside and outside the elevator. They plainly show that Mrs. Rice did slap at Rice, that they continued to argue in the elevator, that Rice "came across" with his arm and hit her, that she fell backwards and hit her head on the side railing of the elevator, and that at that point she was

---

[6] In addition to the evidence discussed above, it bears note that Rice had no incentive to lie at the June 16 meeting. At that time, Rice assumed that the League was in possession of the inside-the-elevator video. Tr. 456:2-15; 457:21-458:10; 426:7-16; see also Tr. 514:2-5. He had already been granted pre-trial diversion by a prosecutor who had reportedly seen the inside-the-elevator video. Exhibit 11. He faced no further risk of criminal action except by failing to comply with the terms of his program. And he had been repeatedly advised to be forthcoming with the Commissioner. Tr. 455:22-456:16; 460:6-16; 508:8-12; 509:7-11; 531:12-16.

unconscious. To the extent the NFL argues that Rice misled the Commissioner because he "'chronologically' described the sequence of events leading to his arrest . . . , [but] never explained 'causally' what happened that night," NFL Post-Hearing Br. at 1, this argument fails. Certainly, no one can say with medical certainty whether the blow itself or the contact with the handrail knocked Mrs. Rice unconscious. Tr. 153:24-154:6. But just as certainly, it is immaterial. Whether the blow itself or hitting the railing knocked Mrs. Rice unconscious, the cause was the hit. Rice reported to Commissioner Goodell that he had hit Mrs. Rice; and his lifting and dropping of her prone body were there for all to see in the outside-the-elevator video. Commissioner Goodell himself, in response to the question, "Did Mr. Rice ever say that he knocked out Ms. Palmer?," testified, "No, but he took full responsibility for it, he said it is not her fault, it is my fault." Tr. 95:5-9. In short, I do not find that Rice minimized "causally" what happened that night.

I do not doubt that viewing the video in September evoked horror in Commissioner Goodell as it did with the public. But this does not change the fact that Rice did not lie or mislead the NFL at the June 16 meeting.

* * *

I turn now to the consideration of the second suspension. It cannot be disputed that the "Commissioner has always had sole discretion to determine what constitutes conduct detrimental to the integrity of, or public confidence in, the game of football. . . . The use of the word 'exclusively' demonstrates the parties' intent that the Commissioner, and only the Commissioner, will make the determination of conduct detrimental." *Bounty*, Decision on Recusal, at 1-3 (Nov. 5, 2012); *see also Bounty*, Final Decision, at 4 (Dec. 11, 2012). In this matter, no one disputes that Rice's assault of his wife constitutes "conduct detrimental." If this

15

were a matter where the first discipline imposed was an indefinite suspension, an arbitrator would be hard pressed to find that the Commissioner had abused his discretion. But that is not the case before me.

Rather, based on what I believe was Rice's accurate description of the assault of his then-fiancée, the Commissioner determined, consistent with past punishment, that Rice was to be suspended for two games and fined the pay for an additional game. As discussed above, it was after public criticism that the Commissioner announced candidly that he "didn't get it right" in disciplining Rice and setting the League's policies on domestic violence. Exhibits 43, 47; Tr. 194:4-195:3. The League then promulgated a new policy, setting the presumptive suspension for first-time offenders at six-games. Recognizing that even under the broad deference afforded to him through Article 46, he could not retroactively apply the new presumptive penalty to Rice, the Commissioner called Rice to ensure him that his punishment would remain unchanged. Through this action, Commissioner Goodell acknowledged what the NFL has repeatedly stated in these proceedings: that the Commissioner needed to be fair and consistent in his imposition of discipline.

Following the release of the inside-the-elevator video, which prompted a new round of criticism, the League suspended Rice indefinitely. Now, the League argues that Commissioner Goodell was justified in imposing the second discipline because Rice had misled him and because the video demonstrated a level of violence that he had not understood. NFL Post-Hearing Br. at 3, 31, 32. I have found that Rice did not mislead the Commissioner. Moreover, any failure on the part of the League to understand the level of violence was not due to Rice's description of the event, but to the inadequacy of words to convey the seriousness of domestic

16

violence. That the League did not realize the severity of the conduct without a visual record also speaks to their admitted failure in the past to sanction this type of conduct more severely.

Under Article 46, the Commissioner is entitled to great deference in the review of his decisions, *see, e.g.*, Exhibit 33 at NFL_RICE-000134, but review for abuse of discretion is not a rubber stamp approval. *See, e.g.*, *United States v. Freeman*, 447 F. App'x 280, 281 (2d Cir. 2012). In numerous cases reviewing discipline under Article 46, the hearing officer has decreased the discipline that the Commissioner imposed. *See, e.g.*, Exhibit 52, Exhibit 54. An abuse of discretion can be found where the decision maker has acted in an "arbitrary or capricious manner." *See, e.g.*, *Qi Xing Huang v. Bureau of Citizenship & Immigration Servs.*, 269 F. App'x 138, 139 (2d Cir. 2008). Because Rice did not mislead the Commissioner and because there were no new facts on which the Commissioner could base his increased suspension, I find that the imposition of the indefinite suspension was arbitrary. I therefore vacate the second penalty imposed on Rice. The provisions of the first discipline—those regarding making continued use of counseling and other professional services, having no further involvement with law enforcement, and not committing any additional violations of League policies—still stand.

                                                Hon. Barbara S. Jones (ret.)
                                                Hearing Officer

Dated:       New York, NY
               November 28, 2014