# Exhibit A-NFLPA-48



**LEGAL DEPARTMENT**

## <u>CONFIDENTIAL</u>

July 17, 2017

Roger Goodell, NFL Commissioner
Adolpho Birch, Senior Vice President
Todd Jones, Special Counsel
Lisa Friel, Special Counsel
Tonya Lovelace Davis, Advisor to NFL
Mary Jo White, Advisor to NFL
Kenneth Houston, Advisor to NFL
Peter Harvey, Advisor to NFL

Re:     Responsive Submission of Mr. Ezekiel Elliott to the NFL's Investigations

Dear Commissioner Goodell, Mr. Birch, Mr. Jones, Ms. Friel, Ms. Davis, Ms. White, Mr. Houston and Mr. Harvey:

The following submission is respectfully offered by Mr. Ezekiel Elliott.

### I.     Introduction

Mr. Elliott and the NFLPA appreciate the opportunity to respond to the NFL's investigations of the Tiffany Thompson allegations (the "Thompson matter") and the March parade incident prior to determination by the NFL of whether or not either matter constitutes a violation of the NFL's Personal Conduct Policy (PCP).  The allegations made by Ms. Thompson are wholly separate from the March parade incident, and we address the matters separately in this submission.

As the NFL and the advisors know, in the Thompson matter, law enforcement thoroughly investigated Ms. Thompson's allegations, and the District Attorney declined to file charges against Mr. Elliott.   The District Attorney stated that law enforcement's investigation yielded "conflicting and inconsistent" information regarding Ms. Thompson's two reports to police that Mr. Elliott had struck her while in a car on July 22, 2016 and assaulted her multiple times over the course of the preceding days.  Analysis of






**LEGAL DEPARTMENT**

the NFL's lengthy report amplifies and underscores the accuracy of the D.A.'s assessment of the allegations.  Not only is there a dearth of any evidence "beyond a reasonable doubt" that Mr. Elliott assaulted Ms. Thompson, but the totality of the so-called evidence collected by the NFL reveals that application of *any* legal standard—including the "credible evidence" standard of the PCP—results in the same conclusion: an abundance of "conflicting and inconsistent information" that does not remotely credibly support the allegations of assault offered by a young lady who is emotionally immature, behaviorally irresponsible, and angry with Mr. Elliott because he would not establish an exclusive, monogamous relationship with her.

The preparation of a thorough response to the Thompson matter has been an uncomfortable process because it necessarily requires an uncomfortably frank assessment of Ms. Thompson's character, behavioral habits, and credibility.  As detailed below, careful analysis of the NFL's investigation exposes Ms. Thompson's inconsistencies, lies to police and to the NFL, instructions to her friends to obstruct justice by lying to law enforcement, intentional deletion of communication evidence, admitted patterns of excessive intoxication and drug use, and stated intention to "ruin" Mr. Elliott's career.

In a situation that lacks any clear proof of wrongdoing by Mr. Elliott, the relative credibility of the parties is dispositive, and on that issue, the evidence shows that Ms. Thompson is found extremely wanting.  Indeed, during the June 26, 2017 meeting, Ms. Friel stated that Ms. Thompson's allegations regarding the July 22, 2016 incident—about which she filed a false police report and asked her friend to lie to police—were "not credible," but rather a complete fabrication.  That determination is extremely telling: As one of the attendees at the June 26, 2016 meeting remarked, *credibility is not assessed in a vacuum.*  While it is baffling that someone who lied to police and asked her friend to lie



**LEGAL DEPARTMENT**

to police could ever be considered remotely credible, the detailed information presented in this submission eliminates any doubt that Ms. Thompson is not a reliable, credible or honest person regarding her allegations about Mr. Elliott.[1]

We are confident that an objective evaluation of the Thompson matter and this employer's expansive investigation of the intimate interactions of two immature young (20 and 21 years-old) people, will lead to the proper conclusion that Mr. Elliott's interactions with Ms. Thompson did not violate the PCP, and we hope that such evaluation will also engender thoughtful, critical reflection by the NFL on the wisdom, fairness and justice of this type of implementation of the NFL's PCP investigatory paradigm.

Regarding the March parade incident in Dallas, the young lady (Anni Gomez) clearly expressed in her interview with the NFL that she is intimate friends with Mr. Elliott, "everything was done in fun," and she was not hurt, bothered or offended by Mr. Elliott's action, which occurred in an extremely festive atmosphere.  The incident is simply not of the serious, negative nature that the language enumerating the type of conduct covered by the PCP highlights, "illegal, violent, dangerous, or irresponsible puts innocent victims at risk, damages the reputation of others in the game, and undercuts public respect and support for the NFL."

---

[1] As one of Mr. Elliott's attorneys pointed out at the June 26 meeting, in the law enforcement context, alleged victims are rigorously confronted with their lies and inconsistencies, and "real world" serious consequences can flow from such inconsistencies and lies.  That is simply not the case in the employer investigation paradigm that the NFL has created.  Assuming an accuser is not an NFL employee, that individual faces absolutely <u>no</u> consequences for levying false accusations.  Specifically, in the Thompson matter, a young lady who was clearly unhappy with the non-monogamous nature of her interactions with Mr. Elliott, and who clearly expressed her intention to "ruin" Mr. Elliott's career, faces no consequences for her contradictions, omissions, mischaracterizations, and blatant lies to NFL investigators.



**LEGAL DEPARTMENT**

Frankly, when the woman who was the subject of the action under investigation clearly and unequivocally states that she was not at all bothered by the conduct, if the NFL were to "override" her assessment of actions directed toward her and impose any discipline on Mr. Elliott for harmless interaction between people who are intimate friends, such institutional action would be arrogant, presumptuous and disrespectful of Ms. Gomez.

<u>**THE THOMPSON MATTER**</u>

**II. THE OVERWHELMING EVIDENCE DEMONSTRATES THAT MS. THOMPSON'S ALLEGATIONS OF DOMESTIC VIOLENCE AGAINST MR. ELLIOTT ARE NOT CREDIBLE**

<u>**Bruising Causation**</u>

A substantial amount of the purported evidence discussed in the NFL investigation report and Ms. Friel's presentation at the June 26, 2017 meeting focused on attempts to determine causation of the numerous bruises on Ms. Thompson at various periods of time. The NFL asked two doctors to examine photographs and comment on the images in relation to Ms. Thompson's allegations about Mr. Elliott causing various bruises at different points in time. As an initial matter, it must be noted that neither of the physician reports purport to establish actual causation of the bruises with any reasonable degree of medical certainty; moreover, as detailed below, the majority of the pictures reviewed by the doctors indicate old causation timeframes for the bruises, when contact with Mr. Elliott could *not* have been the source of the bruising.

The pervasive presence of older bruising that could not have been caused by contact with Mr. Elliott requires comment on Ms. Thompson's normal appearance and lifestyle: She

4



**LEGAL DEPARTMENT**

is a pale skinned, thin Caucasian woman whose body apparently bruises easily. [2] Moreover, abundant evidence shows that in addition to working in a setting (bottle service) where she must regularly navigate tight spaces filled with tables, chairs and people consuming alcohol, the evidence shows that Ms. Thompson's personal lifestyle regularly includes intoxication and drug use, which obviously increases the likelihood of incidental contact bruising from bumping furniture, doors, falling, etc.   Moreover, abundant medical literature establishes that excessive alcohol consumption contributes to increased bruising due to both decreased blood coagulation factors and impact on balance; logically, ingestion of drugs along with excessive alcohol further increases these risks.

Prior to providing the detailed analytical synthesis of the various photographs, testimony, and reports regarding Ms. Thompson's bruises that appears below, we would like to address a question from Ms. White regarding Mr. Elliott's understanding of the causation of certain of Ms. Thompson's bruises during the multi-day period in July 2016.  As already noted, the images of Ms. Thompson's body during various periods of time indicate that she regularly displays bruising.  When Mr. Elliott was asked about causation of some of her bruises during the July period, he cited his awareness that she had been involved in a specific physical altercation with another woman, but it must be underscored that he also noted that she routinely had bruising on her body.  Thus, to be clear, he was not and is not claiming that the fight with another woman was the singular, definitive cause of her bruises; rather, he was aware of that specific incident which could have caused

---

[2] One of Mr. Elliott's attorneys, Ms. McPhee, is, like Ms. Thompson, very pale and very thin; had she been able to attend the June 26, 2017 meeting, she would have happily testified (and displayed) that she regularly finds bruises that are absolutely not caused by contact with another person.



**LEGAL DEPARTMENT**

bruising, but as a general matter, he was also aware that Ms. Thompson often had bruises, so her "normal" lifestyle patterns (vs. a singular fight) could also be responsible.

Analysis of the information contained in the NFL report, exhibits, and meeting transcript, exposes the lack of credible evidence that any assault by Mr. Elliott caused Ms. Thompson's bruises:

> **A. Pictures Taken By Ms. Thompson on July 18, 2016, Show Bruising From One to Two Weeks Old, And Thus These Injuries Could Not Have Been Inflicted by Mr. Elliott, Who Arrived in Columbus on July 16, 2016, as Alleged by Ms. Thompson**

July 18 was the same day Mr. Elliott told Ms. Thompson that he wanted her to leave his apartment.  Despite Mr. Elliott's pleas, Ms. Thompson refused to leave, and Mr. Elliott ultimately slept in a hotel on the night of July 18.  *See, e.g.*, Report at 38 ("And, I mean, that whole day, what she didn't tell you, was that I was telling her to please take your stuff and leave from my house cause then she would have to come back to my house that night and that's not what I wanted."); *see also* June 26 Tr. at 88:9-17, 89:15-18.

> a. According to the Report, "evidence regarding [the alleged July 17 Facetiming] incident comes in the form of a series of text messages that Ms. Thompson sent her Aunt Elaine a day later after she says Mr. Elliott assaulted her again.  At that time, July 18th at 5:20 p.m., Ms. Thompson texted her Aunt Elaine one word, 'Abusive.'"  Ms. Thompson also told her Aunt Elaine at this time that she had "bruises all over [her]," "Some parts are even swollen" and that the alleged abuse had occurred on "[Sunday] night and Saturday night." Report at 28.
>
> b. Ms. Thompson then sent her Aunt Elaine a text message containing seven photographs that were taken approximately one hour before (between 3:33-4:13 p.m.) her text message conversation with Aunt Elaine and which, according to Ms. Thompson, showed the bruising



**LEGAL DEPARTMENT**

allegedly caused by Mr. Elliott during the two previous days.  Report at 28.  These photographs, "excluding the duplicate, are Exhibits 3A-F and they show bruises on Ms. Thompson's arms, neck and shoulders." *Id* at 32.

c.  As shown below, the NFL's own medical experts found that many of the bruises depicted in the photographs sent by Ms. Thompson to her Aunt Elaine on July 18 could not have possibly been inflicted by Mr. Elliott as alleged by Ms. Thompson since these bruises were one to two weeks old.

      i.  Exs. 3A-3F.

          1.  Ex. 3A: Left arm.  According to NFL medical expert Dr. Thanning, the bruises depicted in this photo ranged from a week to 10 days old.  Report at 32.

          2.  Ex. 3B: Right shoulder.  According to Dr. Thanning, the bruise is "1-2 weeks old."  In addition, both Drs. Thanning and Giordano said that the "three small red marks could be insect bites."  Report at 33.

          3.  Ex. 3C: Upper right arm and shoulder.  Drs. Thanning and Giordano agreed that the bruise on top of the shoulder "was older in age" and that the mark on the clavicle was a "healing abrasion."  Both doctors also noted the presence of two "recent" scratch marks and that the bruise on the upper arm was of "recent origin."  Report at 33.

          4.  Ex 3D: Left leg.  "Fresh injury" that is consistent with a "scratch" mark.  Report at 33.  Dr. Giordano also noted that it "could also be a small fresh linear contusion, the result of having made contract with a linear hard object or surface" and "consistent" with



**LEGAL DEPARTMENT**

"many . . . explanations such as falling down." *Id.* at 33-34.

5. Ex. 3E: Neck. Both NFL medical experts agree that the first mark at the top of Ms. Thompson's neck is a "bitemark." Dr. Thanning indicated that the "top of the bitemark" "is at least a week and a half to 10 days old" and that there would be a "scab on top of the broken skin if this had just happened" to Ms. Thompson. Both Drs. Thanning and Giordano agreed that the second mark is consistent with a "hickey." Report at 34.

    a. Ms. Thompson *never* alleged that Mr. Elliott bit her on July 16, 17 or 18, 2016.

6. Ex. 3F: Right arm. "Both doctors observed a large older roundish bruise" and according to Dr. Thanning, it is "inconsistent with having occurred in the last day or two" as alleged by Ms. Thompson. Dr. Giordano agreed that the bruise appeared "to be more than a few days old and therefore inconsistent with having been sustained the morning of July 17." Report at 34.

    a. An image of this bruise also appears in Exhibit 6B (taken on July 21), and according to Dr. Thanning, the bruise "is a few weeks old." Dr. Giordano stated that "it appeared older than a week old." Report at 42.

        i. Thus, according to the NFL's own medical experts, Mr. Elliott could not have been responsible for almost all of these bruises on Ms. Thompson.

8



**LEGAL DEPARTMENT**

1. *See* Section I.E for possible explanation of recent scratch marks and the one recent bruise shown in this series of photographs (Exhibit 3C).

**B. Pictures Taken by Ms. Thompson on July 21 Also Reflect the Presence of Old Bruising That Could Not Have Been Inflicted by Mr. Elliott as Alleged by Ms. Thompson**

Ms. Thompson took three photographs on the afternoon of July 21.  Report at 41.  July 21 was the same day Mr. Elliott told Ms. Thompson that the two of them "gotta be done," that he "did not want to see her anymore and that she should not try to come out with him that night.  He said later that day, he got back to the Carriage House and she was inside his apartment, in his bed and he again told her he did not want her there.  He said it must have finally gotten through to her that he was serious and 'it like flipped a switch in her head' and she started threatening him, saying she was going to 'ruin him.'  He told investigators that she had been threatening this all week."  Report at 52.  *See also* Report at 53 (text messages from Mr. Elliott to Ms. Thompson on the evening of July 21 ("U gotta go"; "U should leave" "Really."); Report at 98, 100 ("Tiffany, I don't want you here.  You're not supposed to be here; can you please just leave?"  To which Ms. Thompson responded, "Okay, this is what you want? Okay then, I'm going to ruin your life. . . ."); June 26 Tr. at 113:25-114:8.

On the evening of July 21, Ms. Thompson sent a text message to her Aunt Elaine stating that she was "ready to go to the police."  According to the Report, this was "45 minutes after Ms. Thompson had sent the series of text messages to Mr. Elliott telling him she loved him and getting no response."  Report at 55.

9



**LEGAL DEPARTMENT**

    a.  Ex. 6A: Left forearm and wrist.  Dr. Thanning stated that the color of the bruise on the wrist "usually means that it is older."  Report at 41.

    b.  Ex. 6B: Right forearm, wrist, elbow, knuckle.  Both doctors state that the "right forearm" has "a larger fainter bruise closer to the elbow." Report at 41.  "They noted that the larger fainter bruise that appears lower on the forearm appears to be the same bruise seen in Exhibit 3F . . . . Its appearance now to Dr. Thanning suggests it is a few weeks old."  *Id.* at 42.  Dr. Giordano said she would say it appeared older than a week old."  *Id.*

    c.  Ex. 6C: Right eye.  Ms. Thompson told NFL investigators: "I don't know what that bruising was from."  Report at 146-147.

**C.  "Defensive Injuries" and "Grab Marks" Shown in Other Photographs Could Not Have Been Inflicted by Mr. Elliott According to the NFL's Medical Experts**

    a.  According to Ms. Thompson, Mr. Elliott "came to Columbus for [the] weekend [of April 22, 2016] and 'had a girl from LA staying with him that he flew in.'"  Ms. Thompson did not report any interaction with Mr. Elliott until "Saturday [April 23, 2016] . . . where Mr. Elliott showed up" to a nightclub with the girl he had flown in from Los Angeles.  Report at 126.

    b.  Ms. Thompson told NFL investigators that she suffered "visible injuries" from Mr. Elliott after arriving home with him the night of April 23 (in the early morning hours of April 24) "and that she took pictures of these injuries the next day [in actuality, later in the day on April 24th] in her Dublin apartment."  Report at 21.

    c.  Notably, Ms. Thompson did not mention this alleged assault to NFL investigators until her *third* interview (November 1, 2016) and during that interview, she only claimed that Mr. Elliott "yanked



**LEGAL DEPARTMENT**

[her] by the hair" during this incident, but reported no other assault. Report at 116. Two weeks later, on November 16, 2016, Ms. Thompson completely changed her story to NFL investigators, now claiming—for the first time—that Mr. Elliott "yank[ed]" her several times and "grab[bed] [her] arm" at the nightclub on April 23, and then after arriving at Mr. Elliott's home in the early morning hours of April 24, he allegedly "shoved" her into cabinets, "she hit her head and her shoulder," Mr. Elliott "d[id] the pressure point . . . on the side of [her] face" and "grab[bed] [her] and pushe[d] [her] back towards the sofas." Report at 126-127. "Ms. Thompson said that she had 'thumbprint' and 'fingerprint' bruises 'all over' her arms as a result of this incident" in the early morning hours of April 24, 2016. Report at 128.

d.  Ms. Thompson stated that the "injuries [shown in Exhibits 2A-2D taken on April 24, 2016] were sustained during the incident over the phone" earlier that morning. Report at 21, 128.

       i.  The bruises depicted in Exhibit 2B, relating to the April 24, 2016 alleged phone incident "appeared [to Dr. Thanning] to be 'grab marks'" and "appeared to [Dr. Thanning] older . . . perhaps 4-7 days old." Report at 22.

         •  Note the presence of "grab marks" that were "4-7 days old" as of April 24, 2016, and thus could not have been inflicted by Mr. Elliott (1) during the alleged phone incident on April 24 as alleged by Ms. Thompson (2) nor at any other time since, according to Ms. Thompson, Mr. Elliott had just "c[o]me to Columbus for [the] weekend" and Mr. Elliott was not with Ms. Thompson in the weeks leading up to this trip to Columbus. Report at 126.

       ii.  The bruises depicted in Exhibit 2C, relating to the April 24, 2016 alleged phone incident, "did not



**LEGAL DEPARTMENT**

appear consistent [to Dr. Thanning] with an injury that had been inflicted 17-18 hours earlier . . . the time of the alleged 'key incident' but rather appeared to be a few days old."  Report at 23.  Dr. Thanning also said that the "bruise appeared to have been the result of multiple blunt force traumas to" the right arm.  *Id.* at 22-23.  Dr. Giordano concurred that this was an "older bruise" and said that "it was consistent with a defensive injury, as when someone wards off a blow by raising the arm."  *Id.* at 23.

- Note the presence of an injury consistent with "multiple blunt force traumas" and a "defensive injury" that appeared to be a "few days old" and "older" as of April 24, 2016, and thus could not have been inflicted by Mr. Elliott (1) during the alleged phone incident on April 24 as alleged by Ms. Thompson (2) nor at any other time since, according to Ms. Thompson, Mr. Elliott had just "c[o]me to Columbus for [the] weekend" and Mr. Elliott was not with Ms. Thompson in the weeks leading up to this trip to Columbus.  Report at 126.

iii.   According to Dr. Thanning, bruises depicted in Exhibit 2D relating to April 24, 2016 alleged phone incident, "were a little older than some of the others . . . ."  Dr. Thanning further noted that the bruises were "4-6 days in age" and were inconsistent with bruises that had been inflicted "that morning" as alleged by Ms. Thompson. Report at 23.

- Thus, these bruises, which were "4-6 days in age," could not have been inflicted by Mr. Elliott (1) during the alleged phone incident

12



**LEGAL DEPARTMENT**

on April 24 as alleged by Ms. Thompson (2) nor at any other time since, according to Ms. Thompson, Mr. Elliott had just "c[o]me to Columbus for [the] weekend" and Mr. Elliott was not with Ms. Thompson in the weeks leading up to this trip to Columbus.  Report at 126.

**D.  Other Examples of Bruising That Could Not Have Been Inflicted by Mr. Elliott**

a.  Exhibit 7A (taken by police on July 22, 2016): "[B]oth doctors" noted that the "bruises appeared older . . . and could have been as much as a week old. . . ."  Report at 63.[3]

b.  Exhibit 7D (taken by police on July 22, 2016): "Dr. Giordano said she did not see any apparent injuries in Exhibit 7D."  Report at 64.

c.  Exhibit 7E (taken by police on July 22, 2016): Dr. Giordano "stated that this brownish area appears to be the injury that was apparent in Exhibit 6A [taken on July 21], the photograph Ms. Thompson took in her car of her left hand."  Report at 64.  With respect to Exhibit 6A, Dr. Thanning stated that the color of the bruise on the wrist "usually means that it is older."  *Id.* at 41.

d.  Exhibit 8D (Ms. Thompson says taken at Ms. Mason's house on July 22, 2016, *see* Report at 3): According to Dr. Thanning, bruise on the inside of the left wrist shown in Ms. Thompson's Instagram post of July 22, 2016 "could be two weeks old based on its appearance in th[e]

---

[3] Exhibits 7A-H and 10A-D were taken on July 22, 2016—*i.e.*, after the fight between Ms. Thompson and another female in the early morning hours of July 22.  The Report in one area notes that Exhibit 7A was taken "by police on the evening of July 21, 2016" (Report at 90)—however, that is incorrect, as the Report earlier makes clear.  *See* Report at 3, 68.



**LEGAL DEPARTMENT**

photograph.   Dr.  Giordano  concurred  with  Dr.  Thanning's observations."  Report at 70.  Thus, this bruise could not have been inflicted by Mr. Elliott as alleged by Ms. Thompson, since Mr. Elliott arrived in Ohio on July 16, 2016.[4]

### E.   Factual Evidence Relating to Likely Bruising Causation Factors

As some pale, thin women know, bruising can often occur without the person being aware of the contact that caused it (as mentioned in footnote 2, one of Mr. Elliott's attorneys regularly has bruises for which she does not know the specific cause).  While Mr. Elliott does not know, and should not have to attempt to hypothesize about, the origins of Ms. Thompson's bruises, below are citations to evidence indicating that the combination of Ms. Thompson's lifestyle and physical build render her likely to incur bruising on a regular basis:

  a.  Ms. Thompson was out drinking several nights during the relevant time period (*i.e.*, July 16-22).  *See, e.g.*, Report at 27.  Medical literature shows that people bruise more easily when consuming alcohol.  *Id.* at 22 ("Excessive alcohol consumption . . . can cause a coagulation problem.").

  Ms. Thompson to McKaila Blades on July 17: "***Drunk as duck," "Duck," "Duck," "Fuck" . . . . "I was fucked up"; "I was drinking so crazy and took Molly***."[emphasis added].  Report at 27.

  b.  Ms. Thompson works as a bottle service girl—a job that involves working in tight spaces and close interaction with intoxicated patrons, which often results in bumping into people and objects such as tables and chairs.

---

[4] According to the Report, Exhibits 8A-8C were taken by Ms. Thompson "on [an] unknown date."  Report at 3.

14



**LEGAL DEPARTMENT**

    c.   Ms. Thompson takes drugs (Molly, Xanax) and consumes alcohol at the same time, which results in her becoming extremely impaired and falling.  Report at 27, 99, 141; *see also* June 26 Tr. at 33:3-7, 35:16-21; Report at 157 (Ms. Thompson told Aunt Elaine "that she was partying and fell and got a concussion."); ("I called [Ms. Thompson] one day and she picked up and said that she'd broken her heel on her shoe and fell down some steps.").

    d.   According to Ms. Mason, Ms. Thompson was "out with another guy" during the week in question.  Report at 113.  Indeed, there were *several times* during the relevant time period that Ms. Thompson was not with Mr. Elliott.  *See, e.g.*, June 26 Tr. at 151:8-10 (Ms. Friel: "There were a couple of nights, I can look back and we can all look at the timeline, that they went out separately.").

    e.   Sexual intercourse between Ms. Thompson and Mr. Elliott.  Report at 50-51.  Indeed, Ms. Thompson had previously "sent [Ms. Mason] snapshots before of bruises, huge bruises on the inside of her thighs" that she obtained during intercourse with Mr. Elliott.  *Id.* at 109.

    f.   Ms. Thompson got into a physical altercation with a woman at The Social Room on the night of Mr. Elliott's 21st birthday party (early morning hours of July 22).  Report at 56.

        1.   Following this altercation, Ms. Thompson text messaged Mr. Elliott: "I just got fucking beat by one of your hoes bitch."  Report at 56.

        2.   Affidavit of Kenny Alvarado (Security Manager at The Social Room):  "I witnessed a fight outside of Social on the sidewalk. ***Two females were punching each other*** and pulling each others [sic] hair.  I recognized one to be Tiffany Thompson."  Report at 57, emphasis added.



**LEGAL DEPARTMENT**

3. Affidavit of Kerry Cibulskas (Off-Duty Police Officer, who had been with the Columbus Police Department for 17 years): Stated that "***both women involved were throwing punches*** with one hand and pulling each other's hair with the other." Report at 57, emphasis added.

4. Brian Keefe (Off-Duty Police Officer, who had been with the Columbus Police Department for 20 years): Stated that "***both women involved were throwing punches*** with one hand and pulling each other's hair with the other." Report at 57, emphasis added.

The fact of Ms. Thompson's physical fight outside of The Social Room is significant to this investigation not only because it may have been a source of some of her bruising, but also because Ms. Thompson lied to NFL investigators about the incident, which was attested to by several independent witnesses; her lack of truthfulness about it constitutes just one example of conduct that reveals her utter lack of credibility.

**<u>Abundant Evidence Reveals Ms. Thompson's Lack of Credibility Both Through Her Own Words And Actions, As Well As Accounts from Individuals Connected to Her</u>**

*No* direct evidence exists to validate Ms. Thompson's allegations against Mr. Elliott. Thus, distilled to its essence, the crux of this matter is credibility. As enumerated below, abundant evidence glaringly indicates that, when provided with the opportunity to do so in the NFL forum in which she faces absolutely no repercussions for her lack of honesty, Ms. Thompson enhanced and multiplied the lies and misrepresentations she originally presented to law enforcement.

Tellingly, on June 26, 2017, when Ms. White asked Ms. Friel if the NFL found Ms. Thompson credible, the answers were:

1) Regarding the July 22, 2016 allegations that she reported to police – **NO**.

16



**LEGAL DEPARTMENT**

2) Regarding the plethora of other allegations levied by Ms. Thompson – **NO ANSWER.**

Even after multiple interactions with this accuser, Ms. Friel could not respond with a clear, resounding "yes" to the question of whether she found Ms. Thompson credible regarding the non-July 22nd allegations by Ms. Thompson.  It is deeply troubling that in this case, where a young man has been accused of violence, but absolutely _no_ direct evidence of such conduct exists, the NFL would even consider accepting such allegations as true if investigators did not possess complete confidence in the credibility of the accuser, especially in light of her extensive cooperation with the NFL.  To the extent that Ms. Friel's non-answer to that simple and vital question indicates deep discomfort with characterizing Ms. Thompson as a credible person, that hesitation reflects an accurate assessment because Ms. Thompson is not a credible person.

Ms. Friel answered the direct question regarding Ms. Thompson's credibility by deflection: She mentioned _other_ people connected to Ms. Thompson (Ms. Mason and Aunt Elaine) who were interviewed by the NFL and seemed "credible."  _See_ June 26 Tr. at 152:8-153:14.  That non-answer to the direct question about Ms. Thompson's credibility leads back to the same credibility vacuum since the information possessed by the two people deemed "credible" by Ms. Friel never directly witnessed any mistreatment of Ms. Thompson by Mr. Elliott.  Rather, those individuals' secondary understandings of the allegations derived from the same non-credible source, Ms. Thompson.

Significantly, the participation (and lack thereof) of individuals connected to Ms. Thompson in the NFL investigation, including Ayrin Mason, served to further expose Ms. Thompson's lack of credibility.  For example:



**LEGAL DEPARTMENT**

**F.  The Two Friends of Ms. Thompson's Who Have Come Forward to NFL Investigators *Directly* Contradict Her Version of Events**

a. "Of the many friends of Ms. Thompson who had information relevant to this investigation, only two, Ayrin Mason and McKaila Blades, agreed to be interviewed . . . ." Report at 8.

i. Critically, Ms. Mason—who Ms. Friel touted as "very credible" during the June 26 meeting (June 26 Tr. at 152:17)—squarely contradicted the stories provided to investigators by Ms. Thompson.

1. <u>Mason v. Thompson</u>

a. Ms. Thompson told NFL investigators that Mr. Elliott physically abused her in the early morning hours of July 22 outside of the Carriage House.  Report at 59-60.  "Ms. Thompson's friend Ayrin Mason [] sa[id] that Mr. Elliott walked into the Carriage House having made no physical contact with Ms. Thompson whatsoever." *Id.* at 60; *see also Id.* at 111 ("Ms. Mason was asked if there was ever any physical contact that night between Mr. Elliott and Ms. Thompson and stated, no [.]").

b. Ms. Thompson told NFL investigators that Ms. Mason could have been in a position where she just might not have seen what happened [outside the Carriage House in the early morning hours of July 22]. Report at 93.  "Ms. Mason was asked if she could have been positioned somewhere that evening where she would not have seen a physical encounter

18



**LEGAL DEPARTMENT**

between Mr. Elliott and Ms. Thompson and said, no." *Id.* at 111.

c. Ms. Thompson told NFL investigators that on the night of July 21, Ms. Mason "saw all of the bruises and her neck and tried to help her cover up the bruises with make-up." Report at 54; *see also* Report at 88. Ms. Mason denied that she ever helped Ms. Thompson cover up any bruises. *Id.* at 55, 109.

d. Ms. Thompson denied that Mr. Elliott had told her to leave his section of the club (The Social Room) on his 21st birthday. Report at 56. Ms. Mason confirmed that Mr. Elliott had in fact "kicked [Ms. Thompson] out of his section of the club." *Id.* at 56, 109.

e. Ms. Thompson told NFL investigators that "she didn't have anything to drink" the night of July 21 (Mr. Elliott's birthday party). Report at 88. Ms. Mason stated that she and Ms. Thompson drank champagne. *Id.* at 109.

f. Ms. Thompson denied that she had called Taylor Sandbothe a "ho" and also denied that she had tried to confront Mr. Elliott in the parking lot of the Carriage House in the early hours of July 22. Report at 90. Ms. Mason stated that Ms. Thompson called Ms. Sandbothe a "bitch and a ho" and the evidence of Ms. Thompson confronting Mr. Elliott at the Carriage House is overwhelming. *Id.* at 60, 110.

g. According to Ms. Mason, after Ms. Thompson was told by Mr. Elliott's friend that she was "not coming in" to the Carriage House for Mr.



**LEGAL DEPARTMENT**

Elliott's after party on July 22, Ms. Thompson was "yelling and screaming and said that Mr. Elliott's 'career was over.'"  Report at 61-63, 110.  Ms. Thompson denies ever making such a threat.  *Id.* at 91.  As even the Report recognizes, "there would appear to be no question that Ms. Thompson uttered such words in the Carriage House parking lot in the very early morning hours of July 22 as her own friend Ayrin Mason says that she did." *Id.* at 52.

h. Ms. Thompson stated that Ms. Mason knew of an incident of domestic abuse by Mr. Elliott against Ms. Thompson during which Mr. Elliott allegedly dragged Ms. Thompson across the street.  Report at 116, 125.  When asked if Ms. Thompson had mentioned any incidents of domestic violence prior to the date that Ms. Thompson showed her the bruises on July 21, Ms. Mason said no.  *Id.* at 109.

   i. Significantly, Ms. Thompson "did not mention this incident during her first two interviews with investigators." Report at 126 n. 240.

i. With respect to the July 21 incident (after Mr. Elliott had driven home), Ms. Thompson told police that "she ended up with bruises all over her arms and wrist, that she had rug burns on her right knee and bite marks on her right shoulder."  Report at 49.  Ms. Mason, who saw Ms. Thompson on the morning of July 21 just hours after the alleged incident, stated that Ms. Thompson "showed her bruises on her neck, on one arm, and on her pelvis."  *Id.* at 50.

20



**LEGAL DEPARTMENT**

        i.  Bruises on pelvis could have come from "rough sex."  Report at 109 ("[Ms. Thompson] sent [Ms. Mason] snapshots before of bruises, *huge bruises* on the inside of her thighs, and [Ms. Thompson] said, 'the sex was rough, LOL.'") (emphasis added).

        j.  Ms. Thompson told NFL investigators that she and Mr. Elliot were a "couple" at the time of the July incident.  Report at 83.  According to Ms. Mason, however, "Tiffany and Ezekiel were never officially in a relationship."  *Id.* at 108.

  2.  <u>Blades v. Thompson</u>

        a.  Ms. Thompson told NFL investigators that immediately after Mr. Elliott allegedly physically assaulted her in October or November 2015, she Facetime called Ms. Blades to show her the bruises on her face.  Report at 124.  Ms. Blades denied that this Facetime call ever happened.  *Id.* at 107-108.

  3.  *See also* Report at 29 (Shelia Lee "repeatedly questioned Ms. Thompson about the truthfulness of her accusations against Mr. Elliott.").



**LEGAL DEPARTMENT**

### G.  Ms. Thompson Attempted to Obstruct Justice, Intentionally Deleted Evidence and Repeatedly Lied to NFL Investigators

Ms. Friel's inability to offer a clear, resounding endorsement of Ms. Thompson's credibility is not at all surprising in light of the abundant evidence of her dishonest conduct when interacting both with law enforcement and with NFL investigators.  Ms. Thompson's deceptive, untruthful actions have been animated by her expressed desire to "ruin" Mr. Elliott—a vindictive manifestation of her hurt and anger when forced to finally realize that their relationship would never be exclusive/monogamous. Disturbingly, Ms. Thompson has been willing to engage in dishonest behavior with law enforcement and the NFL, and has asked her friends to do the same.

   a.  **Ms. Thompson Told Ms. Mason to Lie to Police Concerning The Alleged Assault of July 22**

   i.  Text message evidence shows that "at 2:53 a.m. that Friday morning [July 22], Ms. Thompson texted Ms. Mason, 'If they ask he dragged me out of the car.'  Ms. Mason responded, 'Okay,' 'Just now?' and Ms. Thompson said, 'When we got here,' 'Like we pulled up and he showed up and then yanked me out if the police ask.'"  Report at 61.

   1.  When asked about this text message to Ms. Mason, Ms. Thompson said: "I just specifically wanted her to just put that in the statement . . . that was just the most important to put in there."  Report at 92.

   2.  In her affidavit, Ms. Mason stated that this statement was "untrue" and that "[w]hen the police arrived . . . I told the police the truth. . ." which is that Ms. Thompson confronted Mr. Elliott and at no time did Mr. Elliott come into contact with Ms. Thompson.



**LEGAL DEPARTMENT**

Affidavit of A. Mason (Ex. 50); *see also* Report at 60-61, 62, 111.

    a.  Again, the NFL has already acknowledged that Ms. Thompson's statements concerning this incident are "not credible."   June 26 Tr. at 152:14.

b.  **Ms. Thompson Told Ms. Mason to Lie to Mr. Elliott's Attorney Concerning the Alleged Assault of July 22**

    i.  On July 27, 2016, Ms. Mason text messaged Ms. Thompson and asked: "Do you want me to lie about what happened that night bc zekes lawyer is about to call me again" and Ms. Thompson wrote back "Ayrin" "Yea."  Report at 66-67.  *Two hours* later, Ms. Thompson tells Ms. Mason (via text) not to lie.  *Id.* at 67.  "Ms. Thompson . . . had no explanation for why it took her over two hours to text Ms. Mason back and say that she should not lie."  *Id.*

c.  **Ms. Thompson Intentionally Destroyed Evidence**

    i.  *See* Report at 30, n. 58: Ms. Thompson intentionally deleted the call log on her phone.

    ii.  *See* Report at 35, n. 68: Ms. Thompson intentionally deleted all of her sent and received text messages from the period of July 16 (after telling Mr. Elliott she was "here") to the evening of July 18.

    iii.  *See* Report at 61: Ms. Thompson intentionally deleted all of her text messages with Ms. Mason that were sent and received prior to July 22 at 5:18 a.m., including the text

23



**LEGAL DEPARTMENT**

message in which she instructed Ms. Mason to lie to police about Mr. Elliott allegedly assaulting her.

### d. No Lie Was Too Big or Too Small For Ms. Thompson in Her Quest to "Ruin" Mr. Elliott's Career

i. *See, e.g.*, Report at 27: "Ms. Thompson told investigators that she was not drunk [the night of July 16 into the morning of July 17], however, text messages recovered from her phone show her texting her friend McKaila Blades from the bar at 1:45 a.m. saying that she was 'Drunk as duck,' 'Duck,' 'Duck,' 'Fuck' and the next day, at 12:20 p.m., 'I was fucked up' and 'I was drinking so crazy and took Molly.'"

ii. Ms. Thompson's numerous lies are detailed throughout this submission.

### H.  Ms. Thompson's Myriad Threats to Ruin Mr. Elliott's Career

As mentioned above, Ms. Thompson's false allegations of assault by Mr. Elliott are the manifestation of her repeatedly expressed intention to "ruin" Mr. Elliott.  Her vindictive behavior appears to be the manifestation of her immature, destructive reaction to her hurt and anger about the fact that a relationship with Mr. Elliott would never be exclusive/monogamous.   There is no factual doubt that Ms. Thompson repeatedly expressed her desire to "ruin" Mr. Elliott, and her dishonest participation in both the law enforcement's and, in a more elaborate manner, the NFL's investigations manifest her attempts to do so:

a. After being told that Mr. Elliott did not want Ms. Thompson at his house on July 21 and did not want her coming out with him, Ms. Thompson told Mr. Elliott: "Okay, this is what you want? Okay then,



**LEGAL DEPARTMENT**

I'm going to ruin your life, you'll see.  If I was you, I wouldn't go out tonight."  Report at 100.

b.  After being told by Mr. Elliott at his 21st birthday that he did not want her coming home with him that night, Ms. Thompson told Mr. Elliott "that's the worst decision you made in your life.  I'm going to ruin your life now."  Report at 102.  *See also id.* at 58.

  i.  *See also* text messages from Ms. Thompson to Mr. Elliott in the early hours of July 22 (Report at 58) ("You better be smart," "And not be a dumb man," "Bitch," "Keep fucking with the wrong bitch.").

c.  According to Ms. Mason, after Ms. Thompson was told by Mr. Elliott's friend that she was "not coming in" to the Carriage House for Mr. Elliott's after party, Ms. Thompson was "yelling and screaming and said that Mr. Elliott's 'career was over.'"  Ms. Thompson then called the police on Mr. Elliott.  Report at 61.

  i.  Numerous other witnesses heard Ms. Thompson threaten to "ruin" Mr. Elliott's career in the early morning of July 22.  Report at 62-63, 66.

d.  Mr. Elliott is "100 percent" certain that Ms. Thompson told him in the early morning hours of July 22 (outside of the Carriage House) that "you're a black male athlete.  I'm a white girl.  They're not gonna believe you."  Report at 104; *see also* June 26 Tr. at 116:19-25, 133:5-12, 143:2-12.

e.  "Ms. Thompson acknowledged that she had sent Mr. Elliott text messages threatening to ruin his life when she was pregnant."  Report at 140.



**LEGAL DEPARTMENT**

I.  **Ms.    Thompson's    Highly    Inappropriate    Conduct—Including Contemplated Extortion—Punctuates Her Lack of Credibility**

    a.  Ms. Thompson made hundreds of harassing calls to Mr. Elliott, including approximately 50 calls from 3:30 a.m. and 5:00 a.m. on June 26 (*i.e.*, hours before Mr. Elliott's recent meeting with the NFL). *See* June 26 Tr. at 126:18-127:14; Report at 77.

    b.  Ms. Thompson registered the email address "ezekielelliott sex vids" in August 2016 and in September 2016 "raised the idea of selling . . . sex tapes she had of herself and Mr. Elliott" and stated that she "want[ed] to" blackmail Mr. Elliott with the videos.  Report at 78; Exhibit 74 (September 21, 2016 text message conversation between Ms. Thompson and Ms. Blades).

> Ms. Thompson: I need money and money quick
> Ms. Blades:    Me tf too
> Ms. Thompson: What if I sold mine and Ezekiel's sex videos
> Ms. Blades:    We'd all be millionaires
> Ms. Blades:    We could black mail him w that
> Ms. Thompson:  I want to bro
> Ms. Blades:    Let's do it
>
>  . . .
>
> Ms. Blades:    Id be like look give me 10k or I'll just sell our sex videos for the same amount flat
>
> . . .
>
> Ms. Thompson: 10k bitch I want 20k
> Ms. Thompson: Go big or go home

    c.  **Ms. Thompson acknowledged that "she had 'hacked' into [Mr. Elliott's email**]."  Report at 137, emphasis added; *see also* June 26 Tr. at 129:12-19.



**NFL PLAYERS**
A S S O C I A T I O N

**LEGAL DEPARTMENT**

    d.  Ms. Thompson imported all of Mr. Elliott's contacts into her phone, and configured the devices so that calls and messages sent to Mr. Elliott's phone were sent to her phone.  Report at 137-38 n. 253; Report at 148 ("I'd hooked up our phones so that his calls appear on my phone.  I had took his i-Cloud info and put it on my phone so that I could send and receive his texts on my phone.").

    e.  Ms. Thompson contacted women who Mr. Elliott was "messing with" (Report at 137) and told them that Mr. Elliott "had certain STDs, things that could damage [his] image, one, and relationships with other people."  June 26 Tr. at 128:23-129:10.  *See also*, Elliott materials at Tab E.

**J.**  **Ms. Thompson's Versions of Events Are Replete with Inconsistencies**

As one of Mr. Elliott's attorneys remarked at the June 26th meeting, it is difficult to tell "accurate" lies (an oxymoron), and indeed, review of the evidence reveals that Ms. Thompson repeatedly offered different versions of her various allegations when she met with law enforcement and NFL investigators on multiple occasions.  Evaluators of this matter should keep in mind the troubling reality of an employer investigation system that stands in sharp contrast to the "real world" law enforcement/legal system—Ms. Thompson faces *no* negative consequences for her lies, inconsistencies, and misrepresentations:

    a.  <u>**Alleged Jaw Incident (November 2015)**</u>

Ms. Thompson told NFL investigators during her first interview in September 2016 that she could not recall when this incident took place, saying only that it "took place before the incident in February."  Report at 81.

        i.  **Story # 1:** Told mother "she had run into something." Report at 14.



**LEGAL DEPARTMENT**

    ii.  **Story # 2:** Told mother that "Ezekiel had picked her up and carried her."  Report at 14.

    iii.  **Story # 3:** Told NFL investigators that Mr. Elliott "grabbed [her] arms and yanked [her] towards him to stop [her] from walking away from him and [she] tried to stop [herself] and [her] jaw ended up hitting right there on the wall."  Report at 13.

    iv.  **Story # 4:**  Told mother that Mr. Elliott "grabbed her and pushed her up against a wall."  Report at 14.

  b.  **Alleged Tub Incident That Caused Ms. Thompson to Suffer a <u>Concussion (November 15 or 16, 2015)</u>**

    i.  **Story # 1:** Told mother that "she had fallen in the tub and hit her head on the soap dish."  Report at 16.

    ii.  **Story # 2:** Told father that "she and Mr. Elliott had gotten into an argument and she tripped and fell down the stairs." Report at 16.

    iii.  **Story # 3:** Told mother that Mr. Elliott "pushed her in the tub, and she fell and hit her head on the soap dish."  Report at 16.

    iv.  **Story # 4:** Told father that Mr. Elliott "pushed [her] into a tub."  Report at 16.

    v.  **Story # 5:** Told Aunt Elaine that "she had been partying and she had broken her heel and had fallen down some steps." Report at 16.  Regarding Ms. Thompson's concussion, Aunt Elaine text messaged her friend stating that Ms. Thompson "ha[d] been partying so much that she passed out and hit her head.  Got a concussion."  Report at 16.  *See also id.* at 157 (Ms. Thompson told Aunt Elaine "that she was partying and



**LEGAL DEPARTMENT**

fell and got a concussion."); ("I called [Ms. Thompson] one day and she picked up and said that she'd broken her heel on her shoe and fell down some steps.").

c.  **Alleged Aventura, Florida Incident (February 12, 2016)**

    i.  **Story # 1**: Told 911 operator that she "got hit by [her] boyfriend."  Report at 17.

    ii.  **Story # 2**: Told NFL investigators that Mr. Elliott "shoved her with his open hand in her chest into a wall and elbowed her." Report at 17.

    iii.  **Story # 3:** Told Aventura Police that "Mr. Elliott had pushed her up against a wall and that the force of the push had left her with shoulder pain."  Report at 18.

    iv.  **Story # 4**: Told Aunt Elaine that Mr. Elliott "shoved" her. Report at 19.

    v.  **Story # 5:** Told Aunt Elaine that Mr. Elliott had "hit her." Report at 19.

    vi.  **Story # 6:** "Later" told Aunt Elaine that Mr. Elliott had "pushed her, but that was it."  Report at 19, 113.

    vii.  **Story # 7**: Told father that Mr. Elliott had "choked" her, but never told anyone else—including the police—that Mr. Elliott had choked her during this alleged incident.  Report at 19.

    viii.  **Story # 8:** Told mother that Mr. Elliott "put his hands on her" and "grabbed her."  Report at 19.



**LEGAL DEPARTMENT**

    ix. **Story # 9:** Told mother that Mr. Elliott "like open hand like shoved me and like hit me in my chest."  Report at 124.

    x. **Story # 10:** Told her friend B Shook that Mr. Elliott "touched" her.  Report at 20.

    d. **Alleged Facetiming Incident (July 17)**

      i. **Story # 1**: Told NFL investigators that Mr. Elliott "pushed [her]" and "tried to hit [her] and [she] blocked it with [her] arm."  Report at 114.

      ii. **Story # 2:** Told NFL investigators that Mr. Elliott "yank[ed] her out of the bed and pushe[d] [her] up against the door by holding [her] with both of his hands."  Mr. Elliott "chok[ed] [her] and "went to hit her and she blocked it with her arm at which point Mr. Elliott went back to bed."  Report at 27.

      iii. **Story # 3**: Told the Columbus Police that Mr. Elliott "picked [her] up by [her] neck and threw [her] around."   Ms. Thompson also noted that her "right forearm is bruised from [Mr. Elliott] hitting it due to [her] trying to cover [her] face."  Report at 28.[5]

---

[5] Ms. Thompson's allegation that Mr. Elliott tried to "hit" her, but that she "blocked it" with her right forearm is bogus.  Report at 27-28.  Needless to say, if a man of Mr. Elliott's size—6'1, 230 pounds—and considerable strength tried to "hit" the 5'5, 117 pound Ms. Thompson, Ms. Thompson would not have been able to "block[]" Mr. Elliott's attempt, and even if she could have, the bruise left by the successful "block" would have been far more substantial than what is depicted in the picture of Ms. Thompson's right arm that she took one day after this alleged incident.  *See* Exhibit 3F.  In any event, as set forth above, Dr. Thanning found that the bruise on Ms. Thompson's right forearm is "inconsistent with having occurred in the last day or two" as alleged by Ms. Thompson, and Dr. Giordano agreed that the bruise appeared "to be more than a few days old and therefore inconsistent with having been sustained the morning of July 17."  Report at 34.



**LEGAL DEPARTMENT**

    iv.  **Story # 4**: According to the responding officer on July 22, Ms. Thompson stated that "Mr. Elliott attempted to hit her in the face and that she raised her right arm to cover her face." Report at 28.

    v.  **Story # 5**: Told Columbus City Attorney's Office that Mr. Elliott "dragged her out of the bed and then threw her up against the door of his bedroom.  She said he then pressed his right hand around her neck and started choking her for about 20-30 seconds.  She said he then let go, clenched his fist and went to hit her in the face.  She said she brought her right forearm up to cover her face and she had a bruise there."  Report at 28-29.

  e.  **<u>Alleged Locked Out Incident (July 18)</u>**

Significantly, Ms. Thompson never mentioned this alleged incident during her first interview with NFL investigators in September 2016 (Report at 78-95), nor in her second interview in October 2016 (*Id.* at 106-107).

    i.  **Story # 1**: Told NFL investigators that Mr. Elliott "reached over and grabbed her by the arm and pushed her back against the seat and grabbed the keys out of her hand." Report at 30.

    ii.  **Story # 2**:  Told Columbus Police in written statement that Mr. Elliott "was throwing [her] around."  Report at 36.

    iii.  **Story # 3**: According to the responding officer on July 22, Ms. Thompson stated that Mr. Elliott "choked her leaving a red mark and bruise on her neck."  Report at 36.

---

Thus, there is zero evidence corroborating Ms. Thompson's claim that she suffered a bruise on her right forearm (Report 28) as a result of Mr. Elliott "hitting it due to [her] trying to cover [her] face."  *Id.*



**LEGAL DEPARTMENT**

    1. As the Report is forced to recognize, the statements provided by Ms. Thompson to Columbus Police ("ii" and "iii" above) "are inconsistent with what Ms. Thompson told the League's investigators, as she only told them that [Mr. Elliott] had grabbed her arm while she was in the car and took the keys from her." Report at 36.

    iv. **Story # 4**: Told the Columbus City Attorney that Mr. Elliott "'snatched' the keys from her and took his right hand and twisted her left arm and that this resulted in a bruise." Report at 36.

  f. **Alleged Incident After Mr. Elliott Returned Home After Spending The Night in a Hotel (July 19)**

    i. **Story # 1**: Told NFL investigators that Mr. Elliott "grabbed her arm and pushed her away with a stiff arm."  Mr. Elliott "kept pushing her down, hitting her, yanking her, slapping her in the face, pulling her hair . . . ."  Report at 40.

    ii. **Story # 2**: Told Columbus Police that Mr. Elliott "started choking her and smacking her face."  Report at 43.

    iii. **Story # 3**:  According to the responding officer on July 22, Ms. Thompson stated that she and Mr. Elliott "did not fight" on Tuesday, July 19.  Ms. Thompson told the responding officer that when Mr. Elliott returned after being out the night of July 18, Mr. Elliott "picked her up and threw her against the wall."  Report at 43.

    iv. **Story # 4**:  Told Columbus City Attorney's Office that Mr. Elliott "grabbed her by her arms and threw her on the bed . . . . Mr. Elliott put his finger into her face and 'kept smacking [her] face to turn back' and look at him."  Report at 44.



**LEGAL DEPARTMENT**

g.  **<u>Alleged Incident After Mr. Elliott Drove Home (July 21)</u>**

i.  **Story # 1**: Told NFL investigators that "Mr. Elliott picked [her] up and threw her against the storage closet; that she fell to the ground." Report at 47.  She further noted that Mr. Elliott "pinned her to the floor and started choking her and that this left a bruise line across her neck.  She said [Mr. Elliott] was grabbing her arms, leaving thumb prints on them and then going back to choking her, first with one hand and then with both."  *Id.* at 47-48.  She also said that Mr. Elliott "hit [her] in the arms and 'punched her.'"  *Id.* at 87.

ii.  **Story # 2:** Told Columbus Police that Mr. Elliott "grabbed her by her neck, choked her until she started to gasp for breath and then dragged her across the carpet with one hand pulling her hair and the other around her neck."  Report at 49.

iii.  **Story # 3:** According to the responding officer on July 22, Ms. Thompson stated that Mr. Elliott "picked her up under her arms under her armpits and threw her against the wall; that he then grabbed her throat and after releasing it, dragged her across the floor . . ."  Report at 49.

iv.  **Story # 4:** Told City Attorney's Office that Mr. Elliott "picked her up under both under arms off the bed . . . threw her up against the door of the storage closet.  She said she fell and hit her head and felt dizzy.  She said that she then tried to get up and he dragged her into the bedroom . . . ."  She said Mr. Elliott "grabbed her neck with one hand and pinned her down to the floor and he got on top of her and started shaking and her and she started gasping for breath.  She said he then lifted her up and threw her away from her things, up against the bed . . . ."  Report at 49-50.



**LEGAL DEPARTMENT**

    v. **Story # 5:** Told Aunt Elaine on July 21 that Mr. Elliott "just keeps grabbing" her.  Report at 55.

h. <u>**Alleged Incident in The Carriage House Parking Lot (July 22)**</u>

Ms. Friel has already acknowledged that Ms. Thompson's allegations of assault by Mr. Elliott with respect to this incident are "not credible."  *See* June 26 Tr. at 152:1-16 ("Ms. White: With respect to what she has told you and told the police, city attorney, with respect to the July 22 incident, have you found what she said to you – we will take it with you first – to be credible, as to the July 22 event?  Ms. Friel: No . . . . We felt comfortable making the determination that she was not credible about the July 22 incident in large part because her own friend, Ayrin Mason, said it did not occur.")

Tellingly, when Ms. White asked Ms. Friel if she "[o]therwise . . . generally found [Ms. Thompson] to be credible," Ms. Friel could not answer with a straight "yes," but instead pointed to the credibility of *other* witnesses—Ms. Mason and Aunt Elaine—neither of whom had any independent knowledge of any alleged abuse by Mr. Elliott, but rather just repeated to NFL investigators what Ms. Thompson had told them.  June 26 Tr. at 152:8-153:14.

    i. **Fabricated Story # 1**: "Mr. Elliott came over to her car, told her that she needed to leave, she said no, and he grabbed one of her wrists as she was holding the steering wheel, and dragged her out of the car."  Report at 60.  She said that when Mr. Elliott was allegedly dragging her out of the car, "her knee hit the door."  *Id.* at 89.

    ii. **Fabricated Story # 2:** Told Columbus Police that Mr. Elliott "yanked my right arm and dragged me out of the car."  Report at 61-62.  Ms. Thompson also lied about the alleged bruises inflicted as a result of this completely made up assault, noting that her "right hand/wrist" were "bruised and red" as a result of the assault.  Report at 62.



**LEGAL DEPARTMENT**

1. Incredibly, after being confronted with all of the other witness statements regarding the parking lot incident, Ms. Thompson continued to "insist[] that they were not true and that her version of events as given to the League's investigators was what really happened." Report at 66.

### III.   MR. ELLIOTT HAS BEEN COOPERATIVE AND CREDIBLE THROUGHOUT BOTH LAW ENFORCEMENT AND THE NFL'S INVESTIGATIONS

In stark contrast to Ms. Thompson's inconsistencies, misrepresentations, and lies to law enforcement and the NFL throughout the course of her campaign to "ruin" Mr. Elliott, from the first moment when Mr. Elliott was questioned about Ms. Thompson's allegations by law enforcement and the NFL, he has consistently, unequivocally denied assaulting Ms. Thompson.

### A.  Mr. Elliott has consistently credibly denied Ms. Thompson's allegations

a. Mr. Elliott has always maintained that he *never* physically assaulted Ms. Thompson at any time.  Report at 8; June 26 Tr. at 135:2-6 ("I've never assaulted Tiffany Thompson.  I would never do that. I was not raised that way.  I am very close with my mom.  I have two little sisters.  I would never want them to go through anything like that.").  *See also* June 26 Tr. at 139:5-12, 144:12-20.

b. According to Dallas Cowboys General Counsel Jason Cohen, Mr. Elliott told him that "this was a lie.  He was so adamant that this was a lie."  Report at 151; *see also id.* (Mr. Elliott told Brian Wansley "he hadn't done anything.").



**LEGAL DEPARTMENT**

### B. Mr. Elliott Was Truthful in His Description of His Relationship with Ms. Thompson

Frankly, it is utterly absurd that a "serious" investigation would look to the verbal characterizations or descriptions used by emotionally immature 20/21 year-olds to describe the nature of their interactions as indicative of credibility.  To the extent any mature adult might think it is relevant to assessing credibility, Mr. Elliott has always been consistent in his firm resistance of any label indicating an exclusive/monogamous relationship with Ms. Thompson, but in Mr. Elliott's emotional calculus, non-exclusive sexual interactions did not preclude him from sometimes experiencing positive or affectionate feelings toward her.

   a.   Mr. Elliott:

      i.   Mr. Elliott told NFL investigators that he and Ms. Thompson "liked" each other and "cared" about one another, but that they were never in a "relationship."  Report at 8; *see also* June 26 Tr. at 41:2-5.

      ii.   Mr. Elliott told Columbus Police that he "[n]ever" dated Ms. Thompson but that he had "a sexual relationship with her."  Report at 62.

      iii.   Mr. Elliott "continued to say in text messages [to Ms. Thompson beginning in June 2016] that [he and Ms. Thompson] were not together."  Report at 24.

      iv.   Mr. Elliott told Aunt Elaine "Tiff and I haven't never even been in a relationship together."  Exhibit 27 (March 12, 2016 text messages).  Aunt Elaine replied: "You don't ever have to be in a relationship together."  *Id.*



**NFL PLAYERS**
**A S S O C I A T I O N**

**LEGAL DEPARTMENT**

    b.  Ms. Thompson:

        i.  Ms. Thompson told Aventura Police that she and Mr. Elliott were "friend[s] with benefits."  Report at 129.

        ii.  Ms. Thompson told NFL investigators that she was aware that Mr. Elliott was "messing around with other girls" during the time he was sexually involved with her.  Report at 80.

    c.  Ms. Mason:

        i.  Significantly, Mr. Elliott's characterization of his relationship with Ms. Thompson is consistent with Ms. Mason's characterization.

            1.  Ms. Mason on the relationship between Mr. Elliott and Ms. Thompson as of July 2016: "Tiffany and Ezekiel were never officially in a relationship."  Report at 108.

            2.  As noted above, Ms. Friel found Ms. Mason to be "very credible."  June 26 Tr. at 152:17.

    d.  Aunt Elaine:

        i.  Mr. Elliott told Aunt Elaine "Tiff and I haven't never even been in a relationship together."  Exhibit 27 (March 12, 2016 text messages).  Aunt Elaine replied: "You don't ever have to be in a relationship together."  *Id.*

**C.  Mr. Elliott Credibly Denied That Ms. Thompson Lived with Him**

    a.  Ms. Thompson acknowledged that she would "leave" Mr. Elliott's residence for "like a week and go home and stay with my family."  Report at 79.  In other words, Ms. Thompson was living with her family, but had been



**LEGAL DEPARTMENT**

spending a lot of time at Mr. Elliott's residence—which is quite common between college-aged adults. *See also id.* at 136 (Ms. Thompson said "she would go home to her family one or two nights a week.").

b. Ms. Thompson admitted that "bank statements were sent to her parents' address which was the address she also used for job application[s]." Report at 136.

    i. The fact that Ms. Thompson's car insurance bills were sent to Mr. Elliott's apartment is of no moment; Mr. Elliott was paying for the car, so it would make sense for bills associated with the car to be sent to his residence.

**D.  Mr. Elliott Did Not Lie to NFL Investigators About The Police Having Been Called by Ms. Thompson Prior to July 22, 2016**

a. Ms. Friel stated at the June 26 meeting that Ms. Roberts had asked Mr. Elliott [at his September 2016 interview] "if Tiffany, to his knowledge, had ever called the police on him before July 22 and he said no, not to his knowledge."  June 26 Tr. at 159:5-8.

b. However, as evidenced by the transcript of Mr. Elliott's September 2016 interview, Ms. Roberts' question to Mr. Elliott on this subject was not as clear as Ms. Friel led the Panel to believe during the June 26 meeting.

    Ms. Roberts:  Okay.  So I know that Tiffany had been threatening to call the police, it looks like pretty consistency [sic] between July 16th and July 22nd and of course on July 2nd she goes through with this and does call police.

    Ms. McPhee:  22nd.

    Ms. Roberts:  22nd. Right.  And then goes through with that.  Um, at any other time had she called the police? All of these times she's like I'm going to call the police.  I'm going to call the police.  You're telling



**LEGAL DEPARTMENT**

her to leave on these various incidents at any other time had she called the police?

Mr. Elliott: She said she called, she said she called.  Remember when she said the police were involved?  I mean, [I] don't know if she called the police then, but I mean, that's the only other time I could think that she would.  But other than that, no.

Ms. Roberts: But that was that same night, wasn't it?

Mr. Elliott:  Yeah.

September 28, 2016 Tr. at 29.

    c. As shown from the dialogue above, Ms. Roberts focused Mr. Elliott's attention on the period of July 16-22, including by referencing Mr. Elliott "telling [Ms. Thompson] to leave on these various incidents," and thus Mr. Elliott (quite reasonably) interpreted Ms. Roberts' question to be referring to whether the police had ever been called by Ms. Thompson at any time prior to July 22, *but during the period of July 16-22.*  This is also evidenced by Mr. Elliott's response "[r]emember when she said the police were involved?," which is referring to Ms. Thompson's statement to him on July 21, 2016.

    d. Mr. Elliott did not intend to mislead NFL investigators, but rather tried to provide a truthful response to Ms. Roberts' question as he interpreted it.

    e. Indeed, it would make no sense for Mr. Elliott to lie about such an easily verifiable fact.

**E.  Mr. Elliott Did Not Intend to Mislead NFL Investigators When He Stated That Ms. Thompson Was Not "Ignoring" Him on The Street on July 18, 2016**

    a. At the time of his interview in September 2016, Mr. Elliott did not recall that Ms. Thompson had "ignored" him "for like a couple of seconds" on July

39



**LEGAL DEPARTMENT**

18, 2016.  Report at 97.  When Ms. Roberts jogged Mr. Elliott's memory about this short-lived, insignificant event from more than two months earlier, he truthfully explained what had occurred:

> So what she told me too, she called me cause I was at dinner right around the comer. She told me to come meet her. So I went to meet her at the bar and she was ignoring me for like a couple seconds. But after that I mean we weren't ignoring each other anymore.  *Id.*

**F.  Mr. Elliott Truthfully Told NFL Investigators That Ms. Thompson Was Not Supposed to Stay with Him After Picking Him Up from the Airport and That He Was Trying to Get Rid of Her All Week**

   a.  The Report details Mr. Elliott's numerous attempts to get Ms. Thompson to leave his apartment through the period of July 16-22, which is consistent with Mr. Elliott's statement that Ms. Thompson was not supposed to stay with him at his Canvasback Lane apartment after picking him up from the airport.  *See e.g,* Report at 38, 52, 53, 98, 100.  *See also e.g.*, June 26 Tr. at 25:3-7, 88:9-17, 89:15-18, 113:25-114:8.

   b.  The absence of electronic evidence for every instance in which Mr. Elliott told Ms. Thompson that he did not want to be with her does not mean that Mr. Elliott was untruthful with NFL investigators—especially against the backdrop of the evidence cited above.

**G.  The Report Makes Clear That Mr. Elliott Was Trying to Get Rid of Ms. Thompson on July 21**

   a.  Contrary to Ms. Friel's assertion at the June 26 meeting, the evidence shows that Mr. Elliott did not want to be with Ms. Thompson on July 21, 2016.

      i.  *Compare* June 26 Tr. at 160:14-22 (Ms. Friel: Mr. Elliott "stated that all day on Thursday July 21 that he was trying to get rid of [Ms. Thompson] and break up with her.  I think he said he went over to her apartment and told her that they were done and they were over. Again, there is some text message evidence that would suggest that



**LEGAL DEPARTMENT**

that wasn't truthful.  That that was not, in fact, what was going on on July 21.").

    ii.  *With* Report at 53 (text messages from Mr. Elliott to Ms. Thompson on July 21: "U gotta go"; "U should leave"; "Really"; "We really can't do this anymore.").

**H. Mr. Elliott Truthfully Told NFL Investigators That Ms. Thompson Threatened to Ruin Him All Week Long, Not Just The Night of July 22**

    a.  Once again, the absence of electronic evidence of every reported threat made by Ms. Thompson against Mr. Elliott during the period of July 16-22 does not mean that these threats were not made.  Nor does the fact that Mr. Jackson did not mention these threats in his affidavit.  This is especially true given Ms. Thompson's history of threats against Mr. Elliott and utter lack of credibility.

    b.  Ms. Thompson admitted to NFL investigators that she "would kind of say things [to Mr. Elliott] just out of anger" (Report at 140-41) and that she had threatened Mr. Elliott prior to July 22, 2016.  *Id.* at 140 ("Ms. Thompson acknowledged that she had sent Mr. Elliott text messages threatening to ruin his life when she was pregnant.").

    c.  Section II.H details the myriad threats made against Mr. Elliott by Ms. Thompson.

**I. Mr. Elliott Is "100 Percent" Certain That Ms. Thompson Made A Racially Inflammatory Remark Amidst Her Threats to "Ruin" Him**

    a.  Mr. Elliott has told NFL investigators from day one of the investigation that Ms. Thompson made the racially charged remark: "You're a black male athlete.  I'm a white girl.  They're not gonna believe you."  [sic] Report at 104; *see also* June 26 Tr. at 116:19-117:3.



**LEGAL DEPARTMENT**

    b.   The fact that Mr. Elliot did not write this specific threat down in his police report does not mean that Ms. Thompson did not make it, and invocation of that historically racially inflammatory dynamic would logically make a very strong memory impression on the young black man to whom it was directed.  Indeed, Mr. Elliott is "100 percent" certain that this threat was made to him by Ms. Thompson, while Ms. Thompson has lied about making *any* threat to Mr. Elliott in the early morning hours of July 22.  June 26 Tr. at 133:5-12, 143:2-12.

## J.  MR. ELLIOTT HAS CLEARLY MET HIS OBLIGATION TO REASONABLY COOPERATE WITH AN EMPLOYER'S INVESTIGATION

As reflected in the 360+ pages of materials attached to this submission, during the course of the NFL's bizarrely protracted investigation into specious allegations about intimate interactions between two young, immature individuals (20/21 years-old), amidst the chaos of Mr. Elliott's first year as a professional athlete, he worked with his advisors to more than "reasonably cooperate" with the NFL's investigation.

One insinuation—or outright allegation—by Ms. Friel/the NFL is that Mr. Elliott engaged in deceptive behavior regarding his phones because he did not produce to the NFL months-old texts or call logs.  That allegation is absolutely unjustified and infuriating to Mr. Elliott and his advisors because, as everyone is aware, text messages only temporarily reside on specific devices for a limited time unless the user backs up the device into a cloud.  Not only did Mr. Elliott produce *all* of his communications records (phone bills) in his possession for the requested SIX MONTH period, but he upgraded his phones on November 9, 2016—long before the NFL's first request for months-old text message communications and phone call logs on December 16, 2016.  *See* Tab M; Report at 9.

Moreover, Mr. Elliott made the rational decision not to utilize a back-up cloud program because *Ms. Thompson admitted to hacking into his devices and emails*.  Finally, we ask the



**LEGAL DEPARTMENT**

advisors to review the hundreds of pages of materials that Mr. Elliott provided, and they will see that over the course of the numerous months when he received sporadic requests from the NFL, he produced abundant information available at those times, including bills, call logs and texts. Any allegation that Mr. Elliott has not reasonably cooperated with NFL's investigation is wholly without merit, especially in light of the inefficiencies of the NFL's process.

## CONCLUDING REMARKS REGARDING THE THOMPSON MATTER

This submission's disentanglement of the voluminous "evidence" gathered by the NFL in the course of its lengthy investigation of Ms. Thompson's allegations makes clear what Mr. Elliott has maintained from the moment he was confronted with her false allegations of assault one year ago: There is *no* credible evidence that Mr. Elliott physically assaulted Ms. Thompson or violated the PCP in any way in his interactions with Ms. Thompson.

Unfortunately, the process of this investigation and Mr. Elliott's submission did yield abundant evidence of the immature, perhaps emotionally hurtful intimate interactions between two very young people. It's embarrassing to have to "analyze" and foreground extremely personal, intimate, sometimes extremely irresponsible behavior by immature young people that evokes troubling reactions, but the NFL's insistence on proceeding with this investigation in the manner that it did necessitated this process; certainly, Ms. Thompson can never accuse the NFL of not "seriously" investigating her specious, untruthful allegations.

Mr. Elliott and the NFLPA are confident that after meeting with Mr. Elliott and reviewing this submission, the NFL and its advisors will reach the only correct conclusion about the Thompson matter:

43



**NFL PLAYERS**
A S S O C I A T I O N

**LEGAL DEPARTMENT**

Mr. Elliott never violated the PCP in the course of his interactions with Ms. Thompson, and Mr. Elliott met his cooperation obligation with his employer's protracted investigation of this matter.

<u>**THE MARCH PARADE INCIDENT**</u>

The NFL's first notification of Mr. Elliott and the NFLPA that it initiated an investigation of the March parade incident was the NFL's inclusion of its brief report about its interview of the young lady involved in the matter, Anni Gomez.  Perhaps the NFL did not ask to separately interview Mr. Elliott because the innocuous, harmless nature of the incident was repeatedly emphasized by the young lady who was involved.  In any event, Ms. Gomez's words speak for themselves: She was not offended or forced to do anything against her will, the action occurred in a festive environment, "everything was done in fun," and she was and is friends with Mr. Elliott.  Report, p. 2-3.[6]

The PCP describes in vivid language the type of behavior that it targets as a basis for discipline, "[behavior that is] illegal, violent, dangerous, or irresponsible puts innocent victims at risk, damages the reputation of others in the game, and undercuts public respect and support for the NFL."  While the interactions of these young, exuberant people may not be to everyone's liking, the pivotal question in this non-violent, non-harmful, non-criminal context is the woman's reaction to interaction with her body, and Ms. Gomez could not have been more clear with the NFL investigator:

---

[6] Ms. Gomez explained her reaction to Mr. Elliott's action as shown in the video played at the June 26 meeting as "just a fast reaction of being caught by surprise and not knowing for sure who it was that reached out."  Report, p. 3.



**LEGAL DEPARTMENT**

- She was never offended by anything Mr. Elliott did.  Report, p. 3.
- She was and remains friends with Mr. Elliott; he has always been very nice to her.  Report, p. 3.
- She was very comfortable discussing the matter, and she had no concerns with the NFL's interview.  Report, p. 3.

This investigatory matter stands in stark contrast to the Thompson matter in part because Ms. Gomez was candid and honest about the totally innocuous nature of the incident when interviewed by the NFL.  Thus, Mr. Elliott and the NFLPA's response to the question of whether this incident violated the PCP can been similarly straightforward and efficient:

Simple analysis under the clear strong language of the PCP, shows that this fact pattern does not constitute a violation, and it would be presumptuous, arrogant and disrespectful of Ms. Gomez if the NFL were to disregard/override her clear assessment of an interaction with her and discipline Mr. Elliott for the March parade incident.

Mr. Elliott and the NFLPA thank the advisors and the NFL for their careful consideration of this submission, and if any additional information is desired, please do not hesitate to let us know.



**NFL PLAYERS**
A S S O C I A T I O N

**LEGAL DEPARTMENT**

Respectfully submitted on behalf of Mr. Ezekiel Elliott,

Heather M. McPhee
NFLPA Associate General Counsel

cc:     Ezekiel Elliott
        Tom DePaso
        Ned Ehrlich
        Jon Amoona
        Frank Salzano
        Rocky Arceneaux
        Scott Rosenblum