IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of EZEKIEL ELLIOTT,<br><br>           Petitioner,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,<br><br>           Respondents. | CASE NO. 4:17-cv-00615<br><br>RESPONDENTS' OPPOSITION TO PETITIONER'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION |

## INTRODUCTION

Petitioner National Football League Players Association (the "NFLPA") asks this Court to grant a temporary restraining order enjoining something that does not even exist—a "forthcoming" arbitration award. It does so in an effort to beat the National Football League (the "NFL") to the courthouse in a race that has not even begun. Worse still, it does so while *conceding* that there is nothing for the Court to do.

As demonstrated in Respondents' contemporaneously filed Motion to Dismiss, this Court lacks jurisdiction to grant Petitioner's requested relief: no statute allows it, the NFLPA lacks standing to seek it, and the case is unripe in any event. That should be the end of the matter. *See, e.g.*, *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011) (noting that a "district court must have jurisdiction at the commencement of the suit," and jurisdiction cannot be created "retroactively where it did not previously exist").

Even if this court had jurisdiction, the NFLPA fails to make the requisite showing that might warrant the extraordinary remedy of a temporary restraining order. The NFLPA claims

1

that it is likely to succeed in its claim that the underlying proceeding was "fundamentally unfair" in light of certain procedural and evidentiary rulings by the Arbitrator. But this is hardly the first time the NFLPA has made this argument. Courts around the country have consistently and squarely rejected it, along with every other attempt by petitioners to second-guess arbitration decisions upholding NFL player discipline. *See NFLMC v. NFLPA,* 820 F.3d 527, 545-48 (2d Cir. 2016) ("*Brady*") (rejecting NFLPA's "fundamental fairness" arguments regarding evidentiary rulings by NFL arbitrator); *NFLPA v. NFL,* 831 F.3d 985, 998-99 (8th Cir. 2016) ("*Peterson*") (same); *see also*, *e.g.*, *Williams v. NFL*, 495 F. App'x 894, 895-98 (10th Cir. 2012); *Williams v. NFL*, 582 F.3d 863, 883-86 (8th Cir. 2009); *Holmes v. NFL*, 939 F. Supp. 517, 523-25 (N.D. Tex. 1996). These decisions recognize that the NFL and the NFLPA bargained for "final and binding" dispute resolution before an *arbitrator*, not in federal court. They foreclose the extraordinary remedy the NFLPA seeks.

Nor can the NFLPA demonstrate that Ezekiel Elliott will suffer "irreparable" harm, or that the harms weigh in his favor. Any harm is compensable by money damages (lost income), has already occurred (reputational harm), or is purely speculative (whether the Dallas Cowboys will make the playoffs). By contrast, having a federal court decide when Elliott will be able to play is a blatant interference with the parties' collectively bargained grievance process. The parties have agreed to final resolution by the Arbitrator consistent with the strong federal labor policy preference "for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 36 (1987). The NFLPA's collateral attack on that process profoundly affects the competitive integrity of the game and impairs the effective enforcement of the policy against domestic violence. The NFLPA cannot establish *any* of the necessary factors to support injunctive relief.

## FACTUAL BACKGROUND

***The NFL's Investigation of Elliott's Alleged Domestic Abuse.*** On July 22, 2016, Tiffany Thompson reported to the Columbus Police Department that she had been physically abused by Elliott multiple times over the course of the prior week. (*See* ECF #1-47, 48 (Ex. A-NFLPA-44 to Decl. of J. Kessler in Support of Petition to Vacate Arbitration Award (hereinafter "Elliott Report") at 7.)[1] Thompson had been in a relationship with Elliott for more than a year, during which he had left Ohio State University and been drafted by the Dallas Cowboys.[2] (*Id.* at 11-13.) Although the Columbus City District Attorneys found Thompson's claims to be credible, they declined to prosecute given the stringent burden of proof in criminal prosecutions. (*Id.* at 119-20 (Columbus District Attorney told NFL investigators "[w]e generally believed [Thompson] for all of the incidents").)

The Personal Conduct Policy (the "Policy") places NFL players on notice that they are subject to a baseline suspension of six games for engaging in acts of domestic or dating violence, even if "the conduct does not result in a criminal conviction." (ECF #1-19 (Kessler Decl., Ex. A-NFLPA-16) at 2, 6-7 (providing that players are subject to discipline if they are found by the Commissioner to have engaged in "[a]ctual or threatened physical violence against another person, including dating violence [and] domestic violence")). The NFL thus promptly opened an investigation under the Policy as soon as the domestic violence allegations against Elliott came to light. (*See* Elliott Report at 7-9.) The NFL's investigation was led by Lisa Friel, a former

---

[1] Unless otherwise stated, all record citations refer to those exhibits attached to the Declaration of Jeffrey Kessler in Support of the Petition to Vacate Arbitration (ECF #1-2), as recorded on the Court's docket.

[2] During the course of these proceedings, Elliott vehemently denied that he was "dating" Thompson, including in a written statement to the police. (*See, e.g.,* Elliott Report at 95-96.) Instead, he claims that Thompson was simply someone he liked to "party" and "have sex" with, despite evidence that he paid for her automobile and apartment, she became pregnant with his child (which he insisted she have aborted), told her he "love[d]" her and could not "be done with [her]," and demanded that she see him during the week when Thompson was injured. (*Id.* at 11-12, 20, 24-26; ECF #2-13 (Kessler Decl., Ex. C), (hereinafter, "Hearing Tr.") (Day 2) at 90-92, 109-16.)

Chief of the New York City Sex Crimes Prosecutor's office, and was assisted by Kia Roberts, a former New York State prosecutor with experience in domestic violence cases. (ECF #2-13 (Kessler Decl, Ex. C, Hearing Tr. (Day 1)) at 135; *id.* (Day 2) at 260.) During the course of the ensuing investigation, the NFL conducted 22 witness interviews (including multiple interviews of both Thompson and Elliott), reviewed thousands of pages of documents, and considered photographic and other evidence provided by Thompson, Elliott, independent witnesses, and the Columbus City District Attorney's Office. (*See* Elliott Report at 1-7.) The NFL also retained an expert to conduct a forensic review of certain electronic evidence, and two medical experts to opine on photographs of bruises on Thompson's body. (*Id.*)

On June 6, 2017, Friel and Roberts issued a 164-page report exhaustively detailing the investigation's factual findings, including witness interview summaries, the documentary evidence relied upon in completing the report, transcripts of witness interviews, and an analysis by Roberts of certain conflicts between Thompson's interview statements and other evidence. (*See generally* Elliott Report; *see also* ECF #2-13 (Kessler Decl., Ex. C, Hearing Tr. (Day 1) at 142-43 (discussing "Inconsistency Transcripts") (Ex. 99 of Elliott Report)).) After the report was completed, Friel conducted a transcribed interview of Elliott during which she asked him to respond to information developed during the investigation. (*See* ECF #1-49 (Kessler Decl. Ex. A-NFLPA-45).) The June 26 interview of Elliott also was attended by four "independent advisors"[3] retained to assist NFL Commissioner Roger Goodell in evaluating the evidence developed in the report and in their meeting with Elliott and his representatives. (*Id.* at 2, 5-7.)

---

[3] They are: Tonya Lovelace, the CEO of the Women of Color Network; Peter Harvey, the former Attorney General of the State of New Jersey; Ken Houston, a former NFL player and member of the Pro Football Hall of Fame; and Mary Jo White, a former U.S. Attorney and Chair of the Securities and Exchange Commission.

During the investigation, attorneys for the NFLPA and Elliott were asked to provide any information relevant to Elliott's defense. (*See* Elliott Report at 9.) They also were permitted to attend Elliott's witness interviews. (*Id.* at 95, ECF #1-49.) As the investigation neared its conclusion, the NFLPA and Elliott were given copies of the investigative report, its supporting documentation, and the medical experts' reports, and were given a chance to provide written responses. (*See* ECF #1-49 at 10-12, ECF #1-52 (Kessler Decl. Ex. A-NFLPA-48).)

***The Commissioner's Disciplinary Findings.*** Article 46 of the collective bargaining agreement ("CBA") negotiated between the NFL and the NFLPA permits the Commissioner to enforce the Policy under his authority to discipline players for conduct found to be "detrimental to the integrity of, or public confidence in, the game of professional football." (*See* ECF #1-62 (Kessler Decl., Ex. A-NFLPA-58), Art. 46, Sec. 1(a).) On August 11, 2017, Elliott was notified of the Commissioner's determination that Elliott had violated the Policy by committing physical violence against Thompson on three occasions during the week of July 16, 2016. (ECF #1-53 (Kessler Decl. Ex. A-NFLPA-49) at 3-5.) The Commissioner based his findings on the extensive information compiled in the 164-page Investigative Report, the transcript of the June 26, 2017 meeting with Elliott, his representatives, and the independent advisors, and the subsequent materials submitted on Elliott's behalf. (*Id.*) The Commissioner specifically noted that he had carefully considered the various arguments raised by Elliott and the NFLPA regarding the evidence, including the credibility of Thompson. (*Id.* at 4.) He also noted that he had consulted independently with the four advisors at Elliott's second interview. (*Id.*) Based on his findings, the Commissioner suspended Elliott for six games. (*Id.* at 5.)

***Elliott's Appeal of the Commissioner's Determination.*** Players suspended pursuant to Article 46 are entitled to appeal the Commissioner's determination to the Commissioner or his

designee. (*See* ECF #1-62, Art. 46, Sec. 2(a).) Elliott exercised that right on August 15, and the Commissioner appointed Harold Henderson as Arbitrator. (ECF #1-54 (Kessler Decl., Ex. A-NFLPA-54).)

Pursuant to the requirements of Article 46, the NFL provided the NFLPA "copies of any exhibits upon which [it] intend[ed] to rely" three days prior to the hearing. (ECF #1-62, Art. 46, Sec. 2(f)(ii).) These included many of the same materials previously provided to Elliott and the NFLPA: the investigative report; its underlying evidence, including photographs, text messages, and witness transcripts; Elliott's interview transcript; and the reports drafted by the NFL's medical experts. (*See* ECF #2-1-12 (Kessler Decl., Ex. B).)

Elliott's appeal was heard by the Arbitrator over a three-day period, from August 29 to 31. (*See* ECF #2-13 (Kessler Decl, Ex. C (Hearing Tr. (Days 1-3)).) Prior to the hearing, the NFLPA filed a motion to compel the production of certain documents and the in-person testimony of various witnesses, including Thompson. (ECF #1-57 (Kessler Decl., Ex. A-NFLPA-53).) Following oral argument via conference call, the Arbitrator issued a written decision granting the motion in part and denying it in part. (ECF #1-59 (Kessler Decl., Ex. A-NFLPA-55).) In particular, the Arbitrator required the testimony of the two investigators responsible for the investigative report, noted that the NFL had agreed to coordinate the testimony of its medical experts, and denied the request to compel Thompson's testimony or documents beyond the specific discovery requirements of the CBA. (*Id.* at 1-2.) With respect to Thompson, the Arbitrator noted that she is not employed by, or subject to the control of the NFL, and was "not persuaded" that Thompson's testimony was required by the parties' CBA. Nor did the Arbitrator believe that it would be "fundamentally unfair" if Thompson did not testify in person because "[t]he Commissioner's decision in this case was based on affidavits, statements

and interview reports, all of which are available to Mr. Elliott under the procedures of Article 46." (*Id.*)

During the course of the appeal hearing, Elliott called seven witnesses, submitted testimony from others by affidavit, and cross-examined Friel, Roberts, and the NFL's medical expert. (*See* ECF #2-13 (Kessler Decl, Ex. C, Hearing Tr. (Days 1-3))*.*) The NFLPA and Elliott's attorneys asked the Arbitrator to vacate (or at least reduce) his six-game suspension based on extensive arguments over a wide range of issues during the hearing—including the very evidentiary and fairness arguments that they collaterally raise in their Petition to Vacate. (*Id*.) Elliott's appeal is currently under review by the Arbitrator, who is required to issue a decision "as soon as practicable." (ECF #1-62, Art. 46, Sec. 2(d).) Elliott's suspension will not begin until after the award issues.

## ARGUMENT

The NFLPA's request for a temporary restraining order fails for two reasons: (1) it is premature and otherwise barred by federal labor law; and (2) the NFLPA cannot meet the standard for obtaining extraordinary injunctive relief in any event.

### I.  AS A MATTER OF LAW, A FUTURE ARBITRAL AWARD CANNOT BE ENJOINED

#### A.  This Court Lacks Jurisdiction To Award The Requested Relief

This Court cannot grant the NFLPA any relief because it lacks jurisdiction to do so. As explained in detail in Respondents' Motion to Dismiss (which is incorporated by reference here), no statute provides jurisdiction to review a hypothetical award (*see* Mot. at 5-8), the NFLPA lacks standing to seek vacatur of a hypothetical award (*id.* at 8-10), and a dispute over a hypothetical award is not ripe (*id.* at 11-13). That is true regardless of when the award issues, as the NFLPA "cannot rely on events that unfolded after the filing of the complaint to establish" this

7

Court's jurisdiction. *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 458 (5th Cir. 2005). Because binding precedent forecloses this Court's jurisdiction to award Petitioner's requested relief in this premature suit, the NFLPA's motion should be denied on that ground alone.

### B. A Pending Labor Arbitration Decision Cannot Be Reviewed or Enjoined

The NFLPA's suit runs headlong into another fatal obstacle: Federal courts are expressly prohibited from issuing injunctions in labor disputes like this one. The Norris-LaGuardia Act ("NLGA") divests federal courts of "jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute." 29 U.S.C. § 101; *see also Local Union No. 733 of the Int'l Bhd. Of Elec. Workers v. Ingalls Shipbuilding Div., Litton Sys., Inc.*, 906 F.2d 149, 152 (5th Cir. 1990) ("The [NLGA] removes, in large part, the jurisdiction of the federal courts to issue injunctions in labor disputes."). The NLGA defines "labor dispute" broadly to include "any controversy concerning terms or conditions of employment." *Id*. § 113(c); *see also Brady v. NFL*, 640 F.3d 785, 789 (8th Cir. 2011) ("Congress wrote the [NLGA] . . . to take the federal courts 'out of the labor injunction business.'") (quoting *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982)).

The NFLPA's request for a temporary restraining order and injunction falls squarely within that statutory prohibition. The NFLPA maintains "that Elliott was deprived of his labor and arbitral law rights to a fundamentally fair" labor arbitration proceeding. (ECF #1 at 30.) That alleged deprivation, which unquestionably concerns the terms and conditions of Elliott's employment, is a "labor dispute" under the NLGA. *See, e.g.*, *NFLPA v. NFL*, 724 F. Supp. 1027, 1027 (D.D.C. 1989) (NLGA does not permit injunction against NFL's suspension of players); *Taylor v. Sw. Bell Tel. Co.*, 251 F.3d 735 (8th Cir. 2001) (vacating injunction restraining arbitration of employee's termination). The NFLPA makes no attempt to show that this case falls

outside of the NLGA.[4]  This Court is therefore barred from "issu[ing] any restraining order or temporary or permanent injunction." 29 U.S.C. § 101.

## II. THE NFLPA CANNOT SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER

Even if the NFLPA could somehow overcome these jurisdictional and statutory bars, it has not come close to meeting the burden for seeking the extraordinary remedy of a temporary restraining order:  "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest." *Dickey's Barbeque Pit, Inc. v. Celebrated Affairs Catering, Inc.*, 2017 WL 1079431, at *2 (E.D. Tex. Mar. 22, 2017) (Mazzant, J.) (citing *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008)).  The Fifth Circuit "has repeatedly cautioned that 'a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on *all four* requirements.'" *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (quoting *Tex. Med. Providers Performing Abortion Serv. v. Lackey*, 667 F.3d 570, 574 (5th Cir. 2012) (emphasis added)).  The NFLPA cannot carry its burden as to any of them.

### A. The NFLPA Cannot Succeed On The Merits

"An 'absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law.'" *Tex. Med. Providers*,

---

[4] The NFLPA has not alleged that this case falls within the narrow "unlawful acts" exception to the NLGA's broad prohibition on injunctive relief. 29 U.S.C. § 107 (providing for an exception only upon a showing that, *inter alia*, "unlawful acts have been threatened"); *see also Boys Mkts., Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970) (permitting injunction of a strike so long as employer has agreed to arbitrate the dispute).

9

667 F.3d at 574 (quoting *Lake Charles Diesel, Inc v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003)). That absence of likely success on the merits is fatal to the NFLPA's motion.

"[J]udicial review of an arbitration award arising from the terms of a CBA is narrowly limited." *Albemarle Corp. v. United Steel Workers*, 703 F.3d 821, (5th Cir. 2013) (internal quotation marks and citation omitted). "'As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.'" *Id.* (quoting *Misco*, 484 U.S. at 38). "If the arbitrator acted within the ambit of his authority," then "the arbitrator's construction and award must be affirmed no matter how 'good, bad, or ugly.'" *United Steel v. Delek Ref., Ltd.*, 575 F. App'x 330, 333 (5th Cir. 2014) (quoting *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2071 (2013)); *see also Brady*, 820 F.3d at 536. Settled precedent makes clear that federal district courts "'have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.'" *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Misco*, 484 U.S. at 37 (quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568 (1960))). Likewise, any procedural rulings "which grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *Misco*, 484 U.S. at 40. Accordingly, under the LMRA, an award will only be set aside where the arbitrator "dispensed his own brand of industrial justice." *See Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 495 (5th Cir. 2003); *Holmes*, 939 F. Supp. at 524.

The NFLPA makes two arguments for why the forthcoming award is "fundamentally unfair," but neither comes close to satisfying this "narrowly limited" standard of review.

*First*, the NFLPA repeats the same argument it made in arbitration to support overturning or reducing Elliott's suspension: that suspending Elliott would be unfair because the concerns

expressed by Roberts about Thompson's credibility and the sufficiency of the evidence were "conceal[ed] from the NFLPA, Elliott, the Commissioner, and his panel of outside expert advisors." (ECF #5 at 10). That claim, which remains under review by the Arbitrator, is wrong as a factual matter because all of the evidence underlying Roberts' concerns was specifically included in the investigative report and the Commissioner was specifically informed of Roberts' concerns. (*See, e.g.*, Elliott Report, Ex. 99; Hearing Tr. (Day 1) at 142-43, 249-50; *id.* (Day 2) at 266-67, 301-02, 320-24, 336-39.) His subsequent determination, made after *additional* evidence was developed in the record, and after which he had the opportunity to receive other expert opinions from the advisors, thus fell within his disciplinary authority.

In fact, the parties agreed in the CBA that only the Commissioner has authority to decide whether a violation has occurred. Nothing in the CBA requires the Commissioner (or, for that matter, the Arbitrator) to defer to the opinion of a member of his staff, particularly after he has received additional evidence and other expert opinions. *See NFLPA v. NFLMC* (2016) (Marks, Arb.), attached as Exhibit A to the Declaration of Eric Gambrell at 30-40 (holding that under Article 46, only the Commissioner is authorized to decide whether a player has engaged in conduct detrimental to the NFL, and that decision may not be delegated to a member of his staff). Thus, the NFLPA's argument also fails as a matter of law because there "simply is no fundamental unfairness in affording the parties precisely what they agreed on." *Brady*, 820 F.3d at 547; *see also Peterson*, 831 F.3d at 999 (the NFLPA cannot "identify any structural unfairness in the Article 46 arbitration process for which it bargained").[5]

---

[5] This case is therefore nothing like *Gulf Coast Industrial Workers Union v. Exxon Co., USA*, 70 F.3d 847 (5th Cir. 1995), relied upon by the NFLPA, where a labor arbitration award was vacated because of arbitrator misconduct. In *Exxon*, the arbitrator expressly told the employer at the hearing that evidence critical to the dispute—the record of a terminated employee's positive drug test—had been admitted as a business record, but then refused to consider the test results in ordering that the employee be reinstated. *Id.* at 848-50. Here, there is no

*Second*, the NFLPA also argues that the Arbitrator should have compelled the NFL to produce Thompson at the hearing, or compelled the testimony of the Commissioner. But both are "procedural questions that arise during arbitration . . . [that] are left to the sound discretion of the arbitrator and should not be second-guessed by the courts." *Brady,* 820 F.3d at 545 (citing *Misco*, 484 U.S. at 40); *see also Columbian Chems. Co.*, 331 F.3d at 491 (refusal of arbitrator to approve subpoena of documents "did not yield a fundamentally unfair hearing under the LMRA"). The CBA does not require the testimony of any witnesses in an Article 46 hearing, let alone the testimony of every witness the parties ask to present. Instead, the parties agreed in collective bargaining to leave the determination of what testimony is appropriate to the sound discretion of the Arbitrator. His decision not to compel Thompson's testimony was plainly grounded in the CBA and cannot provide a basis to vacate his final award.

Indeed, in *Holmes*, the federal district court rejected this very "right to confront" argument, holding that the procedure chosen by the arbitrator (NFL Commissioner Paul Tagliabue)—in which a suspended player was denied the opportunity to, *inter alia*, cross-examine witnesses—"in effect, was a construction of what the . . . CBA required." 939 F. Supp. at 524 (citing *Misco*, 484 U.S. at 39). The court went on to explain:

> If an arbitrator's procedural error is "not in bad faith or so gross as to amount to affirmative misconduct," it will not warrant judicial intervention. Indeed, the "instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct" are "very rare."

*Id.* at 524-25 (quoting *Misco*, 484 U.S. at 40); *see also Brady,* 820 F.3d at 545-47 (holding failure to compel production of investigative notes and testimony of NFL General Counsel regarding role in preparation of investigative report did not constitute "fundamental unfairness").

---

allegation or evidence that the NFLPA was misled by the Arbitrator—or anyone else—concerning the evidence considered by the Commissioner or that is before the Arbitrator.

"Had the [NFLPA and NFL] wished to allow for more expansive discovery, they could have bargained for that right." *Brady*, 820 F.3d at 547. But "[t]hey did not, and there is simply no fundamental unfairness in affording the parties precisely what they agreed on." *Id.*[6] Elliott and the NFLPA were fully informed of the claims against Elliott, given voluminous evidence (including transcripts and summaries of Thompson's statements to the NFL) to support the claims, and afforded a full and fair opportunity to respond. Nothing more is required.[7]

### B. Neither Elliott Nor the NFLPA Will Suffer Irreparable Harm.

The NFLPA also fails to demonstrate that Elliott is "likely to suffer irreparable harm in the absence of preliminary relief." *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016) (Mazzant, J.) (internal quotation marks and citation omitted). "Harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* (internal quotation marks and citation omitted). "An injunction is appropriate only if the anticipated injury is imminent and not speculative." *Id.* (citation omitted).

The NFLPA's primary complaint is that Elliott's suspension will cause him to miss work and cost him current and future earnings. (ECF #5-1 ¶¶ 5-8, 10.). But missing work is a quintessential economic harm that does *not* constitute irreparable harm. *See Sampson v. Murray*,

---

[6] Other labor arbitration cases are in accord. "'[A]rbitral factfinding is generally not equivalent to judicial factfinding … the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath are often severely limited or unavailable.'" *Gonzalez v. S. Pac. Transp. Co.*, 773 F.2d 637, 643-44 (5th Cir. 1985) (quoting *McDonald v. City of W. Branch*, 466 U.S. 284, 291 (1984)). "A party [to a labor arbitration] does not have an absolute right to cross-examination." *Sunshine Min. Co. v. United Steelworkers of Am., AFL-CIO*, 823 F.2d 1289, 1295 (9th Cir. 1987). Instead, an employee "receive[s] industrial due process" if he has a "notice of the grievances against [him] and an opportunity to be heard." *Teamsters*, 735 F.2d at 906.

[7] The NFLPA's reliance on *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300–01 (5th Cir. 2004), as support for its argument that "[a]n arbitrator's unreasonable restriction of access to evidence, both documentary and testimonial, that is important to the case is a recognized ground for vacatur within the Fifth Circuit" (ECF #5 at 9) is completely misplaced. *Karaha Bodas* involved a foreign arbitration award governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards and thus has nothing to do with review of labor arbitration awards under the LMRA. *See* 364 F.3d at 281. In any event, as the NFLPA concedes, in *Karaha Bodas*, the foreign award was affirmed notwithstanding the arbitrator's restrictions on discovery. *Id.* at 302.

415 U.S. 61, 90 (1974) ("[T]emporary loss of income . . . does not usually constitute irreparable injury."). The same rule applies to professional athletes; under labor law, there is no "satisfactory basis for distinguishing football players from other organized workers." *Brown v. Pro Football, Inc.,* 518 U.S. 231, 249-50 (1996).

The NFLPA also alleges Elliott will be subject to reputational harm because it is difficult "to reverse a nationally ingrained perception that the athlete committed domestic abuse." (ECF #5 at 13). Reputational damage, however, generally does not constitute "irreparable" harm. *See, e.g.*, *Sampson*, 415 U.S. at 91-92. Nor does the NFLPA explain how an injunction will change the perception. To the extent Elliott has suffered reputational harm, that harm is due to his own actions, including the well-publicized actions that led Thompson to call the Columbus Police Department. The public's perception of Elliott will not change based on entry of a temporary restraining order related to an Arbitrator's evidentiary rulings. The NFLPA's concerns about reputational harm ring especially hollow given the avalanche of publicity the *NFLPA engendered* by filing the damning details of Elliott's misconduct on a public docket.[8]

Finally, the NFLPA's contentions that Elliott's absence will prevent the Dallas Cowboys from making the Super Bowl and Elliott from winning a rushing title are purely speculative. Those milestones are extraordinarily difficult to achieve regardless of whether Elliott plays. Such speculative harm cannot satisfy the NFLPA's burden. *See, e.g.*, *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987) ("speculative injury does not constitute a showing of irreparable harm"); *Nat'l Football League Players Ass'n v. Nat'l Football League*, 724 F. Supp. 1027, 1028 (D.D.C. 1989) (alleged damage to "players' skills, reputations, and professional careers" as a result of steroid suspensions do not constitute irreparable harm).

---

[8] *See, e.g.*, https://sportsday.dallasnews.com/dallas-cowboys/cowboys/2017/09/01/sex-drugs-abortion-ezekiel-elliotts-defense-might-make-look-worse.

### C.   The Remaining Factors Do Not Support an Injunction

The NFLPA also fails to establish that the balance of hardships and public interest favor entry of a temporary restraining order. The harm that Elliott may suffer if the suspension is not enjoined, as noted above, is either compensable or speculative. By contrast, an injunction will significantly harm the NFL and national labor policy. It is the "decided preference" of federal labor policy "for private settlement of labor disputes without the intervention of government." *Misco,* 484 U.S. at 36; *see also* 29 U.S.C. § 173(d). Here, the NFL and the NFLPA have bargained for an internal grievance process with streamlined appeal procedures that produce a "full, final, and complete disposition of the dispute . . . ." (ECF #No. 1-62 (Kessler Decl., Ex. A-NFLPA-58), Art. 46, Sec. 2(d).) An injunction would eviscerate these agreed-to procedures, frustrate the NFL's ability to efficiently and effectively enforce the Policy, and impact the competitive landscape as the courts, rather than the NFL itself, would dictate League personnel decisions. It also would undermine the strong public policy in favor of the "private settlement of labor disputes." *Misco,* 484 U.S. at 36.

Finally, to the extent it can be said that there is a public interest in a particular player's participation in six of his team's games, that hardly outweighs the public's interest in the prevention of domestic violence and violence against women.

### CONCLUSION

For the foregoing reasons, and those stated in the accompanying Motion to Dismiss, the NFLPA's motion for a temporary restraining order should be denied.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

*/s/ Eric Gambrell*
Eric Gambrell
egambrell@akingump.com
Texas Bar No. 00790735
*Lead Attorney*
Patrick G. O'Brien
pobrien@akingump.com
Texas Bar No. 24046541
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

Daniel L. Nash
*Pro hac vice* application pending
dnash@akingump.com
Nathan J. Oleson
*Pro hac vice* application pending
noleson@akingump.com
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

ATTORNEYS FOR RESPONDENTS NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 4th day of September, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case who have consented in writing to accept this Notice as service of this document by electronic means.

                */s/ Eric Gambrell*