

NATIONAL FOOTBALL LEAGUE

September 5, 2017

Jeffrey Kessler, Esq.                          Daniel Nash, Esq.
Winston & Strawn                               Akin Gump
200 Park Avenue                                1333 New Hampshire Ave NW
New York, NY  10166-4193                       Washington, DC 20036

### Re:  Ezekiel Elliott Appeal – Player Conduct Policy

Gentlemen:

Ezekiel Elliot, a player with the Dallas Cowboys, was notified by letter from B. Todd Jones dated August 11, 2017, (i) that he was suspended without pay for the first six games of the 2017 season, and (ii) that he was directed to engage a qualified professional to arrange a clinical evaluation and, should counseling or treatment be recommended, to comply with those recommendations.

This discipline arose out of several domestic violence incidents in Columbus, Ohio during the week of July 16, 2016. Mr. Elliott's role in those incidents was found to have violated the NFL Personal Conduct Policy (the "Policy"). A timely appeal was filed on Mr. Elliot's behalf by the NFLPA, which appeal was heard on August 29, August 30, and September 1. This letter sets forth the decision regarding that appeal, which follows careful review and consideration of the evidence in the record, including witness testimony and documents submitted by the parties, as well as arguments of counsel that were made at the hearing.

### BACKGROUND

In late July, 2016 the NFL became aware of allegations by Tiffany Thompson that Mr. Elliott had committed multiple acts of physical violence against her in Columbus, Ohio during the week of July 16, 2016. Those allegations were investigated by the Columbus Police Department and no arrest was made at that time. Subsequently, on September 6, 2016, the Columbus City Attorney's office publicly announced its decision not to pursue a criminal prosecution with respect to those incidents, "primarily due to conflicting and inconsistent information across all incidents resulting in concern regarding the sufficiency of the evidence to support the filing of criminal charges." NFL Exh. B-2 at Exh. 102.

The NFL learned of this announcement and promptly initiated an investigation of the allegations against Mr. Elliott under the direction of Ms. Lisa Friel, NFL Senior Vice President - Special Counsel for Investigations. An extensive investigation followed, which culminated in a report submitted by Ms. Friel and Kia Roberts, Director of Investigations, submitted on June 6,

2017. That report addressed interviews of Ms. Thompson and Mr. Elliott conducted on September 26 and September 28, 2016, respectively. Ms. Thompson was interviewed one other time in person, and four times by telephone.

After the report was submitted and shared with the NFLPA and counsel for Mr. Elliott, he was interviewed on June 26, 2017 by a panel of advisors selected by the Commissioner to advise him on this case. Mr. Elliott's counsel and NFLPA counsel were present for that interview, along with NFL executives and counsel. The transcript of that interview is part of this record. NFL Exh.E.

On August 11, 2017, Mr. Jones' discipline letter (NFL Exh.A-1) was sent, which included the following:

> The Commissioner has now had the opportunity to review the record, including the investigative reports, transcripts of the June 26, 2017 meeting and the materials submitted on your behalf. He also consulted separately with each of the independent advisers concerning the evidence and the points made by your representatives. In that respect, the advisers individually were of the view that there is substantial and persuasive evidence supporting a finding that you engaged in physical violence against Ms. Thompson on multiple occasions during the week of July 16, 2016. The Commissioner has considered those views in the context of his evaluation of the record and the advice and recommendations of the advisers have helped to inform his findings and conclusions, which are set forth below. NFL Exhibit A-1, P.3.

The Commissioner found, based on the credible evidence in the record, that on three occasions Mr. Elliott had used physical force against Ms. Thompson resulting in her injury:

1)Early morning of July 17, 2016 at 1860 Canvasback Lane, Columbus, Ohio Mr. Elliott used physical force that caused injuries to Ms. Thompson's arms neck and shoulders which appear recent and consistent with Ms. Thompson's description of the incident and how that occurred.

2) On the morning of July 19, 2016 at the Canvasback Lane apartment, Mr. Elliot used physical force that caused injuries to Ms. Thompson's face, arms, wrists and hands.

3) In early morning hours of July 21, 2016 in an altercation at the Canvasback Lane apartment Mr. Elliott used physical force that caused injuries to Ms. Thompson's face, neck, arms, knees and hips. A witness stated that she observed these injuries to Ms. Thompson later the same day. It was determined that the injuries displayed appear recent and consistent with Ms. Thompson's descriptions of the incident and how they occurred.

Mr. Elliot was disciplined for those three incidents, and not for other incidents on July 18 and 22 that had also been addressed in the investigation.

The investigation also addressed an incident on March 11, 2017 during a Saint Patrick's Day parade in Dallas. A video was posted on the Internet showing Mr. Elliott pulling down the top of

2

a woman's blouse to expose her breast, which conduct he has admitted. No discipline was imposed for that incident, but Mr. Elliott's behavior during that event was inappropriate and disturbing, reflecting a lack of respect for women. When viewed together with the July incidents it suggests a pattern of poor judgment and behavior for which effective intervention is necessary for your personal and professional welfare. Clinical evaluation by a qualified professional was directed, as well as compliance with counseling or treatment recommendations, if any.

### NFLPA POSITION

On behalf of Mr. Elliott the NFLPA argues that the record does not support a determination that credible evidence establishes the existence of a violation of the Policy, so the discipline must be overturned. Tr. pp. 24-25. The NFLPA asserts that the hearing officer under Article 46 of the CBA must apply the fair and consistent standard to decide if the evidence here is credible. The credible evidence standard is newly added in the policy, and did not appear in prior versions.. The NFLPA argues further that where there has been no criminal charge against the player, the credibility of the accuser and accused is key. Because the Commissioner did not interview either in this case, the union argues, he has no basis to judge the credibility of the only two people who directly witnessed the events- Ms. Thompson and Mr. Elliott. On the other hand, the Union contends, the Columbus City Attorney interviewed both and found credibility issues which caused him to decline filing a criminal charge. Columbus police officers who responded to the initial call made the same decision and did not arrest Mr. Elliott because of inconsistent and conflicting statements.

The NFLPA put great significance on the fact that NFL investigators found numerous inconsistencies among Ms. Thompson's statements. Even more significant, in their view, is the absence of a recommendation for discipline in the NFL's extensive investigation report, which they attribute to the lack of credible evidence sufficient to support the existence of a violation. Moreover, they contend that the NFL's refusal to produce Ms. Thompson to testify at the appeal hearing is further evidence of the lack of confidence in her credibility. Counsel for Mr. Elliott said that the hearing officer should draw an adverse inference from her absence and assume that her testimony would not be credible. Tr. 43 – 44.

According to the NFLPA, Ms. Thompson's lack of credibility is demonstrated not only by the many inconsistencies and conflicts in her statements to the league investigators and law enforcement about the events which transpired in the week of July 16, 2017, but on prior occasions as well. For example, in Aventura, FL she called the police to report that Mr. Elliott was assaulting her. Police officers responded and investigated, but declined to make an arrest or charge Mr. Elliott because Ms. Thompson showed no signs of injury and there were no witnesses to the events. According to the NFLPA, there should be no deference given the Commissioner's decision here because important facts were omitted from the Investigation Report and other materials on which he relied. Accordingly, the NFLPA argues, the discipline should be overturned in its entirety because the allegations are not supported by credible evidence as required by the Policy.

**NFL POSITION**

The league contends that the record in this case contains everything the Commissioner relied upon to make his decision on discipline. It includes an investigative report authored by Lisa Friel and Kia Roberts dated June 6, 2017 with exhibits 1-103 attached (NFL Exhibits B-1, B-2). He was also provided the NFL investigation report on the St. Patrick's Day incident (NFL Exhibit C– 1, C-2) and medical reports. (NFL exhibits D-1, D-2) The record also includes the Kia Robinson memorandum on inconsistencies in the Tiffany Thompson statements. NFL Exhibit 99. According to the NFL, in assessing whether discipline is fair and consistent the hearing officer must give deference to the Commissioner's decision. Transcript  p. 84.

The NFL argues that the Commissioner gave careful consideration to all arguments. Tr. 85 According to the NFL, it is the Commissioner's responsibility to assess credibility in the first instance; the hearing officer's job is to review whether his determination is arbitrary and capricious. Tr. p. 86. The NFL contends that the conclusion of the Commissioner on discipline is supported by credible evidence, and that it is beyond the scope of a hearing officer's role to re-examine every bit of evidence and testimony that he reviewed and make a second determination on issues of credibility. Therefore, the NFL argues, the discipline in this case should be upheld.

**DISCUSSION**

I start by turning to the NFL Personal Conduct Policy for guidance in resolving this appeal. This policy originated in 1997 when Commissioner Tagliabue promulgated what was then called a violent crime policy. Over the 20 years since, the policy has been modified several times, usually in response to difficulties and issues that arose in the administration policy, or in response to changing values and standards of society. The most recent changes were adopted and published in 2016 with significant changes in the procedures for discipline. In part, the revised policy provides as follows:

> Discipline– A player violates this policy when he has a disposition of a criminal proceeding (as defined), or if the league's investigation demonstrates that he engaged in conduct prohibited by the Personal Conduct Policy. In cases where a player is not charged with a crime, or is charged but not convicted, he may still be found to have violated the Policy if the credible evidence establishes that he engaged in conduct prohibited by this Personal Conduct Policy.

> The disciplinary officer, a member of the league office staff who will be a highly qualified individual with a criminal justice background, will follow the process outlined below to investigate a potential violation, produce a report and if desired present a disciplinary recommendation for the Commissioner's consideration. The Commissioner will review the report (and recommendation if presented) and determine the appropriate discipline, if any, to be imposed on the player.

To assist in evaluating a potential violation, expert and independent advisers may be consulted by the disciplinary officer, the Commissioner, and others as needed. Such advisers include former players and others with appropriate backgrounds and experience in law enforcement, academia, judicial and public service, mental health, and persons with other specialized subject matter expertise. Any experts or advisors consulted in this respect may provide advice and counsel or testimony as appropriate, but will not make any disciplinary determinations.

Players who are subject to discipline will be given notice of the potential violation for which discipline maybe imposed. The player will be furnished with the records and other reports that were relied on in addressing the matter, including records from law enforcement and a copy of any investigatory report and any documents relied upon by a league investigator in generating this report. The player will be permitted to submit information in writing to rebut or otherwise respond to the report. In addition, he will have the opportunity to meet with the disciplinary officer in advance of discipline being imposed. …

Following review, the Commissioner, either directly or through a member of his staff, will communicate his decision to the player regarding any disciplinary action to be taken. Personal Conduct Policy 2016

In this case the player has not been charged with a crime, so only if credible evidence establishes that he engaged in prohibited conduct may he be found to have violated the Policy. The disciplinary officer, Todd Jones, directed an investigation which was conducted by Lisa Friel, Senior Vice President and Special Counsel-Investigations, and Kia Roberts, Director of Investigations in the League's Security Department, both seasoned prosecutors with extensive experience investigating domestic violence crimes. Both investigators expressed surprise that they were not asked to make a recommendation on discipline based on their investigation and report, and Ms. Roberts could not explain why she was not invited to participate in the meeting with the expert and independent advisors; however, their roles fit squarely into the process outlined in the revised Policy. That process reserves the determination on discipline to the Commissioner by separating the functions; the disciplinary officer will provide a report on the investigation and also a disciplinary recommendation for the Commissioner's consideration "if desired."

Other aspects of the process as outlined in the Policy were followed meticulously. A four person panel of expert and independent advisers reviewed the investigation report and attachments. They interviewed Mr. Elliot, who was accompanied by Union representatives and counsel. He was invited to provide for the record any documents or other evidence he wished to be considered, and he did so. He met with the panel in New York on June 26 2017 where he participated in the discussion and took that opportunity to answer questions and provide information to the panel.

At the opening of that meeting, NFL counsel Adolpho Birch introduced the outside advisers fn/ and stated on the record: "And, importantly, they are not going to be part of the decision-making process in the determination of this discipline. That is not their function as they well understand and as we understand as the policy provides. That matter is committed to the Commissioner. But the role of the advisers us to provide, through their backgrounds and expertise, their perspectives to assist him in formulating his decision as he makes that determination." NFL Exhibit E, p. 8. Ms. Friel asked questions of Mr. Elliott and the advisers asked questions of Ms. Friel and Mr. Elliott.  A transcript of this session was provided to Mr. Elliot that same week. NFL Exhibit 1, p. 3. On July 7 and July 17 Mr. Elliot, through counsel, submitted materials that he wanted to be included in the record. NFL Exhibits F and G.

The hearing transcript shows numerous instances where counsel and witnesses express surprise and dismay at the handling of some aspects of this disciplinary case. I submit that is because they are not fully aware of what the new Policy provides. This may the first time the new process was fully deployed, at least in a case where there was no criminal charge or conviction. Yet, on close inspection one can see a carefully thought out, detailed, multi-faceted process which was adhered to closely. A lack of familiarity does not necessarily mean irregularity. If this is in fact a first effort under the new procedures they got it right.

New Evidence: Mr. Elliott's counsel cites the emergence of "new" evidence not presented to the Commissioner as a basis for overturning the discipline. I need not to decide when new evidence, or its absence in the record, requires revisiting the issue for fairness and consistency because we are not presented such new evidence in this case. New evidence does not include anything the parties knew, or could have known, at the time the discipline was initially imposed.

Alvarez Jackson's corroboration of "everything Mr. Elliott said" surely is not new; Mr. Elliott's best friend since childhood and college roommate, Mr. Jackson cooperated with counsel's efforts to avoid charges against Mr. Elliott in Columbus, spending three hours with the City Attorney. He also provided affidavits on August 2 and again on August 12, 2016. Transcript 2, p. 200; NFL Exhibit B-1, Attachment 42. He testified at the appeal hearing that "I didn't feel that it was necessary to speak with the NFL because I spoke with the prosecutor, we spent a good amount of time together. We got all the facts down and they got it right." Tr. 2, p. 200.

fn/ The panel of advisers was composed of the following:
- Peter Harvey, Esq., former Attorney General for the State of New Jersey
- Mr. Kenneth Houston, former NFL player and member of the Pro Football Hall of Fame
- Ms. Tonya Lovelace, CEO of the Women of Color Network, Inc.; and
-Mary Jo White, Esq., Former United States Attorney for the Southern District of New York and former Chair of the Securities Exchange Commission

Similarly, Macie Hewitt's affidavit presents nothing that was not known, or could not have been known, based on the affidavit itself. She avers that she knows Mr. Elliott socially and that they have several mutual friends, that she attended his private birthday party, and that she was invited to and briefly attended his after-party at the Carriage House. No information was offered to explain the genesis of her affidavit, but I note that no year appears in the date line by the notary's signature and seal, so it is unknown if it was executed a few weeks after the incident or a few days before the hearing, more than a year later. Also, at paragraph 2 of the affidavit, she states that the incident occurred on Thursday, July 21, <u>2017</u>. Absent an explanation as to why this information was not known and available to the player earlier, this is not "new" evidence that would call for reconsideration of the initial disciplinary decision. The affidavit refutes every aspect of Ms. Thompson's account of those events, as well as those of Ms. Mason, and explain the injuries she saw on Instagram the next day- injuries Mr. Elliott and several other witnesses did not see. Players Exh. 57.

The testimony of Ms. Friel and Ms. Roberts was said to reveal new evidence which, according to the NFLPA, would have affected the Commissioner's decision if he had known, namely that due to inconsistent statements they did not find Ms. Thompson sufficiently credible to support discipline in some of the incidents investigated. However, all the statements and inconsistencies are included in the Investigative report and other materials provided to the Commissioner for his review. Their recommendations were not sought or required at that point, pursuant to the recent changes to the Policy.

## CONCLUSION

Appeals under Article 46 of the CBA are, in many ways, a unique exercise in labor arbitrations. It has long been settled that the Commissioner has broad discretion to decide the process for taking action against a player for conduct detrimental to the integrity of, or public confidence in, the game of professional football. That principle, first established in the League's Constitution and Bylaws, has been included in the CBA for many years, through many renegotiations, extensions and new agreements. The unusual and long-established characteristic of this process is the ability of the Commissioner to hear appeals of discipline for conduct detrimental or to appoint a designee to hear the appeal and act in his stead with the same final and binding effect on both parties.

As his designated Hearing Officer in this matter, my responsibility is to determine whether the Commissioner's decision on discipline of Mr. Elliott is arbitrary and capricious, meaning was it made on unreasonable grounds or without any proper consideration of circumstances. It is not the responsibility, nor within the authority of, the Hearing Officer to conduct a *de novo* review of the case and second guess his decision. Rather, the review is to determine whether the player was afforded adequate notice of his alleged violation, the right to representation, opportunity to present evidence, and a decision which is fair and consistent. In a case involving violation of a policy, fair and consistent means whether the process and result were in compliance with the terms of that policy. This one is, in every respect.

Here the process for imposing discipline outlined in the Policy has been followed closely, step by step. I find it unnecessary to reexamine all the evidence presented in this record because my careful and diligent review of everything the Commissioner reviewed and relied on draws me to the conclusion that the record contains sufficient credible evidence to support whatever determinations he made. He is entitled to deference on those judgments absent irregularities not present here. While the record contains inconsistencies in statements, an adjudicator makes informed judgments on the credibility of witnesses and evidence.

The Commissioner's determination is affirmed and the appeal is denied.

Sincerely,

Harold Henderson (cf)

Harold Henderson
Hearing Officer

cc: Heather McPhee, Esq.
    Adolpho Birch, Esq.