# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

NATIONAL FOOTBALL LEAGUE §
PLAYERS ASSOCIATION, on its own §
behalf and on behalf of EZEKIEL ELLIOTT §
§
§   Civil Action No.  4:17-CV-00615
v.   §   Judge Mazzant
§
NATIONAL FOOTBALL LEAGUE and §
NATIONAL FOOTBALL LEAGUE §
MANAGEMENT COUNCIL §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Petitioner's Emergency Motion for Temporary Restraining Order or Preliminary Injunction (Dkt. #5).  The Court has a very limited role in this case.  The Court is being called upon to determine, at this preliminary stage, whether Dallas Cowboys running back Ezekiel Elliott ("Elliott") received a fundamentally fair arbitration hearing.  The question of whether there was credible evidence of domestic abuse is not before the Court. Nor are any of the underlying facts in the dispute between Elliott and Tiffany Thompson ("Thompson").  Based upon the preliminary injunction standard, the Court finds, that Elliott did not receive a fundamentally fair hearing, necessitating the Court grant the request for preliminary injunction.[1]

---

[1] Petitioner moved for a temporary restraining order or preliminary injunction.  A temporary restraining order is generally used in a situation in which the defendant or, in this case respondent, did not have notice or the opportunity to respond to the motion.  If a court finds a temporary restraining order is warranted, it will go into effect for no more than fourteen days, and the court would set a hearing to determine whether it should issue a preliminary injunction. Here, the National Football League and National Football League Management Council (collectively, "NFL") had the opportunity to respond. The Court held a hearing on the motion, at which the NFL presented its arguments, and both parties filed supplemental briefing after the hearing.  Considering the procedural history in this case, the Court proceeds on a preliminary injunction analysis.

## BACKGROUND

This dispute centers on the NFL Commissioner Roger Goodell's ("Commissioner" or "Goodell" or "Commissioner Goodell") decision to suspend Elliott for six games due to allegations of domestic violence made by Thompson.  In July 2016, Columbus, Ohio law enforcement officers investigated allegations made by Thompson against Elliott for domestic violence.  After the initial investigation on the scene, law enforcement officers found no probable cause for an arrest, due to "conflicting versions of what had taken place over the listed dates."  (Dkt. #5 at p. 4).  The police continued to investigate the incidents until September; however, law enforcement officers decided not to criminally prosecute Elliott given the "conflicting and inconsistent information across all incidents."  (Dkt. #1, Exhibit 43 at p. 2).

Pursuant to the NFL's Personal Conduct Policy ("PCP"), the Commissioner may discipline players even without a criminal charge, arrest, or conviction. (Dkt. #1, Exhibit 22 at p. 5).  However, discipline is only warranted when "credible evidence establishes that [the player] engaged in conduct prohibited by this [PCP]."  (Dkt. #1, Exhibit 22 at p. 5).  Thus, following law enforcement's investigation, the NFL engaged in its own investigation of Elliott's alleged conduct.  Kia Roberts ("Roberts"), Director of Investigations, and Lisa Friel ("Friel"), Senior Vice President and Special Counsel for Investigations, investigated the accusations against Elliott for an entire year.  After the investigation, Roberts and Friel assembled the NFL Investigative Report ("the Elliott Report").  The Commissioner also assembled outside advisors who met on June 26, 2017, and interviewed Elliott. (Dkt. #2, Exhibit 13 at 117:10–21, 337:3–9 (Aug. 30, 2017)).

On August 11, 2017, B. Todd Jones sent Elliott a letter informing him that Commissioner Goodell decided to impose a six-game suspension on Elliott.  Jones stated that, in making his decision, the Commissioner reviewed "the record, including [the Elliott Report], the transcript of

the June 26, 2017 meeting, and the material submitted on [Elliott's] behalf." (Dkt. #1, Exhibit 53 at p. 4).

After receiving the letter, Elliott filed his appeal pursuant to the NFL–National Football League Players Association's ("NFLPA") Collective Bargaining Agreement (the "CBA"). The appeal went to an arbitrator charged with determining whether Commissioner Goodell's disciplinary decision was arbitrary and capricious. (Dkt. #23, Exhibit 2 at p. 7). In other words, the arbitrator decides whether Goodell's decision was made on unreasonable grounds or without any proper consideration of circumstances. (Dkt. #23, Exhibit 2 at p. 7).

While preparing for arbitration, the NFLPA filed a motion to compel requesting the arbitrator, Harold Henderson ("Henderson"), order the NFL to provide Thompson for cross-examination, along with the NFL investigators' notes. (Dkt. #1, Exhibit 57). The arbitrator denied the request, stating "[t]he Commissioner's decision in this case was based on affidavits, statements, and interview reports, all of which are available to Mr. Elliott under the procedures of the [CBA]." (Dkt. #1, Exhibit 59). In that same motion, the NFLPA also asked Henderson to order the NFL to provide Roberts to testify. (Dkt. #1, Exhibit 57). The NFL responded to the request arguing that Henderson should deny the NFLPA's request because Roberts's testimony was cumulative and unnecessary. (Dkt. #1, Exhibit 58). Henderson granted the NFLPA's motion to compel Roberts to testify at the arbitration proceeding.

During the arbitration, the NFLPA and Elliott discovered Roberts's conclusions that Thompson's accusations were incredible, inconsistent, and without corroborating evidence to sufficiently support any discipline against Elliott. (Dkt. #2, Exhibit 13 at 143:5–8, 172:21–24, 173:9–22, 175:4–19 (Aug. 29, 2017); Dkt. #2, Exhibit 13 at 301:23–302:4 (Aug. 30, 2017)). Further, the NFLPA and Elliott learned that Commissioner Goodell had a meeting with Friel and

outside advisors, from which Roberts was excluded.  Following this revelation, the NFLPA asked Henderson to compel Commissioner Goodell to testify to determine whether critical facts were concealed from Commissioner Goodell during the decision-making process; however, the arbitrator denied the request.  (Dkt. #2, Exhibit 13 at 348:18–349:15 (Aug. 30, 2017)).

On August 31, 2017, the three-day arbitration concluded.  Henderson announced he would issue a decision shortly after.  On September 1, 2017, the NFLPA, on behalf of Elliott, sued the NFL seeking vacatur of Henderson's impending decision based on the factual scenario presented in this case.  Further, the NFLPA, on behalf of Elliott, filed this emergency motion for a temporary restraining order or preliminary injunction, due to the fast-approaching NFL season (Dkt. #5).  On September 5, 2017, after suit was filed, and during the Court's hearing on Petitioner's motion, Henderson affirmed Commissioner Goodell's six-game suspension of Elliott.[2]

## APPLICABLE LAW

Under Rule 65 of the Federal Rules of Civil Procedure, "[e]very order granting an injunction and every restraining order must: (a) state the reasons why it issued; (b) state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required."  FED. R. CIV. P. 65(d).  A plaintiff seeking a temporary restraining order must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest.  *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

---

[2] Because the award was issued at the hearing, the Court instructed that if the parties wished to file supplemental briefing regarding the effect of the award on the Court's analysis, they should do so by 5:00 p.m. on September 6, 2017.  Both parties field supplemental briefs (Dkt. #23; Dkt. #24).  The NFLPA filed a Motion to Strike or Alternatively Leave to File Second Supplemental Brief arguing that Section I of the NFL's brief was outside the scope of what the Court ordered (Dkt. #25).  The NFL field a response (Dkt. #26). The Court will only consider portions of the supplemental briefs that were ordered by the Court, which is the portions pertaining to the arbitration award.

## ANALYSIS

The NFLPA asks this Court to issue a temporary restraining order or a preliminary injunction to maintain the status quo until a decision on the merits of the petition for vacatur can be decided.  The NFL argues that this Court lacks subject matter jurisdiction to hear the case.  The NFL further asserts that even if the Court does have jurisdiction, the elements are not met for a preliminary injunction.  Before the Court can address the preliminary injunction's merits, the Court must address its subject matter jurisdiction.[3]

### I.      Subject Matter Jurisdiction

The NFL argues the Court lacks jurisdiction over the case for three reasons: (1) the Court cannot vacate a hypothetical award under any statutory scheme; (2) the NFLPA does not have standing to assert a petition for vacatur before an award is issued; and (3) the claim is not ripe until Henderson issues the award. The Court will address each argument in turn.

#### A. Vacatur of Hypothetical Award

The NFL contends that no statute provides the Court with jurisdiction to review a hypothetical award.[4]  Specifically, the NFL claims that the Federal Arbitration Act ("FAA"), the Labor Management Relations Act ("LMRA"), and the Norris–LaGuardia Act ("NLGA") prevent the Court from having jurisdiction in this case.

At the hearing, both parties agreed that the FAA does not confer jurisdiction to the Court, and jurisdiction derives from the LMRA.  Therefore, the Court will focus on the NFL's argument concerning the LMRA.  The NFL maintains that, under the LMRA, federal courts do not have

---

[3] The Court notes that the NFL have filed a motion to dismiss, arguing the Court does not have jurisdiction.  However, this motion is not ripe.  The Court will address the motion to dismiss once the briefing is complete and ripe for review.
[4] These arguments were initially made before Henderson issued an arbitral award. Because jurisdiction is established at the time suit is filed, the Court will address its subject matter jurisdiction at the time the NFLPA filed its petition. *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004).

jurisdiction over a violation of a collective bargaining agreement unless the employee exhausts the procedures provided for in the agreement.  The NFL asserts that when the agreement provides for arbitration as a procedure, as it is here, exhaustion does not occur until the award is final and complete.  The NFL contends that NFLPA did not properly exhaust its remedies because the NFLPA filed its suit before Henderson issued his final arbitration award.  Therefore, the NFL argues that the Court does not have jurisdiction over the NFLPA's claim.

For a federal court to maintain jurisdiction over the alleged breach of a collective bargaining agreement, an LMRA "claim must satisfy three requirements: (1) a claim of a violation of (2) a contract (3) between an employer and a labor organization." *Carpenters Local Union 1846 of United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 500 (5th Cir. 1982).  As long as these three requirements are met an individual can sue for breach of the collective bargaining agreement. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163 (1983) (citing *Smith v. Evening News Ass'n*, 371 U.S. 195 (1962)).  Here, the NFLPA alleges a violation of a contract, the CBA. The CBA was entered into by the NFLPA, a labor organization, and the NFL, an employer.

The NFL is correct that an individual is generally required to exhaust, or at least attempt to exhaust, any remedies provided for in the collective bargaining agreement before filing suit in a federal court.  However, the Supreme Court and the Fifth Circuit have recognized exceptions to this exhaustion requirement. *Id.* (first citing *Rep. Steel Corp. v. Maddox*, 379 U.S. 650 (1965); then citing *Clayton v. Auto. Workers*, 451 U.S. 679 (1981)); *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 328 (1969); *Bache v. AT&T*, 840 F.2d 283, 288 (5th Cir. 1988).  The Fifth Circuit identified that exhaustion is not required if:

> (1) the union wrongfully refuses to process the employee's grievances, thus, violating its duty of fair representation; (2) the employer's conduct amounts to a

> repudiation of the remedial procedures specified in the contract; or (3) exhaustion of contractual remedies would be futile because the aggrieved employee would have to submit his claim to a group "which is in large part chosen by the (employer and union) against whom (his) real complaint is made."

*Rabalais v. Dresser Indus., Inc.*, 566 F.2d 518, 519 (5th Cir. 1978) (quoting *Glover*, 393 U.S. at 330) (citing *Vaca v. Sipes*, 386 U.S. 171 (1967); *Boone v. Armstrong Cork Co.*, 384 F.2d 285 (5th Cir. 1967)); *accord Wardlow v. Ark. Best Corp.*, 261 F.3d 138, 141–42 (5th Cir. 1959); *McNealy v. Becnel*, No. 14-2181, 2017 WL 2313143, at *8 (E.D. La. May 26, 2017).  The Court focuses on the second exception to the exhaustion requirement: "when the employer's conduct amounts to a repudiation of the remedial procedures specified in the contract." *Rabalais*, 566 F.2d at 519 (5th Cir. 1978) (quoting *Glover*, 393 U.S. at 330).  A repudiation "occurs when a party's conduct 'shows a fixed intention to abandon, renounce, and refuse to perform the contract.'" *Plains Cotton Coop. Assoc. v. Gray*, 672 F. App'x 372, 375 (5th Cir. 2016) (quoting *Hunter v. Pricekubecka, PLLC*, 339 S.W.3d 795, 802 (Tex. App.—Dallas, 2011, no pet.)).

The Court finds that the facts of this case do not require exhaustion.  The allegations that the NFL withheld evidence from the NFLPA and Elliott amount to a repudiation of the required procedures specified in the CBA.  The CBA requires that the "NFLPA and NFL have the right to attend all hearings provided for in [Article 46] and to present, by testimony or otherwise, any evidence relevant to the hearing."  (Dkt. #1, Exhibit 62 at p. 209).  Here, the NFLPA contends that the NFL withheld information regarding Roberts's assessment of Thompson's credibility and the credibility of the evidence from the NFLPA, Elliott, and *possibly* Commissioner Goodell.  According to the facts before the Court, Roberts, a primary investigator of Elliott's case, developed opinions about the credibility of witnesses she interviewed, including Thompson, as well as whether to issue punishment in the case.  This information was not put into the Elliott Report and may not have been communicated to Commissioner Goodell.  Because this information was not in

the Elliott Report or any other documentary evidence the NFL provided to the NFLPA, neither the NFLPA nor Elliott knew about Roberts's opinions.  Thus, the Court finds, the NFL further sought to ensure that the NFLPA and Elliott would never find out about Roberts's opinions by arguing that her testimony would be cumulative of Friel's and unnecessary in the arbitration.[5]  (Dkt. #1, Exhibit 58).  While the last effort failed, the NFL's initial efforts to stop the NFLPA and Elliott from learning of the relevant evidence of Roberts's opinions were successful.  The NFLPA and Elliott were unable to present this relevant evidence and instead unexpectedly learned this at the end of the second day of arbitration.

The NFL's breach of the CBA is only compounded by Henderson's breach of the CBA. Specifically, Henderson denied access to certain procedural requirements, which were necessary to be able to present all relevant evidence at the hearing.  These procedural requests, that Henderson denied are: (1) access investigators' notes; (2) cross-examine Thompson; and (3) question Commissioner Goodell.  Since Henderson barred access to the investigators' notes, Thompson's cross-examination, and the examination of Commissioner Goodell, and each was of utmost importance and extremely relevant to the hearing, Henderson breached the CBA.  Although a breach of the agreement by an arbitrator is not a recognized exception of the exhaustion requirement, Henderson's breach further supports allowing an exception in this case.  Because both the NFL and Henderson breached their obligations under the CBA the Court finds exhaustion of the NFLPA's remedies unnecessary.

However, even if the Court required exhaustion in this case, the NFLPA properly exhausted its remedies.  While the NFLPA did not wait for the final arbitration award, the NFLPA submitted its requests to Henderson, which he denied.  In doing so, the NFLPA properly submitted its fairness

---

[5] The NFL further argued at the hearing that Roberts's testimony was consistent with Friel's, but this language was not included in their response to the motion to compel.

objections to the arbitrator before seeking judicial review.  *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 487 (5th Cir. 2002) (citing *Hooters of Am., Inc. v. Phillips*, 173 F.3d 953, 940–41 (4th Cir. 1999)).  The NFLPA had no further action to take.

The NFL criticizes the NFLPA for not supporting this theory of exhaustion with any case law.  Notably, absent from the NFL's briefing on the jurisdictional issue is any case law where a court held that the petitioner or plaintiff failed to exhaust their remedies in a situation similar to the one before the Court.  Specifically, where the claim was submitted to the arbitrator and the arbitrator had already decided all the pertinent procedural issues, which in turn make up the claim for fundamental unfairness.  For example, the NFL cites to the Fifth Circuit's decision in *Meredith v. Louisiana Federation of Teachers* for the proposition that an employee must exhaust all contractual procedures for redress before filing suit in federal court.  209 F.3d 398, 402 (5th Cir. 2000).  However, in *Meredith*, the employee did not seek to compel arbitration.  *Id.*  Here, the NFLPA sought arbitration, submitted requests to the arbitrator, and received a decision from the arbitrator on these requests.

The NFL also argues federal courts are prohibited from issuing injunctions in labor disputes based on the NLGA.  The NFLPA counters that this action is not barred under the NLGA because injunctions involving labor disputes are allowed when the requested relief would not operate to enjoin a strike or otherwise peaceful, concerned labor activity.  The NFLPA maintains that it seeks to enforce the terms of the CBA and prevent illegal conduct imposed against Elliott.  This argument is persuasive.  The Court joins numerous other courts in holding the NLGA does not prevent an injunction in this scenario.  *Mackey v. Nat'l Football League*, 543 F.2d 606, 623 (8th Cir. 1976); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 234–235 (D. Minn. 1992); *Denver Rockets v.*

*All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1066–1067 (C.D. Cal 1971), *reinstated by Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204 (1971).

### B. Standing

The NFL asserts that the NFLPA lacks standing to assert the petition for vacatur because the petition was filed before Henderson issued an award.  Further, the NFL claims Elliott will not suffer an injury unless Henderson's award affirms Goodell's suspension in whole or in part. Nevertheless, the NFL contends that even if any injury existed, the Court could not redress it. Additionally, the NFL asserts that the NFLPA's claim is not ripe because the NFLPA filed its petition before Henderson issued the award.

"The Constitution (article 3, § 2) limits the exercise of judicial power to 'cases' and 'controversies.'"  *Aetna Life Ins. Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, 239 (1937). Both the standing and the ripeness requirements are crucial elements to the justiciability of a case. *See Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007).  Standing and ripeness are related, yet separate, inquiries.  *See id.*  "In simple terms, 'standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time."  *Id.*

To establish standing, a plaintiff must meet three elements.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61; *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 454 (5th Cir. 2017).  First, a plaintiff must prove he has sustained an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical.  *Planned Parenthood*, 862 F.3d at 454.  Second, there must be a causal connection between the injury and the conduct complained of.  *Id.*  Third, a favorable decision is likely to redress the injury.  *Id.*  An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial

risk that the harm will occur.  *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014)).

First, Elliott will sustain a concrete and particular injury, immediate suspension from practices and games, if Henderson, affirms the Commissioner's suspension, whether in full or in part.  The NFL argues because Henderson has not issued an award, Elliott has not sustained an injury.  However, "this argument ignores the well-established principle that a threatened injury may be sufficient to establish standing."  *Id.* (citing *Loa-Herrera v. Trominski*, 231 F.3d 984, 988 (5th Cir. 2000)).   Here, the NFLPA requested Henderson allow the NFLPA (1) to access investigators' notes; (2) to cross-examine Thompson; and (3) to question Commissioner Goodell.  Henderson denied these requests.  Based on these denials and the fact that an arbitrator gives deference to the Commissioner's decision, it is evident that Henderson will likely affirm, in some manner, the Commissioner's suspension.  As such, "there is a substantial risk that the harm will occur."  *Id.*  Furthermore, the NFLPA and Elliott suffered an injury that existed when the NFLPA filed its petition.  The essence of the NFLPA's claims is that the NFL withheld, and Henderson denied access to, both testimonial and documentary evidence that was material, pertinent, and relevant to the hearing, which resulted in violations of the CBA and federal labor law.  Additionally, these details prevented the NFLPA from having the ability to properly present its case at arbitration.  This injury existed at the time the NFLPA filed suit, making it concrete and particularized.

Second, a causal connection exists between both the threatened and existing injuries and the conduct complained of.  In other words, Elliott's injuries are fairly traceable to the actions taken by the NFL and Henderson.  Specifically, the NFLPA alleges the NFL withheld Roberts's opinions and conclusions until the second day of arbitration.  Such conduct creates connections

with both the imminent and existing injuries because the NFLPA was prevented from properly presenting its case at arbitration.  Furthermore, Henderson's refusal to allow the NFLPA to (1) access investigators' notes; (2) cross-examine Thompson; and (3) question Commissioner Goodell, after the NFLPA discovered the withheld evidence, formed yet another reason the NFLPA was prevented from properly presenting its case.

Finally, a favorable decision here is likely to redress the injuries.  Elliott and the NFLPA suffer from both imminent and existing injuries.  If the Court issues a preliminary injunction, such relief redresses both injuries.  Specifically, a preliminary injunction barring the NFL from enforcing an arbitration award affirming, in whole or part, the Commissioner's suspension prevents any unjust suspension of Elliott from practices and games.

### C. Ripeness

Additionally, the NFL initially argued that the case was not ripe because Henderson had not issued an award.  However, Henderson issued his final award after the NFL made this argument.  Because ripeness is a question of timing, the relevant inquiry is whether the action is ripe at the time of the decision.  *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974). The Court is to consider events that occurred before suit is filed as well as events that took place after commencement of the suit.  *Roman Catholic Diocese of Dall. v. Sebelius*, 927 F. Supp. 2d 406, 424 (N.D. Tex. 2013).  Considering the case law and the facts of this case, the case is ripe and ready for review.

## II.   Preliminary Injunction

The NFLPA asserts that it can show (1) a substantial likelihood of success on the merits; (2) irreparable harm; (3) the threatened harm outweighs the injury of granting an injunction; and

(4) the public interest supports granting an injunction.  The NFL maintains that the NFLPA cannot meet any of these requirements.

### A.  Substantial Likelihood of Success on the Merits

To prevail on a motion for preliminary injunction, a movant must demonstrate a substantial likelihood of success on the merits.  This requires a movant to present a prima facie case.  *See Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)).  A prima facie case does not mean movants must prove they are entitled to summary judgment.  *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

The NFLPA seeks to vacate the arbitration award suspending Elliott for six games.  "Judicial review of an arbitration award is extraordinarily narrow."  *Gulf Coast Indus. Workers Union v. Exxon Co. USA*, 70 F.3d 847, 850 (5th Cir. 1995) (quoting *Antwine v. Prudential Bache Sec., Inc.*, 899 F.2d 410, 413 (5th Cir. 1990)).  "[C]ourts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or misinterpretation of the contract."  *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987).  When asked to vacate an arbitration award, the Court has a very limited question before it: whether the arbitration proceedings were fundamentally unfair.  *Id.* (citing *Forsythe Int'l, S.A. v. Gibbs Oil Co.*, 915 F.2d 1017, 1021 (5th Cir. 1990)).

The NFLPA argues Elliott did not receive a fundamentally fair hearing because (1) Henderson denied access to the investigators' notes; (2) Henderson denied Elliott the opportunity to cross-examine Thompson;[6] and (3) Henderson denied Elliott the chance to question

---

[6] The Court notes that the NFL argues that Thompson is not under its control and it had no ability to force Thompson to testify.  However, the record indicates that the NFL did not even ask Thompson to testify.  Thompson was cooperative throughout the entirety of the NFL's investigation, and there is nothing in the record to suggest that she was unwilling to testify at the arbitration hearing.

Goodell about what he knew before making his ultimate decision to suspend Elliott for six games. These types of procedural questions "are left to the sound discretion of the arbitrator and should not be second-guessed by the courts." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016) ("*Brady II*") (citing *United Paperworkers*, 484 U.S. at 40); *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). However, the FAA[7] creates a narrow exception that allows courts to intervene and vacate an award when a hearing is not fundamentally fair. An arbitration is fundamentally unfair when, among other things, "the arbitrators are guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3); *see also Brady II*, 820 F.3d at 545; *Parker v. J C Penny Corp., Inc.*, 426 F. App'x 285, 289 (5th Cir. 2011). While "[t]he arbitrator is not bound to hear all of the evidence tendered by the parties . . . he must give each of the parties to the dispute adequate opportunity to present its evidence and arguments." *Forsythe Int'l, S.A.*, 915 F.2d at 1023; *see also InfoBilling, Inc. v. Transaction Clearing, LLC*, No. SA-12-CV-01116, 2013 WL 1501570, at *5 (W.D. Tex. 2013). The arbitrator must also ensure that each party has all relevant documentary evidence, and if a party shows prejudice, the failure to do so can constitute grounds to vacate under the FAA. *Universal Comput. Sys., Inc. v. Big Bell 21, LLC*, No. 13-cv-00702, 2014 WL 12603178, at *4 (S.D. Tex. Jan. 29, 2014) (quoting *Chevron Transport Corp. v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969)).

While it is a narrow exception and rare circumstance which a court interferes with an arbitral award, this case presents unique and egregious facts, necessitating court intervention.

---

[7] When reviewing the validity of a labor arbitration award under the LMRA, courts look to the FAA for guidance. *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 292 (5th Cir. 2003) (citing *United Paperworkers*, 484 U.S. at 41 n.9).

Courts should use this exception in extreme circumstances and should perform the analysis on a case-by-case basis.  Thus, even though the Court is not deciding whether the NFL engaged in a conspiracy to achieve a certain result, the actions of the NFL have to be considered in the Court's analysis of whether Henderson gave Elliott a fundamentally fair hearing.  The Court recognizes and acknowledges that under ordinary circumstances, the denial of witnesses and documentary evidence falls within the discretion of the arbitrator.  *Brady II*, 820 F.3d at 545 (citing *United Paperworkers*, 484 U.S. at 40); *Am. Eagle Airlines, Inc.*, 343 F.3d at 405.  However, the set of facts presented in this case are everything but ordinary and are such that the denial of key witnesses and documents amounts to serious misconduct by the arbitrator.

In this case, two individuals, Roberts and Friel, were assigned to investigate the allegations of domestic violence lodged against Elliott.  Roberts's role in the investigation involved speaking with various witnesses, including interviewing the accuser and accused, Thompson and Elliott, along with reviewing some of the documentary evidence in this case, and helping create the Elliott Report.  *See, e.g.*, Dkt. #2, Exhibit 13 at 134:18–135:15, 145:9–13, 150:20–151:5 (Aug. 29, 2017); Dkt. #1, Exhibit 47 and 48 at pp. 78–159.  Notably, Roberts described herself as a "grunt" and "the boots on the ground in the investigation."  (Dkt. #2, Exhibit 13 at 135:1–5 (Aug. 29, 2017)).  Roberts interviewed Thompson two times and followed up on the phone with Thompson four times.  (Dkt. #2, Exhibit 13 at 140:10–12 (Aug. 29, 2017)).  Conversely, Roberts claims that Friel took more of a supervisory role in the investigation (Dkt. #2, Exhibit 13 at 135:1–2 (Aug. 29, 2017)).  Friel states that she interviewed two doctors and Elliott. (Dkt. #2, Exhibit 13 at 261:3–4, 10–13 (Aug. 30, 2017)).  However, Friel admits she never interviewed Thompson.  (Dkt. #2, Exhibit 13 at 261:17–19 (Aug. 30, 2017)).

At the end of the investigation, Roberts and Friel compiled the Elliott Report, which contained all facts obtained during the investigation.  By the end of the investigation, Roberts and Friel each developed an opinion on the evidence and on the credibility of the witnesses, including Thompson and Elliott.   Roberts concluded that insufficient evidence existed to corroborate Thompson's allegations and that Thompson was not a credible witness.  (Dkt. #2, Exhibit 13 at 143:5–8, 172:21–24, 173:9–22, 175:4–19 (Aug. 29, 2017); Dkt. #2, Exhibit 13 at 301:23–302:4 (Aug. 30, 2017)).  Roberts communicated this opinion to Friel.  (Dkt. #2, Exhibit 13 at 301:23–302:4 (Aug. 30, 2017)).   Friel, on the other hand, concluded that sufficient evidence existed to corroborate all of Thompson's allegations except one specific incident.  (Dkt. #2, Exhibit 13 at 289:7–298:23 (Aug. 30, 2017)).

While the PCP allows the investigators to include in the report a disciplinary recommendation for Commissioner Goodell's consideration, the NFL made an unusual departure from what it had done in past investigations and did not include recommendations from either investigator.[8]  (Dkt. #2, Exhibit 13 at 136:22–137:10 (Aug. 29, 2017)).  Friel, along with counsel, made the joint decision to exclude recommendations from the Elliott Report in this case.  (Dkt. #2, Exhibit 13 at 265:15-25 (Aug. 30, 2017)).   However, as the remainder of the events will demonstrate, the only opinion that Friel, along with counsel, sufficiently excluded was Roberts's opinion.

After Commissioner Goodell received the Elliott Report, he met with certain NFL personnel, including Friel.  It was at this time that Friel was given the opportunity to share her opinions and recommendations on the case and the credibility of the witnesses.  Interestingly,

---

[8] The current version of the PCP was developed in 2016. The current version allows for investigator recommendations to be included in the final investigative report.  (Dkt. #1, Exhibit 19 at p. 5).

Roberts was not invited to attend this meeting.  While Friel expressed her opinions and conclusions at this meeting, the Court is less than convinced that the same can be said for Roberts's opinions.[9] As such, not only were Roberts's recommendations excluded from the report, they were also kept from Commissioner Goodell and his advisors.  (Dkt. #2, Exhibit 13 at 322:13–338:22 (Aug. 30, 2017)).

Consistent with its previous actions to suppress Roberts's dissenting opinions, the NFL kept this sequence of events from the NFLPA and Elliott until the arbitration hearing.  In fact, had the NFL succeeded in its overall goal, this sequence of events would still be concealed from Elliott and the NFLPA.  The NFLPA filed a motion to compel the testimony of Roberts, and the NFL argued in response that her testimony was unnecessary, consistent with Friel's testimony, and cumulative.  (Dkt. #1, Exhibit 58).  Luckily, the NFLPA found the fairness needle in the unfairness haystack and Henderson ordered Roberts to testify.  The arbitration record shows that Roberts's testimony was everything but unnecessary, consistent, and cumulative.

The NFL's actions demonstrate that from the very beginning of the decision-making process, a cloud of fundamental unfairness followed Elliott.  Unfortunately, this cloud followed Elliott into the arbitration proceedings.  The arbitration record shows that the NFL, at the *very least*, turned a blind eye to Roberts's dissenting opinion.  This entire set of circumstances was put

---

[9] Friel presented varying testimony throughout her arbitration regarding Roberts's opinions. She initially claimed that she could not discuss what conversations took place during the meeting because "[w]e had counsel in the room at the time, so [the conversations] would be protected by privilege." (Dkt. #2, Exhibit 13 at 275:3–5 (Aug. 30, 2017)). Friel stated, "I don't know if [Roberts]" had the opportunity to discuss her views on the sufficiency of the evidence. Friel further said that "[Roberts wasn't in the meeting [Friel] had with [the Commissioner]." (Dkt. #2, Exhibit 13 at 320:19– 321:4 (Aug. 30, 2017)). She additionally states "[t]hat's not to say [Roberts's] views were not communicated to him in some other fashion. I don't know the answer to that." (Dkt. #2, Exhibit 13 at 322:10–12 (Aug. 30, 2017)). She confidently states that she does not "know if they were or weren't [communicated to him in some fashion,]" but she asserts "that's certainly possible." (Dkt. #2, Exhibit 13 at 322:15–17 (Aug. 30, 2017)). However, in response to the very next question she communicated Roberts's views to Goodell. (Dkt. #2, Exhibit 13 at 322:18–20 (Aug. 30, 2017)). Yet, she could not "tell [the attorney] precisely" how Roberts's views were expressed, but just that "it was presented to him." (Dkt. #2, Exhibit 13 at 323:17–19 (Aug. 30, 2017)). Then, Friel claims that "Cathy Lanier may have" expressed Roberts's views to the Commissioner, but she does not "recall anything specific." (Dkt. #2, Exhibit 13 at 324:21–325:4 (Aug. 30, 2017)).

in front of Henderson.   It is in this light the Court views Henderson's decisions to exclude Thompson and Commissioner Goodell as necessary witnesses, as gross errors resulting in a fundamentally unfair hearing.

Henderson's denial of these requests prevented the NFLPA and Elliott from properly presenting their case and meeting their burden of proof.  The NFLPA had the burden of convincing the arbitrator that Commissioner Goodell's decision was arbitrary and capricious.   Henderson prevented Elliott access to credible evidence necessary to discharge this burden.  In this situation, where credibility is questioned and a dissenting opinion regarding the case and the credibility of Thompson are withheld from, at a minimum, the NFLPA and Elliott, the ability to cross-examine Thompson is both material and pertinent.   Additionally, in the situation where the evidence that was in front of the Commissioner still remains unclear, it is material and pertinent to question Commissioner Goodell.

The circumstances of this case are unmatched by any case this Court has seen.   *See generally Brady II*, 820 F.3d 527; *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 125 F. Supp. 3d 449 ("*Brady I*").  In *Brady I* and *Brady II*, Tom Brady sought to compel an investigator's notes and testimony from the NFL's general counsel, Jeff Pash.  *Brady I*, 125 F. Supp. 3d at 470–71.  The Second Circuit ultimately held that the arbitrator's denial of this request was not fundamentally unfair since the evidence was not material and pertinent to the case. *Brady II*, 820 F.3d at 528

Here, Elliott is accused of engaging in domestic violence against Thompson, an allegation he denies.  Further, the NFLPA sought to (1) access to investigators' notes; (2) cross-examine Thompson; and (3) question Commissioner Goodell.  Such requests were denied. Unlike *Brady I and Brady II*, the evidence and testimony precluded is material, pertinent, and critically important

to Elliott's case.  *See general id.*  Additionally, this case concerns withheld material evidence from the NFLPA and Elliot, and possibly Commissioner Goodell.  As such, this case involves essential evidence that was sought and denied resulting in a fundamentally unfair hearing.

Fundamental unfairness is present throughout the entire arbitration process.  Due to such fundamental unfairness, the Court's intervention is justified. The NFLPA was not given the opportunity to discharge its burden to show that Goodell's decision was arbitrary and capricious. At every turn, Elliott and the NFLPA were denied the evidence or witnesses needed to meet their burden.  Fundamental unfairness infected this case from the beginning, eventually killing any possibility that justice would be served.  Accordingly, the Court finds that the NFLPA demonstrated a substantial likelihood of success on the merits.

### B.  Substantial Threat of Irreparable Harm

Plaintiffs must demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages."  *Janvey*, 647 F.3d at 600. An injunction is appropriate only if the anticipated injury is imminent and not speculative.  *Winter*, 555 U.S. at 22.

Elliott is faced with missing six games, which is a large portion of the NFL's season, and potentially deprives Elliott of the ability to achieve individual successes and honors.  (Dkt. #5, Exhibit 1 at ¶¶ 5, 8).  The careers of professional athletes are "short and precarious, providing a limited window in which players have the opportunity to play football in pursuit of individual and team achievements."  (Dkt. #5, Exhibit 1 at ¶ 6).  The Court joins the long line of cases that have previously held that improper suspensions of professional athletes can result in irreparable harm to the player.  *Nat'l Football League Players Ass'n v. Nat'l Football League*, 598 F. Supp. 2d 971,

982 (D. Minn. 2008) ("*Williams*") (citing *Jackson*, 802 F. Supp. 226, 230–31 (D. Minn. 1992));

*Brady v. NFL*, 779 F. Supp. 2d 992, 1005 (D. Minn. 2011), *rev'd on other grounds*, 644 F.3d 661

(8th Cir. 2011); *Prof'l Sports, Ltd. v. Va. Squires Basketball Club Ltd*, 373 F. Supp. 946, 949 (W.D.

Tex. 1974).   The Court finds that Elliott is likely to suffer irreparable harm if he is improperly

suspended based on a fundamentally unfair arbitration proceeding.  *See id.*

### C.  Balance of Hardships

When deciding whether to grant an injunction, "courts must balance the competing claims of

injury and must consider the effect on each party of the granting or withholding of the requested

relief."  *Winter*, 555 U.S. at 24 (citation omitted).   The NFL argues that the harm it will suffer as

a result of an injunction is greater than that of Elliott because the NFLPA and NFL have an

agreed-upon internal procedure that will be eviscerated by an injunction in this case.   This

argument is unpersuasive.   While the NFLPA and NFL have an agreed-upon procedure, that

procedure is intended to be one of fundamental fairness.   Given the current set of facts, an

injunction does not eviscerate the internal procedures of the NFL and NFLPA but merely ensures

the internal procedures are being carried out in the appropriate manner.   Both the NFL and the

NFLPA "have an interest in ensuring that the suspensions meted out under the [PCP] are not tainted

by [fundamental unfairness] and wrongdoing."  *Williams*, 598 F. Supp. 2d at 983.   Therefore, the

Court finds that the NFLPA showed the balance of hardships weighs in favor of granting an

injunction.

### D.  Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the

public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S.

at 24 (quoting *Weinberger*, 465 U.S. at 312).   This factor overlaps substantially with the balance-

of-hardships requirement.  *Id.*  The NFL argues that the public interest favors denying the NFLPA's application for injunction because the preference for labor disputes is for a private settlement.  While the Court agrees that there is a preference for private settlements, the Court still retains review over the arbitral process to maintain minimum standards of fairness.  *See Gulf Coast Indus. Workers Union*, 70 F.3d at 850; *Murphy Oil USA, Inc. v. United Steel Workers AFL-CIO Local 8363*, No. 08-3899, 2009 WL 537222, at *3 (E.D. La. Mar. 4, 2009).  The NFLPA sufficiently demonstrated that the public interest supports issuing an injunction in this case.

### E.  Bond

The party moving for a preliminary injunction must give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  The amount of that security "is a matter for the discretion of the trial court."  *Kaepa Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978)).  In light of circumstances in this case, the Court elects not to require security from the NFLPA.

### CONCLUSION

The question of what happened between Elliott and Thompson in July 2016 is not before the Court. Nor is the Court making any credibility findings.  As previously stated herein, the Court has a limited role in this case. The question before the Court is merely whether Elliott received a fundamentally fair hearing before the arbitrator.  The answer is he did not. The Court finds, based upon the injunction standard, that Elliott was denied a fundamentally fair hearing by Henderson's refusal to allow Thompson and Goodell to testify at the arbitration hearing. Their absence

effectively deprived Elliott of any chance to have a fundamentally fair hearing.  The Court grants the request for preliminary injunction.

It is therefore **ORDERED** that Petitioner's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. #5) is hereby **GRANTED**.

It is further **ORDERED** that the suspension of Ezekiel Elliott, affirmed by Henderson's award, is enjoined until the Court's final ruling on the Petition.

**SIGNED this 8th day of September, 2017.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE