No. 17-40936

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,
agent of on its own behalf and on behalf of EZEKIEL ELLIOTT,

*Plaintiff-Appellee,*

v.

NATIONAL FOOTBALL LEAGUE; NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Eastern District of Texas,
No. 4:17-cv-00615

———————————

## EMERGENCY MOTION FOR STAY PENDING APPEAL

———————————

ERIC GAMBRELL
PATRICK G. O'BRIEN
AKIN GUMP STRAUSS
HAUER & FELD LLP
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201
(214) 969-2800
egambrell@akingump.com

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
SUBASH S. IYER
MICHAEL D. LIEBERMAN
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Defendants-Appellants*

(*Additional Counsel Listed on Inside Cover*)

September 15, 2017

DANIEL L. NASH
NATHAN J. OLESON
AKIN GUMP STRAUSS
HAUER & FELD LLP
1333 New Hampshire Ave, NW
Washington, DC 20036
(202) 887-4000
dnash@akingump.com

# CERTIFICATE OF INTERESTED PERSONS

*NFLPA v. NFL, et al.*, No. 17-40936

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. Defendants-Appellants: The National Football League, The National Football League Management Council, and the 32 member clubs that compose both of those unincorporated associations.  Those member clubs are:

| CLUBS | ENTITIES |
|---|---|
| Arizona Cardinals | Arizona Cardinals Football Club LLC |
| Atlanta Falcons | Atlanta Falcons Football Club, LLC |
| Baltimore Ravens | Baltimore Ravens Limited Partnership |
| Buffalo Bills | Buffalo Bills, LLC |
| Carolina Panthers | Panthers Football, LLC |
| Chicago Bears | The Chicago Bears Football Club, Inc. |
| Cincinnati Bengals | Cincinnati Bengals, Inc. |
| Cleveland Browns | Cleveland Browns Football Company LLC |
| Dallas Cowboys | Dallas Cowboys Football Club, Ltd |
| Denver Broncos | PDB Sports, Ltd. d/b/a Denver Broncos Football Club |
| Detroit Lions | The Detroit Lions, Inc. |
| Green Bay Packers | Green Bay Packers, Inc. |
| Houston Texans | Houston NFL Holdings, L.P. |

| CLUBS | ENTITIES |
|---|---|
| Indianapolis Colts | Indianapolis Colts, Inc. |
| Jacksonville Jaguars | Jacksonville Jaguars, LLC |
| Kansas City Chiefs | Kansas City Chiefs Football Club, Inc. |
| Los Angeles Chargers | Chargers Football Company, LLC |
| Los Angeles Rams | The Los Angeles Rams, LLC |
| Miami Dolphins | Miami Dolphins, Ltd. |
| Minnesota Vikings | Minnesota Vikings Football, LLC |
| New England Patriots | New England Patriots LLC |
| New Orleans Saints | New Orleans Louisiana Saints, L.L.C. |
| New York Giants | New York Football Giants, Inc. |
| New York Jets | New York Jets LLC |
| Oakland Raiders | The Oakland Raiders, a California Limited Partnership |
| Philadelphia Eagles | Philadelphia Eagles, LLC |
| Pittsburgh Steelers | Pittsburgh Steelers LLC |
| San Francisco 49ers | Forty Niners Football Company LLC |
| Seattle Seahawks | Football Northwest LLC |
| Tampa Bay Buccaneers | Buccaneers Team LLC |
| Tennessee Titans | Tennessee Football, Inc. |
| Washington Redskins | Pro-Football, Inc. |

2.  Plaintiff-Appellee: The National Football League Players Association, on its own

behalf and on behalf of Ezekiel Elliott.

3. Counsel for Defendants-Appellants: Kirkland & Ellis LLP (Paul D. Clement, Erin E. Murphy, Subash S. Iyer, Michael D. Lieberman); Akin Gump Strauss Hauer & Feld LLP (Eric Gambrell, Patrick G. O'Brien, Daniel L. Nash, Nathan J. Oleson).

4. Counsel for Plaintiff-Appellee: Winston & Strawn LLP (Thomas Melsheimer, Jeffrey L. Kessler, David L. Greenspan, Jonathan J. Amoona, Angela Smedley, Joseph A. Litman).

s/Paul D. Clement
Paul D. Clement
 *Counsel of Record*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ..................................................................... v

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................... 2

ARGUMENT ................................................................................. 10

I.    The NFL Is Likely To Prevail On Appeal Because The District Court
      Plainly Lacked Subject-Matter Jurisdiction Over This Case ...................... 10

II.   Even If The District Court Had Subject-Matter Jurisdiction, The
      NFL Is Likely To Succeed On The Merits ....................................... 15

III.  The Equities Favor A Stay ..................................................... 20

CONCLUSION ............................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Albemarle Corp. v. United Steel Workers*,
    703 F.3d 821 (5th Cir. 2013)..............................................................16

*Anderson v. Norfolk & W. Ry. Co.*,
    773 F.2d 880 (7th Cir. 1985)..............................................................14

*Bache v. Am. Tel. & Tel.*,
    840 F.2d 283 (5th Cir. 1988)..............................................................12

*Bailey v. Bicknell Minerals*,
    819 F.2d 690 (7th Cir. 1987)........................................................ 12, 13

*Brown v. Pro Football, Inc.*,
    518 U.S. 231 (1996)..........................................................................21

*Daigle v. Gulf State Utils., Local Union No. 2286*,
    794 F.2d 974 (5th Cir. 1986)..............................................................11

*Forsythe Int'l v. Gibbs Oil*,
    915 F.2d 1017 (5th Cir. 1990)............................................................15

*Grupo Dataflux v. Atlas Glob. Grp.*,
    541 U.S. 567 (2004).................................................................... 10, 14

*Meredith v. La. Fed'n of Teachers*,
    209 F.3d 398 (5th Cir. 2000)..............................................................11

*NFL Mgmt. Council v. NFLPA* (*Brady*),
    820 F.3d 527 (2d Cir. 2016)......................................................... 16, 17

*Planned Parenthood v. Abbott*,
    734 F.3d 406 (5th Cir. 2013)..............................................................10

*Prestige Ford v. Ford Dealer Comput. Servs.*,
    324 F.3d 391 (5th Cir. 2003)..............................................................15

*Rabalais v. Dresser Indus.*,
    566 F.2d 518 (5th Cir. 1978)..........................................................11, 13

*Republic Steel v. Maddox*,
 379 U.S. 650 (1965)...........................................................................................11

*Sampson v. Murray*,
 415 U.S. 61 (1974)...........................................................................................21

*Sidhu v. Flecto Co.*,
 279 F.3d 896 (9th Cir. 2002)...........................................................................11

*United Offshore v. S. Deepwater Pipeline Co.*,
 899 F.2d 405 (5th Cir. 1990)...........................................................................15

*United Paperworkers Int'l Union v. Misco, Inc.*,
 484 U.S. 29 (1987)............................................................................... 16, 18, 21

*United States ex rel. Jamison v. McKesson Corp.*,
 649 F.3d 322 (5th Cir. 2011)...........................................................................10

*Vaca v. Sipes*,
 386 U.S. 171 (1967)...........................................................................................11

**Statute**

Labor Management Relations Act,
 29 U.S.C. §185(a) ............................................................................................10

# INTRODUCTION

Like any case involving a star athlete, this case has generated substantial attention and commentary.  But, at bottom, this case involves a collateral challenge to a labor arbitrator's decision.  While such collateral challenges generally may be brought, they face little prospect of success.  The standard facing the party challenging the arbitrator's decision is among the most daunting known to the law.  And when the gravamen of the challenge is procedural unfairness, the standard is more daunting still.  But the most elementary aspect of the substantial deference owed to a labor arbitrator's decision is that no court challenge may be filed until *after* the arbitrator has ruled.  The district court here lost sight of that most basic rule, and every other well-established principle of deference:   The court not only entertained a blatantly premature challenge, but then found a likelihood of success in a procedural challenge to the arbitrator's decision.   That precedent-defying decision will not stand, and nothing in the stay equities favors delaying an arbitrator's decision that will almost certainly be vindicated at the end of the proceedings (though likely by a court in a different district with jurisdiction over a timely filed action).  The misguided order below should be stayed and then promptly reversed.

# BACKGROUND

The Commissioner of the National Football League suspended Ezekiel Elliott, a running back for the Dallas Cowboys, for six games after finding that Elliott violated League policy by committing multiple acts of physical violence against a woman he had been dating. That suspension was the product of a year-long investigation that culminated in an exhaustive 164-page report and was conducted in careful adherence to the procedures set forth in the collective bargaining agreement ("CBA") between the League and the NFL Players Association ("NFLPA") and in a separate policy detailing additional procedures to address violence against women.

Elliott exercised his right under the CBA to appeal the Commissioner's decision to an arbitrator and took part in a three-day evidentiary hearing, during which he was allowed ample cross-examination, including of the League's two lead investigators. *Before the arbitrator could even issue his decision*, however, the NFLPA collaterally attacked the as-yet-unfinished arbitration process in federal court. In this indisputably premature lawsuit, which unabashedly challenged an award that did not yet exist, the NFLPA sought to temporarily restrain and preliminarily enjoin the League from enforcing the "forthcoming" arbitration award "to be issued" by the arbitrator. Article III alarm bells thus should have rung loudly from day one, as federal courts do not have jurisdiction to review un-issued and still-

2

pending arbitration awards.  The NFLPA's premature lawsuit—filed in a blatant effort to obtain "first-filed" status in the player's preferred venue—therefore should have been dismissed immediately.  The decision below, which not only exercised jurisdiction but also entered a preliminary injunction based on perceived unfairness, fundamentally misunderstands first principles of judicial review of labor arbitration awards.

1. For over 40 years, the CBA has given the Commissioner broad authority to discipline players for "conduct detrimental to the integrity of, or public confidence in, the game of professional football."  CBA, Art. 46 ("Ex.G"), §1(a).[1]  In 2014, the Commissioner issued a Personal Conduct Policy ("Policy") providing additional guidance about the League's procedures for domestic or dating violence incidents.  Ex.H.  The Policy made clear that players would face a baseline suspension of six games for such acts, even if "the conduct does not result in a criminal conviction."  Ex.H2.  If the player is not charged with a crime, he may still be found to have violated the Policy "if the credible evidence establishes that he engaged in [prohibited] conduct."  Ex.H5.

Under the Policy, investigations into domestic violence accusations are run by a staff member with a criminal justice background, who is responsible for producing

---

[1] "Ex.__" refers to the Exhibits accompanying this motion.

an investigative report but need only "present a disciplinary recommendation" "if desired" by the Commissioner. Ex.H3, 5. The player must be given notice of the potential violation and furnished with the report and the documents on which it relies, and may respond both in writing and at an in-person meeting with the disciplinary officer. Ex.H6. When the investigation is completed, the Commissioner "review[s] the report (and recommendation if presented) and determine[s] the appropriate discipline, if any." Ex.H5.

Players found to have violated the Policy are entitled to an appeal, which is heard by the Commissioner or his designee. Ex.G, §2(a). At the appeal hearing, the player has a right to counsel and to "present, by testimony or otherwise, any evidence relevant to the hearing." §2(b). Article 46 imposes only one discovery obligation: Before the hearing, the parties shall "exchange copies of any exhibits upon which they intend to rely." §2(f)(ii). The CBA contains no procedures for compelling witnesses, conducting cross-examination, or introducing evidence. Such matters are committed to the sound discretion of the hearing officer, whose final decision constitutes a "full, final and complete disposition of the dispute," "binding" on all parties. §2(d).

2. On July 22, 2016, Tiffany Thompson reported to the Columbus Police Department that she had been physically abused by Ezekiel Elliott multiple times

during the prior week.  ECF #1-47 at 7.[2]  Thompson had been in a relationship with

Elliott for over a year, during which time the Dallas Cowboys drafted him.  *Id.* at 11-

13.  Although the Columbus City District Attorneys found Thompson's claims

credible, they declined to prosecute because of the stringent criminal burden of

proof.  ECF #1-48 at 119-20 ("We generally believed [Thompson] for all of the

incidents").

When the allegations came to light, the League opened an investigation led by

Lisa Friel, a former Chief of the New York City Sex Crimes Prosecutor's office, who

was assisted by Kia Roberts, a former New York State prosecutor with experience

in domestic violence cases.  ECF #1-47 at 1, 7-9.  During the year-long investigation,

they conducted 22 witness interviews (including multiple interviews of Thompson

and Elliott); reviewed thousands of pages of documents; and considered extensive

photographic and other evidence.  *Id.* at 1-7.  The NFL also retained medical and

forensic experts to analyze text messages and Thompson's injury photographs.  *Id.*

Friel and Roberts produced a 164-page report exhaustively detailing their

findings.  ECF #1-47, #1-48.  Supported by 103 exhibits, the report included

summaries of all witness interviews, photographs of Thompson's injuries, and

Roberts' analysis of inconsistencies between Thompson's interview statements and

---

[2] "ECF __-__" refers to the district court docket entry and exhibit number.

other evidence.  Ex.E4; ECF #2-9 at 70-74.  The NFLPA and Elliott were given copies of the report and its exhibits, and they responded in person and in writing. *See* ECF #1-49 at 10-12; ECF #1-52.

After reviewing the evidence, the Commissioner determined that Elliott committed physical violence against Thompson on three occasions.  Ex.F3-6.  The Commissioner's decision acknowledged the concerns that Elliott had repeatedly raised about Thompson's credibility, but emphasized that "no finding, and no disciplinary action, was based simply on one individual's statements."  Ex.F4-5. "Rather," the Commissioner's findings were "based on a combination of photographic, medical, testimonial and other evidence that is sufficiently credible in the Commissioner's judgment to establish the facts, even allowing for concerns ... about [Thompson's] credibility."  Ex.F4.  Putting an even finer point on it, the decision elaborated, "[i]rrespective of the characterization of Ms. Thompson's statements ..., the photographic and medical forensic evidence corroborates many critical elements of the allegations."  *Id*.  Based on his findings, the Commissioner suspended Elliott for six games.  Ex.F5.

3. Elliott appealed, and the Commissioner designated Harold Henderson to serve as Arbitrator.  The Arbitrator made several procedural rulings, some favoring the League, others favoring the NFLPA.  As relevant here, he granted the NFLPA's motion to compel Friel and Roberts to testify, but denied its requests to compel

Thompson or the Commissioner to testify, or to compel production of Roberts' investigative notes. Exs.C, D.

The appeal was heard from August 29-31, 2017. Elliott called seven witnesses and submitted additional testimony by affidavit. He cross-examined Friel and Roberts, who testified that the report included their investigatory notes, all evidence that raised concerns about Thompson's credibility, as well as Roberts' summary of inconsistencies in Thompson's account. Ex.E1-4. Friel also testified that the Commissioner was made aware of Roberts' concerns before issuing his decision. Ex.E3.

On September 5, 2017, the Arbitrator affirmed the Commissioner's decision. Ex.B8. The Arbitrator rejected the NFLPA's claim that the League erred by not asking the investigators to include disciplinary recommendations in their report, explaining that the Policy's plain language states that the report will include a recommendation only "if desired" by the Commissioner. Ex.B5 (quoting Ex.H5). The Arbitrator also concluded that neither Friel nor Roberts revealed "new evidence" when they testified that they did not find Thompson sufficiently credible to support discipline for some of the incidents investigated because "all the statements and inconsistencies are included in the [i]nvestigative report and other materials provided to the Commissioner." Ex.B7. Finally, the Arbitrator emphasized that his role was not to second-guess the Commissioner's decision, but to "determine

7

whether the player was afforded adequate notice ..., the right to representation, opportunity to present evidence, and a decision which is fair and consistent." *Id.* The process and result here, he concluded, complied with those requirements "in every respect." *Id.*

4. On August 31, 2017, before the Arbitrator had even rendered his decision, the NFLPA filed this petition seeking to vacate the "forthcoming Arbitration Award," which at some point "will be issued." Ex.I1. The NFLPA also moved for a temporary restraining order and to preliminarily enjoin the NFL "from enforcing the forthcoming arbitration award to be issued." Ex.J1.

The NFL moved to dismiss, explaining that federal courts do not have jurisdiction to review arbitration awards that have not yet issued, and opposed the NFLPA's motions on jurisdictional grounds and on the merits. The court held a hearing on September 5, 2017, the same day as the Arbitrator issued his decision. Three days later, the court granted a preliminary injunction. *See* Ex.A.

The court acknowledged that "an individual is generally required to exhaust, or at least attempt to exhaust, any remedies provided for in the [CBA] before filing suit." Ex.A6. But it excused exhaustion based on an exception that the NFLPA never invoked that applies "when the employer's conduct amounts to a repudiation of the remedial procedures specified in the contract." Ex.A7. According to the court,

"allegations that the NFL withheld evidence from the NFLPA and Elliott amount to a repudiation of the required procedures specified in the CBA." *Id.*

On the merits, the court paid lip-service to its "very limited role," Ex.A1, but then asserted the sweeping power to vacate any arbitration award resulting from procedures it believed were "not fundamentally fair," Ex.A14. Relying not on the relevant CBA provisions, but on its own *ad hoc* judgment of what evidence should have been provided, the court faulted the Arbitrator for declining to compel production of the investigators' notes or testimony from Thompson or the Commissioner. Ex.A13-19. The court criticized the League for not including in the investigative report "a disciplinary recommendation for Commissioner Goodell's consideration" before conceding that neither the CBA nor the Policy requires it. Ex.A16. The court then resolved the remaining preliminary-injunction factors in the NFLPA's favor and enjoined the Arbitrator's decision. Ex.A19-22.[3]

---

[3] The NFL requested a stay from the district court on Monday, September 11, 2017, asking the court to rule immediately given the exigencies. ECF #30. Instead, the court issued a briefing schedule that allowed as much time for briefing the stay as for the preliminary injunction. ECF #6, #31. Although the schedule allowed the NFL until today to file a reply, the NFL filed on Wednesday evening (just hours after the NFLPA's response), asked the court to rule by yesterday, and informed that it would file in this Court this morning with or without a decision to allow this Court to issue prompt relief. ECF #35. As of this filing, the district court still has not acted.

## ARGUMENT

A stay pending appeal may be granted when the movant is likely to succeed on the merits and the stay equities support immediate relief. *Planned Parenthood v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). The decision below readily satisfies those factors, as it is an extraordinary overreach that is exceedingly unlikely to survive appeal and, in the meantime, will cause irreparable damage to the League's ability to enforce the parties' agreed-upon CBA in a timely and orderly fashion. Put differently, the six-game suspension approved by the arbitrator will ultimately stand, and no one's interests are served by delaying that discipline based on a misguided order by a district court that lacked jurisdiction.

## I. The NFL Is Likely To Prevail On Appeal Because The District Court Plainly Lacked Subject-Matter Jurisdiction Over This Case.

This case should have been dismissed at the outset, as federal courts do not have subject-matter jurisdiction over arbitration awards that have not yet issued. As the district court acknowledged, subject-matter jurisdiction is determined by "the state of things at the time of the action brought," *Grupo Dataflux v. Atlas Glob. Grp.*, 541 U.S. 567, 570-71 (2004), and cannot arise based on post-filing developments, *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011). The district court premised its subject-matter jurisdiction on the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185(a). But jurisdiction under the LMRA does not arise until the employee "has exhausted contractual procedures for redress."

10

*Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 402 (5th Cir. 2000); *see also Republic Steel v. Maddox*, 379 U.S. 650, 652 (1965) (employees "must attempt use of the contract grievance procedure agreed upon ... as the mode of redress"). Accordingly, when a CBA provides an arbitration proceeding as "the exclusive and final remedy" for a claimed breach, the employee may not resort to the courts until that procedure has run its course. *Daigle v. Gulf State Utils., Local Union No. 2286*, 794 F.2d 974, 977 (5th Cir. 1986); *see Vaca v. Sipes*, 386 U.S. 171, 184 (1967); Ex.G, §2(d) (Arbitrator's award constitutes "full, final and complete disposition of the dispute").

Here, it is undisputed that the Arbitrator had not issued an award when the NFLPA filed this lawsuit.  The NFLPA therefore had not exhausted its contractual remedies, and the court should have dismissed for lack of jurisdiction.  Although the district court acknowledged that clear rule, it nonetheless moved ahead, invoking an exception that applies when "the employer's conduct amounts to a repudiation of the remedial procedures specified in the contract." *Rabalais v. Dresser Indus.*, 566 F.2d 518, 519 (5th Cir. 1978).  That is plainly wrong.

The "repudiation" exception applies only when the employer denies the existence of the grievance procedures altogether or refuses to provide the employee access to them. *See, e.g., Sidhu v. Flecto Co.*, 279 F.3d 896, 899 (9th Cir. 2002) ("[W]e will excuse the requirement for exhaustion based on repudiation only if the

employer repudiates the specific grievance procedures provided for in the CBA.");

*Bailey v. Bicknell Minerals*, 819 F.2d 690, 692 (7th Cir. 1987) ("When one party to an agreement proclaims that it no longer considers the obligation to arbitrate binding, then a request for arbitration is futile; the other party need not waste time but may proceed straight to court."). Finding repudiation when arbitral proceedings are ongoing and the plaintiff seeks to enjoin a "forthcoming" arbitration award "to be issued" is an oxymoron. The very facts that the proceedings are ongoing and an award forthcoming are sufficient to render the repudiation exception inapplicable. Put differently, the repudiation exception is a narrow exception that does not force an employee to await arbitral proceedings that will never happen because the employer has repudiated them. But that exception manifestly does not excuse exhaustion when the arbitral proceedings are ongoing and an award is "forthcoming." That is true no matter how flawed the employee thinks the ongoing proceedings, because the employee's chance to challenge those proceedings, like the award, is "forthcoming."

The law on this is crystal clear. "The fact that [the NFL] actually processed [Elliott's] grievances" fatally "undermines" his "argument ... that [the NFL] repudiated the contract's remedial procedures." *Bache v. Am. Tel. & Tel.*, 840 F.2d 283, 288 (5th Cir. 1988). And the fact that the NFLPA alleged—and the court found—that the NFL somehow breached the CBA by not asking Roberts to include

her personal opinion about Thompson's credibility in the report, Ex.A7-8, is entirely beside the point. That is a dispute about the particulars of the ongoing grievance process, not a repudiation of the process altogether. "An employer can obviously take a stance contrary to that of the employee during the grievance process without being deemed to have repudiated that process." *Rabalais*, 566 F.2d at 520. The district court did not cite a single case finding repudiation when a grievance proceeding was ongoing and the award forthcoming. The reason is obvious: The pendency of the ongoing proceedings is fundamentally inconsistent with a charge of repudiation, which likely explains why the NFLPA did not even make the argument.

The district court's contrary ruling "confuses repudiation of the grievance procedure and a refusal to accept an employee's position with respect to a grievance." *Id.* Converting every substantive disagreement about the CBA into a repudiation would let the repudiation exception swallow the exhaustion rule: "Every dispute would allow the complainant to bypass arbitration because the other side's failure to do as the complainant wishes 'repudiates' the agreement." *Bailey*, 819 F.2d at 692. "It is hard to see how a reasonably careful lawyer could miss the difference between repudiating the agreement to arbitrate (which excuses a demand for arbitration) and disagreeing about the continued effect of some substantive provision of the contract (which does not)." *Id.* Unfortunately, that is just the difference the district court missed. The resulting decision obliterates the first

13

principle of judicial deference to labor arbitration awards: A court has no jurisdiction to act when the grievance proceedings are ongoing and the award is forthcoming.

The district court alternatively ruled that "the NFLPA properly exhausted its remedies" because it "sought arbitration, submitted requests to the arbitrator, and received a decision from the arbitrator on these requests." Ex.A8-9. But that gets matters backwards. The very fact that Elliott was actively participating in ongoing proceedings underscores that there were viable, ongoing proceedings to exhaust. At most, Elliott had begun the process of exhausting those remedies when the suit was filed. But seeking arbitration and having evidentiary motions denied does not exhaust arbitral remedies any more than filing a lawsuit and having motions in limine denied produces a final judgment. "To be considered 'final,' an arbitration award must be intended by the arbitrator to be [a] complete determination of every issue submitted." *Anderson v. Norfolk & W. Ry. Co.*, 773 F.2d 880, 883 (7th Cir. 1985). It is thus no surprise that neither the NFLPA nor the court cited a single case in which a party was permitted to file suit under the LMRA about a dispute that was submitted to arbitration but not yet finally resolved.

Finally, this jurisdictional defect is not cured by the fact that the Arbitrator has now issued his decision. As the district court itself recognized, Ex.A5 n.4, the "jurisdiction of the court depends upon the state of things at the time of the action brought." *Grupo Dataflux*, 541 U.S. at 570-71. All agree that the Arbitrator had not

14

issued his ruling when the NFLPA sued. Accordingly, the court did not have jurisdiction, and its order is *ultra vires*. That alone is reason enough to enter a stay.

## II. Even If The District Court Had Subject-Matter Jurisdiction, The NFL Is Likely To Succeed On The Merits.

Even assuming the district court had jurisdiction, its decision is manifestly wrong on the merits. Not only does it completely fail to respect the narrowly circumscribed role for courts in reviewing arbitration awards; its findings are also utterly divorced from the reality of the arbitration proceedings.

While this Court typically reviews a decision granting a preliminary injunction for abuse of discretion, this Circuit has endorsed a *de novo* standard of review when a court has enjoined an arbitration award. *United Offshore v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990); *Forsythe Int'l v. Gibbs Oil*, 915 F.2d 1017, 1020-21 (5th Cir. 1990). Because the district court's review of an arbitration award should be "extraordinarily narrow," *de novo* review allows this Court "to assess whether the district court accorded sufficient deference in the first instance, an assessment that a more restrictive appellate review would cripple." *Prestige Ford v. Ford Dealer Comput. Servs.*, 324 F.3d 391, 393 (5th Cir. 2003).

Moreover, this Court's *de novo* review will accord great deference to the arbitrator (as the district court itself should have done). "[A] federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential— indeed, among the most deferential in the law." *NFL Mgmt. Council v. NFLPA*

(*Brady*), 820 F.3d 527, 532 (2d Cir. 2016).   "[A]s long as the arbitrator is even

arguably construing or applying the contract and acting within the scope of his

authority," the court must enforce the arbitrator's decision—even if the "court is

convinced he committed serious error." *Albemarle Corp. v. United Steel Workers*,

703 F.3d 821, 824 (5th Cir. 2013) (quoting *United Paperworkers Int'l Union v.

Misco, Inc.*, 484 U.S. 29, 38 (1987)).   And that deferential standard becomes still

more deferential when, as here, an arbitrator's *procedural* rulings are attacked.

"[W]hen the subject matter of a dispute is arbitrable," as here, "'procedural'

questions which grow out of the dispute and bear on its final disposition are to be

left to the arbitrator." *Misco*, 484 U.S. at 40.

Under the highly deferential standard that should have governed, this should

have been an exceedingly easy case.   The court's sole job was to make sure that the

Arbitrator's decisions "even arguably constru[ed] or appl[ied] the contract." *Id.* at

38.   Instead, the court engaged in a far different endeavor, unguided by precedent or

the parties' agreement, to conduct an *ad hoc* evaluation of whether the Arbitrator's

rulings comported with the court's own conception of what procedures would be

"fair."   Indeed, the district court's freeform, *de novo* "fundamental fairness" analysis

did not identify a single aspect of the CBA that the Arbitrator even arguably failed

to follow.   In reality, the Arbitrator meticulously followed the procedures outlined in

the CBA.   The League provided Elliott and the NFLPA with an appeal hearing, in

16

which Elliott was accompanied by counsel and permitted to present relevant evidence, Ex.G, §2(b), and the Arbitrator promptly rendered a written decision, §2(d).  The CBA requires nothing more.

The court faulted the Arbitrator for declining to compel production of Roberts' interview notes or of testimony from Thompson or the Commissioner.  Each of those decisions, however, was not only *arguably*, but *actually*, grounded in the CBA. First, as for Roberts' notes, the Arbitrator explained that Article 46, §2(f)(ii) specifies what evidence must be disclosed in an arbitration hearing:  "the parties shall exchange copies of any exhibits upon which they intend to rely."  *See* Ex.C2.  That is it.  The Arbitrator sensibly interpreted that provision to rule that a party need not produce documents on which it does not intend to rely—an interpretation that he noted "has consistently been applied for many years."  *Id.*  The Second Circuit addressed this precise issue in *Brady*, holding that the arbitrator's refusal to compel production of the NFL's General Counsel's notes about his role in preparing an investigative report did not constitute "fundamental unfairness."  820 F.3d at 545-47.  As that court explained, "had the [NFLPA and NFL] wished to allow for more expansive discovery, they could have bargained for that right."  *Id.* at 547.  But "they did not, and there is simply no fundamental unfairness in affording the parties precisely what they agreed on."  *Id.*  In all events, the Arbitrator's decision could not possibly have

17

undermined the fairness of the proceedings, as Roberts testified at the hearing that all the content of her notes was included in the report.  Ex.E1.

As for Thompson's testimony, the CBA does not require the NFL to compel the presence of any witness; nor does it guarantee the player the right to cross-examine anyone.  Indeed, Article 46 "does not address the scope of witness testimony at appeal hearings" at all, and instead "leav[es] to the discretion of the hearing officer determination of the scope of the presentations necessary for the hearing to be fair."  Ex.C2.  That is the best, and certainly at least an arguably correct, interpretation of the CBA.  The district court had no authority to override the CBA based on its own personal conception of fundamental unfairness.

Moreover, the Arbitrator specifically considered Elliott's fairness objections, noting that Thompson's testimony was not essential because Elliott had access to all the affidavits, statements, and interview reports on which the Commissioner relied.  *See* Ex.C1-2.  The court was not permitted to second-guess that factual determination, as federal courts "do not sit to hear claims of factual or legal error by an arbitrator."  *Misco*, 484 U.S. at 38.  In all events, the Arbitrator's decision was plainly correct:  Not only did he lack the authority to compel testimony from a non-party, but nothing was to be gained by forcing the victim of domestic abuse to endure cross-examination from Elliott's attorneys—particularly when the NFLPA's credibility concerns had already been disclosed and forcefully aired.

18

Finally, as for the Commissioner's testimony, again, the CBA does not require the testimony of *any* witnesses, let alone the Commissioner.  If the parties had contemplated that the Commissioner would be required to personally justify his decision to the Arbitrator, surely they would have said so in their CBA.  Instead, the CBA allows the Commissioner to consider an appeal of his own decision, Ex.G, §2(a), and presumably does not contemplate that he would provide testimony to himself.  When, as here, the Commissioner delegates the appeal, that does not create any greater basis for him to testify.  At a bare minimum, in declining to compel the Commissioner to testify, the Arbitrator articulated a contractually permissible approach, explaining that his testimony was unnecessary because the NFLPA had access to all the information on which he relied.  The district court did not begin to explain how that ruling could be so far outside the bounds of what the CBA contemplates that it was not even arguably grounded in the CBA.  Given that the CBA does not require *any* testimony, there is simply no argument that the Arbitrator flagrantly misapplied the CBA by declining the NFLPA's request.

At any rate, there was no need to compel the Commissioner's testimony to confirm that he understood and considered the investigators' credibility concerns. The investigative report not only exhaustively detailed all discrepancies in the evidence, but also included an exhibit prepared by Roberts herself specifically highlighting conflicts between Thompson's statements and other evidence. *See* ECF

19

#1-47, #1-48; ECF #2-9 at 70-74.  And the disciplinary decision expressly addressed those credibility concerns, explaining that the Commissioner found the evidence as a whole "sufficiently credible ... *even allowing for concerns ... about the complaining witness's credibility*."  Ex.F4 (emphasis added).  The Arbitrator thus acted well within his broad discretion in finding that all information bearing on Thompson's credibility was before the Commissioner and that nothing would be gained from requiring the Commissioner to confirm what was already evident from his decision—namely, that there never was any conspiracy to shield him from the reality that this matter could not be resolved based on the statements of Elliott and Thompson alone.  The district court's "fundamental fairness" ruling thus not only oversteps the judicial role, but is utterly divorced from the reality of what the arbitration proceeding entailed.

## III.   The Equities Favor A Stay.

The NFL will suffer irreparable harm absent a stay.  The NFL and NFLPA collectively bargained for a disciplinary process that allows the Commissioner to discipline players for engaging in "conduct detrimental to the integrity of, or public confidence in, the game of professional football."  Ex.G, §1(a).  That agreement recognizes that unremedied misconduct is detrimental to the game of football, and that the Commissioner must be able to promptly and effectively remedy such misconduct.  The district court's decision undermines that bargained-for authority,

communicating to the players and the NFLPA that the Commissioner's disciplinary authority (not to mention the first-filed rule) can be easily subverted by filing premature and meritless lawsuits. If Elliott is able to forestall the Commissioner's decision by filing prematurely in his favored forum and asserting that every missed game is an irreparable injury, it is difficult to fathom any case in which a player could not delay his discipline for a full season simply by filing a lawsuit—which would undermine the CBA's disciplinary process and Congress' preference for "private settlement of labor disputes." *Misco*, 484 U.S. at 37.

By contrast, the NFLPA and Elliott will not suffer irreparable harm if a stay is granted. The NFLPA claims that Elliott's suspension will cause him to miss work and cost him current and future earnings. Ex.K12-13. But "temporary loss of income ... does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). That rule applies with full force to professional athletes; there is no "satisfactory basis for distinguishing football players from other organized workers," *Brown v. Pro Football, Inc.*, 518 U.S. 231, 249-50 (1996), all of whom could allege the exact same harm if suspended or fired.

Nor is the "reputational harm" that Elliott alleged "the type of irreparable injury ... predicate to the issuance of a temporary injunction." *Sampson*, 415 U.S. at 91-92. And to the extent Elliott has suffered reputational harm, that is due principally to his own decision to publicly release the League's investigative report

21

detailing his misconduct, not from the suspension imposed as a consequence of that misconduct.

Finally, while there is public interest in a player's participation in six of his team's football games, that interest pales in comparison to the public's interest in preventing domestic violence and the Commissioner's ability to punish and deter such violence.  Moreover, given that the order below faulted the arbitral process for its procedural unfairness, not for missing some substantive obstacle to a suspension, there is every prospect that Elliott will have to serve his suspension sooner or later. And no one—not the fans, the League, or Elliott himself—will be served by having that suspension served later in the season or even next season, rather than now.

The bottom line is that the order below, which deviates from the most basic principles of deference to bargained-for arbitral processes, is exceptionally unlikely to stand.  It is both *ultra vires* and deeply flawed on the merits.  In recognition of that reality, this Court should stay the order immediately and promptly reverse it.  To minimize disruptive uncertainty, the NFL requests a stay ruling ideally by September 19, 2017 (when Week 3 practices begin), but no later than September 26, 2017 (Week 4).  The NFL stands ready to brief the appeal with whatever degree of expedition this Court deems appropriate.  But the process of remedying the district court's massive overreach should begin as promptly as possible by staying its unprecedented and indefensible order.

## CONCLUSION

This Court should stay the injunction.

Respectfully submitted,

s/Paul D. Clement

Eric Gambrell
Patrick G. O'Brien
AKIN GUMP STRAUSS
HAUER & FELD LLP
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201
(214) 969-2800
egambrell@akingump.com

Daniel L. Nash
Nathan J. Oleson
AKIN GUMP STRAUSS
HAUER & FELD LLP
1333 New Hampshire Ave, NW
Washington, DC 20036
(202) 887-4000
dnash@akingump.com

Paul D. Clement
 *Counsel of Record*
Erin E. Murphy
Subash S. Iyer
Michael D. Lieberman
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Defendants-Appellants*

September 15, 2017

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 27.3, I hereby certify that the facts supporting emergency consideration of the motion are true and complete.

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I hereby certify that the textual portion of the foregoing motion (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 5,197 words as determined by the word counting feature of Microsoft Word 2016.

I certify that the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses with Windows Defender, last updated September 15, 2017, and is free of viruses.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that service will be accomplished by the CM/ECF system or by electronic mail.

<u>s/Paul D. Clement</u>
Paul D. Clement

# TABLE OF EXHIBITS

| Exhibit | Description of Document | Dist. Ct. Docket No. |
|---|---|---|
| A | Memorandum Opinion and Order (E.D. Tex. Sept. 8, 2017) | 28 |
| B | Henderson Appeal Decision (Sept. 5, 2017) | 22-2 |
| C | Henderson Motion to Compel Ruling (Aug. 23, 2017) | 1-59 |
| D | Henderson Oral Ruling on Commissioner Testimony | 2-13 |
| E | Roberts and Friel Testimony Excerpts | 2-13 |
| F | Commissioner Decision (Aug. 11, 2017) | 1-53 |
| G | Article 46 | 1-62 |
| H | Personal Conduct Policy | 1-19 |
| I | Petition to Vacate Arbitration Award (Aug. 31, 2017) | 1 |
| J | Notice of Emergency Motion for Temporary Restraining Order or Preliminary Injunction (Sept. 1, 2017) | 5 |
| K | Emergency Motion for Temporary Restraining Order or Preliminary Injunction (Sept. 1, 2017) | 5 |
| L | Respondents' Motion to Dismiss and Brief in Support (Sept. 4, 2017) | 7 |
| M | Respondents' Opposition to Petitioner's Emergency Motion for Temporary Restraining Order or Preliminary Injunction | 8 |
| N | Petitioners' Reply in Support of Emergency Motion for Temporary Restraining Order or Preliminary Injunction | 13 |
| O | Respondents' Emergency Motion to Stay Injunction Pending Appeal | 30 |
| P | Petitioner's Opposition to Respondents' Emergency Motion to Stay Injunction Pending Appeal | 34 |
| Q | Respondents' Reply in Support of Emergency Motion to Stay Injunction Pending Appeal | 35 |

# EXHIBIT A

# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

NATIONAL FOOTBALL LEAGUE    §
PLAYERS ASSOCIATION, on its own    §
behalf and on behalf of EZEKIEL ELLIOTT    §
   §
   §    Civil Action No. 4:17-CV-00615
v.    §    Judge Mazzant
   §
NATIONAL FOOTBALL LEAGUE and    §
NATIONAL FOOTBALL LEAGUE    §
MANAGEMENT COUNCIL    §

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Petitioner's Emergency Motion for Temporary Restraining Order or Preliminary Injunction (Dkt. #5). The Court has a very limited role in this case. The Court is being called upon to determine, at this preliminary stage, whether Dallas Cowboys running back Ezekiel Elliott ("Elliott") received a fundamentally fair arbitration hearing. The question of whether there was credible evidence of domestic abuse is not before the Court. Nor are any of the underlying facts in the dispute between Elliott and Tiffany Thompson ("Thompson"). Based upon the preliminary injunction standard, the Court finds, that Elliott did not receive a fundamentally fair hearing, necessitating the Court grant the request for preliminary injunction.[1]

---

[1] Petitioner moved for a temporary restraining order or preliminary injunction. A temporary restraining order is generally used in a situation in which the defendant or, in this case respondent, did not have notice or the opportunity to respond to the motion. If a court finds a temporary restraining order is warranted, it will go into effect for no more than fourteen days, and the court would set a hearing to determine whether it should issue a preliminary injunction. Here, the National Football League and National Football League Management Council (collectively, "NFL") had the opportunity to respond. The Court held a hearing on the motion, at which the NFL presented its arguments, and both parties filed supplemental briefing after the hearing. Considering the procedural history in this case, the Court proceeds on a preliminary injunction analysis.

# BACKGROUND

This dispute centers on the NFL Commissioner Roger Goodell's ("Commissioner" or "Goodell" or "Commissioner Goodell") decision to suspend Elliott for six games due to allegations of domestic violence made by Thompson.  In July 2016, Columbus, Ohio law enforcement officers investigated allegations made by Thompson against Elliott for domestic violence.  After the initial investigation on the scene, law enforcement officers found no probable cause for an arrest, due to "conflicting versions of what had taken place over the listed dates."  (Dkt. #5 at p. 4).  The police continued to investigate the incidents until September; however, law enforcement officers decided not to criminally prosecute Elliott given the "conflicting and inconsistent information across all incidents."  (Dkt. #1, Exhibit 43 at p. 2).

Pursuant to the NFL's Personal Conduct Policy ("PCP"), the Commissioner may discipline players even without a criminal charge, arrest, or conviction. (Dkt. #1, Exhibit 22 at p. 5).  However, discipline is only warranted when "credible evidence establishes that [the player] engaged in conduct prohibited by this [PCP]."  (Dkt. #1, Exhibit 22 at p. 5).  Thus, following law enforcement's investigation, the NFL engaged in its own investigation of Elliott's alleged conduct.  Kia Roberts ("Roberts"), Director of Investigations, and Lisa Friel ("Friel"), Senior Vice President and Special Counsel for Investigations, investigated the accusations against Elliott for an entire year.  After the investigation, Roberts and Friel assembled the NFL Investigative Report ("the Elliott Report").  The Commissioner also assembled outside advisors who met on June 26, 2017, and interviewed Elliott. (Dkt. #2, Exhibit 13 at 117:10–21, 337:3–9 (Aug. 30, 2017)).

On August 11, 2017, B. Todd Jones sent Elliott a letter informing him that Commissioner Goodell decided to impose a six-game suspension on Elliott.  Jones stated that, in making his decision, the Commissioner reviewed "the record, including [the Elliott Report], the transcript of

the June 26, 2017 meeting, and the material submitted on [Elliott's] behalf." (Dkt. #1, Exhibit 53 at p. 4).

After receiving the letter, Elliott filed his appeal pursuant to the NFL–National Football League Players Association's ("NFLPA") Collective Bargaining Agreement (the "CBA"). The appeal went to an arbitrator charged with determining whether Commissioner Goodell's disciplinary decision was arbitrary and capricious. (Dkt. #23, Exhibit 2 at p. 7). In other words, the arbitrator decides whether Goodell's decision was made on unreasonable grounds or without any proper consideration of circumstances. (Dkt. #23, Exhibit 2 at p. 7).

While preparing for arbitration, the NFLPA filed a motion to compel requesting the arbitrator, Harold Henderson ("Henderson"), order the NFL to provide Thompson for cross-examination, along with the NFL investigators' notes. (Dkt. #1, Exhibit 57). The arbitrator denied the request, stating "[t]he Commissioner's decision in this case was based on affidavits, statements, and interview reports, all of which are available to Mr. Elliott under the procedures of the [CBA]." (Dkt. #1, Exhibit 59). In that same motion, the NFLPA also asked Henderson to order the NFL to provide Roberts to testify. (Dkt. #1, Exhibit 57). The NFL responded to the request arguing that Henderson should deny the NFLPA's request because Roberts's testimony was cumulative and unnecessary. (Dkt. #1, Exhibit 58). Henderson granted the NFLPA's motion to compel Roberts to testify at the arbitration proceeding.

During the arbitration, the NFLPA and Elliott discovered Roberts's conclusions that Thompson's accusations were incredible, inconsistent, and without corroborating evidence to sufficiently support any discipline against Elliott. (Dkt. #2, Exhibit 13 at 143:5–8, 172:21–24, 173:9–22, 175:4–19 (Aug. 29, 2017); Dkt. #2, Exhibit 13 at 301:23–302:4 (Aug. 30, 2017)). Further, the NFLPA and Elliott learned that Commissioner Goodell had a meeting with Friel and

outside advisors, from which Roberts was excluded. Following this revelation, the NFLPA asked Henderson to compel Commissioner Goodell to testify to determine whether critical facts were concealed from Commissioner Goodell during the decision-making process; however, the arbitrator denied the request. (Dkt. #2, Exhibit 13 at 348:18–349:15 (Aug. 30, 2017)).

On August 31, 2017, the three-day arbitration concluded. Henderson announced he would issue a decision shortly after. On September 1, 2017, the NFLPA, on behalf of Elliott, sued the NFL seeking vacatur of Henderson's impending decision based on the factual scenario presented in this case. Further, the NFLPA, on behalf of Elliott, filed this emergency motion for a temporary restraining order or preliminary injunction, due to the fast-approaching NFL season (Dkt. #5). On September 5, 2017, after suit was filed, and during the Court's hearing on Petitioner's motion, Henderson affirmed Commissioner Goodell's six-game suspension of Elliott.[2]

## APPLICABLE LAW

Under Rule 65 of the Federal Rules of Civil Procedure, "[e]very order granting an injunction and every restraining order must: (a) state the reasons why it issued; (b) state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d). A plaintiff seeking a temporary restraining order must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

---

[2] Because the award was issued at the hearing, the Court instructed that if the parties wished to file supplemental briefing regarding the effect of the award on the Court's analysis, they should do so by 5:00 p.m. on September 6, 2017. Both parties field supplemental briefs (Dkt. #23; Dkt. #24). The NFLPA filed a Motion to Strike or Alternatively Leave to File Second Supplemental Brief arguing that Section I of the NFL's brief was outside the scope of what the Court ordered (Dkt. #25). The NFL field a response (Dkt. #26). The Court will only consider portions of the supplemental briefs that were ordered by the Court, which is the portions pertaining to the arbitration award.

## ANALYSIS

The NFLPA asks this Court to issue a temporary restraining order or a preliminary injunction to maintain the status quo until a decision on the merits of the petition for vacatur can be decided.  The NFL argues that this Court lacks subject matter jurisdiction to hear the case.  The NFL further asserts that even if the Court does have jurisdiction, the elements are not met for a preliminary injunction.  Before the Court can address the preliminary injunction's merits, the Court must address its subject matter jurisdiction.[3]

### I.     Subject Matter Jurisdiction

The NFL argues the Court lacks jurisdiction over the case for three reasons: (1) the Court cannot vacate a hypothetical award under any statutory scheme; (2) the NFLPA does not have standing to assert a petition for vacatur before an award is issued; and (3) the claim is not ripe until Henderson issues the award. The Court will address each argument in turn.

### A. Vacatur of Hypothetical Award

The NFL contends that no statute provides the Court with jurisdiction to review a hypothetical award.[4]  Specifically, the NFL claims that the Federal Arbitration Act ("FAA"), the Labor Management Relations Act ("LMRA"), and the Norris–LaGuardia Act ("NLGA") prevent the Court from having jurisdiction in this case.

At the hearing, both parties agreed that the FAA does not confer jurisdiction to the Court, and jurisdiction derives from the LMRA.  Therefore, the Court will focus on the NFL's argument concerning the LMRA.  The NFL maintains that, under the LMRA, federal courts do not have

---

[3] The Court notes that the NFL have filed a motion to dismiss, arguing the Court does not have jurisdiction.  However, this motion is not ripe.  The Court will address the motion to dismiss once the briefing is complete and ripe for review.
[4] These arguments were initially made before Henderson issued an arbitral award. Because jurisdiction is established at the time suit is filed, the Court will address its subject matter jurisdiction at the time the NFLPA filed its petition. *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004).

jurisdiction over a violation of a collective bargaining agreement unless the employee exhausts the procedures provided for in the agreement. The NFL asserts that when the agreement provides for arbitration as a procedure, as it is here, exhaustion does not occur until the award is final and complete. The NFL contends that NFLPA did not properly exhaust its remedies because the NFLPA filed its suit before Henderson issued his final arbitration award. Therefore, the NFL argues that the Court does not have jurisdiction over the NFLPA's claim.

For a federal court to maintain jurisdiction over the alleged breach of a collective bargaining agreement, an LMRA "claim must satisfy three requirements: (1) a claim of a violation of (2) a contract (3) between an employer and a labor organization." *Carpenters Local Union 1846 of United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 500 (5th Cir. 1982). As long as these three requirements are met an individual can sue for breach of the collective bargaining agreement. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163 (1983) (citing *Smith v. Evening News Ass'n*, 371 U.S. 195 (1962)). Here, the NFLPA alleges a violation of a contract, the CBA. The CBA was entered into by the NFLPA, a labor organization, and the NFL, an employer.

The NFL is correct that an individual is generally required to exhaust, or at least attempt to exhaust, any remedies provided for in the collective bargaining agreement before filing suit in a federal court. However, the Supreme Court and the Fifth Circuit have recognized exceptions to this exhaustion requirement. *Id.* (first citing *Rep. Steel Corp. v. Maddox*, 379 U.S. 650 (1965); then citing *Clayton v. Auto. Workers*, 451 U.S. 679 (1981)); *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 328 (1969); *Bache v. AT&T*, 840 F.2d 283, 288 (5th Cir. 1988). The Fifth Circuit identified that exhaustion is not required if:

> (1) the union wrongfully refuses to process the employee's grievances, thus, violating its duty of fair representation; (2) the employer's conduct amounts to a

repudiation of the remedial procedures specified in the contract; or (3) exhaustion of contractual remedies would be futile because the aggrieved employee would have to submit his claim to a group "which is in large part chosen by the (employer and union) against whom (his) real complaint is made."

*Rabalais v. Dresser Indus., Inc.*, 566 F.2d 518, 519 (5th Cir. 1978) (quoting *Glover*, 393 U.S. at 330) (citing *Vaca v. Sipes*, 386 U.S. 171 (1967); *Boone v. Armstrong Cork Co.*, 384 F.2d 285 (5th Cir. 1967)); *accord Wardlow v. Ark. Best Corp.*, 261 F.3d 138, 141–42 (5th Cir. 1959); *McNealy v. Becnel*, No. 14-2181, 2017 WL 2313143, at *8 (E.D. La. May 26, 2017). The Court focuses on the second exception to the exhaustion requirement: "when the employer's conduct amounts to a repudiation of the remedial procedures specified in the contract." *Rabalais*, 566 F.2d at 519 (5th Cir. 1978) (quoting *Glover*, 393 U.S. at 330). A repudiation "occurs when a party's conduct 'shows a fixed intention to abandon, renounce, and refuse to perform the contract.'" *Plains Cotton Coop. Assoc. v. Gray*, 672 F. App'x 372, 375 (5th Cir. 2016) (quoting *Hunter v. Pricekubecka, PLLC*, 339 S.W.3d 795, 802 (Tex. App.—Dallas, 2011, no pet.)).

The Court finds that the facts of this case do not require exhaustion. The allegations that the NFL withheld evidence from the NFLPA and Elliott amount to a repudiation of the required procedures specified in the CBA. The CBA requires that the "NFLPA and NFL have the right to attend all hearings provided for in [Article 46] and to present, by testimony or otherwise, any evidence relevant to the hearing." (Dkt. #1, Exhibit 62 at p. 209). Here, the NFLPA contends that the NFL withheld information regarding Roberts's assessment of Thompson's credibility and the credibility of the evidence from the NFLPA, Elliott, and *possibly* Commissioner Goodell. According to the facts before the Court, Roberts, a primary investigator of Elliott's case, developed opinions about the credibility of witnesses she interviewed, including Thompson, as well as whether to issue punishment in the case. This information was not put into the Elliott Report and may not have been communicated to Commissioner Goodell. Because this information was not in

the Elliott Report or any other documentary evidence the NFL provided to the NFLPA, neither the

NFLPA nor Elliott knew about Roberts's opinions.  Thus, the Court finds, the NFL further sought

to ensure that the NFLPA and Elliott would never find out about Roberts's opinions by arguing

that her testimony would be cumulative of Friel's and unnecessary in the arbitration.[5]  (Dkt. #1,

Exhibit 58).  While the last effort failed, the NFL's initial efforts to stop the NFLPA and Elliott

from learning of the relevant evidence of Roberts's opinions were successful.  The NFLPA and

Elliott were unable to present this relevant evidence and instead unexpectedly learned this at the

end of the second day of arbitration.

The NFL's breach of the CBA is only compounded by Henderson's breach of the CBA.

Specifically, Henderson denied access to certain procedural requirements, which were necessary

to be able to present all relevant evidence at the hearing.   These procedural requests, that

Henderson denied are: (1) access investigators' notes; (2) cross-examine Thompson; and

(3) question Commissioner Goodell.  Since Henderson barred access to the investigators' notes,

Thompson's cross-examination, and the examination of Commissioner Goodell, and each was of

utmost importance and extremely relevant to the hearing, Henderson breached the CBA.  Although

a breach of the agreement by an arbitrator is not a recognized exception of the exhaustion

requirement, Henderson's breach further supports allowing an exception in this case.  Because

both the NFL and Henderson breached their obligations under the CBA the Court finds exhaustion

of the NFLPA's remedies unnecessary.

However, even if the Court required exhaustion in this case, the NFLPA properly exhausted

its remedies.  While the NFLPA did not wait for the final arbitration award, the NFLPA submitted

its requests to Henderson, which he denied.  In doing so, the NFLPA properly submitted its fairness

---

[5] The NFL further argued at the hearing that Roberts's testimony was consistent with Friel's, but this language was not included in their response to the motion to compel.

objections to the arbitrator before seeking judicial review. *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 487 (5th Cir. 2002) (citing *Hooters of Am., Inc. v. Phillips*, 173 F.3d 953, 940–41 (4th Cir. 1999)). The NFLPA had no further action to take.

The NFL criticizes the NFLPA for not supporting this theory of exhaustion with any case law. Notably, absent from the NFL's briefing on the jurisdictional issue is any case law where a court held that the petitioner or plaintiff failed to exhaust their remedies in a situation similar to the one before the Court. Specifically, where the claim was submitted to the arbitrator and the arbitrator had already decided all the pertinent procedural issues, which in turn make up the claim for fundamental unfairness. For example, the NFL cites to the Fifth Circuit's decision in *Meredith v. Louisiana Federation of Teachers* for the proposition that an employee must exhaust all contractual procedures for redress before filing suit in federal court. 209 F.3d 398, 402 (5th Cir. 2000). However, in *Meredith*, the employee did not seek to compel arbitration. *Id.* Here, the NFLPA sought arbitration, submitted requests to the arbitrator, and received a decision from the arbitrator on these requests.

The NFL also argues federal courts are prohibited from issuing injunctions in labor disputes based on the NLGA. The NFLPA counters that this action is not barred under the NLGA because injunctions involving labor disputes are allowed when the requested relief would not operate to enjoin a strike or otherwise peaceful, concerned labor activity. The NFLPA maintains that it seeks to enforce the terms of the CBA and prevent illegal conduct imposed against Elliott. This argument is persuasive. The Court joins numerous other courts in holding the NLGA does not prevent an injunction in this scenario. *Mackey v. Nat'l Football League*, 543 F.2d 606, 623 (8th Cir. 1976); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 234–235 (D. Minn. 1992); *Denver Rockets v.*

*All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1066–1067 (C.D. Cal 1971), *reinstated by Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204 (1971).

### B. Standing

The NFL asserts that the NFLPA lacks standing to assert the petition for vacatur because the petition was filed before Henderson issued an award. Further, the NFL claims Elliott will not suffer an injury unless Henderson's award affirms Goodell's suspension in whole or in part. Nevertheless, the NFL contends that even if any injury existed, the Court could not redress it. Additionally, the NFL asserts that the NFLPA's claim is not ripe because the NFLPA filed its petition before Henderson issued the award.

"The Constitution (article 3, § 2) limits the exercise of judicial power to 'cases' and 'controversies.'" *Aetna Life Ins. Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, 239 (1937). Both the standing and the ripeness requirements are crucial elements to the justiciability of a case. *See Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). Standing and ripeness are related, yet separate, inquiries. *See id.* "In simple terms, 'standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time." *Id.*

To establish standing, a plaintiff must meet three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61; *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 454 (5th Cir. 2017). First, a plaintiff must prove he has sustained an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. *Planned Parenthood*, 862 F.3d at 454. Second, there must be a causal connection between the injury and the conduct complained of. *Id.* Third, a favorable decision is likely to redress the injury. *Id.* An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial

10

risk that the harm will occur.  *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014)).

First, Elliott will sustain a concrete and particular injury, immediate suspension from practices and games, if Henderson, affirms the Commissioner's suspension, whether in full or in part.  The NFL argues because Henderson has not issued an award, Elliott has not sustained an injury.  However, "this argument ignores the well-established principle that a threatened injury may be sufficient to establish standing."  *Id.* (citing *Loa-Herrera v. Trominski*, 231 F.3d 984, 988 (5th Cir. 2000)).  Here, the NFLPA requested Henderson allow the NFLPA (1) to access investigators' notes; (2) to cross-examine Thompson; and (3) to question Commissioner Goodell. Henderson denied these requests.  Based on these denials and the fact that an arbitrator gives deference to the Commissioner's decision, it is evident that Henderson will likely affirm, in some manner, the Commissioner's suspension.  As such, "there is a substantial risk that the harm will occur."  *Id.*  Furthermore, the NFLPA and Elliott suffered an injury that existed when the NFLPA filed its petition.  The essence of the NFLPA's claims is that the NFL withheld, and Henderson denied access to, both testimonial and documentary evidence that was material, pertinent, and relevant to the hearing, which resulted in violations of the CBA and federal labor law. Additionally, these details prevented the NFLPA from having the ability to properly present its case at arbitration.  This injury existed at the time the NFLPA filed suit, making it concrete and particularized.

Second, a causal connection exists between both the threatened and existing injuries and the conduct complained of.  In other words, Elliott's injuries are fairly traceable to the actions taken by the NFL and Henderson.  Specifically, the NFLPA alleges the NFL withheld Roberts's opinions and conclusions until the second day of arbitration.  Such conduct creates connections

with both the imminent and existing injuries because the NFLPA was prevented from properly presenting its case at arbitration. Furthermore, Henderson's refusal to allow the NFLPA to (1) access investigators' notes; (2) cross-examine Thompson; and (3) question Commissioner Goodell, after the NFLPA discovered the withheld evidence, formed yet another reason the NFLPA was prevented from properly presenting its case.

Finally, a favorable decision here is likely to redress the injuries. Elliott and the NFLPA suffer from both imminent and existing injuries. If the Court issues a preliminary injunction, such relief redresses both injuries. Specifically, a preliminary injunction barring the NFL from enforcing an arbitration award affirming, in whole or part, the Commissioner's suspension prevents any unjust suspension of Elliott from practices and games.

## C. Ripeness

Additionally, the NFL initially argued that the case was not ripe because Henderson had not issued an award. However, Henderson issued his final award after the NFL made this argument. Because ripeness is a question of timing, the relevant inquiry is whether the action is ripe at the time of the decision. *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974). The Court is to consider events that occurred before suit is filed as well as events that took place after commencement of the suit. *Roman Catholic Diocese of Dall. v. Sebelius*, 927 F. Supp. 2d 406, 424 (N.D. Tex. 2013). Considering the case law and the facts of this case, the case is ripe and ready for review.

## II.    Preliminary Injunction

The NFLPA asserts that it can show (1) a substantial likelihood of success on the merits; (2) irreparable harm; (3) the threatened harm outweighs the injury of granting an injunction; and

(4) the public interest supports granting an injunction.  The NFL maintains that the NFLPA cannot meet any of these requirements.

### A.  Substantial Likelihood of Success on the Merits

To prevail on a motion for preliminary injunction, a movant must demonstrate a substantial likelihood of success on the merits.  This requires a movant to present a prima facie case.  *See Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)).  A prima facie case does not mean movants must prove they are entitled to summary judgment.  *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

The NFLPA seeks to vacate the arbitration award suspending Elliott for six games.  "Judicial review of an arbitration award is extraordinarily narrow."  *Gulf Coast Indus. Workers Union v. Exxon Co. USA*, 70 F.3d 847, 850 (5th Cir. 1995) (quoting *Antwine v. Prudential Bache Sec., Inc.*, 899 F.2d 410, 413 (5th Cir. 1990)).  "[C]ourts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or misinterpretation of the contract."  *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987).  When asked to vacate an arbitration award, the Court has a very limited question before it: whether the arbitration proceedings were fundamentally unfair.  *Id.* (citing *Forsythe Int'l, S.A. v. Gibbs Oil Co.*, 915 F.2d 1017, 1021 (5th Cir. 1990)).

The NFLPA argues Elliott did not receive a fundamentally fair hearing because (1) Henderson denied access to the investigators' notes; (2) Henderson denied Elliott the opportunity to cross-examine Thompson;[6] and (3) Henderson denied Elliott the chance to question

---

[6] The Court notes that the NFL argues that Thompson is not under its control and it had no ability to force Thompson to testify.  However, the record indicates that the NFL did not even ask Thompson to testify.  Thompson was cooperative throughout the entirety of the NFL's investigation, and there is nothing in the record to suggest that she was unwilling to testify at the arbitration hearing.

Goodell about what he knew before making his ultimate decision to suspend Elliott for six games. These types of procedural questions "are left to the sound discretion of the arbitrator and should not be second-guessed by the courts." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016) ("*Brady II*") (citing *United Paperworkers*, 484 U.S. at 40); *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). However, the FAA[7] creates a narrow exception that allows courts to intervene and vacate an award when a hearing is not fundamentally fair. An arbitration is fundamentally unfair when, among other things, "the arbitrators are guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3); *see also Brady II*, 820 F.3d at 545; *Parker v. J C Penny Corp., Inc.*, 426 F. App'x 285, 289 (5th Cir. 2011). While "[t]he arbitrator is not bound to hear all of the evidence tendered by the parties . . . he must give each of the parties to the dispute adequate opportunity to present its evidence and arguments." *Forsythe Int'l, S.A.*, 915 F.2d at 1023; *see also InfoBilling, Inc. v. Transaction Clearing, LLC*, No. SA-12-CV-01116, 2013 WL 1501570, at *5 (W.D. Tex. 2013). The arbitrator must also ensure that each party has all relevant documentary evidence, and if a party shows prejudice, the failure to do so can constitute grounds to vacate under the FAA. *Universal Comput. Sys., Inc. v. Big Bell 21, LLC*, No. 13-cv-00702, 2014 WL 12603178, at *4 (S.D. Tex. Jan. 29, 2014) (quoting *Chevron Transport Corp. v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969)).

While it is a narrow exception and rare circumstance which a court interferes with an arbitral award, this case presents unique and egregious facts, necessitating court intervention.

---

[7] When reviewing the validity of a labor arbitration award under the LMRA, courts look to the FAA for guidance. *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 292 (5th Cir. 2003) (citing *United Paperworkers*, 484 U.S. at 41 n.9).

Courts should use this exception in extreme circumstances and should perform the analysis on a case-by-case basis.  Thus, even though the Court is not deciding whether the NFL engaged in a conspiracy to achieve a certain result, the actions of the NFL have to be considered in the Court's analysis of whether Henderson gave Elliott a fundamentally fair hearing.  The Court recognizes and acknowledges that under ordinary circumstances, the denial of witnesses and documentary evidence falls within the discretion of the arbitrator.  *Brady II*, 820 F.3d at 545 (citing *United Paperworkers*, 484 U.S. at 40); *Am. Eagle Airlines, Inc.*, 343 F.3d at 405.  However, the set of facts presented in this case are everything but ordinary and are such that the denial of key witnesses and documents amounts to serious misconduct by the arbitrator.

In this case, two individuals, Roberts and Friel, were assigned to investigate the allegations of domestic violence lodged against Elliott.  Roberts's role in the investigation involved speaking with various witnesses, including interviewing the accuser and accused, Thompson and Elliott, along with reviewing some of the documentary evidence in this case, and helping create the Elliott Report.  *See, e.g.*, Dkt. #2, Exhibit 13 at 134:18–135:15, 145:9–13, 150:20–151:5 (Aug. 29, 2017); Dkt. #1, Exhibit 47 and 48 at pp. 78–159.  Notably, Roberts described herself as a "grunt" and "the boots on the ground in the investigation."  (Dkt. #2, Exhibit 13 at 135:1–5 (Aug. 29, 2017)).  Roberts interviewed Thompson two times and followed up on the phone with Thompson four times.  (Dkt. #2, Exhibit 13 at 140:10–12 (Aug. 29, 2017)).  Conversely, Roberts claims that Friel took more of a supervisory role in the investigation (Dkt. #2, Exhibit 13 at 135:1–2 (Aug. 29, 2017)).  Friel states that she interviewed two doctors and Elliott. (Dkt. #2, Exhibit 13 at 261:3–4, 10–13 (Aug. 30, 2017)).  However, Friel admits she never interviewed Thompson.  (Dkt. #2, Exhibit 13 at 261:17–19 (Aug. 30, 2017)).

At the end of the investigation, Roberts and Friel compiled the Elliott Report, which contained all facts obtained during the investigation.  By the end of the investigation, Roberts and Friel each developed an opinion on the evidence and on the credibility of the witnesses, including Thompson and Elliott.   Roberts  concluded  that  insufficient  evidence  existed  to  corroborate Thompson's allegations and that Thompson was not a credible witness.  (Dkt. #2, Exhibit 13 at 143:5–8, 172:21–24, 173:9–22, 175:4–19 (Aug. 29, 2017); Dkt. #2, Exhibit 13 at 301:23–302:4 (Aug. 30, 2017)).  Roberts communicated this opinion to Friel.  (Dkt. #2, Exhibit 13 at 301:23–302:4 (Aug. 30, 2017)).  Friel, on the other hand, concluded that sufficient evidence existed to corroborate all of Thompson's allegations except one specific incident.  (Dkt. #2, Exhibit 13 at 289:7–298:23 (Aug. 30, 2017)).

While  the  PCP  allows  the  investigators  to  include  in  the  report  a  disciplinary recommendation for Commissioner Goodell's consideration, the NFL made an unusual departure from what it had done in past investigations and did not include recommendations from either investigator.[8]  (Dkt. #2, Exhibit 13 at 136:22–137:10 (Aug. 29, 2017)).  Friel, along with counsel, made the joint decision to exclude recommendations from the Elliott Report in this case.  (Dkt. #2, Exhibit 13 at 265:15-25 (Aug. 30, 2017)).   However, as the remainder of the events will demonstrate, the only opinion that Friel, along with counsel, sufficiently excluded was Roberts's opinion.

After Commissioner Goodell received the Elliott Report, he met with certain NFL personnel, including Friel.  It was at this time that Friel was given the opportunity to share her opinions and recommendations on the case and the credibility of the witnesses.  Interestingly,

---

[8] The current version of the PCP was developed in 2016. The current version allows for investigator recommendations to be included in the final investigative report.  (Dkt. #1, Exhibit 19 at p. 5).

Roberts was not invited to attend this meeting.  While Friel expressed her opinions and conclusions at this meeting, the Court is less than convinced that the same can be said for Roberts's opinions.[9] As such, not only were Roberts's recommendations excluded from the report, they were also kept from Commissioner Goodell and his advisors.  (Dkt. #2, Exhibit 13 at 322:13–338:22 (Aug. 30, 2017)).

Consistent with its previous actions to suppress Roberts's dissenting opinions, the NFL kept this sequence of events from the NFLPA and Elliott until the arbitration hearing.  In fact, had the NFL succeeded in its overall goal, this sequence of events would still be concealed from Elliott and the NFLPA.  The NFLPA filed a motion to compel the testimony of Roberts, and the NFL argued in response that her testimony was unnecessary, consistent with Friel's testimony, and cumulative.  (Dkt. #1, Exhibit 58).  Luckily, the NFLPA found the fairness needle in the unfairness haystack and Henderson ordered Roberts to testify.  The arbitration record shows that Roberts's testimony was everything but unnecessary, consistent, and cumulative.

The NFL's actions demonstrate that from the very beginning of the decision-making process, a cloud of fundamental unfairness followed Elliott.  Unfortunately, this cloud followed Elliott into the arbitration proceedings.  The arbitration record shows that the NFL, at the *very least*, turned a blind eye to Roberts's dissenting opinion.  This entire set of circumstances was put

---

[9] Friel presented varying testimony throughout her arbitration regarding Roberts's opinions. She initially claimed that she could not discuss what conversations took place during the meeting because "[w]e had counsel in the room at the time, so [the conversations] would be protected by privilege." (Dkt. #2, Exhibit 13 at 275:3–5 (Aug. 30, 2017)). Friel stated, "I don't know if [Roberts]" had the opportunity to discuss her views on the sufficiency of the evidence. Friel further said that "[Roberts wasn't in the meeting [Friel] had with [the Commissioner]." (Dkt. #2, Exhibit 13 at 320:19–321:4 (Aug. 30, 2017)). She additionally states "[t]hat's not to say [Roberts's] views were not communicated to him in some other fashion. I don't know the answer to that." (Dkt. #2, Exhibit 13 at 322:10–12 (Aug. 30, 2017)). She confidently states that she does not "know if they were or weren't [communicated to him in some fashion,]" but she asserts "that's certainly possible." (Dkt. #2, Exhibit 13 at 322:15–17 (Aug. 30, 2017)). However, in response to the very next question she communicated Roberts's views to Goodell. (Dkt. #2, Exhibit 13 at 322:18–20 (Aug. 30, 2017)). Yet, she could not "tell [the attorney] precisely" how Roberts's views were expressed, but just that "it was presented to him." (Dkt. #2, Exhibit 13 at 323:17–19 (Aug. 30, 2017)). Then, Friel claims that "Cathy Lanier may have" expressed Roberts's views to the Commissioner, but she does not "recall anything specific." (Dkt. #2, Exhibit 13 at 324:21–325:4 (Aug. 30, 2017)).

in front of Henderson.  It is in this light the Court views Henderson's decisions to exclude Thompson and Commissioner Goodell as necessary witnesses, as gross errors resulting in a fundamentally unfair hearing.

Henderson's denial of these requests prevented the NFLPA and Elliott from properly presenting their case and meeting their burden of proof.  The NFLPA had the burden of convincing the arbitrator that Commissioner Goodell's decision was arbitrary and capricious.  Henderson prevented Elliott access to credible evidence necessary to discharge this burden.  In this situation, where credibility is questioned and a dissenting opinion regarding the case and the credibility of Thompson are withheld from, at a minimum, the NFLPA and Elliott, the ability to cross-examine Thompson is both material and pertinent.  Additionally, in the situation where the evidence that was in front of the Commissioner still remains unclear, it is material and pertinent to question Commissioner Goodell.

The circumstances of this case are unmatched by any case this Court has seen.  *See generally Brady II*, 820 F.3d 527; *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 125 F. Supp. 3d 449 ("*Brady I*").  In *Brady I* and *Brady II*, Tom Brady sought to compel an investigator's notes and testimony from the NFL's general counsel, Jeff Pash.  *Brady I*, 125 F. Supp. 3d at 470–71.  The Second Circuit ultimately held that the arbitrator's denial of this request was not fundamentally unfair since the evidence was not material and pertinent to the case. *Brady II*, 820 F.3d at 528

Here, Elliott is accused of engaging in domestic violence against Thompson, an allegation he denies.  Further, the NFLPA sought to (1) access to investigators' notes; (2) cross-examine Thompson; and (3) question Commissioner Goodell.  Such requests were denied. Unlike *Brady I and Brady II*, the evidence and testimony precluded is material, pertinent, and critically important

to Elliott's case. *See general id.* Additionally, this case concerns withheld material evidence from the NFLPA and Elliot, and possibly Commissioner Goodell. As such, this case involves essential evidence that was sought and denied resulting in a fundamentally unfair hearing.

Fundamental unfairness is present throughout the entire arbitration process. Due to such fundamental unfairness, the Court's intervention is justified. The NFLPA was not given the opportunity to discharge its burden to show that Goodell's decision was arbitrary and capricious. At every turn, Elliott and the NFLPA were denied the evidence or witnesses needed to meet their burden. Fundamental unfairness infected this case from the beginning, eventually killing any possibility that justice would be served. Accordingly, the Court finds that the NFLPA demonstrated a substantial likelihood of success on the merits.

### B.  Substantial Threat of Irreparable Harm

Plaintiffs must demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

Elliott is faced with missing six games, which is a large portion of the NFL's season, and potentially deprives Elliott of the ability to achieve individual successes and honors. (Dkt. #5, Exhibit 1 at ¶¶ 5, 8). The careers of professional athletes are "short and precarious, providing a limited window in which players have the opportunity to play football in pursuit of individual and team achievements." (Dkt. #5, Exhibit 1 at ¶ 6). The Court joins the long line of cases that have previously held that improper suspensions of professional athletes can result in irreparable harm to the player. *Nat'l Football League Players Ass'n v. Nat'l Football League*, 598 F. Supp. 2d 971,

982 (D. Minn. 2008) ("*Williams*") (citing *Jackson*, 802 F. Supp. 226, 230–31 (D. Minn. 1992));

*Brady v. NFL*, 779 F. Supp. 2d 992, 1005 (D. Minn. 2011), *rev'd on other grounds*, 644 F.3d 661

(8th Cir. 2011); *Prof'l Sports, Ltd. v. Va. Squires Basketball Club Ltd*, 373 F. Supp. 946, 949 (W.D.

Tex. 1974). The Court finds that Elliott is likely to suffer irreparable harm if he is improperly

suspended based on a fundamentally unfair arbitration proceeding. *See id.*

### C.  Balance of Hardships

When deciding whether to grant an injunction, "courts must balance the competing claims of

injury and must consider the effect on each party of the granting or withholding of the requested

relief." *Winter*, 555 U.S. at 24 (citation omitted). The NFL argues that the harm it will suffer as

a result of an injunction is greater than that of Elliott because the NFLPA and NFL have an

agreed-upon internal procedure that will be eviscerated by an injunction in this case. This

argument is unpersuasive. While the NFLPA and NFL have an agreed-upon procedure, that

procedure is intended to be one of fundamental fairness. Given the current set of facts, an

injunction does not eviscerate the internal procedures of the NFL and NFLPA but merely ensures

the internal procedures are being carried out in the appropriate manner. Both the NFL and the

NFLPA "have an interest in ensuring that the suspensions meted out under the [PCP] are not tainted

by [fundamental unfairness] and wrongdoing." *Williams*, 598 F. Supp. 2d at 983. Therefore, the

Court finds that the NFLPA showed the balance of hardships weighs in favor of granting an

injunction.

### D.  Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the

public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

at 24 (quoting *Weinberger*, 465 U.S. at 312). This factor overlaps substantially with the balance-

of-hardships requirement.  *Id.*  The NFL argues that the public interest favors denying the NFLPA's application for injunction because the preference for labor disputes is for a private settlement.  While the Court agrees that there is a preference for private settlements, the Court still retains review over the arbitral process to maintain minimum standards of fairness.  *See Gulf Coast Indus. Workers Union*, 70 F.3d at 850; *Murphy Oil USA, Inc. v. United Steel Workers AFL-CIO Local 8363*, No. 08-3899, 2009 WL 537222, at *3 (E.D. La. Mar. 4, 2009).  The NFLPA sufficiently demonstrated that the public interest supports issuing an injunction in this case.

### E.  Bond

The party moving for a preliminary injunction must give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  The amount of that security "is a matter for the discretion of the trial court."  *Kaepa Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978)).  In light of circumstances in this case, the Court elects not to require security from the NFLPA.

### CONCLUSION

The question of what happened between Elliott and Thompson in July 2016 is not before the Court. Nor is the Court making any credibility findings.  As previously stated herein, the Court has a limited role in this case. The question before the Court is merely whether Elliott received a fundamentally fair hearing before the arbitrator.  The answer is he did not. The Court finds, based upon the injunction standard, that Elliott was denied a fundamentally fair hearing by Henderson's refusal to allow Thompson and Goodell to testify at the arbitration hearing. Their absence

21

effectively deprived Elliott of any chance to have a fundamentally fair hearing.  The Court grants the request for preliminary injunction.

It is therefore **ORDERED** that Petitioner's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. #5) is hereby **GRANTED**.

It is further **ORDERED** that the suspension of Ezekiel Elliott, affirmed by Henderson's award, is enjoined until the Court's final ruling on the Petition.

**SIGNED this 8th day of September, 2017.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

Case 4:17-cv-00615-ALM Document 82-2 Filed 09/05/17 Page 59 of 219 PageID #: 3619

September 5, 2017


Jeffrey Kessler, Esq.                          Daniel Nash, Esq.
Winston & Strawn                               Akin Gump
200 Park Avenue                                1333 New Hampshire Ave NW
New York, NY  10166-4193                       Washington, DC 20036

### Re:  Ezekiel Elliott Appeal – Player Conduct Policy

Gentlemen:

Ezekiel Elliot, a player with the Dallas Cowboys, was notified by letter from B. Todd Jones dated
August 11, 2017, (i) that he was suspended without pay for the first six games of the 2017
season, and (ii) that he was directed to engage a qualified professional to arrange a clinical
evaluation and, should counseling or treatment be recommended, to comply with those
recommendations.

This discipline arose out of several domestic violence incidents in Columbus, Ohio during the
week of July 16, 2016. Mr. Elliott's role in those incidents was found to have violated the NFL
Personal Conduct Policy (the "Policy"). A timely appeal was filed on Mr. Elliot's behalf by the
NFLPA, which appeal was heard on August 29, August 30, and September 1. This letter sets
forth the decision regarding that appeal, which follows careful review and consideration of the
evidence in the record, including witness testimony and documents submitted by the parties, as
well as arguments of counsel that were made at the hearing.


### BACKGROUND

In late July, 2016 the NFL became aware of allegations by Tiffany Thompson that Mr. Elliott had
committed multiple acts of physical violence against her in Columbus, Ohio during the week of
July 16, 2016.  Those allegations were investigated by the Columbus Police Department and no
arrest was made at that time. Subsequently, on September 6, 2016, the Columbus City
Attorney's office publicly announced its decision not to pursue a criminal prosecution with
respect to those incidents, "primarily due to conflicting and inconsistent information across all
incidents resulting in concern regarding the sufficiency of the evidence to support the filing of
criminal charges." NFL Exh. B-2 at Exh. 102.

The NFL learned of this announcement and promptly initiated an investigation of the
allegations against Mr. Elliott under the direction of Ms. Lisa Friel, NFL Senior Vice President -
Special Counsel for Investigations. An extensive investigation followed, which culminated in a
report submitted by Ms. Friel and Kia Roberts, Director of Investigations, submitted on June 6,

2017. That report addressed interviews of Ms. Thompson and Mr. Elliott conducted on September 26 and September 28, 2016, respectively. Ms. Thompson was interviewed one other time in person, and four times by telephone.

After the report was submitted and shared with the NFLPA and counsel for Mr. Elliott, he was interviewed on June 26, 2017 by a panel of advisors selected by the Commissioner to advise him on this case.  Mr. Elliott's counsel and NFLPA counsel were present for that interview, along with NFL executives and counsel. The transcript of that interview is part of this record. NFL Exh.E.

On August 11, 2017, Mr. Jones' discipline letter (NFL Exh.A-1) was sent, which included the following:

> The Commissioner has now had the opportunity to review the record, including the investigative reports, transcripts of the June 26, 2017 meeting and the materials submitted on your behalf. He also consulted separately with each of the independent advisers concerning the evidence and the points made by your representatives. In that respect, the advisers individually were of the view that there is substantial and persuasive evidence supporting a finding that you engaged in physical violence against Ms. Thompson on multiple occasions during the week of July 16, 2016. The Commissioner has considered those views in the context of his evaluation of the record and the advice and recommendations of the advisers have helped to inform his findings and conclusions, which are set forth below. NFL Exhibit A-1, P.3.

The Commissioner found, based on the credible evidence in the record, that on three occasions Mr. Elliott had used physical force against Ms. Thompson resulting in her injury:

> 1)Early morning of July 17, 2016 at 1860 Canvasback Lane, Columbus, Ohio Mr. Elliott used physical force that caused injuries to Ms. Thompson's arms neck and shoulders which appear recent and consistent with Ms. Thompson's description of the incident and how that occurred.
> 2) On the morning of July 19, 2016 at the Canvasback Lane apartment, Mr. Elliot used physical force that caused injuries to Ms. Thompson's face, arms, wrists and hands.
> 3) In early morning hours of July 21, 2016 in an altercation at the Canvasback Lane apartment Mr. Elliot used physical force that caused injuries to Ms. Thompson's face, neck, arms, knees and hips. A witness stated that she observed these injuries to Ms. Thompson later the same day. It was determined that the injuries displayed appear recent and consistent with Ms. Thompson's descriptions of the incident and how they occurred.

Mr. Elliot was disciplined for those three incidents, and not for other incidents on July 18 and 22 that had also been addressed in the investigation.

The investigation also addressed an incident on March 11, 2017 during a Saint Patrick's Day parade in Dallas. A video was posted on the Internet showing Mr. Elliott pulling down the top of

a woman's blouse to expose her breast, which conduct he has admitted. No discipline was imposed for that incident, but Mr. Elliott's behavior during that event was inappropriate and disturbing, reflecting a lack of respect for women. When viewed together with the July incidents it suggests a pattern of poor judgment and behavior for which effective intervention is necessary for your personal and professional welfare. Clinical evaluation by a qualified professional was directed, as well as compliance with counseling or treatment recommendations, if any.

### NFLPA POSITION

On behalf of Mr. Elliott the NFLPA argues that the record does not support a determination that credible evidence establishes the existence of a violation of the Policy, so the discipline must be overturned. Tr. pp. 24-25. The NFLPA asserts that the hearing officer under Article 46 of the CBA must apply the fair and consistent standard to decide if the evidence here is credible. The credible evidence standard is newly added in the policy, and did not appear in prior versions.. The NFLPA argues further that where there has been no criminal charge against the player, the credibility of the accuser and accused is key. Because the Commissioner did not interview either in this case, the union argues, he has no basis to judge the credibility of the only two people who directly witnessed the events- Ms. Thompson and Mr. Elliott. On the other hand, the Union contends, the Columbus City Attorney interviewed both and found credibility issues which caused him to decline filing a criminal charge. Columbus police officers who responded to the initial call made the same decision and did not arrest Mr. Elliott because of inconsistent and conflicting statements.

The NFLPA put great significance on the fact that NFL investigators found numerous inconsistencies among Ms. Thompson's statements.  Even more significant, in their view, is the absence of a recommendation for discipline in the NFL's extensive investigation report, which they attribute to the lack of credible evidence sufficient to support the existence of a violation. Moreover, they contend that the NFL's refusal to produce Ms. Thompson to testify at the appeal hearing is further evidence of the lack of confidence in her credibility. Counsel for Mr. Elliott said that the hearing officer should draw an adverse inference from her absence and assume that her testimony would not be credible. Tr. 43 – 44.

According to the NFLPA, Ms.  Thompson's lack of credibility is demonstrated not only by the many inconsistencies and conflicts in her statements to the league investigators and law enforcement about the events which transpired in the week of July 16, 2017, but on prior occasions as well. For example, in Aventura, FL she called the police to report that Mr. Elliott was assaulting her. Police officers responded and investigated, but declined to make an arrest or charge Mr. Elliott because Ms. Thompson showed no signs of injury and there were no witnesses to the events. According to the NFLPA, there should be no deference given the Commissioner's decision here because important facts were omitted from the Investigation Report and other materials on which he relied. Accordingly, the NFLPA argues, the discipline should be overturned in its entirety because the allegations are not supported by credible evidence as required by the Policy.

## NFL POSITION

The league contends that the record in this case contains everything the Commissioner relied upon to make his decision on discipline. It includes an investigative report authored by Lisa Friel and Kia Roberts dated June 6, 2017 with exhibits 1-103 attached (NFL Exhibits B-1, B-2). He was also provided the NFL investigation report on the St. Patrick's Day incident (NFL Exhibit C– 1, C-2) and medical reports. (NFL exhibits D-1, D-2) The record also includes the Kia Robinson memorandum on inconsistencies in the Tiffany Thompson statements. NFL Exhibit 99. According to the NFL, in assessing whether discipline is fair and consistent the hearing officer must give deference to the Commissioner's decision. Transcript  p. 84.

The NFL argues that the Commissioner gave careful consideration to all arguments. Tr. 85 According to the NFL, it is the Commissioner's responsibility to assess credibility in the first instance; the hearing officer's job is to review whether his determination is arbitrary and capricious. Tr. p. 86. The NFL contends that the conclusion of the Commissioner on discipline is supported by credible evidence, and that it is beyond the scope of a hearing officer's role to re-examine every bit of evidence and testimony that he reviewed and make a second determination on issues of credibility. Therefore, the NFL argues, the discipline in this case should be upheld.

## DISCUSSION

I start by turning to the NFL Personal Conduct Policy for guidance in resolving this appeal. This policy originated in 1997 when Commissioner Tagliabue promulgated what was then called a violent crime policy. Over the 20 years since, the policy has been modified several times, usually in response to difficulties and issues that arose in the administration the policy, or in response to changing values and standards of society. The most recent changes were adopted and published in 2016 with significant changes in the procedures for discipline. In part, the revised policy provides as follows:

> Discipline– A player violates this policy when he has a disposition of a criminal proceeding (as defined), or if the league's investigation demonstrates that he engaged in conduct prohibited by the Personal Conduct Policy. In cases where a player is not charged with a crime, or is charged but not convicted, he may still be found to have violated the Policy if the credible evidence establishes that he engaged in conduct prohibited by this Personal Conduct Policy.

> The disciplinary officer, a member of the league office staff who will be a highly qualified individual with a criminal justice background, will follow the process outlined below to investigate a potential violation, produce a report and if desired present a disciplinary recommendation for the Commissioner's consideration. The Commissioner will review the report (and recommendation if presented) and determine the appropriate discipline, if any, to be imposed on the player.

To assist in evaluating a potential violation, expert and independent advisers may be consulted by the disciplinary officer, the Commissioner, and others as needed. Such advisers include former players and others with appropriate backgrounds and experience in law enforcement, academia, judicial and public service, mental health, and persons with other specialized subject matter expertise. Any experts or advisors consulted in this respect may provide advice and counsel or testimony as appropriate, but will not make any disciplinary determinations.

Players who are subject to discipline will be given notice of the potential violation for which discipline maybe imposed. The player will be furnished with the records and other reports that were relied on in addressing the matter, including records from law enforcement and a copy of any investigatory report and any documents relied upon by a league investigator in generating this report. The player will be permitted to submit information in writing to rebut or otherwise respond to the report. In addition, he will have the opportunity to meet with the disciplinary officer in advance of discipline being imposed. …

Following review, the Commissioner, either directly or through a member of his staff, will communicate his decision to the player regarding any disciplinary action to be taken. Personal Conduct Policy 2016

In this case the player has not been charged with a crime, so only if credible evidence establishes that he engaged in prohibited conduct may he be found to have violated the Policy. The disciplinary officer, Todd Jones, directed an investigation which was conducted by Lisa Friel, Senior Vice President and Special Counsel-Investigations, and Kia Roberts, Director of Investigations in the League's Security Department, both seasoned prosecutors with extensive experience investigating domestic violence crimes. Both investigators expressed surprise that they were not asked to make a recommendation on discipline based on their investigation and report, and Ms. Roberts could not explain why she was not invited to participate in the meeting with the expert and independent advisors; however, their roles fit squarely into the process outlined in the revised Policy. That process reserves the determination on discipline to the Commissioner by separating the functions; the disciplinary officer will provide a report on the investigation and also a disciplinary recommendation for the Commissioner's consideration "if desired."

Other aspects of the process as outlined in the Policy were followed meticulously. A four person panel of expert and independent advisers reviewed the investigation report and attachments. They interviewed Mr. Elliot, who was accompanied by Union representatives and counsel. He was invited to provide for the record any documents or other evidence he wished to be considered, and he did so. He met with the panel in New York on June 26 2017 where he participated in the discussion and took that opportunity to answer questions and provide information to the panel.

At the opening of that meeting, NFL counsel Adolpho Birch introduced the outside advisers fn/ and stated on the record: "And, importantly, they are not going to be part of the decision-making process in the determination of this discipline. That is not their function as they well understand and as we understand and as the policy provides. That matter is committed to the Commissioner. But the role of the advisers us to provide, through their backgrounds and expertise, their perspectives to assist him in formulating his decision as he makes that determination." NFL Exhibit E, p. 8. Ms. Friel asked questions of Mr. Elliott and the advisers asked questions of Ms. Friel and Mr. Elliott. A transcript of this session was provided to Mr. Elliot that same week. NFL Exhibit 1, p. 3. On July 7 and July 17 Mr. Elliot, through counsel, submitted materials that he wanted to be included in the record. NFL Exhibits F and G.

The hearing transcript shows numerous instances where counsel and witnesses express surprise and dismay at the handling of some aspects of this disciplinary case. I submit that is because they are not fully aware of what the new Policy provides. This may the first time the new process was fully deployed, at least in a case where there was no criminal charge or conviction. Yet, on close inspection one can see a carefully thought out, detailed, multi-faceted process which was adhered to closely. A lack of familiarity does not necessarily mean irregularity. If this is in fact a first effort under the new procedures they got it right.

New Evidence: Mr. Elliott's counsel cites the emergence of "new" evidence not presented to the Commissioner as a basis for overturning the discipline. I need not to decide when new evidence, or its absence in the record, requires revisiting the issue for fairness and consistency because we are not presented such new evidence in this case. New evidence does not include anything the parties knew, or could have known, at the time the discipline was initially imposed.

Alvarez Jackson's corroboration of "everything Mr. Elliott said" surely is not new; Mr. Elliott's best friend since childhood and college roommate, Mr. Jackson cooperated with counsel's efforts to avoid charges against Mr. Elliott in Columbus, spending three hours with the City Attorney. He also provided affidavits on August 2 and again on August 12, 2016. Transcript 2, p. 200; NFL Exhibit B-1, Attachment 42. He testified at the appeal hearing that "I didn't feel that it was necessary to speak with the NFL because I spoke with the prosecutor, we spent a good amount of time together. We got all the facts down and they got it right." Tr. 2, p. 200.

---

fn/ The panel of advisers was composed of the following:
      - Peter Harvey, Esq., former Attorney General for the State of New Jersey
      - Mr. Kenneth Houston, former NFL player and member of the Pro Football Hall of Fame
      - Ms. Tonya Lovelace, CEO of the Women of Color Network, Inc.; and
      -Mary Jo White, Esq., Former United States Attorney for the Southern District of New York and former
       Chair of the Securities Exchange Commission

Similarly, Macie Hewitt's affidavit presents nothing that was not known, or could not have been known, based on the affidavit itself.  She avers that she knows Mr. Elliott socially and that they have several mutual friends, that she attended his private birthday party, and that she was invited to and briefly attended his after-party at the Carriage House. No information was offered to explain the genesis of her affidavit, but I note that no year appears in the date line by the notary's signature and seal, so it is unknown if it was executed a few weeks after the incident or a few days before the hearing, more than a year later. Also, at paragraph 2 of the affidavit, she states that the incident occurred on Thursday, July 21, <u>2017</u>. Absent an explanation as to why this information was not known and available to the player earlier, this is not "new" evidence that would call for reconsideration of the initial disciplinary decision. The affidavit refutes every aspect of Ms. Thompson's account of those events, as well as those of Ms. Mason, and explain the injuries she saw on Instagram the next day- injuries Mr. Elliott and several other witnesses did not see. Players Exh. 57.

The testimony of Ms. Friel and Ms. Roberts was said to reveal new evidence which, according to the NFLPA, would have affected the Commissioner's decision if he had known, namely that due to inconsistent statements they did not find Ms. Thompson sufficiently credible to support discipline in some of the incidents investigated. However, all the statements and inconsistencies are included in the Investigative report and other materials provided to the Commissioner for his review. Their recommendations were not sought or required at that point, pursuant to the recent changes to the Policy.

<u>**CONCLUSION**</u>

Appeals under Article 46 of the CBA are, in many ways, a unique exercise in labor arbitrations. It has long been settled that the Commissioner has broad discretion to decide the process for taking action against a player for conduct detrimental to the integrity of, or public confidence in, the game of professional football. That principle, first established in the League's Constitution and Bylaws, has been included in the CBA for many years, through many renegotiations, extensions and new agreements. The unusual and long-established characteristic of this process is the ability of the Commissioner to hear appeals of discipline for conduct detrimental or to appoint a designee to hear the appeal and act in his stead with the same final and binding effect on both parties.

As his designated Hearing Officer in this matter, my responsibility is to determine whether the Commissioner's decision on discipline of Mr. Elliott is arbitrary and capricious, meaning was it made on unreasonable grounds or without any proper consideration of circumstances. It is not the responsibility, nor within the authority of, the Hearing Officer to conduct a *de novo* review of the case and second guess his decision. Rather, the review is to determine whether the player was afforded adequate notice of his alleged violation, the right to representation, opportunity to present evidence, and a decision which is fair and consistent. In a case involving violation of a policy, fair and consistent means whether the process and result were in compliance with the terms of that policy. This one is, in every respect.

Here the process for imposing discipline outlined in the Policy has been followed closely, step by step. I find it unnecessary to reexamine all the evidence presented in this record because my careful and diligent review of everything the Commissioner reviewed and relied on draws me to the conclusion that the record contains sufficient credible evidence to support whatever determinations he made. He is entitled to deference on those judgments absent irregularities not present here. While the record contains inconsistencies in statements, an adjudicator makes informed judgments on the credibility of witnesses and evidence.

The Commissioner's determination is affirmed and the appeal is denied.

Harold Henderson
Hearing Officer

Cc: Heather McPhee, Esq.
    Adolpho Birch, Esq.

# EXHIBIT C



## NATIONAL FOOTBALL LEAGUE

August 23, 2017

Heather McPhee, Esq.  
NFL Players Association  
1133 20th St. NW  
Washington, DC 20036

Adolpho Birch, Esq.  
NFL Management Council  
345 Park Avenue  
New York, NY 10154

### Re: Ezekiel Elliot Article 46 Appeal-Motion to Compel – DECISION

Dear Ms. McPhee and Mr. Birch:

This is in response to a motion filed on August 22, 2017 by the NFLPA and Ezekiel Elliot requesting that the NFL be ordered to produce certain witnesses and documents in connection with this appeal. Production of those same witnesses and enumerated documents, among others, were requested of the NFL on August 18, 2017. The NFL responded on August 22, agreeing that certain witnesses and documents would be produced and declining to produce others. Those which the NFL declined to produce are the subject of this motion.

On a conference call with counsel for all parties on August 23 counsel reiterated and expanded the positions reflected in the NFLPA's Motion to Compel and the NFL's opposition thereto. This sets out my decision as to each of the outstanding issues.

<u>Witnesses</u>  
Tiffany Thompson lodged allegations of physical assault against Mr. Elliott which gave rise to the subject discipline and appeal. She is not employed by the NFL or any related entity, and there is no indication that she ever was. The league has stated that it has no control over Ms. Thompson and no ability to compel her attendance at the appeal hearing. Moreover, the NFL believes it has no obligation under CBA Article 46 to arrange for Ms. Thompson's attendance at the hearing.

The NFLPA contends she is the accuser whose statements are the sole direct evidence against Mr. Elliott, and that to deny him the right and opportunity to confront her in person for examination under oath amounts to denial of due process and fundamental fairness.

I am not persuaded that under the provisions of Article 46 the NFL is required to produce Ms. Thompson for testimony at the hearing. Nor do I believe her live testimony and availability for cross examination are essential to Mr. Elliott's defense. The Commissioner's decision in this case was based on affidavits, statements and interview reports, all of which are available to Mr. Elliott under the procedures of Article 46. It is neither the purpose of the appeal hearing nor the role of the hearing officer to conduct a *de novo* review of the investigation but rather to determine whether the record sufficiently supports that the Commissioner's decision is fair and just, not arbitrary and

August 23, 2017
Page Two

capricious. Article 46 does not address the scope of witness testimony at appeal hearings, leaving to the discretion of the hearing officer determination of the scope of the presentations necessary for the hearing to be fair, including compelling the attendance of witnesses. The motion to order the NFL to produce Tiffany Thompson to testify at the appeal hearing is denied.

Lisa Friel and Kia Roberts are the lead NFL investigators who authored the investigative report on which Commissioner Goodell relied in imposing discipline on Mr. Elliott. Mr. Birch has agreed to make Lisa Friel available to answer questions at the hearing but declined to offer the same with Kia Roberts, as her testimony would be cumulative and unnecessary. She conducted interviews of witnesses, including several of Ms. Thompson, separately. She is employed in the city where the hearing will be held so it should not be overly burdensome to produce her. The NFL should make Ms. Roberts available at the hearing.

Dr. Lone Thanning and Dr. Lorraine Giordano are not required to be produced by the NFL, but Mr. Birch has stated that the league has contacted both doctors and will coordinate their appearance if they are available.

<u>Documents</u>
This motion seeks to compel the NFL to produce "obviously relevant documents" including investigators' notes on witness interviews and records of communications with independent advisors to the Commissioner. Article 46 provides only that "the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing." This article does not contemplate production of any other documents, and the usual remedy for failure to comply is exclusion of the subject documents from use at the hearing. This interpretation has consistently been applied for many years. Thus, as a general rule, the only relevant factor in pre-hearing production of documents is the intent to rely on them at the hearing. The motion to compel production of documents is denied.

Any remaining issues, if there are any, will be addressed at the outset of the hearing next week.

Sincerely,

Harold Henderson (af)

Harold Henderson
Hearing Officer

# EXHIBIT D

345

**REDIRECT/FRIEL/KESSLER**

1 because in overarching ways he tried to make us
2 believe something different about his relationship
3 and about him trying to get rid of her all week.
4 I did not say that I found -- comparing the two of
5 them. That's not what I did. That's not what the
6 investigation came down to or comes down to,
7 comparing which one was less credible. They both
8 had real credibility issues. The investigation
9 came down to looking at all the other evidence
10 that got gathered, all the other witnesses, all
11 the text messages, all the medical evidence, the
12 photographs, what the doctors had to say about
13 them, looking at all that evidence and saying does
14 that support or not support a conclusion that
15 Mr. Elliott engaged in some kind of physical
16 violence with Ms. -- with Tiffany that week.
17     Q. When you had the meeting with the
18 Commissioner and expressed Ms. Roberts' views
19 about the evidence being insufficient and when it
20 was also expressed by her boss, according to you,
21 that was after the interview of Mr. Elliott,
22 correct? That meeting was later?
23     A. No, it was before.
24     Q. Your meeting with the Commissioner was
25 before the time that you met with Mr. Elliott?

346

**REDIRECT/FRIEL/KESSLER**

1     A. Yes. In fact, I think one of the
2 reasons that we wanted to interview him at that
3 June 26th meeting was to gather additional
4 information.
5     Q. It's correct, isn't it, that Ms. Roberts
6 still has the same views today?
7     A. I don't know the answer to that.
8     Q. It's correct that her boss still has the
9 same views today?
10     A. I don't know the answer to that either.
11     Q. Did anyone -- did you meet with the
12 Commissioner after the June 26th interview?
13     A. No.
14     Q. Okay. Do you know how anybody -- how
15 was the Commissioner given any information about
16 the June 26th interview that took place after your
17 meeting with him?
18     A. I don't know.
19     Q. Okay. Do you know if he was ever told
20 anything about the June 26th interview?
21     A. Oh, well, he certainly was aware that
22 there was a June 26th meeting and who was there.
23     Q. I mean do you know if someone sent him
24 the transcript or gave them views about what was
25 uncovered by interviewing Mr. Elliott when he said

347

**REDIRECT/FRIEL/KESSLER**

1 he didn't do any abuse?
2     A. I certainly know that that was discussed
3 because the advisor spoke to him afterwards and
4 the advisors were all at the meeting, so I know
5 they discussed it. I have no firsthand
6 knowledge -- any knowledge whether he got that
7 transcript or not. I can't imagine he did not,
8 but I don't know that so I'm not going to say
9 that.
10     Q. You didn't give it to him or tell him
11 about it?
12     A. It wasn't my role.
13     Q. Okay. And you don't know what the
14 advisor said to him because you weren't at those
15 meetings?
16     A. Correct.
17     Q. And no one reported to you about those
18 meetings afterwards?
19     A. Correct.
20     Q. Okay.
21     MR. KESSLER: I have no further
22 questions.
23     MR. NASH: No further questions.
24     HEARING OFFICER HENDERSON: Thank you,
25 Ms. Friel, for your testimony.

348

**COLLOQUY**

1     MR. KESSLER: Okay. I have -- I will
2 make the request, I do believe I -- before
3 I close the record that -- first I think
4 there's a sufficient basis here to call for
5 the Commissioner to testify and make it
6 very clear what he knew and didn't know
7 about the views of Ms. Roberts and when he
8 knew them and I would request on that basis
9 that he be required to testify, even if we
10 have to have him do it later in this week
11 and hold it open. We can do it at a time
12 that works for his schedule and for your
13 schedule, but I would make that request
14 based on what's happened here before I
15 close this record -- close it subject to
16 Giordano which we know we're keeping it
17 open for.
18     HEARING OFFICER HENDERSON: I'm going
19 to deny that request. I think that the
20 League Management Council set up the case
21 as they hoped to present it and their point
22 from the start was that the documents in
23 this binder are the things that the
24 Commissioner had available, on which he
25 based his decision, and we have those, we

349

**COLLOQUY**

1  can see those. You've had a chance to get
2  additional information about the documents,
3  to cross-examine the authors of people
4  talked about in the documents and so that
5  should give you sufficient information to
6  argue that this being the basis for which
7  he makes his decision here, then it's
8  inadequate or insufficient to support it.
9  My job is to find out, if in making his
10  decision, he's fair and consistent, that
11  he's not abused his discretion about doing
12  what the League would call arbitrary and
13  capricious in his decision and the record
14  that was before him is what's determinative
15  of that one.
16      MR. KESSLER: I understand your ruling.
17  I'll make one more request.
18      Now, with respect to Dr. Thanning's
19  testimony or her information and report
20  that's in the record, it was represented to
21  us that she was not available to testify
22  because she unfortunately had a medical
23  condition and was in the hospital
24  yesterday; is that correct? That's what we
25  were told?

350

**COLLOQUY**

1      MS. MCPHEE: Yes.
2      MR. KESSLER: Is that correct,
3  Mr. Birch? Is that correct?
4      MR. BIRCH: Yes.
5      MR. KESSLER: We have reason to believe
6  that that is false. So I'm going to submit
7  to you the declaration of a private
8  investigator, Mr. Scott Whitlock.
9      Mr. Whitlock will, as you'll see in
10  this declaration, testify that, in fact,
11  Dr. Thanning was in her residence all day
12  yesterday, okay, and he went to her door
13  and she answered and that he stayed there
14  all day really into the night and she never
15  left the residence. Therefore, she was
16  clearly available to be deposed by
17  telephone -- and why we were told -- and
18  I'm not blaming the NFL because maybe she
19  lied to them, so I'm not accusing Mr. Birch
20  of anything, but why somebody said she was
21  in the hospital yesterday we believe is
22  false. I'm going to hand this declaration
23  to you -- and do we have copies to give to
24  the other side -- and based on this, I'm
25  seeking a very simple form of relief. I

351

**COLLOQUY**

1  think you should review this record as if
2  Dr. Thanning's report is not in the record
3  because highly improper effort to keep her
4  from being examined, especially suspicious
5  because she first was going to be made
6  available and then wasn't, which gives rise
7  to the inference that there was some
8  concern on her part or others about being
9  cross-examined about her report.
10      Can we make sure we get the declaration
11  to the NFL about that?
12      So my motion there, before we close
13  this record, is to exclude Dr. Thanning's
14  report for being considered in any way,
15  shape or form here.
16      MR. BIRCH: Can I respond to that?
17      HEARING OFFICER HENDERSON: Yes.
18      MR. BIRCH: Mr. Henderson, let me say a
19  couple of things about that; one, we were
20  advised and I immediately advised the
21  parties -- we were advised by Dr. Thanning
22  that she would be checking herself into the
23  hospital. And I believe that was on Monday
24  when we sent that information to the
25  parties. I think I sent it to all parties

352

**COLLOQUY**

1  to say that she was there and she would be
2  unavailable. She advised us she was
3  checking into the hospital and, you know,
4  as far as I know, we tried to talk to her
5  the entire rest of the day, we got no
6  information whatsoever, which was certainly
7  consistent with her being in the hospital
8  and that I don't know personally whether
9  she was in the hospital for, you know,
10  Monday and Tuesday, just Monday, whatever.
11  But I do think it's relevant that we were
12  advised that she would be unavailable and
13  that's what we were advised. And as a
14  practical matter, we made efforts to go out
15  and see, well, we're going into an extra
16  day here, so let's see if we can get
17  Dr. Giordano for the following day, which
18  wasn't going to be the original day anyway
19  and it turns out we could get him on
20  Thursday, but we made efforts in that
21  respect. So I think it is a little
22  disingenuous to suggest that there was some
23  covert effort to prevent her from
24  testifying as -- even though I got my
25  initial lack of -- lack of blame or

# EXHIBIT E

---

**249**

CROSS/ROBERTS/NASH

1    Q.   And... I apologize.  We have too many
2  different binders?
3    A.   114.
4    MR. KESSLER:  What page?
5    THE WITNESS:  Page 1 -- I'm sorry, page
6  116.
7  BY MR. NASH:
8    Q.   Right.  So we're talking about page 116
9  of the investigative report, which is Exhibit B1?
10    A.   Yes.
11    Q.   And that's a summary of your
12  interview -- by the way, I think you were asked
13  how you prepared these.  You took notes of your
14  interviews?
15    A.   Yes, by hand.
16    Q.   And then you took notes and
17  transcribed -- created these summaries?
18    A.   Yes.
19    Q.   Did you leave anything out?
20    A.   No.
21    Q.   And I think you said throughout your
22  investigation, you didn't leave out anything of
23  the report, including your concerns about
24  Ms. Thompson's credibility?
25    A.   That's correct.

---

**250**

CROSS/ROBERTS/NASH

1    Q.   Is that true about -- did you have
2  concerns about Mr. Elliott's credibility?
3    A.   Yes.
4    Q.   And did you find at times that he wasn't
5  credible about certain things?
6    A.   Yes.
7    Q.   And did you include that?
8    A.   Yes.
9    Q.   Okay.  When I say "that," you included
10  it in your report?
11    A.   That's correct.
12    Q.   Okay.  Now, so in the interview that you
13  did with the prosecutor -- if you go to page 117,
14  if you go to the last paragraph, he said that he
15  met with Ms. Thompson at least twice and he says
16  this:  We never concluded that she was lying to
17  us.  We didn't think that she was lying to us.
18  There is just not enough corroborating evidence.
19  Is that an accurate description of what Mr. Tobias
20  told you?
21    A.   Yes.
22    Q.   Okay.  And then if you go over to page
23  119 --
24    A.   Yes.
25    Q.   -- at the bottom, you asked the

---

**251**

CROSS/ROBERTS/NASH

1  prosecutor -- now, again, this is the --
2  Mr. Kessler read the statement about how they
3  weren't going to prosecute, so you asked -- you
4  followed up, you didn't just rely on the public
5  statement from the Prosecutor's Office, right?
6  You followed up with this interview.
7    A.   Yes, correct.
8    Q.   And you asked Mr. Tobias if during the
9  investigation, he felt that any incident was more
10  credible than the others among the allegations
11  that Ms. Thompson made, and this is what he
12  stated:  No.  We generally believed her for all of
13  the incidents.  And then you asked him:  Well, why
14  didn't you charge Mr. Elliott.  Right?  And then
15  he said, obviously, for charging purposes,
16  probable cause is our standard.  We also looked at
17  the standard of beyond a reasonable doubt for
18  trial.  Is that all an accurate description of
19  what Mr. Tobias told you?
20    A.   That's correct.
21    Q.   Now, lastly, I want to ask you just a
22  few questions about -- I think in his opening,
23  Mr. Kessler said something to the effect that
24  Ms. Thompson faces no consequences for making
25  these allegations against Mr. Elliott.  Do you

---

**252**

CROSS/ROBERTS/NASH

1  remember that?
2    A.   Yes.
3    Q.   Are you aware whether she's faced any
4  consequences?
5    A.   So in my conversations with her, she's
6  been very concerned for her physical safety and
7  that of her family members in Columbus.
8    MR. NASH:  It's not funny, really,
9  sorry.
10    A.   Not necessarily from Mr. Elliott but
11  just because she has a pretty strong social media
12  presence and she was getting a lot of harassment
13  from people pretty much from the moment she posted
14  those photos on July 22, 2016, pretty much from
15  then going forward, so she's been very hesitant at
16  various points about proceeding -- or she was
17  rather about proceeding with the investigation
18  because she was concerned about possibly blow-back
19  that she could get in social media or in real
20  life.
21    Q.   I want to go back to the transcript
22  Mr. Kessler asked because I think some of this is
23  in the transcript, Exhibit 42 of the Players
24  binder and I'm going to go to page 51 and at the
25  top of page 51, I think you're asking her

---

301

**DIRECT/FRIEL/KESSLER**

1 case -- that discipline not be pursued here
2 because of the inconsistencies of the evidence?
3     MR. NASH: I didn't hear that question.
4 Did you say she represented that?
5     MR. ROSENBLUM: I'm going to ask --
6 BY MR. KESSLER:
7     **Q.** Do you know of anyone involved in this
8 investigation of the NFL who said we should not
9 pursue discipline in this matter because the
10 evidence is so inconsistent and there's so many
11 credibility issues?
12     **A. I don't know if I can answer that.**
13     **Q.** Why not?
14     **A. Because it's the bifurcation in what we**
15 **do. One side of us is doing an investigation and**
16 **we get to the end of the evidence and we talk**
17 **about whether we think there's sufficient evidence**
18 **or not; the other side decides discipline. So**
19 **there could be differing opinions on do you think**
20 **you have sufficient corroborating evidence or not.**
21 **Discipline is another issue.**
22     **Q.** Okay. I'll ask then the first question:
23 Did anyone involved in the investigation express
24 the view internally that you're aware of that
25 there was not sufficient evidence that was

302

**CROSS/FRIEL/NASH**

1 corroborating of Miss Thompson?
2     **A. Yes.**
3     **Q.** Who was that?
4     **A. Ms. Roberts.**
5     MR. KESSLER: I have no further
6 questions.
7     MR. NASH: Can we just take a couple
8 minutes?
9     HEARING OFFICER HENDERSON: Off the
10 record, take a few minutes recess.
11     (A brief recess was taken.)
12     HEARING OFFICER HENDERSON: Let's go on
13 the record. After a short recess, we'll
14 resume and Ms. Friel will be cross-examined
15 by Mr. Nash.
16 CROSS-EXAMINATION
17 BY MR. NASH:
18     **Q.** Thank you, Ms. Friel. I want to follow
19 up with the last set of questions that you were
20 just asked about Ms. Roberts.
21     First of all, I think both you and she
22 have testified that she expressed concerns about
23 credibility within the investigation, right?
24     **A. Yes, for sure.**
25     **Q.** And, again, just so that the record is

303

**CROSS/FRIEL/NASH**

1 clear, all of those concerns were put in the
2 report that was given to the Commissioner?
3     **A. Yes.**
4     **Q.** What was Ms. Roberts' role in the
5 investigation?
6     **A. So Ms. Roberts was an investigator whose**
7 **job it was to go out and interview people and come**
8 **back and write up the interviews.**
9     **Q.** Was she responsible for making any
10 decisions about whether or not there was a
11 violation of the Personal Conduct Policy?
12     **A. No.**
13     **Q.** Was Ms. Roberts -- the last question
14 that you answered about what Ms. Roberts had
15 expressed about the evidence in the matter --
16     **A. Uh-huh.**
17     **Q.** -- at the time, do you know when that
18 would have been expressed in the course of the
19 investigation?
20     **A. Prior to the -- to the report issuing on**
21 **June 6th.**
22     **Q.** And would it have been prior to the -- I
23 take it that means it was also prior to the
24 meeting with the advisors?
25     **A. Yes, on June 26th.**

304

**CROSS/FRIEL/NASH**

1     **Q.** And is it fair to say that Ms. Roberts
2 was not privy to the information that was provided
3 to the advisors?
4     **A. Yes.**
5     **Q.** And how would you compare your role and
6 experience in the investigation here with
7 Ms. Roberts?
8     **A. I mean my role is to oversee an**
9 **investigation like this, read the interviews, look**
10 **at all the evidence and assess the sufficiency of**
11 **the evidence to decide do we have sufficient**
12 **evidence or not.**
13     **Q.** Did -- in terms of the report, what was
14 your role?
15     **A. My role was to help write the report --**
16 **or actually. It makes more sense to say it the**
17 **other way, it's Ms. Roberts' role to help me**
18 **prepare the report.**
19     **Q.** And were you responsible for making a
20 determination as to whether Mr. Elliott violated
21 the Personal Conduct Policy?
22     **A. No.**
23     **Q.** And Ms. Roberts was not?
24     **A. No, she was not.**
25     **Q.** Who was responsible?

317

REDIRECT/FRIEL/KESSLER

1    doesn't want you to hear this witness's
2    testimony about that, then I won't ask it.
3    I'll withdraw it.
4        HEARING OFFICER HENDERSON:  That makes
5    it easier.
6        MR. KESSLER:  That makes it easy, I
7    also brought up quadruple hearsay
8    objections, but we'll leave it where it is.
9    That's fine.
10       MR. NASH:  I think with that, I'm
11   almost done.
12   BY MR. NASH:
13       Q.  I just want to make it clear, Ms. Friel,
14   when you prepared the report that was given to the
15   Commissioner, are you confident that everything
16   you believed was relevant evidence to all of these
17   issues was included?
18       A.  Yes, absolutely.
19       MR. NASH:  Okay, nothing further.
20       MR. KESSLER:  I have a few questions
21   about what you stated about Ms. Roberts.
22   REDIRECT EXAMINATION
23   BY MR. KESSLER:
24       A.  Sure.
25       Q.  Ms. Roberts is listed on the NFL

318

REDIRECT/FRIEL/KESSLER

1    Investigative Report as one of two people who
2    submitted the report, you and she together,
3    correct?
4        A.  Correct.
5        Q.  And so would you agree with me she
6    wasn't somebody who just was, you know, doing some
7    interviews.  She, in fact, was the coauthor of the
8    Investigative Report; is that correct?
9        A.  Yes.
10       Q.  Okay.  It's also correct that
11   Ms. Roberts doesn't report to you, correct?
12       A.  Correct.
13       Q.  So she reports to a different boss.  Who
14   is that?
15       A.  Cathy Lanier.
16       Q.  And is it correct that her boss agreed
17   with Ms. Roberts' assessment of the evidence?
18       A.  I don't know what Cathy Lanier's
19   assessment was.
20       Q.  You never discussed that or heard that
21   from her?
22       A.  We had discussions about the sufficiency
23   of the evidence.  I don't know what her -- her
24   final decision would have been on that.
25       Q.  Did you ever hear her support

319

REDIRECT/FRIEL/KESSLER

1    Ms. Roberts who worked for her that the evidence
2    was not sufficient to corroborate Miss Thompson's
3    claims?
4        A.  Cathy Lanier didn't talk in terms of
5    sufficiency of evidence; she's not a lawyer.
6        Q.  Okay.
7        A.  So she did discuss having the same
8    issues of credibility that Ms. Roberts had and I
9    accept all those issues of credibility.  I have
10   the same ones.
11       Q.  She agreed with Ms. Roberts; is that
12   true?
13       A.  On the issues of credibility, yes.
14       Q.  Okay.  Now, with respect to the issue of
15   what's in the report, you testified in your
16   questioning with Mr. Nash that Ms. Roberts'
17   concerns about credibility are in this report that
18   were given to the Commissioner; is that what you
19   testified to?
20       A.  Yes.
21       Q.  Well, I've read this whole report, maybe
22   too many times, okay, is there any statement in
23   this report that Kia Roberts believed that she had
24   significant -- she had concern -- that she
25   personally had; one, concerns about the

320

REDIRECT/FRIEL/KESSLER

1    credibility of Miss Thompson, and number two, did
2    not believe there was sufficient corroborating
3    evidence for her allegations?  Is that somewhere
4    in this report?  If there is, I'd like you to show
5    me where it is?
6        A.  All the information that was the basis
7    of her concerns about credibility are in the
8    report.
9        Q.  Okay.  Is there anything in this report
10   to indicate what Ms. Roberts' personal views were
11   as the coauthor of this report on those issues?
12       A.  No, there's nothing about my personal
13   views in there either.
14       Q.  So there's nothing about either your
15   views or Ms. Roberts' views given to the
16   Commissioner, correct?
17       A.  In the report.  The report does not have
18   that information.
19       Q.  Right.  In the report, it doesn't
20   contain your views or Ms. Roberts' views, right?
21       A.  On the sufficiency of the evidence, yes.
22       Q.  Right.  Now, you met with the
23   Commissioner to give your views about the
24   sufficiency of the evidence, right?
25       A.  I did.

141

## DIRECT/ROBERTS/KESSLER

1    **A.** Yes.

2    **Q.** Okay. Well, first of all, this says

3  that the following are summaries of the interviews

4  conducted. Do you see that?

5    **A.** Yes, sir.

6    **Q.** Okay. So is everything that follows

7  here an interview?

8    **A. I would consider, as I said, those four**

9  **follow-up conversations to be follow-up**

10  **conversations and not interviews.**

11    **Q.** Okay. So even though -- well, who --

12  did you type the words that say: "The following

13  are the summaries of the interviews conducted and

14  represent the sum and substance of the

15  interviews." Are those your words?

16    **A. I believe so.**

17    **Q.** Okay. So when you wrote these words,

18  you thought these were all interviews, right?

19    **A. That's what I wrote.**

20    **Q.** And you meant to be truthful and

21  accurate, right? You weren't misleading anyone

22  when you used the words "interviews," were you?

23    **A. Of course not, no.**

24    **Q.** So let's talk about the six interviews

25  that you did of this witness.

142

## DIRECT/ROBERTS/KESSLER

1    **A. Okay.**

2    **Q.** Okay. Now, am I correct that on a

3  number of times in these interviews, you found

4  what you considered to be inconsistencies in what

5  Ms. Thompson was telling you?

6    **A. Yes.**

7    **Q.** And in fact, you authored a document, I

8  believe, called the inconsistency transcripts; is

9  that correct?

10    **A. I'm not sure what you're looking at.**

11    **Q.** Okay. Let's take a look at B-2 on the

12  NFL binders. You have to go to the NFL binder,

13  Exhibit 99.

14    **A. Mr. Kessler, you said 99?**

15    **Q.** Yes, Exhibit 99 but of B-2. I don't

16  know where your B is.

17    MR. NASH: Yes, that's right.

18    **Q.** And is this a document that you wrote,

19  it says at the bottom by Kia Roberts?

20    **A. Yes, sir.**

21    **Q.** And at the very top, there's a heading

22  that is struck out but it still appears visible

23  saying Tiffany Thompson Inconsistency Transcripts.

24  Did you write that?

25    **A. Yes, sir.**

143

## DIRECT/ROBERTS/KESSLER

1    **Q.** Okay. Why is it struck out by the way?

2    **A. I'm not sure.**

3    **Q.** Okay. And in these -- why did you call

4  these the Inconsistency Transcripts?

5    **A. Because they were transcripts of things**

6  **that she said that were inconsistent with each**

7  **other. So it's almost a comparison for lack of a**

8  **better term.**

9    **Q.** In fact, this is not the only times --

10  these examples in Exhibit 99 are not the only

11  times you found her testimony to be inconsistent,

12  correct?

13    **A. That's correct.**

14    **Q.** So we'll try to go through every single

15  time you found her testimony to be inconsistent.

16  But let's start with these three. Did you pick

17  these particular ones because you thought these

18  were particularly important inconsistencies as

19  opposed to the other inconsistencies?

20    **A. Right. I just remember noting that they**

21  **were inconsistencies. I don't really want to**

22  **qualify their importance, but they were what**

23  **appeared to me to be inconsistencies.**

24    **Q.** Okay. So let's start with the first one

25  that appears, it says it's from the Tiffany

144

## DIRECT/ROBERTS/KESSLER

1  Thompson interview on September 26, 2016. Do you

2  see that?

3    **A. Yes.**

4    **Q.** And if you look, she's talking here,

5  you're talking here, I'm sorry -- in the middle of

6  the page, you have a long question, so I'm going

7  to read what you wrote.

8    **A. Okay.**

9    **Q.** You say underneath your choker, okay, so

10  I'm going to read you what Ayrin wrote.

11    **Ayrin Mason is Tiffany Thompson's good**

12  **friend, who's the ex-girlfriend of a young man**

13  **named Darvan, who was friends with Mr. Elliott.**

14    **Q.** Okay. So her good friend wrote the

15  following: "At approximately 2 o'clock a.m. on

16  July 22nd, I exited Social with Tiffany to walk to

17  our vehicle. Tiffany was approached by another

18  female who proceeded to physically assault Tiffany

19  by first slapping Tiffany in the face and pulling

20  her hair. A fight ensued for approximately a few

21  minutes before it was broken up." Do you see

22  that?

23    **A. Yes.**

24    **Q.** For approximately a few minutes before

25  it was broken up. So let's stop there.

# EXHIBIT F

**NATIONAL FOOTBALL LEAGUE**

**B. Todd Jones**
*Senior Vice President*
*Special Counsel, Conduct*

## CONFIDENTIAL

August 11, 2017

**Via Electronic Delivery**
Mr. Ezekiel E. Elliott
c/o Ned Ehrlich, Esq. and Heather McPhee, Esq.
NFL Players Association
1133 20th Street, NW
Washington, DC 20036

Dear Mr. Elliott:

Pursuant to Article 46 of the Collective Bargaining Agreement, this will set forth Commissioner Goodell's disciplinary decision in connection with your actions between July 17 and July 21, 2016, and separately on March 11, 2017.

## BACKGROUND

In late July of 2016, public sources reported that during the week of July 16, 2016, you were allegedly involved in multiple instances of physical violence against Ms. Tiffany Thompson in Columbus, Ohio. At the time you and Ms. Thompson were in an intimate relationship and spent considerable time together, including at your residence in Columbus. On July 22, 2016, Ms. Thompson reported these incidents to the Columbus Police Department, which initiated an investigation. There was no arrest made and ultimately a decision not to pursue a criminal prosecution was publicly announced by the Columbus City Attorney's office on September 6, 2016.

The League also learned through public sources that on March 11, 2017, while watching a St. Patrick's Day parade in Dallas, Texas from the balcony of a local restaurant, you pulled down the shirt of a young woman, exposing and touching her breast. This incident was captured on video and posted on social media. Again, no arrest was made nor was a complaint filed by the young woman.

Mr. Ezekiel E. Elliott
Page 2

Each of these incidents involved allegations of conduct that is expressly prohibited by the League's Personal Conduct Policy, including "[a]ctual or threatened physical violence against another person." Even when a player is not charged with a crime, "he may still be found to have violated the policy if the credible evidence establishes that he engaged in conduct prohibited by this Personal Conduct Policy." As the Policy states, "[i]t is not enough simply to avoid being found guilty of a crime. We are all held to a higher standard and must conduct ourselves in a way that is responsible, promotes the values of the NFL, and is lawful."

Consequently, the League undertook an extensive investigation of the allegations. With respect to the incidents during the week of July 16, 2016, League investigators interviewed more than a dozen witnesses, including Ms. Thompson, and examined all available evidence, including photographic and digital evidence, thousands of text messages and other records of electronic communications. In addition, two medical experts were consulted regarding identification, causation and aging of certain injuries to Ms. Thompson as depicted in the relevant photos and provided written reports that were shared with your representatives.

With respect to the March 11, 2017 incident, League investigators reviewed the available video evidence and interviewed the woman whose shirt you pulled down.

On June 7, 2017, we provided you and your representatives copies of our Investigative Reports on both the Columbus and Dallas matters for your review and comment. Copies of the expert medical reports were provided to you on July 6, 2017.

The Policy states that in evaluating any potential violation, expert and independent advisors may be consulted by the Commissioner as needed. Such advisors may include former players and others with appropriate backgrounds and experience in law enforcement, academia, judicial and public service, mental health, and persons with other specialized subject matter expertise. In this instance, four such individuals of varying, relevant backgrounds were asked to provide the Commissioner with their perspective and expertise on a number of issues, including the assessment of the various evidentiary issues and evaluation of the statements and behavior of the parties involved:

- Mr. Peter Harvey, Esq., former Attorney General for the State of New Jersey;
- Mr. Kenneth Houston, former player and member of the Pro Football Hall of Fame;
- Ms. Tonya Lovelace, CEO of the Women of Color Network, Inc.; and
- Ms. Mary Jo White, Esq., Former United States Attorney and former Chair of the Securities and Exchange Commission.

On June 26, 2017, you and your representatives had an opportunity to meet personally with these independent advisors to discuss your recollection of the events of the week of July 16, 2016, your relationship with Ms. Thompson, the March, 2017 incident, and other issues you and your representatives believed were pertinent to our review. The advisors had an opportunity to

Mr. Ezekiel E. Elliott
Page 3

engage directly in discussions with you, and to hear your counsel's assessment of the legal, evidentiary and credibility issues presented in this case. A transcript of that meeting was made and shared with your representatives that same week. On July 7 and July 17, 2017, your representatives provided both the independent advisors and our office with written submissions (accompanied by detailed supporting materials) that addressed the issues discussed at this meeting and in the Investigative Reports.

The Commissioner has now had the opportunity to review the record, including the Investigative Reports, the transcript of the June 26, 2017 meeting, and the materials submitted on your behalf. He also consulted separately with each of the independent advisors concerning the evidence and the points made by your representatives in their oral and written submissions. In that respect, the advisors individually were of the view that there is substantial and persuasive evidence supporting a finding that you engaged in physical violence against Ms. Thompson on multiple occasions during the week of July 16, 2016. The Commissioner has considered those views in the context of his evaluation of the record and the advice and recommendations of the advisors have helped to inform his findings and conclusions, which are set forth below.

## FINDINGS

a. Columbus, Ohio Incidents

Based on the entire record, the credible evidence establishes that on multiple occasions during the week of July 16, 2016, you used physical force against Ms. Thompson resulting in her injury, specifically as follows:

- During the early morning hours of July 17, 2016, there was an altercation at the Canvasback Lane apartment in Columbus, Ohio in which you used physical force that caused injuries to Ms. Thompson's arms, neck and shoulders. These injuries are portrayed in several photographs (3 series) confirmed by forensic analysis to have been taken by Ms. Thompson the following day and subsequently sent to her aunt with a text message stating "Absuive" [sic]. Several of these injuries are also portrayed in photographs taken by the Columbus Police Department on July 22, 2016 (7 series). Some of these injuries are also depicted in photographs provided by the Thompson family to the Columbus City Attorney's office on July 22, 2016 (8 series). Collectively, a review of these photographs by both medical experts determined that the injuries to her arms, neck and shoulders appear recent and consistent with Ms. Thompson's description of the incident and how they occurred.

- On the morning of July 19, 2016, there was an altercation at the Canvasback Lane apartment in which you used physical force that caused injuries to Ms. Thompson's face, arms, wrist and hands. These injuries are portrayed in photographs (6 series) confirmed by forensic analysis to have been taken by Ms. Thompson on the afternoon of July 21,

Mr. Ezekiel E. Elliott
Page 4

       2016 and concurrently sent via text message to her mother. These injuries are also portrayed in the photographs taken by the Columbus Police Department on July 22, 2016 (7 series). A review of these photographs by both medical experts determined that the injuries displayed appear recent and consistent with Ms. Thompson's description of the incident and how they occurred.

▪   During the early morning hours of July 21, 2016, there was an altercation at the Canvasback Lane apartment in which you used physical forced that caused injuries to Ms. Thompson's face, neck, arms, knee and hips. Ms. Ayrin Mason stated in her interview that she observed these injuries to Ms. Thompson later that same day. These injuries are portrayed in a photograph taken by Ms. Thompson the afternoon of July 21, 2016 (6C), and in photographs provided by the Thompson family to the Columbus City Attorney's office on July 22, 2016 (8 and 10 series), or taken by that office on the same date (9 series). A review of these photographs by both medical experts determined that the injuries displayed appear recent and consistent with Ms. Thompson's description of the incident and how they occurred.

       In the course of the investigation and during the meeting with the independent advisors, you and your representatives raised multiple issues regarding the complaining witness, which deserved and received careful consideration by the Commissioner. In order to address these issues appropriately, no finding, and no disciplinary action, was based simply on one individual's statements. Rather, the findings set forth above are based on a combination of photographic, medical, testimonial and other evidence that is sufficiently credible in the Commissioner's judgment to establish the facts, even allowing for concerns you and your representatives have advanced about the complaining witness's credibility. As discussed earlier, his judgment in this respect is informed in part by the independent advisors. It is also informed by the views of the Columbus city prosecutor who handled the investigation. The city prosecutor has stated both publicly and to our investigator that after interviewing Ms. Thompson several times "[w]e never concluded that she was lying to us." He also said that, "we generally believed her for all of the incidents."

       Irrespective of the characterization of Ms. Thompson's statements to law enforcement and investigators regarding the incidents identified above, the photographic and medical forensic evidence corroborates many critical elements of the allegations regarding the causes of her injuries. It is also important to note that, while there may be conflicting testimonial evidence regarding the nature and substance of conversations, there is no dispute that you and Ms. Thompson were together in the same location on the dates identified, and no evidence to suggest that anyone else could have caused these injuries.

       Thus, the Commissioner carefully considered the issues raised by the NFLPA on your behalf regarding witness credibility and alternative causation theories. However, in the Commissioner's judgment, there has been no persuasive evidence presented on your behalf with

Mr. Ezekiel E. Elliott
Page 5

respect to how Ms. Thompson's obvious injuries were incurred other than conjecture based on the presence of some of her bruising which pre-dates your arrival in Columbus on July, 16, 2016.

b. St. Patrick's Day Incident and Cooperation with the Investigation

The Commissioner also has determined that the March 11, 2017, St. Patrick's Day parade incident in Dallas will not be considered separately as a basis for additional discipline under the Policy given the circumstances surrounding the incident. You should understand, however, that your behavior during this event was inappropriate and disturbing, and reflected a lack of respect for women. When viewed together with the July incidents, it suggests a pattern of poor judgment and behavior for which effective intervention is necessary for your personal and professional welfare.

Finally, while there are some questions with respect to the completeness of your cooperation with the investigation, the Commissioner has not found a violation of the Policy based on your lack of cooperation and no discipline will be imposed on that basis.

**DECISION**

With respect to discipline for violations that involve physical force against a woman in the context of an intimate relationship, the Policy is clear – a first violation subjects the violator to a baseline suspension without pay of six games, with consideration given to any aggravating or mitigating factors. After reviewing the record, and having considered the advice of the independent advisors on this point, the Commissioner has determined that the evidence does not support finding either mitigating or aggravating factors.

Accordingly, the Commissioner has determined the following:

1.    You are hereby suspended without pay for six (6) regular-season games, subject to appeal.

2.    You must have no further adverse involvement with law enforcement, and must not commit any additional violations of league policies. In that respect, you should understand that another violation of this nature may result in your suspension or potential banishment from the NFL.

Additionally, you are directed to engage a qualified professional, in consultation with the League and your current club, to arrange a clinical evaluation. Should counseling or treatment be recommended, you will be expected to comply with those recommendations. You also will provide contact information and any necessary releases to allow our office to monitor your compliance with the evaluation and any follow-up care, including meetings with you and any treating clinicians as appropriate. These steps are intended to assist you in addressing

Mr. Ezekiel E. Elliott
Page 6

proactively the issues revealed during the course of this investigation. While this is a serious matter, it by no means suggests a belief that you cannot have a long and productive career in the NFL. You will have substantial resources available to you from your club, and from our office, to assist you in learning how to make better decisions and avoid problematic situations. Our goal is for you to have as successful a career as possible. If you genuinely learn from this incident, and commit yourself to continued personal development, there is every reason to be optimistic about your future in and beyond the NFL.

If you wish to appeal this decision, you must notify Adolpho Birch of our office at NFLMCPolicy@NFL.com within three days of receiving this letter. If you do so, a hearing will be scheduled promptly at which either the Commissioner or his designee will preside.

Sincerely,

B. TODD JONES

cc:     Commissioner Goodell
        Jerry Jones
        Adolpho Birch

# EXHIBIT G

## ARTICLE 46
## COMMISSIONER DISCIPLINE

*Section 1.* **League Discipline:** Notwithstanding anything stated in Article 43:

(a)     All disputes involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b)     Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c)     The Commissioner (under Subsection (a)), or the person appointed by the Commissioner under Subsection (b), shall consult with the Executive Director of the NFLPA prior to issuing, for on-field conduct, any suspension or fine in excess of $50,000.

(d)     The schedule of fines for on-field conduct will be provided to the NFLPA prior to the start of training camp in each season covered under this Agreement. The 2011 schedule of fines, which has been provided to and accepted by the NFLPA, shall serve as the basis of discipline for the infractions indentified on that schedule. The designated minimum fine amounts will increase by 5% for the 2012 League Year, and each League Year thereafter during the term of this Agreement. Where circumstances warrant, including, but not limited to, infractions that were flagrant and gratuitous, larger fines, suspension or other discipline may be imposed. On appeal, a player may assert, among other defenses, that any fine should be reduced because it is excessive when compared to the player's expected earnings for the season in question. However, a fine may be reduced on this basis only if it exceeds 25 percent of one week of a player's salary for a first offense, and 50 percent of one week of a player's salary for a second offense. A player may also argue on appeal that the circumstances do not warrant his receiving a fine above the amount stated in the schedule of fines.

*Section 2.* **Hearings:**

(a)     **Hearing Officers.** For appeals under Section 1(a) above, the Commissioner shall, after consultation with the Executive Director of the NFLPA, appoint one or more designees to serve as hearing officers. For appeals under Section 1(b) above, the parties shall, on an annual basis, jointly select two (2) or more designees to serve as hearing officers. The salary and reasonable expenses for the designees' services shall be

shared equally by the NFL and the NFLPA. Notwithstanding the foregoing, the Commissioner may serve as hearing officer in any appeal under Section 1(a) of this Article at his discretion.

(b)      **Representation.** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. The NFLPA and NFL have the right to attend all hearings provided for in this Article and to present, by testimony or otherwise, any evidence relevant to the hearing.

(c)      **Telephone Hearings.** Upon agreement of the parties, hearings under this Article may be conducted by telephone conference call or videoconference.

(d)      **Decision.** As soon as practicable following the conclusion of the hearing, the hearing officer will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s), Club(s) and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to Section 1(b) may only be affirmed, reduced, or vacated by the hearing officer, and may not be increased.

(e)      **Costs.** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and other expenses associated with the appeal.

(f)      **Additional Procedures for Appeals Under Section 1(a).**

(i)      **Scheduling.** Appeal hearings under Section 1(a) will be scheduled to commence within ten (10) days following receipt of the notice of appeal, except that hearings on suspensions issued during the playing season (defined for this Section as the first preseason game through the Super Bowl) will be scheduled for the second Tuesday following the receipt of the notice of appeal, with the intent that the appeal shall be heard no fewer than eight (8) days and no more than thirteen (13) days following the suspension, absent mutual agreement of the parties or a finding by the hearing officer of extenuating circumstances. If unavailability of counsel is the basis for a continuance, a new hearing shall be scheduled on or before the Tuesday following the orignal hearing date, without exception.

(ii)      **Discovery.** In appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing. Failure to timely provide any intended exhibit shall preclude its introduction at the hearing.

(iii)      **Record; Posthearing Briefs.** Unless the parties agree otherwise, all hearings conducted under Section 1(a) of this Article shall be transcribed. Posthearing briefs will not be permitted absent agreement of the NFL and NFLPA or the request of the hearing officer. If permitted, such briefs shall be limited to five pages (single-spaced) and must be filed no later than three (3) business days following the conclusion of the hearing.

*Section 3.* **Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the parties or by the hearing officer upon appropriate motion.

***Section 4.*** **One Penalty:** The Commissioner and a Club will not both discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

***Section 5.*** **Fine Money:**

(a)        Fines will be deducted at the rate of no more than $2,500 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. For the 2016–2020 League Years, the amount will increase from a rate of $2,500 to $3,500 from each pay period.

(b)        For any fine imposed upon a player under Section 1(b), no amount of the fine will be withheld from the player's pay pending the outcome of the appeal, except that if: (i) the fine is imposed on or after the thirteenth (13th) week of the regular season; (ii) the player or the NFLPA does not timely appeal; or (iii) the hearing on a fine imposed for conduct occurring through the thirteenth (13th) week of the regular season is delayed by the player or the NFLPA for any reason beyond the time provided for in Section 2(b) of this Article, the full amount of the fine shall be promptly collected.

(c)        Unless otherwise agreed by the parties., fine money collected pursuant to this Article shall be allocated as follows: 50% to the Players Assistance Trust and 50% to charitable organizations jointly determined by the NFL and the NFLPA. In the absence of said joint determination, the NFL and the NFLPA shall each determine a charitable organization or organizations to which half of the second 50% shall be allocated.

# EXHIBIT H



# PERSONAL CONDUCT POLICY
## League Policies for Players
## 2016

It is a privilege to be part of the National Football League. **Everyone** who is part of the league must refrain from "conduct detrimental to the integrity of and public confidence in" the NFL. This includes owners, coaches, players, other team employees, game officials, and employees of the league office, NFL Films, NFL Network, or any other NFL business.

Conduct by anyone in the league that is illegal, violent, dangerous, or irresponsible puts innocent victims at risk, damages the reputation of others in the game, and undercuts public respect and support for the NFL. We must endeavor at all times to be people of high character; we must show respect for others inside and outside our workplace; and we must strive to conduct ourselves in ways that favorably reflect on ourselves, our teams, the communities we represent, and the NFL.

To this end, the league has increased education regarding respect and appropriate behavior, has provided resources for all employees to assist them in conforming their behavior to the standards expected of them, and has made clear that the league's goal is to prevent violations of the Personal Conduct Policy. In order to uphold our high standards, when violations of this Personal Conduct Policy do occur, appropriate disciplinary action must follow.

This Personal Conduct Policy is issued pursuant to the Commissioner's authority under the Constitution and Bylaws, Collective Bargaining Agreement and NFL Player Contract to address and sanction conduct detrimental to the league and professional football. It applies to players under contract; all rookie players selected in the NFL college draft and all undrafted rookie players, unsigned veterans who were under contract in the prior League Year; and other prospective players once they commence negotiations with a club concerning employment.

## Expectations and Standards of Conduct

It is not enough simply to avoid being found guilty of a crime.  We are all held to a higher standard and must conduct ourselves in a way that is responsible, promotes the values of the NFL, and is lawful.

Players convicted of a crime or subject to a disposition of a criminal proceeding (as defined in this Policy) are subject to discipline. But even if the conduct does not result in a criminal conviction, players found to have engaged in any of the following conduct will be subject to discipline.  Prohibited conduct includes but is not limited to the following:

- Actual or threatened physical violence against another person, including dating violence, domestic violence, child abuse, and other forms of family violence;

- Assault and/or battery, including sexual assault or other sex offenses;

- Violent or threatening behavior toward another employee or a third party in any workplace setting;

- Stalking, harassment, or similar forms of intimidation;

- Illegal possession of a gun or other weapon (such as explosives, toxic substances, and the like), or possession of a gun or other weapon in any workplace setting;

- Illegal possession, use, or distribution of alcohol or drugs;

- Possession, use, or distribution of steroids or other performance enhancing substances;

- Crimes involving cruelty to animals as defined by state or federal law;

- Crimes of dishonesty such as blackmail, extortion, fraud, money laundering, or racketeering;

- Theft-related crimes such as burglary, robbery, or larceny;

- Disorderly conduct;

- Crimes against law enforcement, such as obstruction, resisting arrest, or harming a police officer or other law enforcement officer;

- Conduct that poses a genuine danger to the safety and well-being of another person; and

- Conduct that undermines or puts at risk the integrity of the NFL, NFL clubs, or NFL personnel.

## What Happens When a Violation of This Policy is Suspected?

**Evaluation, Counseling, and Services –** Any player arrested or charged with violent or threatening conduct that would violate this policy will be offered a formal clinical evaluation, the cost of which will be paid by the league, and appropriate follow-up education, counseling, or treatment programs. These evaluations will be available at designated facilities around the country on a confidential basis. The player may select the particular provider at the designated facility.

The evaluation, counseling and other services are not disciplinary, but are instead intended to help and assist the player address the issues giving rise to the proceedings. The player's decision to make beneficial use of these clinical services will be considered a positive factor in determining eventual discipline if a violation is found, and his satisfactory participation in counseling, treatment, or therapy may mitigate the fine or suspension that might otherwise be imposed.

In appropriate cases (for example, cases involving domestic violence or child abuse), the league will make available assistance to victims and families, as well as the player. This assistance may include providing or direction to appropriate counseling, social and other services, clergy, medical professionals, and specialists in dealing with children and youth. These resources will be provided through specialized Critical Response Teams affiliated with the league office and club. These teams will develop standard protocols based on experts' recommendations of appropriate and constructive responses to reported incidents of violence, particularly incidents of domestic violence, child abuse, or sexual assault. These response teams will assist victims and families in matters of personal security and other needs following a reported incident. In addition, information about local non-league resources to help victims and family members will be provided to affected parties.

**Investigations –** Whenever the league office becomes aware of a possible violation of the Personal Conduct Policy, it will undertake an investigation, the timing and scope of which will be based upon the particular circumstances of the matter. Any such investigation may be conducted by NFL Security, independent parties, or by a combination of the two. In cases that are also being investigated by law enforcement, the league will work to cooperate with and to avoid any conflict or interference with the law enforcement proceedings.

In conducting investigations, the league office will make reasonable efforts to safeguard requests for confidentiality from witnesses and others with information. In addition, the league will not tolerate any retaliation against anyone who in good faith reports a possible violation or provides truthful information

during an investigation. Any person who directly or indirectly through others interferes in any manner with an investigation, including by retaliating or threatening to retaliate against a victim or witness, will face separate disciplinary action under this policy. Prohibited retaliation includes, but is not limited to: threats, intimidation, harassment, or any other adverse action threatened, expressly or impliedly, or taken against anyone who reports a violation or suspected violation of this Policy or who participates in an investigation of a complaint.

In investigating a potential violation, the league may rely on information obtained by law enforcement agencies, court records, or independent investigations conducted at the direction of the NFL. League and team employees including players are required to cooperate in any such investigation and are obligated to be fully responsive and truthful in responding to requests from investigators for information (testimony, documents, physical evidence, or other information) that may bear on whether the Policy has been violated. A failure to cooperate with an investigation or to be truthful in responding to inquiries will be separate grounds for disciplinary action. Players who are interviewed in the course of an investigation may be accompanied by an NFLPA representative as provided by Article 51, Section 11 of the CBA.

Because the Fifth Amendment's protection against self-incrimination does not apply in a workplace investigation, the league will reserve the right to compel a player to cooperate in its investigations even when he is the target of a pending law enforcement investigation or proceeding. A player's refusal to speak to a league investigator under such circumstances will not preclude an investigation from proceeding or discipline from being imposed.

**Leave with Pay –** A player may be placed on paid administrative leave pursuant to the Commissioner Exempt List under either of the following circumstances:

First, when a player is formally charged with a crime of violence, meaning that he is accused of having used physical force or a weapon to injure or threaten another person, of having engaged in a sexual assault by force or a sexual assault of a person who was incapable of giving consent, of having engaged in other conduct that poses a genuine danger to the safety or well-being of another person, or of having engaged in animal abuse. The formal charges may be in the form of an indictment by a grand jury, the filing of charges by a prosecutor, or an arraignment in a criminal court.

Second, when an investigation leads the Commissioner to believe that a player may have violated this Policy by committing any of the conduct identified above, he may act where the circumstances and

evidence warrant doing so.  This decision will not reflect a finding of guilt or innocence and will not be guided by the same legal standards and considerations that would apply in a criminal trial.

In cases in which a violation relating to a crime of violence is suspected but further investigation is required, the Commissioner may determine to place a player on the Commissioner Exempt List on a limited and temporary basis to permit the league to conduct an investigation.  Based on the results of this investigation, the player may be returned to duty, be placed on the Commissioner Exempt List for a longer period, or be subject to discipline.

A player who is placed on the Commissioner Exempt List may not practice or attend games, but with the club's permission he may be present at the club's facility on a reasonable basis for meetings, individual workouts, therapy and rehabilitation, and other permitted non-football activities.

A player placed on the Commissioner Exempt List will be notified promptly in writing with a copy to the NFLPA.  Within three (3) business days following such notification, the player, or the NFLPA with the player's approval, may appeal his placement in writing to the Commissioner.  Appeals of placement on the Commissioner Exempt List will be processed pursuant to Article 46 of the Collective Bargaining Agreement.

Leave with pay will generally last until the league makes a disciplinary decision and any appeal from that discipline is fully resolved.

**Discipline –** A player violates this policy when he has a disposition of a criminal proceeding (as defined), or if the league's investigation demonstrates that he engaged in conduct prohibited by the Personal Conduct Policy.  In cases where a player is not charged with a crime, or is charged but not convicted, he may still be found to have violated the Policy if the credible evidence establishes that he engaged in conduct prohibited by this Personal Conduct Policy.

A disciplinary officer, a member of the league office staff who will be a highly-qualified individual with a criminal justice background, will follow the process outlined below to investigate a potential violation, produce a report and if desired present a disciplinary recommendation for the Commissioner's consideration.  The Commissioner will review the report (and recommendation if presented) and determine the appropriate discipline, if any, to be imposed on the player.

To assist in evaluating a potential violation, expert and independent advisors may be consulted by the disciplinary officer, the Commissioner, and others as needed.   Such advisors may include former

players and others with appropriate backgrounds and experience in law enforcement, academia, judicial and public service, mental health, and persons with other specialized subject matter expertise.  Any experts or advisors consulted in this respect may provide advice and counsel or testimony as appropriate, but will not make any disciplinary determinations.

Players who are subject to discipline will be given notice of the potential violation for which discipline may be imposed.  The player will be furnished with the records and other reports that were relied on in addressing the matter, including records from law enforcement and a copy of any investigatory report and any documents relied upon by a league investigator in generating the report. The player will be permitted to submit information in writing to rebut or otherwise respond to the report.  In addition, he will have the opportunity to meet with the disciplinary officer in advance of discipline being imposed.  In cases where there has been a criminal disposition, the underlying disposition may not be challenged in a disciplinary hearing and the court's judgment and factual findings shall be conclusive and binding, and only the level of discipline will be at issue.  Notwithstanding, the player will be free to offer facts regarding the disposition that may mitigate the discipline imposed, as was permitted in previous versions of this policy.

Following review, the Commissioner, either directly or through a member of his staff, will communicate his decision to the player regarding any disciplinary action to be taken.  Depending on the nature of the violation and the player's record, discipline may be a fine, a suspension for a fixed or an indefinite period of time, a combination of the two, or banishment from the league with an opportunity to reapply.  Discipline may also include a probationary period and conditions that must be met for reinstatement and to remain eligible to participate in the league.  Repeat offenders will be subject to enhanced and/or expedited discipline, including banishment from the league with an opportunity to reapply.  In determining discipline, both aggravating and mitigating factors will be considered.  Reference also may be made to requirements to seek ongoing counseling, treatment, or therapy where appropriate as well as the imposition of enhanced supervision, which upon satisfactory compliance would serve to mitigate the discipline otherwise imposed.

Ownership and club or league management have traditionally been held to a higher standard and will be subject to more significant discipline when violations of the Personal Conduct Policy occur.

With regard to violations of the Personal Conduct Policy that involve: (i) criminal assault or battery (felony); (ii) domestic violence, dating violence, child abuse and other forms of family violence; or (iii) sexual assault involving physical force or committed against someone incapable of giving consent, a first

offense will subject the offender to a baseline suspension without pay of six games, with consideration given to any aggravating or mitigating factors. The presence of possible aggravating factors may warrant a longer suspension. Possible aggravating factors include, but are not limited to, a prior violation of the Personal Conduct Policy, similar misconduct before joining the NFL, violence involving a weapon, choking, repeated striking, or when an act is committed against a particularly vulnerable person, such as a child, a pregnant woman, or an elderly person, or where the act is committed in the presence of a child. A second offense will result in permanent banishment from the NFL. An individual who has been banished may petition for reinstatement after one year, but there is no presumption or assurance that the petition will be granted.

Appeals of any disciplinary decision will be processed pursuant to Article 46 of the CBA.

**Reporting –** Clubs and players are obligated to promptly report any matter that comes to their attention (through, for example, victim or witness reports, law enforcement, or media reports) that may constitute a violation of this Policy. Clubs are expected to educate their employees on this obligation to report. Club reports should be made to NFL Security or Adolpho Birch of the Management Council legal staff. Questions about whether an incident triggers a reporting obligation should be directed to Adolpho Birch or Lisa Friel of the league office.

Failure to report an incident will be grounds for disciplinary action. This obligation to report is broader than simply reporting an arrest; it requires reporting to the league any incident that comes to the club's or player's attention which, if the allegations were true, would constitute a violation of the Personal Conduct Policy.

It is important to remember that the obligation to report is a continuing one, and is not satisfied simply by making an initial report of an incident. The obligation includes reporting on a timely basis all information of which a club or player becomes aware. If a club learns additional information, including but not limited to information regarding the nature of an incident, the identity of witnesses, statements regarding the incident (including by the accused), or the existence of evidentiary material (such as documents, electronic communications such as emails or text messages, medical reports, photographs, audio or video recordings, or social media activity), it must promptly report that information to the league office.

Anyone who believes that he or she is a victim of conduct that violates the Personal Conduct Policy or who learns of or witnesses such conduct is strongly encouraged to report the matter to the club or the

league office.  Reports will be addressed promptly and confidentially, and the Critical Response Teams will be available to address issues regarding victim and family security and other support services.   Any player with questions regarding either this reporting obligation or any other aspect of this Personal Conduct Policy may contact his club's Director of Security, Director of Player Engagement, the NFLPA, or the NFL Management Council.

**Conduct Committee –** To ensure that this policy remains current and consistent with best practices and evolving legal and social standards, the Commissioner has named a Conduct Committee. This committee will be made up of NFL owners, who will review this policy at least annually and recommend any appropriate changes in the policy, including investigatory practices, disciplinary levels or procedures, or service components.  The committee will receive regular reports from the disciplinary officer, and may seek advice from current and former players, as well as a broad and diverse group of outside experts regarding best practices in academic, business, and public sector settings, and will review developments in similar workplace policies in other settings.

**Definitions –**

"Disposition of a Criminal Proceeding" – Includes an adjudication of guilt or admission to a criminal violation; a plea to a lesser included offense; a plea of nolo contendere or no contest; or the disposition of the proceeding through a diversionary program, deferred adjudication, disposition of supervision, conditional dismissal, or similar arrangements.

"Probationary Period" – Players found to have violated this policy may be placed on a period of probation as determined by the Commissioner.  During such period, restrictions on certain activities, limitations on participation in Club activities, or other conditions may be imposed.  Failure to comply with such conditions may result in additional discipline including an extension of the period of suspension.

"Repeat Offenders" – Players who have had previous violations of law or of this policy may be considered repeat offenders.  When appropriate, conduct occurring prior to the player's association with the NFL will be considered.

"Workplace Setting" – The workplace setting means any location or conveyance used in connection with NFL activities, including the club facility, training camp, stadium, locker room, location at which a club-sponsored event takes place, and while traveling on team or NFL-related business.

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of EZEKIEL ELLIOTT, | § § § § § | |
| Petitioner, | § § | CASE NO. 4:17-cv-00615 |
| v. | § § | PETITION TO VACATE ARBITRATION |
| NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, | § § § § | AWARD |
| Respondents. | | |

Petitioner National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Dallas Cowboys Running Back Ezekiel Elliott, hereby petitions this Court, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and Section 10 of the Federal Arbitration Act, 9 U.S.C § 10 ("FAA"), to vacate the forthcoming Arbitration Award ("Award"), which is the product of a process that has already deprived the Union and Elliott of fundamental fairness and will be issued by Arbitrator Harold Henderson imminently. Respondents are the National Football League and its labor relations arm, the National Football League Management Council (collectively, the "NFL" or "League").

## INTRODUCTION

1.    No matter how narrowly the NFL tries to define the bedrock labor law requirement to conduct fundamentally fair arbitration hearings, the NFL and its unilaterally appointed arbitrator—Harold Henderson—have already defied it, even before the decision is shortly issued. In the arbitration below, Elliott and the NFLPA appealed a six-game disciplinary

suspension imposed upon Elliott by the NFL that threatens irreparable harm to his season, career, and reputation. In what may mark one of the most fundamentally unfair arbitral processes conceivable, Elliott and the Union were subjected to an arbitration process in which, among other things, there was a League-orchestrated conspiracy by senior NFL executives, including NFL Senior Vice President and Special Counsel for Investigations Lisa Friel, to hide critical information—which would completely exonerate Elliott—from: (i) NFL Commissioner Roger Goodell, who imposed the discipline; (ii) the outside expert advisors who were appointed by the Commissioner to counsel him on imposing discipline; (iii) the NFLPA and Elliott; (iv) the Dallas Cowboys; and (v) NFL fans. That critical information was the now-undisputed fact that the co-lead investigator who conducted every fact witness interview in the investigation of Elliott—Kia Roberts, the NFL's Director of Investigations—reached the conclusion, after reviewing all of the evidence gathered, that Elliott's accuser, Tiffany Thompson, was not credible in her allegations of abuse and that there was insufficient corroborating evidence of her incredible allegations to go forward with <u>any</u> discipline against Elliott. The withholding of this critical information from the disciplinary process was a momentous denial of the fundamental fairness required in every arbitration and, of course, does not satisfy federal labor law's minimal due process requirements.

2.     Further, the fundamental unfairness set forth above was then compounded, multiple times, by denying Elliott the opportunity to confront his accuser and have her sit for cross-examination, a denial which deprived Elliott and the Union of the most basic rights of a fundamentally fair procedure, in a proceeding where everyone agreed that the credibility of the accuser and Elliott were essential to resolution. As for Elliott, he appeared before the arbitrator, testified under oath, and gave strong, credible testimony denying any wrongdoing. Arbitrator Henderson, however, would not grant Elliott and the Union's request to have the accuser,

Thompson, testify, and would not even provide Elliott or the Union with the investigative notes of the six times Thompson was interviewed by the NFL. As such, not only was Elliott denied the most fundamental rights to be able to confront his accuser and to have her credibility assessed against his, the arbitrator also rendered himself incapable of directly assessing the credibility of Thompson—which was critical to the fairness of the proceeding.

3.      The third deprival of fairness was the arbitrator's refusal to compel the testimony of Commissioner Goodell, who imposed Elliott's discipline. Without testimony from the Commissioner, it was not possible to determine the full impact of the conspiracy, or precisely what the Commissioner knew or did not know about his co-lead investigator's conclusion that there was not sufficient credible evidence to proceed with any discipline under a League Personal Conduct Policy that requires "credible evidence" to support the charges in a case like this, where the player has been accused of domestic violence, but law enforcement investigated and rightly declined to bring any charges due to conflicting evidence and inconsistent accounts of the alleged events. Moreover, because Commissioner Goodell was not required to testify, it was impossible for Elliott and the Union to learn additional critical facts, such as: who decided to exclude Roberts from the meeting with the Commissioner's outside expert advisors on June 26; who asked Friel what the investigators had concluded with respect to the credibility of the charges (notwithstanding that the panel's inquiry was never informed by Roberts's credibility determination to begin with); or who decided not to include Roberts in Commissioner Goodell's meeting to discuss the findings of the disciplinary investigation. This third prong of fundamental unfairness thus provides yet another reason, independently and collectively, for why this Petition should be granted and Mr. Henderson's tainted arbitral award should be vacated.

4.     On August 11, 2017, the NFL suspended Elliott for six games for violating Commissioner Goodell's Personal Conduct Policy ("PCP").     Ex. A-NFLPA-16.     The Commissioner's representative stated there was "substantial and persuasive evidence" that Elliott had committed acts of physical violence against the accuser, Thompson, a woman with whom he had an intimate relationship (Discipline Letter, Ex. A-NFLPA-49 at 3, 5).  But that determination was made during a now-exposed conspiracy, in which it was concealed from all relevant parties that the NFL's co-lead investigator, Roberts, had concluded, after reviewing all of the assembled evidence and conducting all of the fact interviews—including six interviews of Thompson—that the accuser's repeatedly inconsistent stories and other credibility issues were an insurmountable obstacle to imposing discipline, as there was insufficient corroborating evidence to support any discipline, or to overcome Elliott's consistent denials of any acts of domestic violence.  Elliott Arb. Hr'g Tr. (Aug. 29), Ex. C at 300:15-22.[1]

5.     Indeed, Elliott was never charged with any crime, and the district attorney investigating Elliott concluded his inquiry with a public statement announcing that Elliott would not be charged due to "conflicting and inconsistent information across all incidents" provided by Elliott's accuser, the only eyewitness against him.  Ex. A-NFLPAC-40.  Nor was Elliott ever arrested, because the police officers on the scene concluded that there was no probable cause to require a mandatory arrest "[d]ue to conflicting versions of what had taken place over the listed dates."  Ex. A-NFLPA-24 at 2.

6.     In imposing discipline against Elliott despite the absence of any action by law enforcement, the NFL conducted a massive investigation that lasted more than a year, co-led by

---

[1] Petitioner will update these filings with the final August 31, 2017 Hearing Transcript when it becomes available.

Roberts, who interviewed every fact witness personally.  This massive amount of work resulted in a final investigative report ("Elliott Report") which, unlike virtually every similar NFL investigative report in the past, deliberately omitted a conclusion.  Had the report stated a conclusion, Roberts, as co-author, would have had to reveal her conclusion, as an experienced lawyer and prosecutor, that there was not sufficient evidence to proceed with any discipline. Unbeknownst to Roberts, it was Friel—who believed that the evidence was *sufficient* to support the imposition of discipline—along with NFL counsel, who determined that the report should be void of a conclusion.  *See* Arb. Hr'g Tr. (Aug. 29), Ex. C. at 138:16-20 (Roberts unaware of who decided that Elliott Report should not provide conclusions); Arb. Hr'g Tr. (Aug. 30), Ex. C at 265:15-21 (decision to exclude conclusions in Report was made by Friel and NFL counsel).  *See also generally*, Ex. A-NFLPA-44 (Elliott Report).   Based on the Elliott Report, the Commissioner determined—without the benefit of the deliberately concealed conclusions reached by Roberts—that there was not credible evidence of a policy violation, and that Elliott committed three—out of five—alleged acts of domestic violence against Thompson.

7.     This flawed determination by the Commissioner was also based on advice he received from four designated outside expert advisors, but those experts too were prevented from learning of the conclusions reached by the NFL's co-lead investigator about the lack of credibility and evidence to support the accuser's claims.  Indeed, when one of the advisors, Mary Jo White, a former prosecutor herself, asked Friel what conclusions Roberts had drawn from the evidence gathered, Friel only admitted that she (Friel) had concluded that one of the five claimed incidents was not credible.  June 26, 2017 Hr'g Tr., Ex. A-NFLPA-45 at 151:20-152:7. As for the rest, Friel did not reveal the conclusions of Roberts that all of the allegations were not credible and could not be supported, and instead gave the impression that the other allegations

5

were found to be credible. *Id.* at 152:8-153:14. There was also a deliberate decision to keep Roberts out of this critical meeting with the advisors, as part of the overall conspiracy to conceal her conclusions from the Commissioner, the player, the Union, the Cowboys, and the world. *E.g.*, Arb. Hr'g Tr. (Aug. 30) 265:15-21; 278:13-21. As for Thompson, it was undisputed that she publicly threatened to ruin Elliott's career at the time she made the false allegations of abuse at issue. *E.g.*, Ex. A-NFLPA-44 at 98, 100. When the police and city attorney would not act on her false allegations, she turned to the NFL and voluntarily provided the NFL with six interviews in which she repeated her false allegations. It was the lack of credibility and continued inconsistency in her claims that led Roberts, who interviewed her, to conclude that the allegations had no merit. Indeed, Roberts prepared a separate document listing some of the most significant inconsistencies in Thompson's claims as compared to other credible witnesses and evidence; she labeled this document the "Inconsistency Transcript" (a term someone at the NFL tried to cross out). *See* Ex. B-NFL-B.2.99. She also noted that Thompson asked one of her friends to lie to police about the allegations against Elliott. Yet, arbitrator Henderson deprived Elliott and the NFLPA of the right to confront this incredible accuser and fully expose her lack of credibility at the arbitration hearing.

8.      Elliott appealed his suspension pursuant to the procedures set forth in Article 46 of the NFL-NFLPA Collective Bargaining Agreement ("CBA"). Thereunder, Commissioner Goodell or his designee—in this case Henderson, the former head of Respondent NFL Management Council—served as the arbitrator. The CBA requires player discipline to be "fair and consistent." Ex. A-NFLPA-15 at 8. And, pursuant to the terms of the PCP, when there is no criminal finding on which to base discipline, there must "credible evidence" to support the

discipline.  Ex. A-NFLPA-16 at 5.  Elliott was deprived at the hearing of a fundamentally fair arbitral process to satisfy his CBA burden on these issues.

9.     The arbitration before Henderson lasted for three days, on August 29-31.  At the conclusion of the hearing, Henderson announced that he would issue his award shortly: it is expected to be issued over this coming Labor Day weekend.  The timing of the Award is critical, as Elliott, and the Cowboys, will suffer immediate irreparable harm once the suspension goes into effect, as Elliott, the star running back for the Cowboys, must begin practicing for the team's opening game against their Division rival, the New York Giants, on Tuesday, September 5.  Because of this urgency, Elliott and the NFLPA intend to file a motion for a temporary restraining order and preliminary injunction to be decided before any suspension of Elliott can go into effect, as a result of an arbitral award borne out of a fundamentally unfair process, which thus must be vacated.

10.     For the avoidance of doubt, the NFLPA and Elliott do not seek in this Petition for the Court to make its own determinations about Elliott's or Thompson's credibility, or any other matter of fact-finding properly left to the arbitrator.  Rather, the controlling and paramount *legal* question presented here is whether an arbitration concerning the existence of "credible evidence" for employee discipline based on "he-said/she-said" claims of domestic violence can be fundamentally fair when senior NFL Executives have conspired to obscure (including from the Commissioner and his advisors) their own Director of Investigations' conclusion that there was no credible evidence upon which to impose discipline, and the arbitrator has refused to require the NFL to make available for testimony and cross-examination: (i) the accuser whose credibility is at issue (or the investigative notes of her six interviews), and (ii) the Commissioner who was deprived of critical facts in making his disciplinary determination.     Presumably, the

Commissioner would have reached a very different disciplinary conclusion—one of exoneration and no discipline—had he known about the evidence which Friel and other unidentified, high-ranking NFL Executives chose to conceal from the disciplinary process.

## JURISDICTION AND VENUE

11.     This is an action to vacate the Award pursuant to Section 301 of the LMRA and Section 10 of the FAA.  This Court thus has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331.

12.     The Dallas Cowboys, one of the thirty-two franchises in the NFL, is headquartered in Frisco, Texas, maintains AT&T Stadium in Arlington, Texas, and does business in this District.  The NFL derives revenue from throughout the State of Texas through advertising, ticket sales, merchandising, and broadcasting and is subject to personal jurisdiction here.

13.     Venue is proper in this court under 28 U.S.C. § 1391 and 29 U.S.C. § 185, as the NFL regularly transacts business in this District and the Cowboys are headquartered in this District.  Moreover, Elliott is employed by the Cowboys, who are headquartered in this District.

## PARTIES

14.     Petitioner NFLPA is a nonprofit corporation duly organized and existing under the laws of the Commonwealth of Virginia.  The NFLPA is the Union and exclusive collective bargaining representative of all present and future NFL players, including Elliott.  The NFLPA's offices are located at 1133 20th Street, N.W., Washington, D.C. 20036.

15.     Petitioner Ezekiel Elliott is a professional football player and member of the NFLPA.  He was selected by the Dallas Cowboys in the 2016 NFL Draft.  Last season, his first in the NFL, he was named Offensive Rookie of the Year, first team All-Pro, and he was selected

for the Pro Bowl. He is the starting running back for the Cowboys and one of the top players at his position in the NFL. Elliott resides in Texas.

16.     Respondent National Football League maintains its offices at 345 Park Avenue, New York, New York, 10154, and is an unincorporated association consisting of thirty-two separately owned and operated professional football franchises, one of which is located in this District. Elliott's team, the Cowboys, is headquartered in this District. And the National Football League conducts business in this District by and through its franchise members.

17.     Respondent National Football League Management Council is the exclusive bargaining representative of all present and future employer member franchises of the NFL.

## RELEVANT NON-PARTIES

18.     Arbitrator Harold Henderson spent 16 years as the NFL's Executive Vice President for Labor Relations and Chairman of Respondent National Football League Management Council's Executive Committee. Upon information and belief, Henderson is still employed part-time by the NFL and thereby reports to the NFL Commissioner, the NFL controls Henderson's pension, prior NFL financial disclosures show that the League paid Henderson $2.5 million from 2009-2012, and the NFLPA expects that Henderson has received significant additional sums since that time (no more recent information is publicly available).

19.     Tiffany Thompson lives in Columbus, Ohio, where Elliott attended college. She previously had a personal, intimate relationship with Elliott. Thompson made the allegations against Elliott that prompted the NFL's investigation into his conduct, and she is the only eyewitness upon whose claims the NFL premised Elliott's suspension.

20.     Kia Roberts is the Director of Investigations for the NFL. She conducted the League's investigation of Thompson's accusations against Elliott, interviewed Thompson six

different times, and compiled many of the notes that were the basis for the Elliott Report.  The

NFL excluded her from meeting with the Commissioner to discuss her conclusions about the

investigation, excluded her from meeting with the Commissioner's outside expert advisors in the

investigation, excluded from the NFL's investigative report her conclusions that there was

insufficient evidence to substantiate the accuser's incredible claims, and tried to prevent her from

testifying at the hearing, before she was ordered to appear.

21.     Lisa Friel is the Special Counsel for Investigations for the NFL.  She was a co-

author of the Elliott Report.  She did meet with Commissioner Goodell to express her

conclusions that discipline should be pursued, and also met with the Commissioner's advisors to

answer their questions, while Roberts was deliberately excluded.

22.     Cathy Lanier is the Senior Vice President of Security for the NFL.  Roberts

reports directly to Lanier.

## STATEMENT OF FACTS

**A.     Discipline for Conduct Detrimental Under the CBA**

23.     The parties are bound by the CBA, which was executed on August 4, 2011.

24.     Through the collectively-bargained NFL Player Contract (Appendix A to the

CBA), the NFL Commissioner is empowered to impose discipline for "conduct detrimental to

the integrity of, or public confidence in, the game of professional football."[2]  As an asserted

exercise of this authority, the Commissioner each year unilaterally (*i.e.*, without collective-

bargaining with the Union) promulgates the PCP to provide notice to players about what the

Commissioner considers to be conduct detrimental to the League, as well as the disciplinary

---

[2]     Available  at  https://nfllabor.files.wordpress.com/2010/01/collective-bargaining-agreement-
2011-2020.pdf.

consequences of such conduct, the investigative procedures to be employed, the role of expert

advisors, and the requirements of evidentiary proof to find a violation. Ex. A-NFLPA-16.

25.    It is undisputed that the CBA requires that the Commissioner's conduct

detrimental discipline be fair and consistent. *Rice* Arbitration Award (Nov. 28, 2014), Ex. A-

NFLPA-15 at 8 ("[D]iscipline under [Article 46] must be fair and consistent."); *Bounty*

Arbitration Award, (Dec. 11, 2012), Ex. D at 4 (role of the Article 46 Hearing Officer is to

"review[] the discipline for consistency of treatment, uniformity of standards for parties similarly

situated and patent unfairness or selectivity"); *see also Peterson* Arbitration Award (Dec. 12,

2014), Ex. E at 3 (fair and consistent is "agreed" standard of review). Arb. Hr'g Tr. (Aug. 29),

Ex. C at 84:3-5 (NFL "certainly do[es]n't dispute that the discipline has to be fair and

consistent.")

26.    And, in the applicable iteration of the PCP, Commissioner Goodell himself added

the evidentiary requirement that conduct detrimental discipline must be supported by "credible

evidence" where, as here, the discipline is not based on criminal charges or findings:

> A player violates this policy if he has a disposition of a criminal
> proceeding (as defined), or if the league's investigation
> demonstrates that he engaged in conduct prohibited by the
> Personal Conduct Policy. *In cases where the player is not charged
> with a crime, or is charged but not convicted, he may still be found
> to have violated the Policy if the **credible evidence** establishes that
> he engaged in conduct prohibited by this Personal Conduct Policy.*
> Ex. A-NFLPA-16 at 5.

27.    Article 46 of the CBA sets forth the procedures for players to appeal conduct

detrimental discipline. Article 46 of the NFL Collective Bargaining Agreement, Ex. A-NFLPA-

58. The hearing officer (arbitrator) is either the Commissioner or his designee. In this case,

Commissioner Goodell designated Henderson.

28.     In the letter to Elliott announcing his suspension ("Discipline Letter"), the NFL wrote that "[p]ursuant to Article 46 of the Collective Bargaining Agreement," Elliott was suspended because of "substantial and persuasive evidence that [Elliott] engaged in physical violence against Ms. Thompson," a violation of the Policy subject to a baseline six-game suspension.  Out of five alleged incidents of domestic violence claimed by Thompson, the Commissioner only found a basis for discipline for three of the alleged acts.  The Commissioner also found no mitigating or extenuating circumstances and imposed a six-game suspension as the discipline.  Ex. A-NFLPA-49 at 1, 3, 5.  That discipline will take effect immediately if Mr. Henderson issues an arbitral award affirming the discipline.

**B.     Columbus Law Enforcement Determines There Is "Conflicting Evidence" and Declines to Charge Elliott**

29.     In July 2016, the Columbus, Ohio Police Department investigated allegations by Thompson that Elliott had been physically abusive toward her on five alleged occasions during the week of July 16, 2016.  *See* Ex A-NFLPA-49 at 1, 3-4.

30.     Officers on the scene on July 22 concluded there was no probable cause to require a mandatory arrest of Elliott under governing Ohio law.  Their Police Report states their determination was "[d]ue to conflicting variations of what happened."  Ex. A-NFLPA-24 at 7.

31.     Thereafter, the Columbus City Attorney's office conducted its own extensive investigation, including interviewing witnesses and gathering relevant evidence.  It thereafter announced, after an extensive fact investigation, that it would not bring charges against Elliott.  Ex. A-NFLPA-40.  The Columbus City Attorney's office explained that "[a]fter reviewing the totality of the evidence," it "declined to approve criminal charges . . . primarily due to conflicting and inconsistent information across all incidents, resulting in concern regarding the sufficiency of the evidence to support the filing of criminal charges."  *Id.* at 2.

### C.     The NFL's Investigation

32.     The NFL's Director of Investigations, Kia Roberts, co-led the League's own investigation into Thompson's allegations with Friel.  But it was Roberts who conducted *all* of the fact interviews and Friel did not conduct any (except for an interview of Elliott with the Commissioner's outside expert advisors, from which Roberts was excluded).  *See* Hr'g Tr. (Aug. 30), Ex. C at 261(8-16).

33.     The NFL would ultimately conduct twenty-two interviews, including six with Thompson and numerous others with her relatives and friends.  Ex. A-NFLPA-44 at 1-2.  Roberts personally interviewed Elliott, Thompson (six times), several of Thompson's friends, and conducted all other fact interviews conducted as part of the NFL investigation.  Ex. A-NFLPA-44.  The League also collected a number of photos from Thompson and public documents from Columbus law enforcement authorities, and asked two medical examiners to review and opine on Thompson's bruises as depicted in the photographs.  *Id.* at 9-10.  Ultimately, it was established that neither doctor could rule out the fact that the bruises depicted were consistent with numerous other possible causes *apart* from the allegations of abuse, including drunken and drug-induced falls, fights with other persons, rough sex and other possible causes.  Hr'g Tr. (Aug. 31), Ex. C. 40-112; 122:22-124:1.

34.     Of the six Thompson interviews, however, the NFL transcribed only two.  Ex. A-NFLPA-42 and 43.  League investigators did take notes of the four, non-transcribed Thompson interviews, but the NFL refused to produce them, and the arbitrator ruled that the NFL could withhold them.  Ex. A-NFLPA-55 at 3.

35.     The NFL similarly chose not to make audio recordings, video recordings, or transcriptions of numerous other fact interviews over the course of the Elliott Investigation.  *See, e.g.*, *id.* at 2-3.

36.     The NFL issued the Elliott Report on June 6, 2017, reporting on the results of its more than year-long investigation.  Ex. A-NFLPA-44.  Unlike most other NFL investigative reports issued in connection with Commissioner discipline, the investigators' conclusions about what the evidence showed were excluded from the report. *See id.*  Neither Roberts nor Friel—the co-authors of the report—could identify who at the NFL made the decision not to have any conclusions or recommendations in this mammoth report, which was more than 160 pages long, with more than 100 exhibits. Ex. A-NFLPA-44.

37.     The League subsequently provided the Report to the NFLPA and Elliott for their review, as the PCP required, and the Union responded on July 17 by filing a report demonstrating the many critical flaws in the purported evidence contained in the Elliott Report, including the glaring unreliability of Thompson's testimony and allegations.  Ex. A-NFLPA-48. But what the Union and Elliott did not know was that Roberts had reached the same conclusion as the player and the Union: there was insufficient evidence to proceed with any violation claim.

38.     The NFL convened a meeting on June 26—attended by League personnel, a panel of outside "expert" advisors to the Commissioner (provided for in the PCP), Elliott, his agents, and NFLPA counsel—at which NFL Special Counsel for Investigations Lisa Friel presented the findings of the Elliott Report.  A-NFLPA-45.  Significantly, Roberts was excluded from this critical meeting, and neither Roberts nor Friel could identify which top NFL Executive made this decision.  *Id.* Hr'g Tr. (Aug. 29) at 162:22-25 (Roberts: Is the question do I know why I wasn't invited?  Mr. Kessler: Yes.  Ms. Roberts: No); Hr'g Tr. (Aug. 30) at 277:5-8 (Q: Who made the

decision for Ms. Roberts not to meet with the outside advisors at the meeting? Friel: I have no idea.")

39.     At this critical hearing, one of the Commissioner's advisors, Mary Jo White, a former Chair of the SEC and a former federal prosecutor, asked the critical question about what conclusions the investigators had reached about the credibility of the allegations.   Because Roberts was excluded from the meeting, only Friel was there to answer, and she continued the cover-up in the following exchange, only admitting that one alleged domestic violence incident was incredible, while sidestepping any revelation of the investigators' conclusions about the four other alleged acts:

> Ms. White: And then, Adolpho, you tell me if this is an inappropriate question. You've obviously, and your investigators, your staff as well, have interviewed Miss Thompson several times from the record.  With respect, I will start at the back end.  With respect to what she has told you and told the police, city attorney, with respect to the July 22 incident, have you found what she said to you – we will take it with you first – to be credible, as to the July 22 event?

> Ms. Friel: No.

> Ms. White: Otherwise, have you generally found her to be credible?  I know that is a big question.

> Ms. Friel: It is a big question.  I will go back and say it this way.  We felt comfortable making the determination that she was not credible about the July 22 incident in large part because of her own friend Ayrin Mason, said it did not occur.  And we found Ayrin Mason very credible.  I would say that the other person we found very credible was her Aunt, Elaine Glenn.  What we looked at in terms of looking at the evidence was here's what Miss Thompson said and what other evidence can we gather to see if it backs up her credibility or does not back up her credibility.  And that would be hard evidence, like the text messages; they say what they say, they went to who they went to.  The photographs, especially the ones with metadata on them.  The opinions we got back from the two doctors that we spoke to.  And as I said, Ayrin Mason who saw injuries during the week as did her Aunt both seeing it [on] FaceTime and then seeing photographs that got sent.  I want to say it that way, that that evidence is really, in my opinion what we should be looking at, and what does all that corroborative consistent or inconsistent evidence say about Miss Thompson's credibility.

40.     Had Roberts been at the meeting, she undoubtedly would have informed the outside expert advisors, the player, and the Union of her conclusion that there was no credible evidence to proceed with respect to any of the allegations.

41.     Further, other top NFL Executives, including Jeffrey Pash, the Executive Vice President and General Counsel of the NFL, and B. Todd Jones, the Senior Vice President and Special Counsel for Conduct, were in attendance.  It is unknown whether one of them made the decision not include Roberts in this critical meeting or whether they were also victims of the conspiracy to conceal.

42.     In response to the Elliott Report and the June 26 meeting, as mentioned above, the NFLPA and Elliott prepared a written submission cataloguing the overwhelming evidence *contained in the NFL's own report* undermining Thompson's credibility.  Ex. A-NFLPA-48.  For example:

- Thompson lied to investigators and encouraged her friend to lie to the police as well (*id.* at 15-16, 22-23);

- Thompson destroyed relevant evidence from her cell phones (*id.* at 23-24);

- Thompson changed her account of critical events repeatedly and only mentioned significant information after she had been interviewed a number of times (*see, e.g.*, *id.* at 11, 20, 27-29);

- Thompson's allegations were inconsistent with other evidence (*see e.g.*, *id.* at 8, 12, 32);

- Thompson's credibility was undermined by her numerous threats to "ruin" Elliott's life and career as revenge for his not wanting to continue his relationship with her in the manner she desired  (*see, e.g.*, *id.* at 9, 24-25); and

- Thompson considered extorting Elliott with alleged sex videos and took steps to effectuate such a plan (*id.* at 26-27).

43.     The NFLPA and Elliott also demonstrated in their response submission that neither of the two medical expert reports submitted to the NFL established any causal link

between Elliott and the injuries Thompson claims he caused, or any reliable basis to even date the alleged injuries. *Id.* at 4.

44.     It was not until the arbitration hearing that the NFLPA learned, through its examination of NFL lead investigators Roberts and Friel, that, in fact, Roberts agreed with the NFLPA and Elliott that there was no basis to proceed with any disciplinary claim based on the evidence that had been gathered.

### D.     The Conspiracy to Conceal Critical Evidence from the Commissioner, the Commissioner's Outside Expert Advisors, the NFLPA, Elliott, the Arbitrator, the Cowboys and NFL Fans

45.     It was only through the examination of Roberts and Friel at the subsequent arbitration hearing that the conspiracy to conceal critical evidence was exposed.

46.     For example, on the first day of the three-day arbitration hearing:

- Roberts testified repeatedly that "I had concerns about [Thompson's] credibility (Arb. Hr'g Tr. (Aug. 29), Ex. C at 172:24) because "[i]t seemed like there were **numerous witnesses** who what they had to say was in, you know—**diametrically opposed** to what [Thompson] stated" (*id.* at 173:19-22) (emphasis added). Roberts could not recall from her time as a prosecutor ever "put[ting] on the stand" a witness that "had this many inconsistencies in their testimony that was going to be used to attack their credibility." *Id.* at 226:22-227:1.  *See also id.* at 175:13-19 ("As I was looking through that additional evidence . . . there were concerns that I had about her credibility"); 188:10-25 (Roberts did not find credible Thompson's explanation for a text message that asked her friend to lie to Elliott's lawyers about an alleged incident of abuse by Elliott);

- In the course of the Elliott Investigation, Roberts regularly found "inconsistencies in what Ms. Thompson" said (*see, e.g.*, *id.* at 142:2-6, 143:9-23) and created an entire document called "Inconsistency Transcripts" to catalogue them all "[b]ecause . . . things that [Thompson] said . . . were inconsistent with each other" (*id.* at 143:3-7); someone at the NFL attempted to cross out the words "Inconsistency Transcripts," but was not successful in doing so. *Id.* at 142:21-143:2;

- The NFL learned that Thompson lied to police and to Roberts about critical details, such as whether Thompson had been involved in a fistfight with another woman during the week of the alleged domestic violence, which could

have caused some of the bruises of which she took pictures (*see, e.g.*, *id.* at 147:2-150:19), and Roberts admitted that from evidence of the fight "[s]tanding on its own," she "wouldn't draw the conclusion Ms. Thompson was telling the truth" (*id.* at 153:7-12);

- Likewise, Roberts found that other witnesses, including Thompson's own friends and third parties, offered different versions of events that were not "consistent with what Ms. Thompson told" the NFL (*id.* at 156:17-25) and compelled Roberts to question Thompson about why someone who was not "a particular friend of Elliott" would offer contradictory testimony (*id.* at 179:5-13); and

- Roberts testified that one of Thompson's friends said that "she was told to lie by Ms. Thompson to police" (*id.* at 159:21-23), and that it was not credible when Thompson tried to explain it away (*id.* at 188:10-25).

47.     Ultimately, it was revealed that Roberts had concluded that Thompson's credibility was so damaged that no discipline should be pursued against Elliott for allegations that could not be supported with sufficient credible evidence. Arb. Hr'g Tr. (Aug. 30), Ex. C. at 301:22-302:4.

48.     Roberts testified on this first day of the arbitration that she shared her credibility concerns about Thompson with Friel and others on the League investigative team (*id.* at 172:21-173:22, 163:11-165:23), including with her boss, Lanier. *Id.* at 165:1-7. It was later revealed that Lanier agreed with Roberts's assessment that there were "issues of credibility" with respect to Thompson. Arb. Hr'g Tr. (Aug. 30), Ex. C at 319:4-10. The conspiracy then came into play. First, Friel and NFL counsel decided that the Elliott Report would not include any conclusions (*id.* at 265:15-21)—but Roberts did not know who decided this. Arb. Hr'g Tr. (Aug. 29), Ex. C at 137:22-138:7. Omitting these conclusions was a necessary step in concealing Roberts's determinations from the Commissioner and others.

49.     Second, Roberts was never included in any meeting with the Commissioner to present her conclusions about the investigation and the lack of sufficient evidence.  *Id.* at 163:11-13.

50.     Third, Roberts was not invited to the meeting with the Commissioner's outside expert advisors, and she did not know who made the decision to exclude her from that critical meeting either.  *Id.* at 161:16-19; 162:22-25.  Nor was she given any other opportunity to convey her conclusions that the accuser was incredible, and there was insufficient evidence to go forward to the outside expert advisors on any other occasion.  *Id.* at 161:20-22.

51.     The conspiracy to conceal Roberts's conclusions as the co-lead investigator were especially harmful because she was the only one of the co-lead investigators to interview Thompson—and she did so six times.  *Id.* at 161:23-162:5.[3]  Roberts also served as the co-author of the Elliott Report, where her conclusions would have been revealed but for the decision by some unknown NFL executive to conceal them.  *Id.* at 136:18-21.

52.     On the second day of the hearing, Friel testified, and the conspiracy became further exposed.  First, after repeated questioning, Friel admitted that it was Roberts' conclusion that after review of the totality of the evidence, there was ***insufficient evidence to corroborate Thompson's version of events***.  Arb. Hr'g Tr. (Aug. 30), Ex. C. at 301:22-302:4.  Friel admitted that this conclusion was excluded from the Elliott report, as a result of a decision that she made with NFL counsel. *Id.* at 265:15-21

53.     Further, Friel testified that she attended a meeting with Commissioner Goodell and other top NFL Executives to discuss the findings of the investigation. *Id.* at 274:22-275:5

---

[3] Roberts acknowledged that Kim Janke, an NFL Security Representative, was also present at the interviews with Thompson.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 162:3-11.

But Roberts was not invited to this meeting either. *Id.* 277:5-8. Since Roberts was the only lead investigator to interview Thompson, and was the co-author of the Elliott Report, it is inexplicable as to why an experienced lawyer like Pash, for example, would not have insisted that Roberts attend this critical meeting to inform the Commissioner about what the investigation had revealed.

54.     After first asserting attorney-client privilege, Friel eventually revealed that she told the Commissioner it was her view that there was sufficient evidence to proceed. *Id.* at 275:1-19. Roberts, on the other hand, could not express her conclusions, based in part on her six interviews of Thompson, to the Commissioner herself, since she was not present.

55.     Finally, Friel claimed not to know who decided not to include Roberts in the meeting with the outside expert advisors on June 26. *Id.* 277:5-8

56.     Friel testified that she "didn't think it was that important" for Roberts to meet with the outside expert advisors. *Id.* at 278:13-21. Roberts, on the other hand, testified that it would be "important to talk to the person who has interviewed the accuser if you're going to make a determination as to whether or not the accuser is telling the truth." Arb. Hr'g Tr. (Aug. 29), Ex. C at 163:1-7.

57.     At no point during the June 26 meeting were the outside expert advisors informed of Roberts' opinion that there was insufficient evidence to corroborate Thompson's version of events. *See generally* NFLPA Ex. 45.

58.     And tellingly, it was Friel—in conjunction with NFL counsel—who determined that the Elliott Report should not include a recommendation as to whether Elliott violated the Personal Conduct Policy. Arb. Hr'g Tr. (Aug. 30), Ex. C. at 15-21.

**E.      Arbitrator Henderson Denies Elliott and the Union Access to Critical Evidence Necessary for a Fair Hearing**

59.      Elliott and the Union timely filed an appeal of his suspension pursuant to Article 46 (Ex. A-NFLPA-50).  The arbitration appeal hearing was conducted from August 29-31.  Arb. Hr'g Tr., Ex. C.

60.      Prior to the hearing, the NFLPA and Elliott requested that the NFL produce, among other things, all documents related to the Thompson interviews, including the investigation notes taken by lead investigator Roberts.  NFLPA Request for Documents and Witnesses, Ex. A-NFLPA-51 at 1-2.  The NFLPA and Elliott also requested that the NFL produce, among other critical witnesses, Thompson, whose credibility went to the very core of the arbitration proceeding.  *Id.* at 3-4.

61.      In an August 22 response letter, the NFL refused to produce Thompson or the notes of the investigators who interviewed her. Ex. A-NFLPA-52 at 2.  The NFL also refused to produce Roberts, arguing that her testimony would be duplicative of Friel's, whom the League agreed to make available. *Id.* at 4.  And the NFL made the unsubstantiated claim that it could not compel Thompson's testimony (*id.* at 3), notwithstanding the fact that she had already, voluntarily submitted to *six* interviews by NFL investigators and also provided the League with numerous photographs and hundreds of text messages. Ex. A-NFLPA-44 at 1-2.  Roberts would later candidly testify that in her nine-years as a prosecutor, she had never "cho[sen] to put a witness on the stand knowing that they had this many inconsistencies in their testimony" (Arb. Hr'g Tr. (Aug. 29), Ex. C at 226:22-227:1)—offering the most likely explanation for why the NFL refused to produce Thompson at the hearing.  Friel later testified that she could not identify any efforts made by the NFL even to find out if Thompson would agree to testify at the hearing. Arb Hr'g (Aug. 30), Ex. C at 277:22-278:12.

62.     On August 25, 2017, following a telephonic hearing, Henderson denied all of the NFLPA's evidentiary requests, except he ordered Roberts to testify at the hearing. Ex. A-NFLPA-55. Even though, as arbitrator, Henderson was required by the PCP to assess the existence of "credible evidence" against Elliott, he inexplicably found that Thompson's "testimony and availability for cross examination" was not "essential to Mr. Elliott's defense," and he ruled that the NFL was not obligated to produce investigation notes of Thompson or anyone else. *Id.* at 2-3.

63.     Henderson's decision was flatly at odds with Article 46 appeal hearing precedent in which arbitrators had compelled the production of important witnesses by the NFL—perhaps none of whom were more important to the player's ability to have a fair hearing than Thompson—the sole eyewitness besides Elliott to the alleged claims of abuse. *See Brady* Decision on Hearing Witnesses and Discovery (June 22, 2015), Ex. F at 2 (ordering live testimony of Ted Wells, who "supervised the investigation and preparation of the Investigative Report that serve[d] as the basis for Mr. Brady's discipline"); *Rice* Order on Discovery and Hearing Witnesses (Oct. 22, 2014), Ex. A-NFLPA-14 at 2 (exercising "discretion of the hearing officer" to "compel[] the witnesses necessary for the hearing to be fair" and ordering live testimony of all witnesses present for "central issue in the case," including Commissioner Goodell); *New Orleans Saints ("Bounty")*, Pre-Hearing Order No. 4 (Nov. 9, 2012), Ex. G at 1 (ordering live testimony of lead investigator Jeff Miller for "reasonable cross-examination"). Even more significantly, this ruling deprived Elliott and the NFLPA of a fundamentally fair hearing.

64.    On the first day of the hearing, the Union and Elliott reiterated their request for the testimony of Thompson and the investigator notes of her interviews.  That request was denied by the arbitrator.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 32:3-15.

65.    At the hearing, Elliott testified—categorically, unequivocally, and under oath—that he had not committed any misconduct against Thompson.  *See e.g.*, Arb. Hr'g Tr. (Aug. 30), Ex. C at 86:4-10; *see also* A-NFLPA-45 at 135:2-3 ("I've never assaulted Tiffany Thompson.  I would never do that."); *see also* Ex. A-NFLPA-44 at 28, 44, 48 (examples from Elliott Report of Elliott denying any wrongdoing).  Moreover, although there was no other witness to the alleged incidents besides Elliott and Thompson, Alvarez Jackson was present in Elliott's apartment during the time of the alleged incidents, and he testified that he neither saw nor heard any evidence of abusive conduct and did not hear of any complaints of abuse from Thompson.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 222:1-5.

66.    The NFLPA and Elliott also presented expert evidence at the hearing, completely debunking the claim that the League's medical experts could reliably determine the date of bruises from the photographs they reviewed, or determine what caused the bruises.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 91-132.  These fatal deficiencies in the NFL's expert reports were ultimately confirmed by the NFL's experts themselves.  Arb. Hr'g Tr. (Aug. 31), Ex. C. 40-112; 122:22-124:1

67.    During the hearing, when the conspiracy to conceal Roberts' conclusions was uncovered, it became evident that Commissioner Goodell himself had become a critical witness for the proceedings.  A major issue in the arbitration was whether the arbitrator should defer to the fact determinations of the Commissioner—as the League argued—when it appeared that critical facts had been concealed from the Commissioner.  The only way to get to the bottom of

the conspiracy to conceal evidence from the Commissioner was to get testimony from the Commissioner himself.  But Henderson denied any access to this critical witness as well.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 348:18-349:15.

### F.     Henderson's Award

68.     At the conclusion of the three days of arbitration on August 31, Henderson stated on the record that he would issue his award shortly.  Because an Award affirming the discipline will take immediate effect when issued, the Union and Elliott were forced to immediately file this Petition to prevent severe and irreparable harm to Elliott, his reputation, and his career.

69.     The Cowboys' first game is September 10, and practices for that opening game begin on Tuesday, September 5.  Unless enjoined by this Court prior to that time, Elliott's suspension, if sustained by the Award, will have devastating effects, making immediate preliminary injunctive relief essential.

## GROUNDS FOR VACATUR:

## DENIAL OF FUNDAMENTAL FAIRNESS

70.     Judicial review of an arbitration award is narrowly circumscribed and deferential. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).  That deference does not mean, however, that arbitration awards are inviolate.  *See Murphy Oil USA, Inc. v. United Steel Workers AFL-CIO Local 8363,* No. CIV.A.08-3899, 2009 WL 537222, at *3 (E.D. La. Mar. 4, 2009) (vacating award).

71.     Bare minimum standards of fairness must characterize every legitimate arbitration.  Where the arbitral process falls short of those standards and deprives a party of a full and fair hearing, the resulting award should be vacated.  *See Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (citing FAA in affirming vacatur of award

procured from "fundamentally unfair" labor arbitration proceedings); *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 494 (5th Cir. 2003).[4]

72.    Thus, "the court has authority to vacate an award if a party has been denied a fundamentally fair hearing." *Murphy Oil USA*, 2009 WL 537222, at *3.  Vacatur is warranted under the LMRA and the FAA "where the arbitrators were guilty of misconduct in . . . refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3).

73.    Courts across jurisdictions have recognized that, irrespective of collectively bargained terms, a fundamentally fair hearing requires that a party is afforded an "adequate opportunity to present its evidence and arguments," or the resulting award is subject to vacatur. *See, e.g.*, *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39-40 (1st Cir. 1985) (affirming vacatur, in part, on fundamental fairness grounds where "the exclusion of relevant evidence 'so affect[ed] the rights of a party that it may be said that he was deprived of a fair hearing'") (citation omitted); *cf. El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) ("each party must be given the opportunity to present its arguments and evidence"); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997) (vacating award because arbitration panel "excluded evidence plainly 'pertinent and material to the controversy,'" which "amounts to fundamental unfairness") (citing 9 U.S.C. § 10(a)(3)).

---

[4] Although this case arises under Section 301 of the LMRA, the Court may look to the FAA for the purposes of adjudicating an arbitral challenge arising out of a collective bargaining agreement. *Int'l Chem. Workers Union*, 331 F.3d at 494 ("When reviewing a case involving a CBA and arising under Section 301, courts are not obligated to rely on the FAA but may rely on it for guidance in reviewing an arbitration award."); (citing *Misco*, 484 U.S. at 41 n.9 (acknowledging that "federal courts have often looked to the [FAA] for guidance in labor arbitration cases," especially where section 301 of the LMRA applies).

74.     The Fifth Circuit is no exception, holding that "[i]t is appropriate to vacate an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing," or if "the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300–01 (5th Cir. 2004).

75.     Indeed, courts within this Circuit and others have held that an arbitrator has an "*affirmative duty* to 'insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other side. . . . [A] failure to discharge this simple duty would constitute a violation of FAA § 10(a)(3), where a party can show prejudice as a result.'" *Ostrom v. Worldventures Mktg., LLC*, 160 F. Supp. 3d 942, 950 (M.D. La. 2016) (citation omitted; emphasis added). Parties "must be allowed to present evidence without unreasonable restriction . . . and must be allowed to confront and cross-examine witnesses," or the award will be subject to vacatur. *ICAP Corporates, LLC v. Drennan*, 2015 WL 10319308, at *6 (D.N.J. Nov. 18, 2015) (citation omitted). Courts have specifically identified investigative files as subject to this affirmative duty. *E.g. Home Indem. Co. v. Affiliated Food Distribs.*, 1997 WL 773712, *4 (S.D.N.Y. Dec. 12, 1997).

76.     The arbitration proceedings below do not satisfy these most rudimentary elements of fundamental fairness. As chronicled above, Elliott was the victim of a deliberate conspiracy to conceal critical evidence, denied access to critical testimony from his accuser, Thompson, and the ability to cross-examine her, and denied access to the NFL's investigator notes of Thompson's interviews, four of which were not even transcribed. *See Gulf Coast*, 70 F.3d at 850 (vacating award under "pertinent and material" standard in LMRA proceeding because arbitrator refused to consider crucial evidence).

77.     Mr. Elliott and the Union were also deprived of the critical testimony of Commissioner Goodell, when it became evident that the conspiracy to conceal evidence from everyone, including the Commissioner, was essential to determining whether any deference should be paid to the Commissioner's fact findings and to determine whether the conspiracy engaged in had destroyed the validity of the entire disciplinary process in this case.

78.     The deprivation of critical evidence, including critical evidence going to the accuser's credibility, was especially unfair and damaging in this proceeding, in which discipline for alleged domestic violence is being pursued even though there was no arrest or criminal charge, let alone a conviction; no tape, audio, or other recording of the alleged conduct; no eyewitness to the alleged conduct other than purportedly the accuser herself; and Elliott has maintained his innocence of this conduct since the allegations were first made, and denied them under oath.  Indeed, the PCP itself has a rule that in such a case, where there are no criminal proceedings, there must be "credible evidence" to sustain the discipline. Ex. A-NFLPA-16 at 5. How can an accused player be expected to have a fair opportunity to demonstrate that the Commissioner was not fair and consistent in finding credible evidence in such a case, when he cannot confront and examine his accuser to demonstrate her lack of credibility?

79.     And, in this case, we now know that there was a conspiracy to conceal the fact that the NFL's own co-lead investigator had concluded, with her boss, that the accuser's claims were incredible and were not sufficiently supported by any corroborating evidence.  This made it all the more critical to require the accuser to testify, but the arbitrator refused.

80.     Although investigators Friel and Roberts were made available, *their* testimony about Thompson's severe credibility issues simply reinforced the critical importance of the NFLPA and Elliott being afforded the opportunity to cross-examine Thompson.  Their testimony

also underscored why the arbitrator could not fairly uphold Elliott's discipline, since he could not fairly or accurately determine credibility without hearing from Thompson himself. The fundamentally unfair arbitration proceedings conducted by Henderson here can be analogized to a judge (and a partial one at that) making assessments about the accuser's credibility and the events in question based solely upon the hearsay testimony from *the prosecutors*, and no testimony or cross-examination of the accuser herself. While this is not a criminal case, fundamental fairness, which applies to all arbitrations, requires that the accuser be available in a case like this, where credibility is the essence of the issue to be determined in the arbitration, and the player bears the heavy burden of proof to show that the Commissioner's discipline was not fair or consistent and based on credible evidence in accordance with the PCP. Nor should the NFL be heard to argue that Thompson was beyond their control. The record demonstrates that Thompson has been fully cooperating with all of the NFL's requests—having provided numerous photographs as well as her cell phones, and having sat for six interviews with the NFL's investigators. Further, the record is clear that the NFL has made no showing that Thompson would refuse to appear, as Ms. Friel testified that she was not aware of any efforts by the NFL even to ask her to do so. Arb. Hr'g. Tr. (Aug. 30, 2017), Ex. C at 277:22-278:12.

81.     The NFLPA and Elliott are not asking the Court to substitute its own judgments for the arbitrator's concerning Elliott's and Thompson's respective credibility. Rather, Petitioners ask the Court to conclude that arbitrator Henderson could not, as a matter of law, conduct a fundamentally fair hearing into the existence of "credible evidence" to justify a six-game suspension in the absence of the testimony and cross-examination of Thompson, and without access to the investigator's notes of her prior interviews.

82.　　　Further, it was not possible for Elliott and the Union to have a fundamentally fair hearing in light of the uncovered conspiracy by the NFL to conceal critical exculpatory facts from the player, the Union, the Commissioner and his outside expert advisors, and the refusal to compel Commissioner Goodell to testify so that the full depths of this conspiracy could be revealed, including what other evidence was concealed from the Commissioner and which top NFL Executives—besides Ms Friel—were responsible for this conspiracy, which fundamentally destroyed the fairness of these proceedings. *See Gulf Coast*, 70 F.3d at 850; *Karaha Bodas*, 364 F.3d at 300–01; *ICAP Corporates*, 2015 WL 10319308, at *6 ("[P]arties to an arbitration 'must be allowed to present evidence ***without unreasonable restriction*** . . . and must be allowed to confront and cross-examine witnesses . . . .  Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award.'") (citation omitted; emphasis added); *Tempo Shain*, 120 F.3d at 20-21 (vacating award where panel "excluded evidence … pertinent and material to the controversy") (citation omitted).

83.　　　For all of the above reasons, the arbitration conducted by Henderson was fundamentally unfair and inconsistent with the most basic requirements for a fair arbitral proceeding.

84.　　　In light of the foregoing, and from the face of the arbitral record submitted herewith, as well as further submissions to be made in support of this Petition to Vacate, the Court should conclude that Elliott and the NFLPA were denied the fundamental fairness guaranteed to them under the LMRA and FAA.  The Award should thus be set aside.

## PRAYER FOR RELIEF

## VACATUR OF AWARD

85.     The NFLPA and Elliott repeat and re-allege Paragraphs 1-84 as if set forth fully

herein.

86.     The NFLPA and Elliott petition to vacate the Award on the ground that Elliott

was deprived of his labor and arbitral law rights to a fundamentally fair proceeding.

87.     WHEREFORE, in light of the foregoing, and in accordance with Section 301 of

the LMRA and Section 10 of the FAA, the NFLPA and Elliott respectfully request that the Court

vacate the Award.

Dated: August 31, 2017                          Respectfully submitted,

                                                WINSTON & STRAWN LLP

                                                By: */s/ Thomas M. Melsheimer*
                                                **Thomas M. Melsheimer**
                                                Texas Bar No. 13922550
                                                tmelsheimer@winston.com

                                                2501 N. Harwood Street, 17th Floor
                                                Dallas, TX 75201
                                                (214) 453-6500 – Telephone
                                                (214) 453-6400 – Facsimile

                                                **Jeffrey L. Kessler (*pro hac vice pending*)**
                                                New York Bar No. 1539865
                                                jkessler@winston.com
                                                **David L. Greenspan (*pro hac vice pending*)**
                                                New York Bar No. 4042099
                                                dgreenspan@winston.com
                                                **Jonathan J. Amoona (*pro hac vice pending*)**
                                                New York Bar No. 4797338
                                                jamoona@winston.com
                                                **Angela Smedley (*pro hac vice pending*)**
                                                New York Bar No. 4942132
                                                asmedley@winston.com
                                                **Joseph A. Litman (*pro hac vice pending*)**
                                                New York Bar No. 5030911
                                                jlitman@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700 – Telephone
(212) 294-4700 – Facsimile

*Counsel for Petitioner National Football League
Players Association and Ezekiel Elliott*

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of EZEKIEL ELLIOTT, | § § § § § | |
| | § | CASE NO. 4:17-cv-00615 |
| Petitioner, | § § | |
| v. | § § | EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER |
| NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, | § § § | OR PRELIMINARY INJUNCTION |
| Respondents. | | |

**NOTICE OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER OR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that Petitioner National Football League Players Association,

through its undersigned attorneys, respectfully moves this Court for an Order, pursuant to Federal

Rule of Civil Procedure 65, enjoining Respondents National Football League and National

Football League Management Council, their officers, agents, servants, employees and attorneys

from enforcing the forthcoming arbitration award to be issued by Arbitrator Harold Henderson by

September 5, 2017, which the NFLPA expects will prevent Ezekiel Elliott from participating in

League games or practices or utilizing League facilities, until further order of this Court. Absent

relief from this Court, the suspension upheld by the award would take immediate effect, inflicting

irreparable harm on Elliott before this Court would have any opportunity to act on the Petition.

Petitioner's motion is made pursuant to Federal Rule of Civil Procedure 65 and is based

upon the Emergency Motion for Temporary Restraining Order or Preliminary Injunction herein

and the Petition to Vacate the Arbitration Award submitted in this action.  Respondents were

provided notice of this motion in accordance with Federal Rule of Civil Procedure 65, and the

declarations attached demonstrate that, absent preliminary relief, Elliott will suffer immediate and

irreparable injury before Respondents can be heard in opposition.


Dated: September 1, 2017

WINSTON & STRAWN LLP

By: */s/ Thomas M. Melsheimer*
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com
**Lane M. Webster (*pro hac vice* pending)**
Texas Bar No. 24089042
lwebster@winston.com

2501 N. Harwood Street, 17th Floor
Dallas, TX 75201
(214) 453-6500 – Telephone
(214) 453-6400 – Facsimile


**Jeffrey L. Kessler (*pro hac vice* pending)**
New York Bar No. 1539865
jkessler@winston.com
**David L. Greenspan (*pro hac vice* pending)**
New York Bar No. 4042099
dgreenspan@winston.com
**Jonathan Amoona (*pro hac vice* pending)**
New York Bar No. 4797338
jamoona@winston.com
**Angela A. Smedley (*pro hac vice* pending)**
New York Bar No. 4942132
asmedley@winston.com
**Isabelle Mercier-Dalphond (*pro hac vice* pending)**
New York Bar No. 5187604
imercier@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700 – Telephone
(212) 294-4700 – Facsimile

*Counsel for Petitioner National Football League Players Association and Ezekiel Elliott*

# EXHIBIT K

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of EZEKIEL ELLIOTT, | § § § § § | |
| | § | CASE NO. 4:17-cv-00615 |
| Petitioner, | § § | |
| v. | § § | EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION |
| NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, | § § § § | |
| Respondents. | § | |

## EMERGENCY MOTION FOR TEMPORARY
## RESTRAINING ORDER OR PRELIMINARY INJUNCTION

## PRELIMINARY STATEMENT

Petitioner National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Dallas Cowboys running back Ezekiel Elliott ("Elliott"), brings this Emergency Motion for a Temporary Restraining Order or Preliminary Injunction to prevent the National Football League ("NFL" or "League") from enforcing the six-game suspension imposed by NFL Commissioner Roger Goodell. The NFLPA expects that on or before September 5, Arbitrator Harold Henderson will issue an arbitral decision (the "Award") denying Elliott and the NFLPA's disciplinary appeal. The Award—and ensuing suspension—would then take immediate effect, inflicting instantaneous and irreparable harm. Although the Court need not act until the Award is issued, Elliott and the NFLPA will demonstrate now that they readily satisfy the requirements for preliminary injunctive relief should Elliott's appeal be denied.

To obtain such relief, the Fifth Circuit requires only that movants present serious questions about their claims. Here, however, Elliott and the NFLPA show a likelihood of success on the ultimate merits of their vacatur claim. The Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA") and the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA") do not sanction an Award, such as this one, that is borne out of a fundamentally unfair arbitration where critical evidence is suppressed at every turn. There are at least three reasons why.

*First*, Lisa Friel and other unknown senior NFL executives conspired to conceal critical evidence about Elliott's innocence from all those involved in the disciplinary process—from Elliott, his Union, and his team to Commissioner Roger Goodell (the disciplinarian) and his panel of outside expert advisors. As detailed in the Petition to Vacate Arbitration Award (Doc. No. 1) ("Petition") and the arbitral record appended thereto, Kia Roberts—the NFL's Director of Investigations, who co-led the NFL's nearly year-long investigation into the allegations that Elliott

1

committed acts of domestic violence, and who personally conducted every witness interview—concluded that the accuser, Tiffany Thompson, *was not credible and that there was insufficient corroborating evidence to proceed with **any** discipline of Elliott*.  But senior NFL executives conspired to suppress this information from the Commissioner and his panel of outside expert advisors who were responsible for imposing discipline.  While we are unaware of the exact motivations, it appears that Friel and others had determined that Elliott needed to be made an example of to show the NFL's "tough" stance on domestic violence.  This suppression of exculpatory evidence—including from the NFLPA and Elliott—infected the arbitral process and yielded an Award that cannot stand under federal labor law.

*Second*, despite the fact that Elliott's appeal turned on the credibility of his accuser, he and the NFLPA were denied their fundamental right to cross-examine Thompson at the arbitration hearing.  No criminal charges were ever brought against Elliott precisely because the Ohio prosecutor, like the League's co-lead investigator Roberts, found that Thompson's claims and the other evidence amounted to "conflicting and inconsistent information across all incidents."  Yet, not only did the Arbitrator refuse to require any testimony from Thompson, he even denied Elliott and the NFLPA access to the NFL investigators' notes of their six interviews with Thompson.

*Third*, the Arbitrator also denied Elliott and the NFLPA the right to question Commissioner Goodell, who imposed the discipline.  The Commissioner's testimony would have established what he knew and did *not* know and the scope of the efforts to suppress exculpatory information.  This evidence was fundamental to the arbitration because the NFL's lawyers argued to Henderson that he should defer to the Commissioner's fact-finding.  But no such deference could possibly have been appropriate where the Commissioner had been kept in the dark about critical information, such as the fact that the NFL executive principally responsible for conducting the

investigation concluded that the accuser was not credible and that the corroborating evidence was

insufficient to justify any discipline against Elliott.

With respect to the remaining elements for obtaining preliminary injunctive relief, they

should be non-controversial and are supported by ample precedent.  It is hard to imagine how the

NFL could even try to deny that Elliott will suffer severe and irreparable harm to his season, career,

and reputation should he be suspended for six-games—nearly half of an NFL season, where careers

are precarious and short.  *See* Declaration of J. Arceneaux, Jr. ("Arceneaux Decl.") ¶¶ 5-6,

submitted herewith.  Injunctive relief would also prevent the Cowboys from losing their star

running back for games that cannot be re-played.  *See* Declaration of J. Cohen ("Cohen Decl.") ¶

7, submitted herewith.  As to the balance of hardships, enjoining the suspension would simply

maintain the status quo while the Court considers the Petition.  Elliott was an active member of

the Cowboys during the full year that the League spent investigating Thompson's accusations.

And the NFL faces no risk of cognizable harm because permitting the unlawful suspension of the

Cowboys star player could upset competitive balance around the League and the NFL could simply

suspend Elliott at a later date should the Petition ultimately be denied.  Finally, public interest also

supports enjoining employee discipline where it is the product of an unjust and fundamentally

unfair arbitration that is contrary to the most basic tenets of due process.

## SUMMARY OF FACTS ABOUT THE UNDERLYING ARBITRATION[1]

On July 22, 2016, law enforcement officers in Columbus, Ohio began investigating

allegations made by Tiffany Thompson—a woman with whom Elliott had an intimate

relationship—that Elliott had engaged in multiple incidents of domestic violence against her over

---

[1] For a more detailed description of the underlying facts and relevant factual support for this
motion, the NFLPA refers the Court to the Petition and the extensive  arbitral record and exhibits
appended thereto, all of which the NFLPA incorporates by reference.

the course of the week of July 16, 2016.  Elliott was never arrested.  Police on the scene found no probable cause because of "conflicting versions of what had taken place over the listed dates." Nor was Elliott ever charged with any crime.  On September 6, 2016, after an extensive investigation, the Columbus city prosecutor's office made a public statement that their office would not be charging Elliott at all, due to "the totality of the evidence" revealing "conflicting and inconsistent information across all incidents," including the claims of Elliott's accuser, the only witness against him.  Ex. A-NFLPA-40.  Elliott, for his part, has all along categorically denied that he engaged in any wrongful acts or abuse toward Thompson.

Pursuant to the NFL's Personal Conduct Policy ("PCP"), however, the League takes the position that it may discipline players under the NFL-NFLPA collective bargaining agreement ("CBA") for "conduct detrimental" to the NFL even in the absence of criminal findings.  But there is an important caveat.  The PCP provides that in cases where a player is accused of criminal behavior, but no criminal charges are levied, the Commissioner may impose discipline only if "*credible evidence* establishes that [the player] engaged in conduct prohibited by this [PCP]."  Ex. A-NFLPA-16 at 5.  It is also undisputed that such discipline must be "fair and consistent."  Ex. A-NFLPA-15 at 8; Arb. Hr'g Tr. (Aug. 29), Ex. C at 84:3-7.

Contrary to the Ohio authorities' conclusion, the NFL proceeded with its own investigation into Thompson's allegations, led by NFL Director of Investigations Kia Roberts.  The League conducted 22 witness interviews—including six with Thompson—and collected extensive documentary and other evidence from Thompson and Columbus law enforcement.  Exs. A-NFLPA-44 & 49.  The NFL's investigation, which lasted almost a year, culminated with the release of the Investigative Report ("Elliott Report") on June 6, 2017.  Ex. A-NFLPA-44.  As part of the

investigative process, the Commissioner was given advice about whether to impose discipline from four outside expert advisors that he had designated under the PCP.  Ex. A-NFLPA-49 at 2.

The Commissioner ultimately decided that during the week of July 16, 2016, Elliott had committed three out of five acts of domestic violence alleged by Thompson.  Ex. A-NFLPA-49 at 3-6.  But what the Commissioner and his advisors apparently did not know (and what Elliott and the Union clearly did not know), is that Friel and other NFL executives had deliberately concealed the fact that Roberts—who had personally conducted all of the fact witness interviews and co-authored the Elliott Report—had reached the conclusion that Thompson's accusations were incredible, inconsistent, and not supported by corroborating evidence sufficient to support the imposition of any discipline against Elliott.  *See* Doc. No. 1 at ¶¶ 45-58; Arb. Hr'g Tr. (Aug. 30), Ex. C at 301:22-302:4 (Roberts' conclusion); *id.* at 265:15-21 (decision to omit conclusions in Elliott Report); Arb. Hr'g Tr. (Aug. 29), Ex. C at 161:16-22 (Roberts never met with outside expert advisors); *id.* at 163:11-13 (Roberts excluded from meeting with Commissioner).  The shocking revelation of this effort to suppress exculpatory evidence during the arbitration confirmed that the entire discipline and disciplinary appeal process had been irretrievably corrupted.

NFL Director of Investigations Roberts reached her conclusions because, among other things, Thompson repeatedly lied to the investigators, told her friend to lie to police about the abuse, gave inconsistent accounts of the alleged incidents, destroyed relevant e-mails and text messages, plotted to extort money from Elliott, and threatened Elliott that she would ruin him and his career because he did not want the same type of relationship that Thompson did.  *See* Doc. No. 1 at ¶ 42; *e.g.*, Ex. A-NFLPA-30; Ex. A-NFLPA-41; Ex. A-NFLPA-44 at 98, 100; *see also e.g.,* Ex. A-NFLPA-48 at 9, 11, 12, 15-16, 20, 22-29 (collecting evidence from NFL investigation).  Specifically, as Roberts testified at the arbitration, she "ha[d] concerns about [Thompson's]

credibility," it "seemed like there were **numerous witnesses** who what they had to say was in, you

know—**diametrically opposed** to what [Thompson] stated had occurred that evening," and in her

nine-year career as a (former) prosecutor, Roberts had never "cho[sen] to put a witness on the

stand knowing that they had this many inconsistencies in their testimony."  Arb. Hr'g Tr. (Aug.

29), Ex. C at 172:24, 173:19-22; 226:21-25 (emphasis added).

The NFL's co-lead investigator, NFL Senior Vice President Lisa Friel, testified that she

was fully aware of Roberts' conclusion that there was not enough corroborating evidence to

overcome Thompson's credibility problems to proceed with discipline.  Arb. Hr'g Tr. (Aug. 30),

Ex. C at 301:22-302:4.  Friel and unidentified NFL counsel, however, decided to keep Roberts'

conclusions out of the Elliott Report (*id.* at 265:15-21) and Roberts was thereafter excluded from

meeting with Commissioner Goodell or his outside expert advisors.  Arb. Hr'g Tr. (Aug. 29), Ex.

C at 161:16-22; 163:11-13.  The apparent desire to portray the NFL's new domestic violence policy

as "tough" caused those who suppressed the evidence to corrupt the fairness of the process.

Deprived of the most important conclusions from the investigation in the Elliott Report or

through his outside expert advisor meeting (which Henderson stated during the arbitration was the

relevant record before the Commissioner (*see* Arb. Hr'g Tr. (Aug. 30), Ex. C at 348:18-349:15),

on August 11, 2017, Commissioner Goodell suspended Elliott for six games on the ostensible basis

of "substantial and persuasive" evidence that Elliott had committed "conduct detrimental" to the

NFL and violated the PCP by committing three out of five alleged acts of domestic violence against

Thompson.  Ex. A-NFLPA-49 at 3-6.  Elliott timely filed an appeal of his discipline pursuant to

the procedures set forth in Article 46 of the CBA.  Exs. A-NFLPA-58 & 50.

Article 46 provides that the hearing officer (arbitrator) on appeal is either the

Commissioner or his designee.  In this case, Commissioner Goodell designated Henderson, who

served 16 years as the NFL's Executive Vice President for Labor Relations and Chairman of

Respondent National Football League Management Council's Executive Committee.   Upon

information and belief, Henderson is still employed part-time by the NFL and has been paid

millions of dollars by the NFL in the past decade.  Doc. No. 1 at ¶ 18.

Given the central importance of Thompson's credibility to the issues before the Arbitrator,

and the PCP's requirement of "credible evidence" in matters where there are no criminal charges,

Elliott and the NFLPA requested that the NFL produce Thompson for cross-examination as well

as their investigator notes of interviews with Thompson.  The NFL refused to provide all of this

critical evidence and its hand-selected Arbitrator denied the NFLPA's Motion to Compel.  Exs. A-

NFLPA-53 & 55.  Petitioners were thus denied the right to confront the lone accuser and gain

access to critical exculpatory evidence in a he-said/she-said proceeding to determine, among other

things, the "credible evidence" that already had been infected by evidence suppression.

The arbitration appeal hearing was held on August 29-31 before Henderson.  Arb. Hr'g

Trs., Ex. C.  In addition to the testimonial revelations from Roberts and Friel recounted above,

Elliott testified categorically, emphatically, and under oath that he is innocent of the allegations of

alleged abuse.  *See e.g.*, Arb. Hr'g Tr. (Aug. 30), Ex. C at 86:4-10.  Further, although there was no

other eye-witness to the alleged incidents besides Elliott and Thompson, Alvarez Jackson was

present in Elliott's apartment during the week of the alleged incidents, and he testified at the

arbitration that he neither saw nor heard any evidence of abusive conduct or learned of any claims

of abuse from Thompson.  *Id.* at 222:1-16.

At the end of the hearing, Henderson announced that he would issue his Award shortly,

which the NFLPA understands to mean this weekend.  Arb. Hr'g Tr. (Aug. 31), Ex. C at 140:18-

23.  The Award already is fatally tainted by a fundamentally unfair arbitration process and if it

sustains any suspension it will inflict immediate and irreparable harm before this Court has an opportunity to rule on the ultimate merits of the Petition. This threat of immediate suspension is imminent.

## **ARGUMENT**

"A plaintiff seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest." *Dickey's Barbecue Pit, Inc. v. Celebrated Affairs Catering, Inc.*, 2017 WL 1079431, at *2 (E.D. Tex. Mar. 22, 2017) (Mazzant, J.) (citing *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008)).

### A.     **Elliott and the NFLPA's Likelihood of Success on their Petition**

To obtain preliminary injunctive relief in the Fifth Circuit, a movant must establish that it has a likelihood of success on the merits of its claims by presenting a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013). This "does not mean Plaintiffs must prove they are entitled to summary judgment." *Dickey's Barbeque*, 2017 WL 1079431, at *2 (citing *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009)). Indeed, "[o]n the 'substantial likelihood of success' element, 'it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Terex Corp. v. Cubex Ltd.*, 2006 WL 3542706, at *2 (N.D. Tex. Dec. 7, 2006).

The Petition, and the arbitral record and exhibits appended thereto, presents Elliott and the NFLPA's case on the merits. The Award will rest upon a patently and fundamentally unfair arbitral process that is contrary to the fundamental fairness required of all arbitral proceedings.

8

*See* FAA § 10(a)(3); *United Paperworkers Int'l v. Misco, Inc.*, 484 U.S. 29, 40 (1987); *Murphy Oil USA, Inc. v. United Steel Workers AFL-CIO Local 8363*, 2009 WL 537222, at *3 (E.D. La. Mar. 4, 2009) (vacating award).[2]  For purposes of the preliminary relief requested here, however, the Court need only find that Petitioners have raised serious and substantial questions that persist with respect to the merits.  *See Terex Corp.*, 2006 WL 3542706, at *2.  Those questions doubtless exist here, where at issue is an arbitration violating the long-standing mandates that a minimum level of procedural fairness be present in every arbitral proceeding.  *See, e.g.*, *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (affirming vacatur of award procured from "fundamentally unfair" arbitration proceedings); *accord Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300–01 (5th Cir. 2004).

An arbitrator's unreasonable restriction of access to evidence, both documentary and testimonial, that is important to the case is a recognized ground for vacatur within the Fifth Circuit and across jurisdictions.  *Karaha Bodas*, 364 F.3d at 300–01 ("It is appropriate to vacate an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing.") (upholding award despite exclusion of evidence because denial of a continuance and additional discovery did not prevent plaintiff from presenting its case).  Indeed, "[a]rbitrators have an affirmative duty to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other side…. [A] failure to discharge this simple duty would constitute a violation of FAA § 10(a)(3), where a party can show prejudice as a result." *Ostrom v. Worldventures Mktg., LLC*, 160 F. Supp. 3d 942, 950 (M.D. La. 2016); *see also ICAP Corporates, LLC v. Drennan*, 2015 WL

---

[2] In reviewing the validity of a labor arbitration award issued in Section 301 (LMRA) cases, courts look to the FAA for guidance.  *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 494 (5th Cir. 2003) (citing *Misco*, 484 U.S. at 41 n.9 ("courts have often looked to the [FAA] for guidance in labor arbitration cases")).

10319308, at *6 (D.N.J. Nov. 18, 2015) ("[P]arties to an arbitration 'must be allowed to present

evidence without unreasonable restriction ... and must be allowed to confront and cross-examine

witnesses ... Where a party to an arbitration does not receive a full and fair hearing on the merits,

a district court will not hesitate to vacate the award.'"); *Tempo Shain Corp. v. Bertek, Inc.*, 120

F.3d 16, 20-21 (2d Cir. 1997) (vacating award where panel "excluded evidence . . . pertinent and

material to the controversy").  Other jurisdictions have specifically identified investigative files as

subject to this affirmative duty.  *E.g. Home Indem. Co. v. Affiliated Food Distribs. Inc.*, 1997 WL

773712, *4 (S.D.N.Y. Dec. 12, 1997).

Applying these principles, there can be no serious dispute that the Petition presents serious

questions, if not a strong likelihood of success, that the underlying arbitration and process were

fundamentally unfair.  Senior NFL executives corrupted the proceedings by concealing from the

NFLPA, Elliott, the Commissioner, and his panel of outside expert advisors, the fact that the NFL's

Director of Investigations—who had personally interviewed every witness in the investigation—

believed that Elliott's accuser was so incredible, and the corroborating evidence so lacking, that

no discipline was appropriate.  It is hard to imagine a more fundamentally unfair and corrupt

disciplinary and arbitral process than one where the opposing party is conspiring to conceal critical

and exculpatory facts.

Further, it was fundamentally unfair to deprive Elliott and the NFLPA of the right to

confront and cross-examine the sole accuser in a proceeding where the Arbitrator assigned them

the burden of proof on the essential issue of whether the discipline was in compliance with the

PCP by being based on "credible evidence."  There was no other eye-witness or direct evidence of

what allegedly happened, so Thompson's testimony was essential, yet Elliott and the NFLPA were

deprived the right of confrontation or even access to the NFL's investigator notes from the six

times the NFL interviewed Thompson. The Arbitrator's express duty under the PCP was to determine if there was a fair and consistent basis for the Commissioner's determination that there was "credible evidence" to support the imposition of discipline against Elliott, but he declined to enable the NFLPA and Elliott to have a fair opportunity to meet their burden of proof on this issue by having the ability to cross-examine the accuser and present the notes of the investigators who interviewed her. Ex. A-NFLPA-55 at 2. The need for access to such evidence was especially critical here, where even Friel—who tried to conceal the exculpatory conclusions of her co-lead investigator Roberts—admitted that some of the accuser's statements and claims of abuse were not credible. Arb. Hr'g Tr, (Aug. 30), Ex. C at 267:1-2 (Thompson has "credibility issues"); Ex. A-NFLPA-45 at 151:22-152:7 (Thompson's claim of abuse on July 22 was incredible).

It was also fundamentally unfair for Henderson to refuse to compel the Commissioner's testimony. The NFL argued to the Arbitrator that he should defer to the Commissioner's fact-finding, but in light of the revelations about Roberts, the only way to determine what facts had been considered by the Commissioner and what facts were concealed was to question the Commissioner himself. Friel's concealment of Roberts' conclusions had tainted the proceedings from the start. If any arbitral record could satisfy the Fifth Circuit's standards for vacating an arbitration on fundamental fairness grounds, it is this one, with a record unprecedented in NFL arbitrations of an affirmative effort by NFL executives to conceal exculpatory evidence and to undermine the integrity of the CBA disciplinary and arbitration processes.[3]

---

[3] Not only did Henderson defy the labor law requirement of fundamental fairness, he defied CBA precedent that players have a right to obtain important testimony and evidence at the arbitration hearing, including from Commissioner Goodell. *See Brady* Decision on Hearing Witnesses and Discovery (June 22, 2015), Ex. F at 2 (ordering live testimony of Ted Wells, who "supervised the investigation and preparation of the Investigative Report that serve[d] as the basis for Mr. Brady's discipline"); *Rice* Order on Discovery and Hearing Witnesses (Oct. 22, 2014), Ex. A-NFLPA-14

### B.      Elliott Will Suffer Irreparable Harm If His Suspension Is Not Enjoined

Elliott unquestionably satisfies the requirement that a party seeking a TRO or preliminary injunction show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate'"; wherever the threatened harm "would impair the [district court's] ability to grant an effective remedy," irreparable harm exists. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Thus, the Fifth Circuit has held that, "where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy." *Id.*

As set forth in the attached declaration of Elliott's agent, Joseph Arceneaux, Jr., the careers of professional football players are short and precarious, providing a limited window in which players have the opportunity to play football in pursuit of individual and team achievements. Arceneaux Decl. ¶ 6. A long line of cases establish that, as a matter of law, depriving professional athletes of the ability to practice and play inflicts irreparable harm. *See, e.g.*, *Brady v. NFL*, 779 F. Supp. 2d 992, 1005 (D. Minn. 2011) ("the threat of harm shown by [football players] here, including lost playing time, constitutes irreparable harm"), *rev'd on other grounds*, 644 F.3d 661 (8th Cir. 2011); *NFLPA v. NFL* ("*Starcaps*"), 598 F. Supp. 2d 971, 982 (D. Minn. 2008)

---

at 2 (exercising "discretion of the hearing officer" to "compel[] the witnesses necessary for the hearing to be fair" and ordering live testimony of all witnesses present for "central issue in the case," including Commissioner Goodell); *Bounty* Pre-Hearing Order No. 4 (Nov. 9, 2012), Ex. G at 1 (ordering live testimony of lead investigator Jeff Miller for "reasonable cross-examination").

("[i]mproper suspensions . . . can undoubtedly result in irreparable harm"); *Prof'l Sports, Ltd. v. Virginia Squires Basketball Club Ltd. P'ship*, 373 F. Supp. 946, 949 (W.D. Tex. 1974).[4]

Elliott stands to miss nearly half of the NFL's sixteen-game regular season and will be prohibited from practicing with his team leading up to the games for which his suspension is in effect. Arceneaux Decl. ¶ 5. Missing any games could deprive Elliott of the ability to achieve individual successes and honors, such as earning a spot in the Pro Bowl for a second consecutive season. Arceneaux Decl. ¶ 8; *see also Starcaps*, 598 F. Supp. 2d at 982 ("a player who has been suspended … is ineligible for post-season awards such as the Pro-Bowl. Those honors carry significant economic and non-economic benefits"). Furthermore, the significant monetary losses that Elliott will suffer due to the six-game suspension cannot be calculated because of the snowball effect on Elliott's reputation, earning potential, and overall market value. Arceneaux Decl. ¶ 10. Indeed, it is very difficult for a professional athlete (or anyone else) to reverse a nationally ingrained perception that the athlete committed domestic abuse. *Id.* ¶ 9. Such damage to Elliott's reputation is not remediable by this Court. *See Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) ("the threat of injury to [employee's] reputation … satisf[ies] irreparable injury" requirement); *Starcaps*, 598 F. Supp. 2d at 982 ("Not only does the player lose playing time, but his reputation may be irretrievably tarnished").

## C.    The Balance of Hardships Favors Issuing the Injunction

In addition to finding irreparable harm to the movant, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *See Winter*, 555 U.S. at 24 (internal citations omitted). Fifth Circuit courts

---

[4] *See also Jackson v. NFL*, 802 F. Supp. 226, 231 (D. Minn. 1992); *Bowman v. NFL*, 402 F. Supp. 754, 756 (D. Minn. 1975); *Haywood v. NBA*, 401 U.S. 1204, 1205 (1971); *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1319 (D. Conn. 1977).

consider whether the "threat of ineffective remedy also outweighs the damage which the injunction might cause." *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 687 (5th Cir. 1980).

If Elliott misses so much as one game, that bell cannot be unrung. But if the Court issues an injunction which merely maintains the status quo until a decision on the Petition can be made, there will be no harm to the NFL even if the Court were to ultimately deny the Petition. The League would simply suspend Elliott at a later time. For example, in the *Starcaps* case, the District of Minnesota enjoined enforcement of an NFL arbitration award upholding suspensions. 598 F. Supp. 2d at 984. The court later decided to confirm the award and the players thereafter served their suspensions with no harm to the NFL. Where, as here, there are serious questions about the propriety of the arbitral process, preliminary injunctive relief can even benefit the NFL because "both the NFLPA and the NFL have an interest in ensuring that the suspensions meted out under the Policy are not tainted by alleged bias and wrongdoing." *Id.* at 983.

Further, the requested injunction will merely maintain the status quo because Elliott was an active member of the Cowboys during the entire year when Roberts was investigating Thompson's accusations. Continuing the status quo a little while longer while the Court decides the Petition will not harm the NFL. On the contrary, one of its members—the Cowboys—will also face irreparable harm if the requested TRO and preliminary injunction is denied. *See Starcaps*, 598 F. Supp. 2d at 982 (teams suffer irreparable harm where players "central to their team's chances of making the playoffs" are prevented from playing); Cohen Decl. ¶ 6; Arceneaux Decl. ¶ 7. The sports media unsurprisingly has predicted that the Cowboys' chances of making the playoffs in 2017 will diminish if Elliott, the starting running back in one of the NFL's elite rushing offenses, is suspended for six games.

### D.     The Injunction Is Aligned with the Public Interest

Finally, when considering the public interest, courts "look[] to the broader ramifications of any potential recovery." *Janvey*, 647 F.3d at 601. "This factor overlaps considerably with [balance of hardships]." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). An injunction to preserve the status quo while the Court reviews the integrity of the arbitral proceedings below will benefit many constituents—including NFL players, fans of the Cowboys and the NFL, and all persons subject to arbitration provisions, among others. For example, forestalling the suspension will avoid devaluation for Cowboys season ticketholders and anguish for Cowboys fans for whom lost games "[are] not compensable monetarily and [are] therefore an irreparable harm." *Starcaps*, 598 F. Supp. 2d at 982.

Moreover, the "public interest easily favors an injunction" where, as here, one is necessary to maintain the status quo between the parties until a determination on the merits is made, and the enjoined party "can be effectively vindicated after a trial on the merits." *Texas*, 809 F.3d at 187 (public interest favored injunction "given the difficulty of restoring the *status quo ante*" if the injunction were not issued); *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997). "As courts have recognized for more than a century, the public interest lies in ensuring that innocent people are not subject to unjust punishment." *Starcaps*, 598 F. Supp. 2d at 983. Accordingly, "[i]f the suspensions at issue are improper," injunctive relief is warranted, as "allowing those suspensions to go forward violates the public interest." *Id.*

### CONCLUSION

For all of the reasons set forth herein, as supported by the accompanying Petition, exhibits, and declarations, the NFLPA respectfully requests that the Court preliminarily enjoin any suspension of Elliott affirmed by the Award until its final ruling on the Petition.

Dated: September 1, 2017

Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Thomas M. Melsheimer*
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com
**Lane M. Webster (*pro hac vice* pending)**
Texas Bar No. 24089042
lwebster@winston.com

2501 N. Harwood Street, 17th Floor
Dallas, TX 75201
(214) 453-6500 – Telephone
(214) 453-6400 – Facsimile

**Jeffrey L. Kessler (*pro hac vice* pending)**
New York Bar No. 1539865
jkessler@winston.com
**David L. Greenspan (*pro hac vice*
pending)**
New York Bar No. 4042099
dgreenspan@winston.com
**Jonathan Amoona (*pro hac vice* pending)**
New York Bar No. 4797338
jamoona@winston.com
**Angela A. Smedley (*pro hac vice* pending)**
New York Bar No. 4942132
asmedley@winston.com
**Isabelle Mercier-Dalphond (*pro hac vice*
pending)**
New York Bar No. 5187604
imercier@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700 – Telephone
(212) 294-4700 – Facsimile

*Counsel for Petitioner National Football
League Players Association and Ezekiel
Elliott*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel has complied with the meet and confer requirement in Local Rule CV-7(h).  Jeffrey L. Kessler, counsel for Petitioner National Football League Players Association and Ezekiel Elliott, conferred with Daniel Nash, counsel for Respondents National Football League and National Football League Management Council, via telephone on September 1, 2017 regarding Petitioner's Emergency Motion for Temporary Restraining Order or Preliminary Injunction.  Counsel for Respondents stated that Respondents opposed the requested relief.  The discussions ended at an impasse, leaving an open issue for the court to resolve.  LR CV-7(i).

/s/ *Thomas M. Melsheimer*
Thomas M. Melsheimer

# EXHIBIT L

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own Behalf and on behalf of EZEKIEL ELLIOTT,** | § § § § § | |
| **Petitioner,** | § § | |
| **v.** | § § | **No. 4:17-CV-00615-ALM** |
| **NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,** | § § § § | |
| **Respondents.** | § | |

## RESPONDENTS' MOTION TO DISMISS AND BRIEF IN SUPPORT

In an improper race to the courthouse, Petitioner National Football League Players Association (the "NFLPA") has defied binding precedent squarely foreclosing its premature suit. This Court lacks jurisdiction and the NFLPA lacks standing to raise the claims or seek the relief set forth in the Petition.

Rather than awaiting the completion of the pending arbitration proceeding and filing a Federal Arbitration Act challenge in "the United States court in and for the district wherein the award was made," 9 U.S.C. § 10—here, the Southern District of New York—the NFLPA asks this Court to restrain a "forthcoming" award. But abundant and consistent Fifth Circuit precedent confirms that federal courts lack power to *vacate* an award that has not yet been "made."

The NFLPA also lacks standing to seek a contingent order preemptively challenging an award that clearly has not yet (and may never) cause it or Ezekiel Elliott any harm. And the

NFLPA's claim is unripe to boot, as even the NFLPA acknowledges that the Arbitrator's forthcoming award *could still afford the NFLPA all the relief it seeks*.

The NFLPA's flagrant evasion of these fundamental jurisdictional limits is apparently founded on the belief that, in a strategic attempt to obtain "first-filed" status, it is free to file a "placeholder" complaint—ostensibly to be pursued if it is dissatisfied with the arbitration award, and simply abandoned if it wins. The NFLPA makes this clear in its application for a TRO: "Although the Court *need not act until the Award is issued*," the NFLPA will "satisfy the requirements for preliminary injunctive relief *should Elliott's appeal be denied.*" (ECF #5, NFLPA Emergency Motion for Temporary Restraining Order or Preliminary Injunction (herein, "TRO Motion") at 1 (emphases added).) In other words, the NFLPA has moved for a TRO while acknowledging that there is not yet any basis to award one. Needless to say, federal court jurisdiction—including the limits set forth in Article III of the U.S. Constitution—is not so easily manipulated. There is no such thing as a placeholder complaint: "Because the district court must have jurisdiction 'at the commencement of the suit,'" "the amendment process [for pleadings] cannot be used to create jurisdiction retroactively where it did not previously exist." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011) (formatting modified; quoting *Aetna Cas. & Sur. Co. v. Hillman*, 796 F.2d 770, 775 (5th Cir. 1986)). Nor can a party "rely on events that unfolded after the filing of the complaint to establish its standing." *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 458 (5th Cir. 2005).

Not only does the NFLPA concede it knows better, it has made precisely this argument in almost identical litigation brought *against* the NFLPA. Late last year, the NFLPA criticized a player for filing a federal lawsuit over his "pending arbitration concerning his potential discipline," arguing that he should have "file[d] a petition to vacate the arbitration decision *after*

it is issued rather than asking a Court to intrude upon an ongoing labor arbitration proceeding."

(Defendant National Football League Players Association's Position Statement [Corrected]

(herein, "NFLPA Position Statement") at 6, *Michael Pennel, Jr. v. NFLPA*, No. 5:16-CV-02889-

JRA (N.D. Ohio Nov. 30, 2016, ECF #8) (emphasis in original).)  The player's lawsuit, the

NFLPA emphasized, asked the federal district court "to prematurely and improperly invade the

labor and arbitral processes for which the NFL and NFLPA bargained."  (*Id.*)  (Of course, filing a

premature lawsuit lacking in subject matter jurisdiction is also a significant waste of the

Court's—and all parties'—time and resources.)

The NFLPA was right the first time.  "After" the award issues—and *if* it sustains Elliott's

suspension in whole or in part—a federal district court with jurisdiction over an action by a party

with standing may consider whether the arbitration award should be vacated, modified, or

confirmed in a new suit filed at that time.  But this Court plainly lacks jurisdiction to adjudicate

this petition to vacate the forthcoming award in *this* suit—regardless of when the award comes

down.  Because Plaintiffs cannot resuscitate jurisdiction based "on events that unfolded after the

filing of the complaint," this Court lacks jurisdiction, the NFLPA lacks standing, and this Court

should immediately dismiss the Petition.

## STATEMENT OF ISSUES FOR DECISION

The issue for decision is whether this Court has subject matter jurisdiction to decide

Petitioner NFLPA's Petition to Vacate.  The NFLPA seeks vacatur of a "forthcoming" arbitration

award that has not yet issued.  This Court lacks subject matter jurisdiction over the hypothetical

award (which is determined as of the commencement of the lawsuit), the NFLPA lacks standing

to seek vacatur of a hypothetical award, and any dispute over the hypothetical award is not ripe.

# BACKGROUND

On August 11, 2017, the NFL Commissioner suspended Elliott for six games for conduct detrimental to the NFL in violation of Article 46 of the parties' collective bargaining agreement ("CBA").  (ECF #1, Petition to Vacate Arbitration Award ("Pet.") ¶ 28.)  Elliott's suspension followed a year-long investigation into domestic violence allegations, which compiled information from twenty-two NFL interviews, reviews of photographic and other documentary evidence from law enforcement authorities, and opinions from two medical examiners, and resulted in the issuance of a 164-page investigative report.  (Pet. ¶¶ 33, 36.)  The Commissioner's disciplinary decision found "substantial and persuasive evidence that [Elliott] engaged in physical violence" against the victim, Tiffany Thompson, on at least three separate occasions.  (*Id.* ¶ 28.)

Elliott appealed pursuant to the CBA's collectively bargained internal grievance process.  (*Id.* ¶ 8.)  By operation of the CBA, the suspension cannot go into effect until that process is complete.  (*Id.* ¶ 28.)  Pursuant to those collectively bargained procedures, the NFL Commissioner appointed a designee, Harold Henderson, to serve as Arbitrator.  (*Id.* ¶¶ 27-28.)  The Arbitrator has authority under the CBA to affirm, reduce, or vacate Elliott's suspension.  (ECF #1-62, (Kessler Decl., Ex. A-NFLPA-58), Art. 46.)  The Arbitrator's appeal decision— known as an award—must be rendered "[a]s soon as practicable."  (*Id.* Art. 46 § 2(d)).  Once issued, that award constitutes "full, final and complete disposition of the dispute" that is "binding" on all parties, as well as the NFL Management Council ("NFLMC") and the NFLPA.  (*Id.*)  No further appeal or process is contemplated or permitted.

The NFLPA's appeal hearing lasted three days, from August 29 through 31.  (Pet. ¶ 68.)  The NFLPA asked the Arbitrator to "overturn [the suspension] because there's no credible evidence."  (ECF #2-13, Kessler Decl, Ex. C, Hearing Tr. (Day 1) at 77.).  In the alternative, the

NFLPA asked the Arbitrator to reduce Elliott's suspension on the grounds that the victim's conduct and behavior provoked Elliott and should be a mitigating factor. (*Id.* at 77-80.) Counsel for the NFLMC argued that the six-game suspension should be affirmed.

On the same day the appeal hearing concluded—but before the Arbitrator issued his award—the NFLPA filed the instant suit seeking to "vacate" the "forthcoming Arbitration Award." (Pet. at 1.)  The following day, the NFLPA filed an application for a Temporary Restraining Order, which clarified that it actually seeks to vacate the forthcoming award only to the extent it loses in arbitration:  "the NFLPA respectfully requests that the Court preliminarily enjoin *any suspension of Elliott affirmed by the Award*[.]"  (TRO Motion at 15 (emphasis added).)  As of the time of this filing, no award has been issued.

## ARGUMENT

## I.   THIS COURT SHOULD DISMISS THE PETITION FOR LACK OF SUBJECT MATTER JURISDICTION

This Court lacks subject matter jurisdiction over this Petition:  no statute provides jurisdiction to review a hypothetical award, the NFLPA lacks standing to seek vacatur of a hypothetical award, and a dispute over the hypothetical award is not ripe.  Accordingly, this Court should dismiss for lack of jurisdiction and failure to state a claim on which relief can be granted.  *See* FED. R. CIV. P. 12(b)(1), (6).

### A.   No Statute Grants Federal Jurisdiction To Review "Forthcoming" Awards.

Neither The Federal Arbitration Act ("FAA"), nor the Labor Management Relations Act ("LMRA"), provides this Court with jurisdiction to review "forthcoming" arbitration awards.

**1.**  The FAA permits parties to vacate arbitration "awards" that have been "made."  9 U.S.C. § 10.  It does not permit parties to file placeholder petitions to vacate "forthcoming," hypothetical awards that do not yet exist.

That commonsense conclusion follows from the FAA's text, which permits district courts to "vacat[e] *the award*" in the district "wherein *the award was made.*" 9 U.S.C. § 10 (emphasis added). Thus, "[b]y its own terms, § 10 authorizes court action only after a final award is made by the arbitrator." *Folse v. Richard Wolf Med. Instruments Corp.*, 56 F.3d 603, 605 (5th Cir. 1995); *see, e.g.*, *Howard v. Volunteers of Am.*, 34 F. App'x 150, 2002 WL 493896, at *1 (5th Cir. Mar. 11, 2002) ("[W]e do not have jurisdiction" to reach merits of § 10 claim "[b]ecause no final award has been issued."); *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980) (district court is "without authority to review the validity of arbitrators' rulings prior to the making of an award"); *Northland Truss Sys., Inc. v. Henning Const. Co., LLC*, 808 F. Supp. 2d 1119, 1123-24 (S.D. Iowa 2011) (same; granting motion to dismiss).

The NFLPA concedes that there is no "final" award here, but rather merely a "forthcoming" one. (*See* Pet. at 1 (defined term "Award" actually refers to "*forthcoming* arbitration award"); *id.* (noting that award "*will be issued* by Arbitrator Harold Henderson imminently"); TRO Motion at 1 ("The NFLPA *expects that* on or before September 5, Arbitrator Harold Henderson *will issue* an arbitral decision (the 'Award') . . . ."); *id.* at 8 ("The Award *will rest* . . . .") (emphases added).) Where, as here, a petitioner concedes that there is "no final award," the FAA provides no relief. *See Folse,* 56 F.3d at 606 ("[O]ur directive in this case is clear: these facts do not permit us to intervene until the parties see this arbitration through to a final award."). And because "the amendment process [for pleadings] cannot be used to create jurisdiction retroactively where it did not previously exist," *Jamison*, 649 F.3d at 328 (quotation marks omitted), the NFLPA cannot cure this fatal jurisdictional defect by attempting to amend after the award issues.

The NFLPA seems to suggest that its petition should survive because it is challenging the forthcoming award on "fairness" grounds.  That argument, too, is squarely foreclosed by binding precedent:  Because "objections to the nature of arbitral proceedings are for the arbitrator to decide in the first instance," any "[f]airness objections should generally be made to the arbitrator subject only to limited post-arbitration judicial review as set forth in section 10 of the FAA." *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 487 (5th Cir. 2002) (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940–41 (4th Cir. 1999)).  Simply put, there is "no authority under the FAA for a court to entertain such [fairness] challenges prior to issuance of the arbitral award." *Id.* at 488.

**2.**  Nor can the NFLPA sidestep the FAA's plain terms by seeking vacatur under Section 301 of the LMRA, 29 U.S.C. § 185 ("LMRA").  The law is clear that "[f]ederal courts *lack jurisdiction* to decide cases alleging violations of a collective bargaining agreement under the Labor Management Relations Act by an employee against his employer unless the employee has exhausted contractual procedures for redress."  *Meredith v. Louisiana Fed'n of Teachers*, 209 F.3d 398, 402 (5th Cir. 2000) (emphasis added; citation omitted).  Where, as here, an arbitration procedure "is the exclusive and final remedy for breach of the collective bargaining agreement, the employee may not sue his employer under § 301 until he has exhausted the procedure." *Daigle v. Gulf State Utilities Co., Local Union No. 2286*, 794 F.2d 974, 977 (5th Cir. 1986).  Such a procedure is not "exhausted" until the arbitration award has become final and complete. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562–63 (1976) ( "Congress has specified . . . that (f)inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes," and that policy can only be effectuated if the grievance procedure "is given full play." (quotations omitted)); *see, e.g., Johnson v. Ceres Gulf,*

*Inc.*, No. 4:13-CV-1851, 2015 WL 1518955, at *2 (S.D. Tex. Mar. 31, 2015) ("It is undisputed

that Johnson did not complete the arbitration procedure pursuant to the CBA and that she has not

exhausted her administrative remedies."). Yet the NFLPA filed this lawsuit despite *admitting*

that it has failed to fully exhaust Article 46's exclusive grievance procedures.

The NFLPA can hardly claim to be unaware of this finality requirement. Barely nine

months ago, the NFLPA criticized a plaintiff who filed an action challenging "the pending

arbitration concerning his potential discipline" on the ground that he was "seek[ing] to stop the

arbitration appeal process in its tracks." (NFLPA Position Statement at 6.) The NFLPA

continued:

> The normal course would be for Plaintiff to file a petition to vacate the arbitration
> decision *after* it is issued rather than asking a Court to intrude upon an ongoing
> labor arbitration proceeding. *** Plaintiff asks this Court to *prematurely and
> improperly invade the labor and arbitral processes for which the NFL and
> NFLPA bargained.*

*Id.* (first emphasis in original). Those words are just as true today as when the NFLPA wrote

them last year. By asking this Court to "intrude upon an ongoing labor arbitration proceeding,"

the NFLPA is now the one improperly invading the parties' collective bargaining agreement—

and flouting Fifth Circuit precedent in the process. This action should be dismissed immediately.

**B.    The NFLPA Lacks Standing To Vacate A Hypothetical Award.**

The NFLPA lacks standing to challenge the forthcoming award regardless. The

Constitution's "cases and controversies" restriction requires any party invoking federal

jurisdiction to demonstrate "standing"—*i.e.*, the "personal interest that must exist at the

*commencement of the litigation.*" *Davis v. FEC*, 554 U.S. 724, 732 (2008) (emphasis added;

quotation omitted); *see Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824) (jurisdiction

"depends upon the state of things at the time of the action brought"). In *Lujan v. Defenders of

Wildlife*, the Supreme Court explained that demonstrating the "irreducible constitutional

minimum of standing" requires a plaintiff to show an "injury in fact" that is "fairly traceable" to the defendant's actions, and that will "likely . . . be redressed by a favorable decision."  504 U.S. 555, 560-61 (1992) (citations and quotation marks omitted).  Moreover, each "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (quotation marks omitted).

Here, the NFLPA brings only one claim and seeks only one form of relief:  vacatur of the forthcoming award under 9 U.S.C. § 10.  (*See* Pet. ¶¶ 85-87 (Prayer for Relief).)  But the NFLPA lacks standing to seek that "form of relief."  Under the parties' CBA, Elliott's suspension is enjoined until after an award is issued.  Until then, the NFLPA and Elliott have suffered no injury whatsoever—never mind one traceable to a phantom award that has yet to be issued.  Nor could any decision of this court "redress" that supposed injury, considering there is no award to vacate. Because the NFLPA lacks standing, its lone claim, and lone request for relief, must be dismissed. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) ("Article III demands that an 'actual controversy' persist throughout all stages of litigation.").

Perhaps recognizing this deficiency, the NFLPA emphasizes that it "expects" the award to issue imminently and therefore "the Court need not act until the award is issued."  (TRO Motion at 1.)  The NFLPA, in other words, has demanded a TRO before there is anything for the Court to enjoin.  But the issuance of the award in the *future* is irrelevant to whether the NFLPA has standing *now*.  Because standing is "determined as of the commencement of the suit," "the party invoking the jurisdiction of the court *cannot rely on events that unfolded after the filing of the complaint to establish its standing*."  *Kitty Hawk*, 418 F.3d at 458 (emphasis added).  As the Fifth Circuit and others have squarely held, alleged injuries that occur for the first time after a complaint was filed simply have no bearing on the standing inquiry.  *See id.* at 459-60 (because

"the contract had not yet been terminated when Kitty Hawk filed this suit and Kitty Hawk had not assumed liability for any back pay," "Kitty Hawk's assumption of the Postal Service's liability for back pay is *not relevant* to the standing analysis" (emphasis added)); *see, e.g.*, *Yamada v. Snipes*, 786 F.3d 1182, 1203, 1203 (9th Cir. 2015) (rejecting plaintiff's argument "that it now has standing" after a change in law because "[s]tanding is determined as of the commencement of litigation" (alteration in original)); *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1101 (10th Cir. 2006) (noting "glaring problem" that alleged injury "could not have occurred until *after* the 'time th[is] action [wa]s brought'" (alterations in original)); *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000) (events occurring after plaintiff filed her original complaint not "relevant on the issue of standing" to seek injunction); *Perry v. Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("It is not enough for Perry to attempt to satisfy the requirements of standing as the case progresses. The requirements of standing must be satisfied from the outset and in this case, they were not.").

Once a final award issues, and *if* it actually affirms Elliott's suspension as the NFLPA "expects," the NFLPA could try again to petition to vacate the award—just as Respondents may petition to confirm it. *See Yamada,* 786 F.3d at 1204 & n.15 ("Nothing we say today . . . precludes [plaintiff] from bringing a future challenge" given plaintiff's argument that it "now has standing."). As a matter of law, however, the NFLPA cannot cure the fatal standing defect that currently exists based on events that post-date its Petition. *See Camsoft Data Sys v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 337 (5th Cir. 2014) ("'Although 28 U.S.C. § 1653 and [Rule] 15(a) allow amendments to cure defective jurisdictional allegations, these rules do not permit the creation of jurisdiction when none existed at the time the original complaint was filed[.]'") (quoting *Arena v. Graybar Elec. Co.*, Inc., 669 F.3d 214, 218 (5th Cir. 2012)).

## C.     The Petition To Vacate A Hypothetical Award Is Not Ripe.

Even if the NFLPA could surmount the foregoing hurdles, its claims are not ripe.  Like standing, "[r]ipeness is a component of subject matter jurisdiction, because a court has no power to decide disputes that are not yet justiciable." *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010); *see Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) (ripeness "overlaps" with standing); *LeClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005) ("Standing and ripeness are two doctrines of justiciability that assure federal courts will only decide Article III cases or controversies.").  Ripeness prevents "'premature' adjudication by distinguishing matters that are 'hypothetical' or 'speculative' from those that are poised for judicial review." *LeClerc*, 419 F.3d at 413–14.

"To determine whether claims are ripe, [courts] evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration." *Lopez*, 617 F.3d at 341.  The NFLPA cannot satisfy either prong.

*First*, the issues before the Court are obviously not yet fit for judicial resolution.  It is well-settled that "[a] court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)).  The NFLPA freely admits that its suit is based on hypothetical events—its position is that the Court will have some role at some unknown time in the future if certain contingent events occur.  The NFLPA "expects" that a decision will come down soon, and further "expects" that it will "prevent Ezekiel Elliott from participating in League games or practices."  (TRO Motion at 1.)  It emphasizes that there is a "threat" of a suspension if the Arbitrator does not rule in its favor.  (*Id.*

at 7-8.)  And it points out that "*if*" Elliott's suspension is sustained by the award, it "will have devastating effects" on the NFLPA and Elliott.  (Pet. ¶ 69.)

Yet during the underlying arbitration proceeding, the NFLPA urged the Arbitrator to "*overturn* [the suspension] because there's no credible evidence."  (ECF #2-13 (Kessler Decl, Ex. C, Hearing Tr. (Day 1) at 77).)  The NFLPA participated in the arbitration and urged the Arbitrator to rule on the evidence before him.   Indeed, the NFLPA argued that the Arbitrator should reduce or vacate Elliott's discipline *based on the very same procedural and "fairness" claims made here.*  (*See, e g.*, ECF #2-13 (Kessler Decl, Ex. C, Hearing Tr. (Day 2) at 364-76).)  The Arbitrator has taken the NFLPA's request for relief under advisement.  Accordingly, it is plainly "hypothetical" and "speculative"—not to mention an utter waste of judicial resources— for this Court to adjudicate whether to vacate a hypothetical award that might still grant the NFLPA the very relief it sought in arbitration.  "If the purported injury is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe for adjudication."  *Lopez*, 617 F.3d at 341–42 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).  That the NFLPA still does not (and cannot) know whether its claims in arbitration will prevail—or whether Elliott's suspension will "occur at all"—confirms that its claims are unripe.  *See Dealer Comp. Servs., Inc. v. Dub Herring Ford*, 547 F.3d 558, 562 (6th Cir. 2008) (holding petition to vacate interlocutory ruling unripe given uncertainty as to anticipated final ruling by arbitration panel, as relief sought was "anchored in future events that may not occur as anticipated, or at all" (quotation omitted)); *Camsoft Data Sys,* 756 F.3d at 336 (no jurisdiction over inventorship dispute before patent issues because "we are unable to establish jurisdiction based on the theory that a disputed pending patent might eventually ripen into a patent controversy that Congress has authorized the federal courts to adjudicate").

*Second*, given that the suspension cannot go into effect until the award issues, the NFLPA and Elliott will suffer no hardship if this Court merely awaits the final award. Indeed, the NFLPA concedes this point. (*See* TRO Motion at 1 (because the award will not inflict harm unless it affirms suspension, "the Court need not act until the Award is issued").) After all, the NFLPA does not truly seek to vacate the award; it seeks to vacate the award *if it loses in arbitration.* Thus, the NFLPA asks the Court to enjoin "any *suspension* of Elliott [that is] *affirmed by the Award*." (TRO Motion at 15; *see also* Pet. ¶ 9 (the NFLPA will file "a motion for a temporary restraining order and preliminary injunction to be decided *before any suspension of Elliott can go into effect*").)

Once the award issues—and *if* it harms the NFLPA and Elliott—they may attempt to seek relief by filing a new action *at that time*. Until then, the NFLPA cannot "graft a provision for interlocutory judicial review onto the otherwise straight-forward regime contemplated by the FAA[.]" *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 748 F.3d 708, 722 (6th Cir. 2014). Saving all judicial review until a final award issues "is consistent with the structure of the [FAA] and with the strong federal policy favoring arbitration as an alternative means of dispute resolution." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 900 (2d Cir. 2015) (quotations omitted). By contrast, the NFLPA's concededly premature filing, which seeks interlocutory relief contingent on the possibility that the Arbitrator does not grant the NFLPA all the relief it seeks, is foreign both to the FAA and LMRA and to the strong federal policies those laws embody.

## CONCLUSION

For the foregoing reasons, the Petition to Vacate should be dismissed.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

 */s/ Eric Gambrell*
Eric Gambrell
egambrell@akingump.com
Texas Bar No. 00790735
*Lead Attorney*
Patrick G. O'Brien
pobrien@akingump.com
Texas Bar No. 24046541
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

Daniel L. Nash
*Pro hac vice* application pending
dnash@akingump.com
Nathan J. Oleson
*Pro hac vice* application pending
noleson@akingump.com
1333 New Hampshire Avenue, NW
Washington, DC  20036
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

ATTORNEYS FOR RESPONDENTS
NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Eric Gambrell*

# EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE | § | |
| PLAYERS ASSOCIATION, on its own | § | |
| behalf and on behalf of EZEKIEL | § | |
| ELLIOTT, | § | |
| | § | **CASE NO. 4:17-cv-00615** |
| Petitioner, | § | |
| | § | **RESPONDENTS' OPPOSITION TO** |
| v. | § | **PETITIONER'S EMERGENCY MOTION** |
| | § | **FOR TEMPORARY RESTRAINING** |
| NATIONAL FOOTBALL LEAGUE and | § | **ORDER OR PRELIMINARY INJUNCTION** |
| NATIONAL FOOTBALL LEAGUE | § | |
| MANAGEMENT COUNCIL, | § | |
| | § | |
| Respondents. | § | |

## INTRODUCTION

Petitioner National Football League Players Association (the "NFLPA") asks this Court to grant a temporary restraining order enjoining something that does not even exist—a "forthcoming" arbitration award. It does so in an effort to beat the National Football League (the "NFL") to the courthouse in a race that has not even begun. Worse still, it does so while *conceding* that there is nothing for the Court to do.

As demonstrated in Respondents' contemporaneously filed Motion to Dismiss, this Court lacks jurisdiction to grant Petitioner's requested relief: no statute allows it, the NFLPA lacks standing to seek it, and the case is unripe in any event. That should be the end of the matter. *See, e.g.*, *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011) (noting that a "district court must have jurisdiction at the commencement of the suit," and jurisdiction cannot be created "retroactively where it did not previously exist").

Even if this court had jurisdiction, the NFLPA fails to make the requisite showing that might warrant the extraordinary remedy of a temporary restraining order. The NFLPA claims

1

that it is likely to succeed in its claim that the underlying proceeding was "fundamentally unfair" in light of certain procedural and evidentiary rulings by the Arbitrator. But this is hardly the first time the NFLPA has made this argument. Courts around the country have consistently and squarely rejected it, along with every other attempt by petitioners to second-guess arbitration decisions upholding NFL player discipline. *See NFLMC v. NFLPA,* 820 F.3d 527, 545-48 (2d Cir. 2016) ("*Brady*") (rejecting NFLPA's "fundamental fairness" arguments regarding evidentiary rulings by NFL arbitrator); *NFLPA v. NFL,* 831 F.3d 985, 998-99 (8th Cir. 2016) ("*Peterson*") (same); *see also*, *e.g.*, *Williams v. NFL*, 495 F. App'x 894, 895-98 (10th Cir. 2012); *Williams v. NFL*, 582 F.3d 863, 883-86 (8th Cir. 2009); *Holmes v. NFL*, 939 F. Supp. 517, 523-25 (N.D. Tex. 1996). These decisions recognize that the NFL and the NFLPA bargained for "final and binding" dispute resolution before an *arbitrator*, not in federal court. They foreclose the extraordinary remedy the NFLPA seeks.

Nor can the NFLPA demonstrate that Ezekiel Elliott will suffer "irreparable" harm, or that the harms weigh in his favor. Any harm is compensable by money damages (lost income), has already occurred (reputational harm), or is purely speculative (whether the Dallas Cowboys will make the playoffs). By contrast, having a federal court decide when Elliott will be able to play is a blatant interference with the parties' collectively bargained grievance process. The parties have agreed to final resolution by the Arbitrator consistent with the strong federal labor policy preference "for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 36 (1987). The NFLPA's collateral attack on that process profoundly affects the competitive integrity of the game and impairs the effective enforcement of the policy against domestic violence. The NFLPA cannot establish *any* of the necessary factors to support injunctive relief.

2

# FACTUAL BACKGROUND

*The NFL's Investigation of Elliott's Alleged Domestic Abuse*.  On July 22, 2016, Tiffany

Thompson reported to the Columbus Police Department that she had been physically abused by

Elliott multiple times over the course of the prior week.  (*See* ECF #1-47, 48 (Ex. A-NFLPA-44

to Decl. of J. Kessler in Support of Petition to Vacate Arbitration Award (hereinafter "Elliott

Report") at 7.)[1]  Thompson had been in a relationship with Elliott for more than a year, during

which he had left Ohio State University and been drafted by the Dallas Cowboys.[2]  (*Id.* at 11-13.)

Although the Columbus City District Attorneys found Thompson's claims to be credible, they

declined to prosecute given the stringent burden of proof in criminal prosecutions.  (*Id.* at 119-20

(Columbus District Attorney told NFL investigators "[w]e generally believed [Thompson] for all

of the incidents").)

The Personal Conduct Policy (the "Policy") places NFL players on notice that they are

subject to a baseline suspension of six games for engaging in acts of domestic or dating violence,

even if "the conduct does not result in a criminal conviction."  (ECF #1-19 (Kessler Decl., Ex. A-

NFLPA-16) at 2, 6-7 (providing that players are subject to discipline if they are found by the

Commissioner to have engaged in "[a]ctual or threatened physical violence against another

person, including dating violence [and] domestic violence")).  The NFL thus promptly opened an

investigation under the Policy as soon as the domestic violence allegations against Elliott came

to light.  (*See* Elliott Report at 7-9.)  The NFL's investigation was led by Lisa Friel, a former

---

[1] Unless otherwise stated, all record citations refer to those exhibits attached to the Declaration of Jeffrey Kessler in Support of the Petition to Vacate Arbitration (ECF #1-2), as recorded on the Court's docket.

[2] During the course of these proceedings, Elliott vehemently denied that he was "dating" Thompson, including in a written statement to the police. (*See, e.g.,* Elliott Report at 95-96.) Instead, he claims that Thompson was simply someone he liked to "party" and "have sex" with, despite evidence that he paid for her automobile and apartment, she became pregnant with his child (which he insisted she have aborted), told her he "love[d]" her and could not "be done with [her]," and demanded that she see him during the week when Thompson was injured. (*Id.* at 11-12, 20, 24-26; ECF #2-13 (Kessler Decl., Ex. C), (hereinafter, "Hearing Tr.") (Day 2) at 90-92, 109-16.)

Chief of the New York City Sex Crimes Prosecutor's office, and was assisted by Kia Roberts, a former New York State prosecutor with experience in domestic violence cases. (ECF #2-13 (Kessler Decl, Ex. C, Hearing Tr. (Day 1)) at 135; *id.* (Day 2) at 260.) During the course of the ensuing investigation, the NFL conducted 22 witness interviews (including multiple interviews of both Thompson and Elliott), reviewed thousands of pages of documents, and considered photographic and other evidence provided by Thompson, Elliott, independent witnesses, and the Columbus City District Attorney's Office. (*See* Elliott Report at 1-7.) The NFL also retained an expert to conduct a forensic review of certain electronic evidence, and two medical experts to opine on photographs of bruises on Thompson's body. (*Id.*)

On June 6, 2017, Friel and Roberts issued a 164-page report exhaustively detailing the investigation's factual findings, including witness interview summaries, the documentary evidence relied upon in completing the report, transcripts of witness interviews, and an analysis by Roberts of certain conflicts between Thompson's interview statements and other evidence. (*See generally* Elliott Report; *see also* ECF #2-13 (Kessler Decl., Ex. C, Hearing Tr. (Day 1) at 142-43 (discussing "Inconsistency Transcripts") (Ex. 99 of Elliott Report)).) After the report was completed, Friel conducted a transcribed interview of Elliott during which she asked him to respond to information developed during the investigation. (*See* ECF #1-49 (Kessler Decl. Ex. A-NFLPA-45).) The June 26 interview of Elliott also was attended by four "independent advisors"[3] retained to assist NFL Commissioner Roger Goodell in evaluating the evidence developed in the report and in their meeting with Elliott and his representatives. (*Id.* at 2, 5-7.)

---

[3] They are: Tonya Lovelace, the CEO of the Women of Color Network; Peter Harvey, the former Attorney General of the State of New Jersey; Ken Houston, a former NFL player and member of the Pro Football Hall of Fame; and Mary Jo White, a former U.S. Attorney and Chair of the Securities and Exchange Commission.

During the investigation, attorneys for the NFLPA and Elliott were asked to provide any information relevant to Elliott's defense. (*See* Elliott Report at 9.) They also were permitted to attend Elliott's witness interviews. (*Id.* at 95, ECF #1-49.) As the investigation neared its conclusion, the NFLPA and Elliott were given copies of the investigative report, its supporting documentation, and the medical experts' reports, and were given a chance to provide written responses. (*See* ECF #1-49 at 10-12, ECF #1-52 (Kessler Decl. Ex. A-NFLPA-48).)

*The Commissioner's Disciplinary Findings.* Article 46 of the collective bargaining agreement ("CBA") negotiated between the NFL and the NFLPA permits the Commissioner to enforce the Policy under his authority to discipline players for conduct found to be "detrimental to the integrity of, or public confidence in, the game of professional football." (*See* ECF #1-62 (Kessler Decl., Ex. A-NFLPA-58), Art. 46, Sec. 1(a).) On August 11, 2017, Elliott was notified of the Commissioner's determination that Elliott had violated the Policy by committing physical violence against Thompson on three occasions during the week of July 16, 2016. (ECF #1-53 (Kessler Decl. Ex. A-NFLPA-49) at 3-5.) The Commissioner based his findings on the extensive information compiled in the 164-page Investigative Report, the transcript of the June 26, 2017 meeting with Elliott, his representatives, and the independent advisors, and the subsequent materials submitted on Elliott's behalf. (*Id.*) The Commissioner specifically noted that he had carefully considered the various arguments raised by Elliott and the NFLPA regarding the evidence, including the credibility of Thompson. (*Id.* at 4.) He also noted that he had consulted independently with the four advisors at Elliott's second interview. (*Id.*) Based on his findings, the Commissioner suspended Elliott for six games. (*Id.* at 5.)

*Elliott's Appeal of the Commissioner's Determination.* Players suspended pursuant to Article 46 are entitled to appeal the Commissioner's determination to the Commissioner or his

designee.  (*See* ECF #1-62, Art. 46, Sec. 2(a).)  Elliott exercised that right on August 15, and the

Commissioner appointed Harold Henderson as Arbitrator.  (ECF #1-54 (Kessler Decl., Ex. A-

NFLPA-54).)

Pursuant to the requirements of Article 46, the NFL provided the NFLPA "copies of any

exhibits upon which [it] intend[ed] to rely" three days prior to the hearing.  (ECF #1-62, Art. 46,

Sec. 2(f)(ii).)  These included many of the same materials previously provided to Elliott and the

NFLPA:  the investigative report; its underlying evidence, including photographs, text messages,

and witness transcripts; Elliott's interview transcript; and the reports drafted by the NFL's

medical experts.  (*See* ECF #2-1-12 (Kessler Decl., Ex. B).)

Elliott's appeal was heard by the Arbitrator over a three-day period, from August 29 to

31.  (*See* ECF #2-13 (Kessler Decl, Ex. C (Hearing Tr. (Days 1-3))).)  Prior to the hearing, the

NFLPA filed a motion to compel the production of certain documents and the in-person

testimony of various witnesses, including Thompson.  (ECF #1-57 (Kessler Decl., Ex. A-

NFLPA-53).)  Following oral argument via conference call, the Arbitrator issued a written

decision granting the motion in part and denying it in part.  (ECF #1-59 (Kessler Decl., Ex. A-

NFLPA-55).)  In particular, the Arbitrator required the testimony of the two investigators

responsible for the investigative report, noted that the NFL had agreed to coordinate the

testimony of its medical experts, and denied the request to compel Thompson's testimony or

documents beyond the specific discovery requirements of the CBA.  (*Id.* at 1-2.)  With respect to

Thompson, the Arbitrator noted that she is not employed by, or subject to the control of the NFL,

and was "not persuaded" that Thompson's testimony was required by the parties' CBA.  Nor did

the Arbitrator believe that it would be "fundamentally unfair" if Thompson did not testify in

person because "[t]he Commissioner's decision in this case was based on affidavits, statements

and interview reports, all of which are available to Mr. Elliott under the procedures of Article 46." (*Id.*)

During the course of the appeal hearing, Elliott called seven witnesses, submitted testimony from others by affidavit, and cross-examined Friel, Roberts, and the NFL's medical expert. (*See* ECF #2-13 (Kessler Decl, Ex. C, Hearing Tr. (Days 1-3)).) The NFLPA and Elliott's attorneys asked the Arbitrator to vacate (or at least reduce) his six-game suspension based on extensive arguments over a wide range of issues during the hearing—including the very evidentiary and fairness arguments that they collaterally raise in their Petition to Vacate. (*Id.*) Elliott's appeal is currently under review by the Arbitrator, who is required to issue a decision "as soon as practicable." (ECF #1-62, Art. 46, Sec. 2(d).) Elliott's suspension will not begin until after the award issues.

## ARGUMENT

The NFLPA's request for a temporary restraining order fails for two reasons: (1) it is premature and otherwise barred by federal labor law; and (2) the NFLPA cannot meet the standard for obtaining extraordinary injunctive relief in any event.

## I.   AS A MATTER OF LAW, A FUTURE ARBITRAL AWARD CANNOT BE ENJOINED

### A.  This Court Lacks Jurisdiction To Award The Requested Relief

This Court cannot grant the NFLPA any relief because it lacks jurisdiction to do so. As explained in detail in Respondents' Motion to Dismiss (which is incorporated by reference here), no statute provides jurisdiction to review a hypothetical award (*see* Mot. at 5-8), the NFLPA lacks standing to seek vacatur of a hypothetical award (*id.* at 8-10), and a dispute over a hypothetical award is not ripe (*id.* at 11-13). That is true regardless of when the award issues, as the NFLPA "cannot rely on events that unfolded after the filing of the complaint to establish" this

Court's jurisdiction. *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 458 (5th Cir. 2005).

Because binding precedent forecloses this Court's jurisdiction to award Petitioner's requested

relief in this premature suit, the NFLPA's motion should be denied on that ground alone.

### B.  A Pending Labor Arbitration Decision Cannot Be Reviewed or Enjoined

The NFLPA's suit runs headlong into another fatal obstacle:  Federal courts are expressly

prohibited from issuing injunctions in labor disputes like this one.  The Norris-LaGuardia Act

("NLGA") divests federal courts of "jurisdiction to issue any restraining order or temporary or

permanent injunction in a case involving or growing out of a labor dispute."  29 U.S.C. § 101;

*see also Local Union No. 733 of the Int'l Bhd. Of Elec. Workers v. Ingalls Shipbuilding Div.,*

*Litton Sys., Inc*., 906 F.2d 149, 152 (5th Cir. 1990) ("The [NLGA] removes, in large part, the

jurisdiction of the federal courts to issue injunctions in labor disputes.").  The NLGA defines

"labor dispute" broadly to include "any controversy concerning terms or conditions of

employment."  *Id*. § 113(c); *see also Brady v. NFL*, 640 F.3d 785, 789 (8th Cir. 2011) ("Congress

wrote the [NLGA] . . . to take the federal courts 'out of the labor injunction business.'") (quoting

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982)).

The NFLPA's request for a temporary restraining order and injunction falls squarely

within that statutory prohibition.  The NFLPA maintains "that Elliott was deprived of his labor

and arbitral law rights to a fundamentally fair" labor arbitration proceeding.  (ECF #1 at 30.)

That alleged deprivation, which unquestionably concerns the terms and conditions of Elliott's

employment, is a "labor dispute" under the NLGA.  *See, e.g.*, *NFLPA v. NFL*, 724 F. Supp. 1027,

1027 (D.D.C. 1989) (NLGA does not permit injunction against NFL's suspension of players);

*Taylor v. Sw. Bell Tel. Co.*, 251 F.3d 735 (8th Cir. 2001) (vacating injunction restraining

arbitration of employee's termination).  The NFLPA makes no attempt to show that this case falls

outside of the NLGA.[4]  This Court is therefore barred from "issu[ing] any restraining order or temporary or permanent injunction." 29 U.S.C. § 101.

## II.   THE NFLPA CANNOT SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER

Even if the NFLPA could somehow overcome these jurisdictional and statutory bars, it has not come close to meeting the burden for seeking the extraordinary remedy of a temporary restraining order:  "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest." *Dickey's Barbeque Pit, Inc. v. Celebrated Affairs Catering, Inc.*, 2017 WL 1079431, at \*2 (E.D. Tex. Mar. 22, 2017) (Mazzant, J.) (citing *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008)).  The Fifth Circuit "has repeatedly cautioned that 'a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on *all four* requirements.'" *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (quoting *Tex. Med. Providers Performing Abortion Serv. v. Lackey*, 667 F.3d 570, 574 (5th Cir. 2012) (emphasis added)).  The NFLPA cannot carry its burden as to any of them.

### A.   The NFLPA Cannot Succeed On The Merits

"An 'absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law.'" *Tex. Med. Providers*,

---

[4] The NFLPA has not alleged that this case falls within the narrow "unlawful acts" exception to the NLGA's broad prohibition on injunctive relief.  29 U.S.C. § 107 (providing for an exception only upon a showing that, *inter alia*, "unlawful acts have been threatened"); *see also Boys Mkts., Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970) (permitting injunction of a strike so long as employer has agreed to arbitrate the dispute).

667 F.3d at 574 (quoting *Lake Charles Diesel, Inc v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th

Cir. 2003)).  That absence of likely success on the merits is fatal to the NFLPA's motion.

  "[J]udicial review of an arbitration award arising from the terms of a CBA is narrowly

limited."  *Albemarle Corp. v. United Steel Workers*, 703 F.3d 821, (5th Cir. 2013) (internal

quotation marks and citation omitted).  "'As long as the arbitrator is even arguably construing or

applying the contract and acting within the scope of his authority, that a court is convinced he

committed serious error does not suffice to overturn his decision.'"  *Id.* (quoting *Misco*, 484 U.S.

at 38).  "If the arbitrator acted within the ambit of his authority," then "the arbitrator's

construction and award must be affirmed no matter how 'good, bad, or ugly.'"  *United Steel v.

Delek Ref., Ltd.*, 575 F. App'x 330, 333 (5th Cir. 2014) (quoting *Oxford Health Plans LLC v.

Sutter*, 133 S. Ct. 2064, 2071 (2013)); *see also Brady*, 820 F.3d at 536.  Settled precedent makes

clear that federal district courts "'have no business weighing the merits of the grievance [or]

considering whether there is equity in a particular claim.'"  *Major League Baseball Players

Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Misco*, 484 U.S. at 37 (quoting *Steelworkers

v. American Mfg. Co.*, 363 U.S. 564, 568 (1960))).  Likewise, any procedural rulings "which

grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *Misco*,

484 U.S. at 40.  Accordingly, under the LMRA, an award will only be set aside where the

arbitrator "dispensed his own brand of industrial justice."  *See Int'l Chem. Workers Union v.

Columbian Chems. Co.*, 331 F.3d 491, 495 (5th Cir. 2003); *Holmes*, 939 F. Supp. at 524.

  The NFLPA makes two arguments for why the forthcoming award is "fundamentally

unfair," but neither comes close to satisfying this "narrowly limited" standard of review.

  *First*, the NFLPA repeats the same argument it made in arbitration to support overturning

or reducing Elliott's suspension:  that suspending Elliott would be unfair because the concerns

expressed by Roberts about Thompson's credibility and the sufficiency of the evidence were "conceal[ed] from the NFLPA, Elliott, the Commissioner, and his panel of outside expert advisors." (ECF #5 at 10). That claim, which remains under review by the Arbitrator, is wrong as a factual matter because all of the evidence underlying Roberts' concerns was specifically included in the investigative report and the Commissioner was specifically informed of Roberts' concerns. (*See, e.g.*, Elliott Report, Ex. 99; Hearing Tr. (Day 1) at 142-43, 249-50; *id.* (Day 2) at 266-67, 301-02, 320-24, 336-39.) His subsequent determination, made after *additional* evidence was developed in the record, and after which he had the opportunity to receive other expert opinions from the advisors, thus fell within his disciplinary authority.

In fact, the parties agreed in the CBA that only the Commissioner has authority to decide whether a violation has occurred. Nothing in the CBA requires the Commissioner (or, for that matter, the Arbitrator) to defer to the opinion of a member of his staff, particularly after he has received additional evidence and other expert opinions. *See NFLPA v. NFLMC* (2016) (Marks, Arb.), attached as Exhibit A to the Declaration of Eric Gambrell at 30-40 (holding that under Article 46, only the Commissioner is authorized to decide whether a player has engaged in conduct detrimental to the NFL, and that decision may not be delegated to a member of his staff). Thus, the NFLPA's argument also fails as a matter of law because there "simply is no fundamental unfairness in affording the parties precisely what they agreed on." *Brady*, 820 F.3d at 547; *see also Peterson*, 831 F.3d at 999 (the NFLPA cannot "identify any structural unfairness in the Article 46 arbitration process for which it bargained").[5]

---

[5] This case is therefore nothing like *Gulf Coast Industrial Workers Union v. Exxon Co., USA*, 70 F.3d 847 (5th Cir. 1995), relied upon by the NFLPA, where a labor arbitration award was vacated because of arbitrator misconduct. In *Exxon*, the arbitrator expressly told the employer at the hearing that evidence critical to the dispute—the record of a terminated employee's positive drug test—had been admitted as a business record, but then refused to consider the test results in ordering that the employee be reinstated. *Id.* at 848-50. Here, there is no

*Second*, the NFLPA also argues that the Arbitrator should have compelled the NFL to produce Thompson at the hearing, or compelled the testimony of the Commissioner.  But both are "procedural questions that arise during arbitration . . . [that] are left to the sound discretion of the arbitrator and should not be second-guessed by the courts."  *Brady,* 820 F.3d at 545 (citing *Misco*, 484 U.S. at 40); *see also Columbian Chems. Co.*, 331 F.3d at 491 (refusal of arbitrator to approve subpoena of documents "did not yield a fundamentally unfair hearing under the LMRA").  The CBA does not require the testimony of any witnesses in an Article 46 hearing, let alone the testimony of every witness the parties ask to present.  Instead, the parties agreed in collective bargaining to leave the determination of what testimony is appropriate to the sound discretion of the Arbitrator.  His decision not to compel Thompson's testimony was plainly grounded in the CBA and cannot provide a basis to vacate his final award.

Indeed, in *Holmes*, the federal district court rejected this very "right to confront" argument, holding that the procedure chosen by the arbitrator (NFL Commissioner Paul Tagliabue)—in which a suspended player was denied the opportunity to, *inter alia*, cross-examine witnesses—"in effect, was a construction of what the . . . CBA required."  939 F. Supp. at 524 (citing *Misco*, 484 U.S. at 39).  The court went on to explain:

> If an arbitrator's procedural error is "not in bad faith or so gross as to amount to affirmative misconduct," it will not warrant judicial intervention.  Indeed, the "instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct" are "very rare."

*Id.* at 524-25 (quoting *Misco*, 484 U.S. at 40); *see also Brady,* 820 F.3d at 545-47 (holding failure to compel production of investigative notes and testimony of NFL General Counsel regarding role in preparation of investigative report did not constitute "fundamental unfairness").

---

allegation or evidence that the NFLPA was misled by the Arbitrator—or anyone else—concerning the evidence considered by the Commissioner or that is before the Arbitrator.

"Had the [NFLPA and NFL] wished to allow for more expansive discovery, they could have bargained for that right." *Brady*, 820 F.3d at 547. But "[t]hey did not, and there is simply no fundamental unfairness in affording the parties precisely what they agreed on." *Id.*[6] Elliott and the NFLPA were fully informed of the claims against Elliott, given voluminous evidence (including transcripts and summaries of Thompson's statements to the NFL) to support the claims, and afforded a full and fair opportunity to respond. Nothing more is required.[7]

### B.    Neither Elliott Nor the NFLPA Will Suffer Irreparable Harm.

The NFLPA also fails to demonstrate that Elliott is "likely to suffer irreparable harm in the absence of preliminary relief." *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016) (Mazzant, J.) (internal quotation marks and citation omitted). "Harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* (internal quotation marks and citation omitted). "An injunction is appropriate only if the anticipated injury is imminent and not speculative." *Id.* (citation omitted).

The NFLPA's primary complaint is that Elliott's suspension will cause him to miss work and cost him current and future earnings. (ECF #5-1 ¶¶ 5-8, 10.). But missing work is a quintessential economic harm that does *not* constitute irreparable harm. *See Sampson v. Murray*,

---

[6] Other labor arbitration cases are in accord. "'[A]rbitral factfinding is generally not equivalent to judicial factfinding … the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath are often severely limited or unavailable.'" *Gonzalez v. S. Pac. Transp. Co.*, 773 F.2d 637, 643-44 (5th Cir. 1985) (quoting *McDonald v. City of W. Branch*, 466 U.S. 284, 291 (1984)). "A party [to a labor arbitration] does not have an absolute right to cross-examination." *Sunshine Min. Co. v. United Steelworkers of Am., AFL-CIO*, 823 F.2d 1289, 1295 (9th Cir. 1987). Instead, an employee "receive[s] industrial due process" if he has a "notice of the grievances against [him] and an opportunity to be heard." *Teamsters*, 735 F.2d at 906.

[7] The NFLPA's reliance on *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300–01 (5th Cir. 2004), as support for its argument that "[a]n arbitrator's unreasonable restriction of access to evidence, both documentary and testimonial, that is important to the case is a recognized ground for vacatur within the Fifth Circuit" (ECF #5 at 9) is completely misplaced. *Karaha Bodas* involved a foreign arbitration award governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards and thus has nothing to do with review of labor arbitration awards under the LMRA. *See* 364 F.3d at 281. In any event, as the NFLPA concedes, in *Karaha Bodas*, the foreign award was affirmed notwithstanding the arbitrator's restrictions on discovery. *Id.* at 302.

415 U.S. 61, 90 (1974) ("[T]emporary loss of income . . . does not usually constitute irreparable injury."). The same rule applies to professional athletes; under labor law, there is no "satisfactory basis for distinguishing football players from other organized workers." *Brown v. Pro Football, Inc.,* 518 U.S. 231, 249-50 (1996).

The NFLPA also alleges Elliott will be subject to reputational harm because it is difficult "to reverse a nationally ingrained perception that the athlete committed domestic abuse." (ECF #5 at 13). Reputational damage, however, generally does not constitute "irreparable" harm. *See, e.g.*, *Sampson*, 415 U.S. at 91-92. Nor does the NFLPA explain how an injunction will change the perception. To the extent Elliott has suffered reputational harm, that harm is due to his own actions, including the well-publicized actions that led Thompson to call the Columbus Police Department. The public's perception of Elliott will not change based on entry of a temporary restraining order related to an Arbitrator's evidentiary rulings. The NFLPA's concerns about reputational harm ring especially hollow given the avalanche of publicity the *NFLPA engendered* by filing the damning details of Elliott's misconduct on a public docket.[8]

Finally, the NFLPA's contentions that Elliott's absence will prevent the Dallas Cowboys from making the Super Bowl and Elliott from winning a rushing title are purely speculative. Those milestones are extraordinarily difficult to achieve regardless of whether Elliott plays. Such speculative harm cannot satisfy the NFLPA's burden. *See, e.g.*, *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987) ("speculative injury does not constitute a showing of irreparable harm"); *Nat'l Football League Players Ass'n v. Nat'l Football League*, 724 F. Supp. 1027, 1028 (D.D.C. 1989) (alleged damage to "players' skills, reputations, and professional careers" as a result of steroid suspensions do not constitute irreparable harm).

---

[8] *See, e.g.*, https://sportsday.dallasnews.com/dallas-cowboys/cowboys/2017/09/01/sex-drugs-abortion-ezekiel-elliotts-defense-might-make-look-worse.

### C.    The Remaining Factors Do Not Support an Injunction

The NFLPA also fails to establish that the balance of hardships and public interest favor entry of a temporary restraining order.  The harm that Elliott may suffer if the suspension is not enjoined, as noted above, is either compensable or speculative.  By contrast, an injunction will significantly harm the NFL and national labor policy.  It is the "decided preference" of federal labor policy "for private settlement of labor disputes without the intervention of government." *Misco,* 484 U.S. at 36; *see also* 29 U.S.C. § 173(d).  Here, the NFL and the NFLPA have bargained for an internal grievance process with streamlined appeal procedures that produce a "full, final, and complete disposition of the dispute . . . ." (ECF #No. 1-62 (Kessler Decl., Ex. A-NFLPA-58), Art. 46, Sec. 2(d).)  An injunction would eviscerate these agreed-to procedures, frustrate the NFL's ability to efficiently and effectively enforce the Policy, and impact the competitive landscape as the courts, rather than the NFL itself, would dictate League personnel decisions.  It also would undermine the strong public policy in favor of the "private settlement of labor disputes." *Misco,* 484 U.S. at 36.

Finally, to the extent it can be said that there is a public interest in a particular player's participation in six of his team's games, that hardly outweighs the public's interest in the prevention of domestic violence and violence against women.

### CONCLUSION

For the foregoing reasons, and those stated in the accompanying Motion to Dismiss, the NFLPA's motion for a temporary restraining order should be denied.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

_ /s/ Eric Gambrell_____
Eric Gambrell
egambrell@akingump.com
Texas Bar No. 00790735
*Lead Attorney*
Patrick G. O'Brien
pobrien@akingump.com
Texas Bar No. 24046541
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

Daniel L. Nash
*Pro hac vice* application pending
dnash@akingump.com
Nathan J. Oleson
*Pro hac vice* application pending
noleson@akingump.com
1333 New Hampshire Avenue, NW
Washington, DC  20036
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

ATTORNEYS FOR RESPONDENTS NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Eric Gambrell*_____

# EXHIBIT N

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of EZEKIEL ELLIOTT, | § § § § | |
| Petitioner, | § § | CASE NO. 4:17-cv-00615 |
| v. | § § | |
| NATIONAL FOOTBALL LEAGUE and NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL, | § § § § § | PETITIONERS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION |
| Respondents. | | |

In its Opposition to Petitioners' Emergency Motion for Temporary Restraining Order or Preliminary Injunction ("Opposition"), the NFL declines to engage Petitioners' showing that, in an arbitration entirely about credibility and the existence of "credible evidence," it was fundamentally unfair to deny Elliott essential witnesses and documents. Instead, the NFL principally and predictably tells the Court it is powerless to act. Each of the NFL's arguments about jurisdiction, ripeness, standing and the Norris-LaGuardia Act ("NLGA") is incorrect. And, as we will show at the hearing, Elliott meets the four elements for preliminary injunctive relief.

## ARGUMENT

### A.  The Court Has Jurisdiction, Petitioners Have Standing, and Their Claim is Ripe

Section 301 of the Labor Management Relations Act ("LMRA") provides this Court with subject-matter jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization . . . in any district," such as this one, "in which its duly authorized officers or agents are engaged in representing or acting for employee members." 29 U.S.C.A. § 185(a), (c). The NFL's Opposition ignores the critical point that the arbitral process at issue *already* violates both labor law and the NFL-NFLPA CBA and therefore vests jurisdiction in this Court under Section 301 of the LMRA. Indeed: *there are no more arbitral proceedings left to exhaust*.

The NFL rests its principal response on the Federal Arbitration Act ("FAA"), but these arguments can be dismissed out of hand because the LMRA—not the FAA—supplies the jurisdictional basis for this case. As the NFL has previously and repeatedly argued: "§ 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, [] governs disputes pursuant to collectively-bargained agreements." NFL Def.'s Ltr. Resp. at 1 & n.1, *Johnson v. NFLPA et al.*, No. 17-cv-5131-RJS (S.D.N.Y. filed Aug 22, 2017), ECF No. 94 (arguing it was improper for petitioner to seek vacatur under the FAA). LMRA courts look to FAA cases for guidance on

1

whether to vacate a labor award, but it is the LMRA that confers jurisdiction.

As for the NFL's LMRA authorities, they stand for the principle that federal courts should not rule on issues regarding ongoing labor arbitration proceedings until the plaintiffs have exhausted their arbitral remedies. The Petition here does not do otherwise. The arbitral record is closed and the NFL does not identify anything that is left for the NFLPA or Elliott to do in the arbitration.[1] Where a plaintiff follows "the CBA procedure [for] filing a grievance . . . and appealing that decision to arbitration," a court may conclude that the plaintiff "has exhausted all . . . administrative remedies under the CBA." *Frost v. Harper*, 2001 WL 34063534, at *3 (S.D. Tex. Nov. 23, 2001); *see also* S*cott v. Anchor Motor Freight, Inc.*, 496 F.2d 276, 279 (6th Cir. 1974); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163 (1983) (plaintiff must "attempt to exhaust any grievance or arbitration remedies provided in [a] collective bargaining agreement" before seeking relief in federal court).

The NFL's position here would eviscerate the Court's authority to issue equitable relief. The Award will take immediate effect and cause (additional) irreparable harm to Elliott. If the NFLPA and Elliott were forced to wait for the Award to be rendered before filing the Petition, no court would have the opportunity to stop Elliott's unlawful suspension in its tracks. Needless to say, a litigant who faces an imminent threat of irreparable harm need not wait until he is injured to file a lawsuit—preempting such harm is the very essence of requests for preliminary injunctive relief. For example, in *Lujan v. Defenders of Wildlife*, cited by the NFL, the Supreme Court found that "injury in fact" giving rise to jurisdiction may be "actual *or imminent*." 504 U.S. 555, 560 (1992). Injunctions are issued when the bulldozer is on the front lawn—not after it has razed the

---

[1] In contrast, for example, in the *Pennell* matter referred to in the NFL's Motion to Dismiss, the petitioner sought to enjoin *the arbitration itself*.

house.  That Arbitrator Henderson could theoretically vacate the discipline simply means that the ongoing harm to Elliott's reputation might stop and Petitioners would no longer seek a TRO. Indeed, Arbitrator Henderson has now advised the parties that he intends to issue his decision by the close of business today.  The NFL's attempt to prevent Petitioners from enjoining the immediate harm that would ensue if Henderson affirms the suspension is without legal merit.

The NFL's "standing" argument fails for similar reasons.  The NFL argues that Elliott does not satisfy the standing requirement of "injury in fact" and a "personal interest that must exist at the commencement of the litigation."  Motion to Dismiss at 8.  But at the time he filed the Petition, Elliott's labor law and CBA rights to a fundamentally fair arbitration had already been breached, he had already suffered reputational harm, and the threat of a suspension was imminent.

The NFL's argument that Elliott's claims also are not ripe because the Award is "speculative" or "hypothetical" is yet another misstatement.  There is nothing "speculative" about Elliott's vacatur claim—it is based on the lack of fundamental fairness in an arbitration proceeding that is complete and in a record presently before the Court.  No aspect of Petitioners' arguments about the unfairness of the proceedings hinge on the outcome of the Award.

Importantly, in conducting a ripeness review, courts balance "the hardship of withholding decision and the fitness of the case for judicial resolution," bearing in mind that ripeness "'is informed by additional circumstances that awaiting [further development of the case] may mitigate if not cure.'" *Roman Catholic Diocese of Dallas v. Sebelius*, 927 F. Supp. 2d 406, 423-424 (N.D. Tex. 2013) (quoting *Brooklyn Union Gas Co. v. FERC*, 190 F.3d 369, 373 (5th Cir. 1999) (alteration in original).  "Since ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the [initial filing] that must govern."  *Id.* at 424 (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)).  This case is ripe for judicial

intervention, and without it, Elliott will suffer the additional irreparable harm of missed practices and games before he has even a chance to exercise his LMRA rights.

### B. The NLGA Does Not Preclude a TRO

Although one would not know it from the NFL's Opposition, the NLGA does not bar injunctive relief in *all* "labor dispute[s]"; the NLGA simply prohibits injunctive relief that is "contrary to the public policy declared in [the NLGA]," which was passed primarily to protect organized activities of workers from court injunctions and concerns itself "primarily . . . with injunctions against strikes." 29 U.S.C. § 101; *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 437 (1987). Accordingly, both the Supreme Court and the Fifth Circuit have held that the Act's prohibition against injunctions is inapplicable where the relief requested would not operate to enjoin a strike or other peaceful, concerted labor activity. *See, e.g.*, *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 253 (1970) (holding that a federal court may enjoin the breach of a collective bargaining agreement to preserve the arbitration process under the contract despite the NLGA); *Jacksonville Maritime Ass'n v. Int'l Longshoremen's Ass'n*, 571 F.2d 319 (5th Cir. 1978). Here, Petitioners seek injunctive relief to enforce—not undermine—the CBA, relief which is consistent with the NLGA. *See Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 454 (1957) ("If [parties] can break [labor] agreements with relative impunity, then such agreements do not tend to stabilize industrial relations."); *Dist. Lodge 26 of Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 610 F.3d 44, 55 (2d Cir. 2010).

Indeed, as the NFL knows, there are a number of cases holding that the NLGA does not prevent injunctive relief against sports leagues enforcing illegal conduct against particular players. *See, e.g.*, *Mackey v. NFL*, 543 F.2d 606, 623 (8th Cir. 1976) (affirming injunction against the NFL's antitrust violations notwithstanding the NLGA); *Jackson v. NFL*, 802 F. Supp. 226, 234-35 (D. Minn. 1992) (holding NLGA did not apply at all or, alternatively, relief could still issue

4

based on the League's non-violent antitrust violation and the traditional factors for determining

equitable relief); *Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F. Supp. 1049 (C.D. Cal. 1971)

(enjoining NBA from enforcing an illegal bylaw), *reinstated by Haywood v. Nat'l Basketball

Ass'n*, 401 U.S. 1204 (1971).  This issue was most recently addressed in *Starcaps*, where the

District of Minnesota held that the NLGA is "not a blanket prohibition on any injunction in a labor

case" and does not preclude an injunction "against the suspensions of particular players whose

arbitration awards, according to the NFLPA, are tainted by the NFL's conduct." *NFLPA v. NFL

("Starcaps")*, 598 F. Supp. 2d 971, 978 (D. Minn. 2008).  Nor was the "illegal acts" test invoked

by the NFL held relevant to the court's determination in this context. *See id.* at 983.

### C.  Petitioners Satisfy the Elements for Preliminary Injunctive Relief

Petitioners will respond at the hearing to the NFL's limited arguments concerning the

merits of the TRO Motion.  We note now, however, that *Brady* and *Peterson* (in which district

courts initially vacated arbitration decisions) principally concerned notice issues not present here

and involved the deprivation of witnesses or evidence which the appeals court found to be merely

collateral.  As for *Holmes v. NFL*, it concerned a player's appeal under a drug policy *not* subject

to the "credible evidence" standard set forth in Commissioner Goodell's Personal Conduct Policy

and at the heart of the proceedings below.  Nor did *Holmes* concern the present situation in which

the player was denied his right to know Goodell's basis for discipline (*i.e.*, was Goodell informed

that his Director of Investigations believed there was no such basis?) or a he-said/she-dispute in

which the player was denied the right to cross-examine his accuser and to exculpatory witness

statements.  In short, the *Holmes* court's conclusion that the player was not denied evidence that

could have made a difference on the merits of his appeal has no application here.

Dated: September 5, 2017

Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Thomas M. Melsheimer*
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com
**Lane M. Webster (*pro hac vice* pending)**
Texas Bar No. 24089042
lwebster@winston.com

2501 N. Harwood Street, 17th Floor
Dallas, TX 75201
(214) 453-6500 – Telephone
(214) 453-6400 – Facsimile

**Jeffrey L. Kessler (*pro hac vice* pending)**
New York Bar No. 1539865
jkessler@winston.com
**David L. Greenspan (*pro hac vice* pending)**
New York Bar No. 4042099
dgreenspan@winston.com
**Jonathan Amoona (*pro hac vice* pending)**
New York Bar No. 4797338
jamoona@winston.com
**Angela A. Smedley (*pro hac vice* pending)**
New York Bar No. 4942132
asmedley@winston.com
**Isabelle Mercier-Dalphond (*pro hac vice* pending)**
New York Bar No. 5187604
imercier@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700 – Telephone
(212) 294-4700 – Facsimile

*Counsel for Petitioners National Football League Players Association and Ezekiel Elliott*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).

/s/ *Thomas M. Melsheimer*
Thomas M. Melsheimer

# EXHIBIT O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **NATIONAL FOOTBALL LEAGUE** | § | |
| **PLAYERS ASSOCIATION, on its own** | § | |
| **behalf and on behalf of EZEKIEL** | § | |
| **ELLIOTT,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| v. | § | **CASE NO. 4:17-cv-00615-ALM** |
| | § | |
| **NATIONAL FOOTBALL LEAGUE and** | § | |
| **NATIONAL FOOTBALL LEAGUE** | § | |
| **MANAGEMENT COUNCIL,** | § | |
| | § | |
| **Respondents.** | § | |

## RESPONDENTS' EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL

Respondents National Football League and National Football League Management Council have exercised their right to appeal this Court's September 8, 2017 Memorandum Opinion and Order granting Petitioner National Football League Players Association's ("NFLPA's") Motion for Temporary Restraining Order and Preliminary Injunction (the "PI Order"). Respondents respectfully request that the Court enter a stay of the PI Order pending Respondents' appeal. *See* FED. R. CIV. P. 62(c) ("While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.").

A court may suspend an injunction pending appeal if Respondents can demonstrate: (1) a likelihood of success on the merits on appeal; (2) a likelihood the applicant will be irreparably injured absent a stay; (3) that issuance of a stay will not substantially injure the other parties; and (4) that the stay is in the public interest. *See Planned Parenthood of Greater Tex. Surgical*

*Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (motion to stay injunction granted in part)*; Smith & Nephew, Inc. v. Arthrex, Inc.*, No. 2:07-cv-0335-TJW-CE, 2010 WL 2522428 (E.D. Tex. June 18, 2010) (motion to stay injunction granted).

Importantly, the Court need not repudiate its earlier determinations in the PI Order in order to stay the injunction pending appeal; "instead, the [stay] movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). Because Rule 8 of the Federal Rules of Appellate Procedure contemplates that parties must seek an injunction pending appeal from the district court before seeking similar relief from the court of appeals, "[p]rior recourse to the initial decisionmaker before seeking an injunction pending appeal would hardly be required as a general matter if [a district court] could properly grant interim relief only on a prediction that it has rendered an erroneous decision." *Washington Metropolitan Area Transit Com. v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977) (stay appropriate when court has ruled on "difficult legal question and when the equities of the case suggest that the status quo should be maintained"); *see also Protect Our Water v. Flowers*, 377 F. Supp. 2d 882, 884 (E.D. Cal. 2004) ("Several courts have observed that the 'success on the merits factor cannot be rigidly applied,' because if it were, an injunction would seldom, if ever, be granted 'because the district court would have to conclude that it was probably incorrect in its determination on the merits.'" (quotation omitted)).

Respondents have presented a substantial case on the merits here. Although the Court previously concluded "that the NFLPA demonstrated a substantial likelihood of success on the merits," PI Order at 19, it did so only after resolving a series of contested legal issues in Petitioner's favor—including contested questions going to the power of this Court to grant *any*

relief to Petitioner.  For example, this Court held that Petitioner met its burden of proving that it exhausted (or was excused from exhausting) its administrative remedies—even though Petitioner had not "support[ed] [its] theory of exhaustion with any case law."  PI Order at 9.  Exhaustion aside, Petitioner filed suit before the Arbitrator rendered a decision despite the extensive authority holding that no action "will lie" under Section 301 of the LMRA unless there is a "final and binding" Award to review.  *Gen. Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 520 (1963); *see, e.g., Orion Pictures Corp. v. Writers Guild of Am., W., Inc.*, 946 F.2d 722, 724 (9th Cir. 1991) ("Generally a district court may review an arbitrator's rulings pursuant to section 301 of the LMRA only after there is a final award.").  And this Court explicitly declined to rule on the NFL's motion to dismiss arguments on the ground that they were "not ripe."  PI Order at 5 n.3.  But if this Court (or the Fifth Circuit) were to conclude that this case was properly subject to dismissal, the preliminary injunction would be dissolved as well.

The NFL also presented serious and substantial questions on the merits.  Given the strong federal policy in favor of arbitration, review of labor arbitration awards is "extremely limited," *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 507 (2001), and is in fact "among the narrowest known to the law."  *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978) (per curiam) (quotation omitted).  For example, although this Court "view[ed]" certain evidentiary decisions by the Arbitrator to be "gross errors resulting in a fundamentally unfair hearing," PI Order 18, there is a substantial question regarding whether the Fifth Circuit, on *de novo* review, will agree.  A court's view of a "gross error" is not a ground for vacatur:  "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," "that a court is convinced [the Arbitrator] committed serious error does *not*

suffice to overturn his decision." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (emphasis added). That is because "it is the *arbitrator's* view of the facts and of the meaning of the contract that [the parties] have agreed to accept." *Id.* at 37–38 (emphasis added).

Beyond likelihood of success, the other factors strongly weigh in favor of maintaining the status quo. The NFL and the NFLPA have bargained for an internal grievance process with streamlined appeal procedures that produce a "full, final, and complete disposition of the dispute." (ECF No. 1-62 (Kessler Decl., Ex. A-NFLPA-58), Art. 46, Sec. 2(d).) The PI Order directly interferes with those agreed-to procedures, frustrates the NFL's ability to efficiently and effectively administer the CBA, and impacts the competitive landscape of the NFL every week a properly suspended player suits up. In contrast, no "irreparable" harm is likely to befall Elliott, who can recoup any lost money in the unlikely event his suspension is permanently enjoined. *See Nat'l Football League Players Ass'n v. Nat'l Football League*, 724 F. Supp. 1027, 1028 (D.D.C. 1989) (alleged damage to "players' skills, reputations, and professional careers" as a result of steroid suspensions do not constitute irreparable harm).

Finally, the public interest supports a stay of the injunction pending appeal. It is the "decided preference" of federal labor policy "for private settlement of labor disputes without the intervention of government." *Misco,* 484 U.S. at 36, 37; *see also* 29 U.S.C. § 173(d). Enjoining the proper working of those systems undoubtedly frustrates that policy. *Misco,* 484 U.S. at 36. The NFL and public also have a strong interest in preventing domestic violence and in ensuring that those who engage in such behavior face timely and proportionate consequences for their actions.

Although Respondents believe that a stay is warranted, to the extent that this Court is disinclined to grant Respondents their requested relief, Respondents respectfully request that this Court dispose of the instant motion immediately, without waiting for the Petitioner to file a responsive brief, so that Respondents can pursue expedited relief in the Fifth Circuit.  *See* FED. R. APP. P. 8(a)(1)(C) ("A party must ordinarily move first in the district court for . . . an order suspending, . . . an injunction while an appeal is pending.").  Absent an order from this Court granting a stay, Respondents intend to seek a stay from the Fifth Circuit tomorrow morning.

## CONCLUSION

For the foregoing reasons, the Injunction should be stayed pending Respondents' appeal.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

*/s/ Eric Gambrell*
Eric Gambrell
egambrell@akingump.com
Texas Bar No. 00790735
*Lead Attorney*
Patrick G. O'Brien
pobrien@akingump.com
Texas Bar No. 24046541
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

Daniel L. Nash
*Pro hac vice*
dnash@akingump.com
Nathan J. Oleson
*Pro hac vice*
noleson@akingump.com
1333 New Hampshire Avenue, NW
Washington, DC  20036
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

ATTORNEYS FOR RESPONDENTS
NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

## **CERTIFICATE OF CONFERENCE**

I hereby certify that Nathan Oleson, counsel for Respondents, personally discussed the relief requested in this Motion via telephone with Jonathan Amoona, counsel for Petitioner, on September 11, 2017 and was informed that Petitioner opposes the Motion and the relief requested.  Counsel for Respondents have complied with the meet and confer requirement in Local Rule CV-7(h) and discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Patrick G. O'Brien*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Patrick G. O'Brien*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **NATIONAL FOOTBALL LEAGUE** | § | |
| **PLAYERS ASSOCIATION, on its own** | § | |
| **behalf and on behalf of EZEKIEL** | § | |
| **ELLIOTT,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:17-cv-00615-ALM** |
| | § | |
| **NATIONAL FOOTBALL LEAGUE and** | § | |
| **NATIONAL FOOTBALL LEAGUE** | § | |
| **MANAGEMENT COUNCIL,** | § | |
| | § | |
| **Respondents.** | § | |

## ORDER GRANTING RESPONDENTS' EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL

On this date the Court considered Respondents' Emergency Motion to Stay Injunction

Pending Appeal.   After considering the arguments, the Court finds the Motion should be

GRANTED.   The Preliminary Injunction entered on September 8, 2017 is hereby STAYED

pending Respondents' appeal.

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE | § | |
| PLAYERS ASSOCIATION, on its own | § | |
| behalf and on behalf of EZEKIEL ELLIOTT, | § | |
| | § | |
| Petitioner, | § | CASE NO. 4:17-cv-00615 |
| | § | |
| v. | § | |
| | § | PETITIONER'S OPPOSITION TO |
| NATIONAL FOOTBALL LEAGUE and | § | RESPONDENTS' EMERGENCY |
| NATIONAL FOOTBALL LEAGUE | § | MOTION TO STAY INJUNCTION |
| MANAGEMENT COUNCIL, | § | PENDING APPEAL |
| | § | |
| Respondents. | | |

Petitioner National Football League Players Association, on its own behalf and on behalf of Dallas Cowboys Running Back Ezekiel Elliott, hereby submits this Opposition to Respondents National Football League and National Football League Management Council's (collectively, "NFL") Emergency Motion to Stay Injunction Pending Appeal (Doc. No. 30) ("Stay Motion").

## **PRELIMINARY STATEMENT**[1]

One need look no further than the Court's Memorandum Opinion and Order (Doc. No. 28) ("PI Order") for all of the reasons why the NFL's Stay Motion must be denied.  As the NFL's own case law points out, there are four elements that *it* must satisfy to obtain a stay:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

---

[1] Defined terms herein have the same meaning as in Petitioner's prior submissions in support of its TRO Motion (Doc. Nos. 5, 13, and 24).

1

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir.

2013) (cited by the NFL; quotations and citations omitted).  The Court has already addressed each

of these issues and decided them decisively in Petitioner's favor.  The NFL identifies no basis for

the Court to reverse course now.  These are not close questions.

The Stay Motion fails at the threshold because the NFL faces *no* threat of irreparable harm

if the stay is not granted, while others, including both Elliott and the Cowboys, will suffer

substantial—in fact, severe and irreparable—harm.  In the event the stay were denied and the

Award eventually confirmed by this Court or the Fifth Circuit, the NFL would simply suspend

Elliott at a later point in time.  There are countless instances of NFL players participating in team

activities and games while they challenged pending discipline—through NFL grievance

procedures and occasionally through the courts—without any adverse harm to the NFL at all.

Indeed, as the Court knows, the NFL unilaterally decided to permit Elliott to play in the opening

game of the regular season this past week regardless of the outcome of the Court's preliminary

injunctive relief ruling.  Respondents cannot credibly claim irreparable harm from what is little

more than standard practice in the NFL.  Nor can the League credibly deny the irreparable harm

to Elliott and the Cowboys that would result if a stay is granted, the status quo is shattered, and

Elliott is suspended from the team.

Moreover, where, as here, the balance of equities "is not heavily tilted in the movant's

favor, the movant must then make a more substantial showing of likelihood of success on the

merits in order to obtain a stay pending appeal."  *Ruiz v. Estelle*, 650 F.2d 555, 565-66 (5th Cir.

1981) (cited in NFL Stay Motion at 2).  The Court has already, correctly, found that the equities

strongly favor *Elliott*—far from being "heavily tilted in the movant's favor."  And there is no way

that the NFL could satisfy a likelihood of success standard by any measure, let alone make a "more substantial showing."

Finally, the NFL's assertion that a stay—which would pave the way for a suspension—would *maintain* the status quo is a fabrication.  The NFL investigated Elliott for a year before even *announcing* discipline while he played in every Cowboys regular season game last season.  It then voluntarily agreed, as noted above, that Elliott would play in the Cowboys' first game while the parties awaited the Court's PI Order.  The Court's preliminary injunction preserved the status quo—Elliott's full participation with the Cowboys; a stay would upend it.

## ARGUMENT

### A.  All Equitable Considerations Tilt Heavily in Favor of Elliott—Not the NFL

#### 1.  The NFL Faces No Threat of Irreparable Harm

The NFL's Stay Motion fails from the get-go because the NFL cannot meet its burden to show irreparable harm absent a stay.

The NFL argues that it will suffer irreparable harm because "[t]he PI Order directly interferes with [] agreed-to [CBA] procedures, frustrates the NFL's ability to efficiently and effectively administer the CBA, and impacts the competitive landscape of the NFL every week a properly suspended player suits up."  Stay Motion at 4.  This, however, ignores the Court's ruling that it is *the NFL* and its hand-picked arbitrator who are "interfer[ing] with" and "frustrat[ing]" CBA procedures and administration.  *See, e.g.*, PI Order at 20 ("Given the current set of facts, an injunction does not eviscerate the internal procedures of the NFL and NFLPA but merely ensures the internal procedures are being carried out in the appropriate manner.").

Moreover, the NFL cannot credibly argue that it will suffer any irreparable harm if the status quo is maintained and Elliott can continue to play.  It suffered no harm during the last year

during which Elliott played for the Cowboys while being investigated, and the NFL *voluntarily*

agreed not to enforce its suspension of Elliott for the first week of the season (*i.e.*, before entry of

the PI Order), so it can't now credibly claim irreparable harm "every week" that Elliott "suits up."

Stay Motion at 4.  In fact, the framework for Commissioner discipline under the CBA *requires*

that players have their right to an Article 46 appeal hearing before they may be disciplined:  "the

Commissioner will have the right, *but only after giving Player the opportunity for a hearing at*

*which he may be represented by counsel of his choice,* to fine player in a reasonable amount, *to*

*suspend Player for a period certain* or indefinitely; and/or to terminate this contract."[2]  This means

that there have been numerous times when the Commissioner imposed discipline that he

presumably believed to be appropriate, but the player nonetheless continued to practice and play

while he exercised his right to appeal.  The fact that the current proceedings are taking place in

court, rather than in a CBA arbitration, is of no moment for the salient takeaway:  full participation

by an NFL player who may ultimately be subject to discipline does not irreparably harm the NFL.

*See generally NFLMC v. NFLPA,* 820 F.3d 527 (2d Cir. 2016) ("*Brady*").[3]  If the Petition is

ultimately denied, the NFL can simply suspend Elliott at a later time—just as it has done

innumerable times while player disciplinary appeals were pending.

---

[2] NFL Player Contract ¶ 15, available at https://nfllabor.files.wordpress.com/2010/01/collective-bargaining-agreement-2011-2020.pdf (emphasis added).

[3] To give just two examples, in both *Bounty* and *Brady*, the Saints players and Brady, respectively, continued to practice and play for their teams while they challenged their discipline through the courts and/or arbitral proceedings.  *See, e.g.*, Jimmy Golen, *Brady to Drop Appeal, Serve 4-Game "Deflategate" Suspension*, AP, July 15, 2016, available at https://apnews.com/ 1af4aba5b49a43a4b356a412844dd262/brady-drop-appeal-serve-4-game-deflategate-suspension; *NFL Players Suspended Over Bounty Program Eligible to Play*, CNN, Sept. 9, 2012, available at http://www.cnn.com/2012/09/07/sport/nfl-bounty-players/index.html; *Player Suspensions Overturned in NFL Bounty Case, but Vilma Seeking Further Relief in Court*, Fox News, Dec. 12, 2012, available at http://www.foxnews.com/sports/ 2012/12/12/ player-suspensions-overturned-in-nfl-bounty-case-but-vilma-seeking-further.html.

The Court has already engaged in fact-finding on the balance of the harms in issuing the PI Order. It identified *no* harm to the NFL from a preliminary injunction. There is thus, also, no harm to the NFL in the absence of a stay pending appeal.

### 2.    A Stay Will "Substantially Injure" Elliott

The NFL barely pays so much as lip service to the stay requirement "that issuance of a stay will not substantially injure the other parties." Stay Motion at 1 (citing *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 734 F.3d at 410). This Court has already held as a matter of fact, and in accord with a "long line of cases," "that improper suspensions of professional athletes can result in irreparable harm." PI Order at 19-20. The NFL identifies no reason for the Court to revisit this determination, and cannot possibly meet its burden to prove that a stay would not "substantially injure" Elliott.

Similarly, there can be no credible dispute that the Dallas Cowboys, a member of the NFL, would suffer irreparable harm to its competitive fortunes if the stay is granted, as would the Cowboys' legion of fans.

### 3.    The Public Has No Interest in a Fundamentally Unfair Arbitration

The NFL's public interest argument—grounded in federal labor policy—has it backwards. It is the denial of fundamental fairness in a labor arbitration that is the paramount public interest concern here. Even the NFL does not, and could not, contend that it is the "decided preference" of labor policy to confirm arbitration awards that have been "infected" by fundamental unfairness which "kill[ed] any possibility that justice would be served." PI Order at 19.[4]

---

[4] The NFL states that it and the public "also have a strong interest in preventing domestic violence." Stay Motion at 4. So do the NFLPA and Elliott. But "[t]he question of what happened between Elliott and Thompson in July 2016 is not before the Court . . . . The question before the Court is merely whether Elliott received a fundamentally fair hearing before the arbitrator. The answer is he did not." PI Order at 21.

## B.      The NFL Cannot Meet Its Burden of a "More Substantial Showing" of Success on the Merits of Its Appeal

Because the equitable factors are "not heavily tilted in the movant's favor, the [NFL] must [] make a more substantial showing of likelihood of success on the merits in order to obtain a stay pending appeal." *Ruiz*, 650 F.2d at 565-66.  The Stay Motion identifies two purported errors on the merits of the PI Order:  the Court's (i) finding subject matter jurisdiction under the LMRA, and (ii) finding that the arbitration was fundamentally unfair.  No matter how the NFL's burden to show a "likelihood of success" on appeal is defined, the NFL cannot carry its burden to meet it.

On the first point, the Court—based upon both Supreme Court and Fifth Circuit authority— correctly concluded that Petitioner was not required to exhaust its remedies before filing suit because the NFL (and Henderson) repudiated the CBA by denying Petitioner's right to present all relevant evidence by, *inter alia*, concealing Director of Investigation Roberts's conclusions from the NFLPA and Elliott before the arbitration and engaging in acts to suppress this evidence, including at the arbitration itself.  PI Order at 6-8, 17 ("The NFL's actions demonstrate that from the very beginning of the decision-making process, a cloud of fundamental unfairness followed Elliott.").  The Court further concluded that even if an exhaustion of remedies were a requirement under the unique facts of this case, Petitioner satisfied it by submitting its fairness objections to the arbitrator and waiting for the close of the arbitration hearing record before filing the Petition; at the time the Petition was filed, there was nothing left to exhaust, as the Arbitrator had already finally and conclusively rejected Elliott's and the NFLPA's requests to obtain and present critical evidence and testimony at the hearing.  PI Order at 8-9.  And despite the Court's observation in its PI Order that the NFL had failed to supply "any case law where a court held that the petitioner or plaintiff failed to exhaust their remedies in a situation similar to the one before the Court" (*id.* at 9), the NFL's Stay Motion still does not identify any such precedent.

With respect to the Court's finding on the merits of Petitioner's fundamental unfairness claim, the NFL recycles its refrain that the "review of labor arbitration awards is extremely limited." Stay Motion at 3 (internal citation and quotation omitted).   But the Court correctly recognized that although "it is a narrow exception and rare circumstance [in] which a court interferes with an arbitral award, *this case presents unique and egregious facts, necessitating court intervention.*" PI Order at 14 (emphasis added).   Based upon its review of the undisputed arbitral record of *this case*, "where credibility is questioned and a dissenting opinion regarding the case and the credibility of [the accuser] are withheld," and "material, pertinent, and critically important" witnesses and documentary evidence is denied, "[f]undamental unfairness is present throughout the entire arbitration process." *Id.* at 18-19.   In fact, the Court found that "[t]he circumstances of this case are unmatched by any case [it] has seen." *Id.* at 18 (citing *Brady I* and *Brady II*, where the evidence denied was held not to be "material and pertinent to the case").   The NFL's Stay Motion presents not a single new ground or argument for why the well-reasoned decision of the Court should be reconsidered.

In short, the Court recognized that vacatur is an extraordinary remedy, but also correctly recognized that this is such an extraordinary case.   The NFL's Stay Motion offers no equitable basis to stay the PI Order and no showing that the Court of Appeals is likely to change this Court's determination.

## CONCLUSION

For all of the foregoing reasons, Petitioner respectfully requests that the Court deny the NFL's Stay Motion.

Dated: September 13, 2017

Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Thomas M. Melsheimer*
**Thomas M. Melsheimer**
Texas Bar No. 13922550
tmelsheimer@winston.com
**Lane M. Webster (*pro hac vice*)**
Texas Bar No. 24089042
lwebster@winston.com

2501 N. Harwood Street, 17th Floor
Dallas, TX 75201
(214) 453-6500 – Telephone
(214) 453-6400 – Facsimile

**Jeffrey L. Kessler (*pro hac vice*)**
New York Bar No. 1539865
jkessler@winston.com
**David L. Greenspan (*pro hac vice*)**
New York Bar No. 4042099
dgreenspan@winston.com
**Jonathan Amoona (*pro hac vice*)**
New York Bar No. 4797338
jamoona@winston.com
**Angela A. Smedley (*pro hac vice*)**
New York Bar No. 4942132
asmedley@winston.com
**Isabelle Mercier-Dalphond (*pro hac vice*)**
New York Bar No. 5187604
imercier@winston.com

200 Park Avenue
New York, New York 10166
(212) 294-6700 – Telephone
(212) 294-4700 – Facsimile

*Counsel for Petitioner National Football League Players Association and Ezekiel Elliott*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically on September 13, 2017, in compliance with Local Rule CV-5(a).

*/s/  Thomas M. Melsheimer*
Thomas M. Melsheimer

# EXHIBIT Q

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **NATIONAL FOOTBALL LEAGUE** | § | |
| **PLAYERS ASSOCIATION, on its own** | § | |
| **Behalf and on behalf of EZEKIEL** | § | |
| **ELLIOTT,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **No. 4:17-CV-00615-ALM** |
| | § | |
| **NATIONAL FOOTBALL LEAGUE and** | § | |
| **NATIONAL FOOTBALL LEAGUE** | § | |
| **MANAGEMENT COUNCIL,** | § | |
| | § | |
| **Respondents.** | § | |

## <u>RESPONDENTS' REPLY IN SUPPORT OF EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL</u>

Nothing in Petitioner National Football League Players Association's opposition changes the conclusion that an immediate stay pending appeal of the Court's preliminary injunction ("PI Order") should be granted. Petitioner does not dispute that to obtain a stay pending appeal, Respondents "'need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting a stay.'" Mot. at 2 (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981)). Respondents easily make that showing in light of ample precedent requiring dismissal of premature actions and barring vacatur of labor arbitration awards under a vaguely defined "fundamental fairness" standard.

An immediate stay of the PI Order pending appeal would be necessary, moreover, even if Petitioner's arguments on jurisdiction and the validity of the Award were apposite. They are not. As to jurisdiction, Petitioner asserts for the very first time—in its *fifth* brief filed in this Court— that its failure to exhaust is excused because of Respondents' supposed "repudiation" of the collectively bargained grievance procedures. But Fifth Circuit precedent is clear and consistent:

the narrow "repudiation" exception has no application where both parties were undisputedly participating in the arbitration process. *See, e.g.*, *Bache v. Am. Tel. & Tel.*, 840 F.2d 283, 288 (5th Cir. 1988) ("The fact that [the employer] actually processed [the employee's] grievances . . . undermines" the argument "that [the employer] repudiated the contract's remedial procedures."); *Rabalais v. Dresser Indus., Inc.*, 566 F.2d 518, 520 (5th Cir. 1978) ("An employer can obviously take a stance contrary to that of the employee during the grievance process without being deemed to have repudiated that process.").

As to the merits, Petitioner is wrong to argue that "fundamental fairness" review, untethered to whether an arbitrator was "arguably construing or applying the contract," provides a basis for vacatur under the Labor Management Relations Act's extraordinarily circumscribed standards. *See, e.g.*, *Nat'l Football League Players Ass'n ex rel. Peterson v. Nat'l Football League*, 831 F.3d 985, 999 (8th Cir. 2016) ("We have never suggested that when an award draws its essence from the collective bargaining agreement, a dissatisfied party nonetheless may achieve vacatur of the arbitrator's decision by showing that the result is 'fundamentally unfair.'"). Nor could the Arbitrator's procedural rulings have been "fundamentally unfair" in any event, given that the Arbitrator did not even arguably violate any of the CBA's bargained-for procedures. *See Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n ex rel. Brady*, 820 F.3d 527, 547 (2d Cir. 2016) ("There is simply no fundamental unfairness in affording the parties precisely what they agreed on."); *see, e.g.*, ECF No. 1-62 (Kessler Decl., Ex. A-NFLPA-58), CBA Art. 46, § 2) (limiting scope of discovery to merely "exchange [of] copies of any exhibits upon which [parties] intend to rely," and specifying nothing about mandatory witness testimony).

As Petitioner concedes, a sufficiently strong likelihood of success makes a stay appropriate even where the other equitable factors are "not heavily tilted in movant's favor." Resp. Br. 6 (quoting *Ruiz*, 650 F.2d at 565-66). But Petitioner fails to rebut Respondents' showing on those factors regardless. Petitioner contends that Respondents cannot be suffering irreparable harm because, in accordance with the CBA, Respondents waited to impose Elliott's suspension until he exercised his right under the CBA to an "opportunity for a hearing at which he may be represented by counsel of his choice." Resp. Br. 4 (quoting NFL Player Contract ¶ 15). But Petitioner ignores that the primary harm Respondents face is the *ongoing judicial interference with the parties' contract*. Indeed, the fact that the parties explicitly bargained for highly expedited procedures resulting in "full, final, and complete" resolution means that is Petitioner, not Respondents, who is truly breaching the CBA. *See* CBA Art. 46 § 2(d), (f)(i) (requiring in-season suspensions to be heard by "the second Tuesday" following appeal and to be decided "[a]s soon as practicable"). Petitioner should not be allowed to evade its CBA obligations by delaying suspensions indefinitely through the courts.

Petitioner also makes much of the fact that Elliot will suffer various speculative consequences if he is prohibited from playing six games this season. Precedent forecloses those arguments. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]emporary loss of income . . . does not usually constitute irreparable injury."); *id.* at 91-92 ("A claim that her reputation would be damaged . . . falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction."). This Court should reject Petitioner's request to craft a special rule that applies only to professional athletes. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 249-50 (1996) ("Ultimately, we cannot find a satisfactory basis for distinguishing football players from other organized workers. We therefore conclude that all

must abide by the same legal rules.").  Elliott's fame and notoriety provide no license to ignore the longstanding federal labor policy preference to avoid judicial interference with the private dispute resolution process for which the parties here bargained.  *See United Paperworkers Int'l Union, AFL-CIO v. Misco*, 484 U.S. 29, 37 (1987).  Accordingly, the balance of equities tips strongly in favor of staying the PI Order pending Fifth Circuit review.

Now that this emergency stay request is fully briefed, Respondents would respectfully request that this Court rule on the request as expeditiously as possible.  If this Court declines to grant relief, Respondents intend to seek a stay from the Court of Appeals and believe it is important to give the Court of Appeals the opportunity to act promptly.  Accordingly, if this Court is unable to issue a decision by the end of the day tomorrow, Respondents intend to seek a stay of the PI Order from the Fifth Circuit on the morning of Friday, September 15, 2017, as the Rules contemplate.  *See* FED. R. APP. P. 8(C) (permitting filing of stay motion with Court of Appeals where, "a motion having been made, the district court . . . failed to afford the relief requested").

## CONCLUSION

For the foregoing reasons, and those stated in Respondents' motion, the PI Order should be stayed pending Respondents' appeal.

Respectfully submitted,


AKIN GUMP STRAUSS HAUER & FELD LLP

 _/s/ Eric Gambrell_____
Eric Gambrell
egambrell@akingump.com
Texas Bar No. 00790735
*Lead Attorney*
Patrick G. O'Brien
pobrien@akingump.com
Texas Bar No. 24046541
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

Daniel L. Nash
*Pro hac vice*
dnash@akingump.com
Nathan J. Oleson
*Pro hac vice*
noleson@akingump.com
1333 New Hampshire Avenue, NW
Washington, DC  20036
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

*Attorneys For Respondents*
*National Football League And*
*National Football League Management*
*Council*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2017, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Patrick G. O'Brien*